**PLAINTIFF's EXHIBIT**

Lyde, et al. v. City of Philadelphia

**P-1**

exhibitsticker.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - -

2

3

ADRIENNE LYDE, et al.,          :

4                               :

          Plaintiff(s)   : NO. 2:22-cv-03965-MMB

5                               :

          vs            :

6                               :

CITY OF PHILADELPHIA,          :

7                               :

          Defendant(s)   :

8

9

- - - - -

10

          Thursday, December 14, 2023

11      Via Zoom Videoconferencing

12          - - - - -

13      Oral deposition of BLANCHE CARNEY,

14  on the above date, beginning approximately 10:00

15  a.m., before Louis A. Manchello, Certified Court

16  Reporter (New Jersey Lic. No. 30XI00141800) and

17  Notary Public of Pennsylvania, held with all parties

18  attending via Zoom Video Conferencing.

19          - - - - -

20

21

22

23

24

Page 2

```
 1   A P P E A R A N C E S:
 2        WEIR GREENBLATT PIERCE
          BY:  NOAH S. COHEN, ESQUIRE
 3          1339 Chestnut Street
            Suite 500
 4          Philadelphia, Pennsylvania  19107
 5          Counsel for the Plaintiff
 6        CLARK HILL
          BY:  H. DAVID SEIDMAN, ESQUIRE
 7          2001 Market Street
            Suite 2620
 8          Philadelphia, Pennsylvania  19103
 9          Counsel for the Defendants
10   A L S O  P R E S E N T:
11        ADRIENNE LYDE
          JENNIFER ALBANDOZ
12        JESSICA BOWERS
13             - - - - -
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1         E X H I B I T S (Continued)
 2   DEPOSITION EXHIBITS              MARKED
 3   Carney-17 Defendant's Objections and     184
       Responses
 4   Carney-18 Defendant's Objections and     187
       Responses
 5   Carney-19 Document Bates stamped Plaintiffs  189
       1226 through 1236
 6   Carney-20 Complaint by Shanti Lewis and    202
       Melinda Medina
 7   Carney-21 Document Bates stamped Plaintiffs  209
       1007 through 1010
 8   Carney-22 Document Bates stamped City 1540   210
       through 1546
 9   Carney-23 Document Bates stamped Plaintiffs  218
       1011 through 1014
10   Carney-24 Document Bates stamped Plaintiffs  221
       13 through 21
11   Carney-25 Document Bates stamped City 1834   222
       through 1836
12   Carney-26 Document Bates stamped Plaintiffs  237
       1015 through 1020
13   Carney-27 Document Bates stamped City 1551   250
       and 1552
14   Carney-28 Directory             255
15             - - - - -
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1          I N D E X
 2   WITNESS       EXAMINED BY        PAGE
 3   BLANCHE CARNEY
          Mr. Cohen        5
 4
             - - - - -
 5
          E X H I B I T S
 6
     DEPOSITION EXHIBITS              MARKED
 7
     Carney-1  Work History Detail of Nancy    6
 8     Giannetta
     Carney-2  Job description for the position  7
 9     of warden
     Carney-3  Warden specification       9
10   Carney-4  Work History Detail for Steven   13
       Angelucci
11   Carney-5  Work History Detail for Cathy    30
       Talmadge
12   Carney-6  Two-page document Bates stamped   33
       City 1919 and City 1920
13   Carney-7  Work History Detail of Warden    42
       Delaney
14   Carney-8  Document Bates stamped City 1573  46
       through 1592
15   Carney-9  Work History Detail of Warden    58
       Farrell
16   Carney-10 Document Bates stamped City 1562  61
       and 1561
17   Carney-11 Document Bates stamped City 1831  84
       through 1833
18   Carney-12 Notice of Cancellation       105
     Carney-13 Five-page document beginning at   120
       Bates stamp City 1068
19   Carney-14 Document Bates stamped City 1843  141
       through 1890
20   Carney-15 Annual performance report for Ms.  154
       Bowers dated 8/28/19 924 through
21     939
     Carney-16 Work History Detail for Earicka   179
22     Patterson
23
24   (Exhibits Continued ...)
```

Page 5

```
 1          BLANCHE CARNEY, having been duly sworn
 2      or affirmed as a witness, was examined and
 3         testified as follows . . .
 4   BY MR. COHEN:
 5      Q.    Good morning, Commissioner.  My name
 6   is Noah Cohen, and I'm the attorney for the
 7   plaintiffs in this case, Adrienne Lyde, Jennifer
 8   Albandoz, and Jessica Bowers.
 9          Have you been deposed before?
10   A.    Yes.
11      Q.    Okay.  So the only thing I'd ask is
12   that, if there's a question pending, we wait to
13   break until you have answered that question.  Okay?
14   A.    Yes.
15      Q.    Nancy Giannetta was the warden of
16   Curran-Fromhold Correctional Facility at the time of
17   her retirement, correct?
18   A.    Yes.
19      Q.    Do you know when Warden Nancy
20   Giannetta retired as warden of Curran-Fromhold
21   Correctional Facility?
22   A.    I believe that was in September of 20 -- no,
23   August of 2023 -- '22.
24      Q.    So I will share my screen.  I will
```

Blanche Carney

Page 6

1  mark this as Carney Exhibit 1.
2       (Whereupon Carney-1 was marked for
3       identification.)
4  BY MR. COHEN:
5       Q.   And if you want me to make something
6  bigger or smaller, please just let me know, and I'm
7  happy to do that.  Okay?
8  A.   Yes.  Can you please enlarge that?
9       Q.   Sure.  Still?
10 A.   A little more.
11      Q.   A little more, sure.
12 A.   Okay.
13      Q.   I'm showing you what has been marked
14 as Carney Exhibit 1.  And at the top here, do you
15 see that it is the Work History Detail of Nancy
16 Giannetta?
17 A.   Yes.
18      Q.   Per this document, do you see that it
19 shows that her retirement was on August 20th of
20 2021?
21 A.   Yes.
22      Q.   Do you have any reason to doubt that?
23 A.   No.
24      Q.   Was Steven Angelucci deputy warden of

Page 7

1  operations at Curran-Fromhold Correctional Facility
2  when Warden Nancy Giannetta retired?
3  A.   Yes.
4       Q.   When Warden Nancy Giannetta retired as
5  warden of Curran-Fromhold Correctional Facility, was
6  Steven Angelucci given site responsibility for
7  Curran-Fromhold Correctional Facility?
8  A.   Yes.
9       Q.   How far after Warden Giannetta's
10 retirement was Steven Angelucci given site
11 responsibility for Curran-Fromhold Correctional
12 Facility?
13 A.   I believe he had site responsibility prior
14 to her retirement.
15      Q.   Who had site responsibility for
16 Curran-Fromhold Correctional Facility on
17 August 21st, 2021, the day after Warden Giannetta's
18 retirement?
19 A.   That is Steven Angelucci.
20      MR. COHEN:  I will share my
21 screen again, and I will mark this as Carney
22 Exhibit 2.
23      (Whereupon Carney-2 was marked for
24      identification.)

Page 8

1  BY MR. COHEN:
2       Q.   This is a four-page document, Bates
3  stamped City 1941 through 1944.
4            By looking at this document, can
5  you tell what it is?
6  A.   Yes.
7       Q.   What is it?
8  A.   It is the City's job description for the
9  position of warden.
10      Q.   By looking at the last page of this
11 document, when was this job description last
12 revised?
13 A.   It's showing a date of revision for 9/14 and
14 11/14.  So it doesn't tell me the year.  It's just
15 saying 9/14 and 11/14.
16      Q.   Would that be of 2014?
17 A.   It could be.
18      Q.   So I will represent to you that,
19 through prior depositions, that this has been
20 established as the warden's specifications, last
21 revised in November of 2014.  Okay?
22 A.   Okay.
23      Q.   Based upon that representation, would
24 you agree that, on August 21st, 2021, these were the

Page 9

1  specifications for warden?
2  A.   I would need to see -- I know there was a
3  revision, but I cannot attest to the exact date.
4       Q.   Okay.  So I will share my screen
5  again, and I will show you this document, which I
6  will mark as Carney Exhibit 3.
7       (Whereupon Carney-3 was marked for
8       identification.)
9  BY MR. COHEN:
10      Q.   Would you agree this is also a warden
11 specification?
12 A.   Yes.
13      Q.   Okay.  And looking at the final
14 page here, page 4 of 4, Bates stamped
15 Plaintiffs 0025, would you agree that this revision
16 occurred in 2022?
17 A.   Yes.
18      Q.   So going back to Carney Exhibit 2,
19 which is Bates stamped City 1941 through 1944, would
20 you agree that this was the warden specification in
21 place as of August 21st, 2021?
22 A.   I would need to see the date on this.  Yes.
23      Q.   Okay.  So would you agree to that?
24 A.   Yes.

Blanche Carney

Page 10

1    Q.    Looking at the third page of the
2  document with Bates stamp City 1943, under where it
3  says, "Specific Experience," would you agree that
4  there are three alternatives for someone to meet the
5  specific experience requirement to be qualified to
6  be a warden?
7  **A.    Yes.**
8    Q.    The first is that the individual have
9  two years directing, through subordinate
10  supervisors, a social service program in a
11  correctional institution, correct?
12  **A.    Yes.**
13    Q.    On August 21st, 2021, Mr. Angelucci
14  had no experience directing a social service
15  program, correct?
16  **A.    In part.**
17    Q.    Can you elaborate?
18  **A.    As a deputy warden of a facility, he could**
19  **have direct responsibility for ensuring that space**
20  **staff were in place for that program to be carried**
21  **out.**
22    Q.    So as of August 21st, 2021, how much
23  experience did Steven Angelucci have directing a
24  social service program?

Page 11

1  **A.    That, I cannot answer fully.  He has an**
2  **extensive career.**
3    Q.    I think a moment ago you said that he
4  had some experience directing a social service
5  program as of August 21st, 2021; am I correct?
6  **A.    Yes.**
7    Q.    So my question is, do you know how
8  much experience he had, as of August 21st, 2021,
9  directing a social service program?
10  **A.    No --**
11    MR. SEIDMAN:  Objection to form.
12  You can answer, if you understand.
13  **A.    I cannot give a total answer of his**
14  **experience.**
15    Q.    Is it your testimony that, currently,
16  on December 14th, 2023, Steven Angelucci has some
17  experience that would count towards this first prong
18  of specific experience that says two years
19  directing, through subordinate supervisors, a social
20  service program in a correctional institution?
21  **A.    Yes.  He may have some experience because he**
22  **is a deputy warden, and he has assisted and worked**
23  **hand in hand with the Human Service Program**
24  **Administrators and the social work supervisors.  And**

Page 12

1  **as the warden, he can address a program that is**
2  **provided to incarcerated people.**
3    Q.    You testified that he may.  My
4  question is, does he?
5  **A.    I would have to say there's a possibility,**
6  **yes.**
7    Q.    As of August 21st, 2021, Mr. Angelucci
8  did not have two years directing, through
9  subordinate supervisors, a social service program in
10  a correctional institution, correct?
11  **A.    I believe so, because we were still in the**
12  **pandemic phase and our program was very limited.**
13    Q.    Currently, on December 14th, 2023,
14  does Steven Angelucci have two years directing,
15  through subordinate supervisors, a social service
16  program in a correctional institution?
17    MR. SEIDMAN:  Objection to form.
18  Can you repeat that question?  Is that the
19  same question you asked already?
20    MR. COHEN:  No.
21    MR. SEIDMAN:  Oh.  Can you
22  repeat the question, Lou?
23    MR. COHEN:  Sure.  Oh, Lou.
24  Sure.

Page 13

1    (Whereupon the court reporter read back
2      as follows:  "Currently, on December 14th,
3      2023, does Steven Angelucci have two years
4      directing, through subordinate supervisors,
5      a social service program in a correctional
6      institution?")
7    THE WITNESS:  He may have.
8  BY MR. COHEN:
9    Q.    The second alternative is that the
10  individual have two years as a deputy warden,
11  correct?
12  **A.    Yes.**
13    Q.    Do you know when Steven Angelucci was
14  promoted to deputy warden?
15  **A.    I do not recall.**
16    MR. COHEN:  I will share my
17    screen.  And I will mark this as Carney
18    Exhibit 4.
19    (Whereupon Carney-4 was marked for
20      identification.)
21  BY MR. COHEN:
22    Q.    Do you see here at the top where it
23  says, "Work History Detail for Steven Angelucci"?
24  **A.    Yes.**

Blanche Carney

Page 14

1    Q.    And going down a bit, would you agree
2  that Mr. Angelucci was made a deputy warden as of
3  November 16th, 2020?
4  A.    Yes.
5    Q.    So, on August 21st, 2021,
6  Mr. Angelucci had a little over nine months
7  experience as a deputy warden, correct?
8  A.    Yes.
9    Q.    Going back to page 3 of Carney
10 Exhibit 2, this portion here where it says,
11 "Two years directing, through subordinate
12 supervisors, a social service program in a
13 correctional institution," in order to meet that
14 criteria, does an individual have to be an HSPA?
15 A.    No.
16   Q.    Can you name any deputy wardens that
17 have qualified for the specific experience of
18 warden, required to be promoted to warden, through
19 this provision of two years directing, through
20 subordinate supervisors, a social service program in
21 a correctional institution?
22 A.    I do not recall.
23   Q.    Can you think of any deputy wardens
24 that have directed a social service program?

Page 15

1  A.    Yes.
2    Q.    Who is that?
3  A.    At one point, in my recollection, was
4  Cathy Talmadge, who used to have direct
5  responsibility for Scared Straight Program that is
6  no longer in operation.  And she was the
7  correctional person that used to coordinate to have
8  youth at risk for becoming involved with the
9  criminal justice system.
10         She would bring those group of
11 youth to come inside the prisons at that time,
12 and they would have them speak with the adult
13 population to try to discourage them from becoming
14 justice involved.
15   Q.    What supervisors reported to her as
16 part of that social service program?
17 A.    I don't believe they reported to her, but
18 she worked hand in hand with the social work
19 supervisors to identify the incarcerated population
20 who would be provided and available to speak to the
21 at-risk youth.
22   Q.    What social service program has
23 Steven Angelucci directed?
24 A.    Steven Angelucci has provided a number of

Page 16

1  programs, reading programs, any book programs, in
2  concert, again, with subordinate supervisors in the
3  restorative and transitional services department.
4  Ultimately, because he was a deputy warden, they
5  would have to coordinate with the deputy wardens to
6  get that work done or services provided.
7    Q.    So you just said that Steven Angelucci
8  provided that program.  Did he direct the program?
9  A.    He could have directed it through the
10 supervisors to carry it out to provide it to the
11 population.
12   Q.    Do you know if he did direct any
13 social service program?
14         MR. SEIDMAN:  Objection to form.
15 She answered the question.
16 BY MR. COHEN:
17   Q.    You can answer, Commissioner.
18 A.    I answered the question.
19   Q.    And what is your answer?
20 A.    The same answer I just gave you.  I believe
21 he did, yes.
22   Q.    And that program was a reading
23 program?
24 A.    We have various book programs.  That's an

Page 17

1  example of one of the programs that he can be
2  directly involved in.
3    Q.    And did he direct that program?
4  A.    He could have, through the coordination of a
5  social work supervisor assigned.
6    Q.    But you don't know if he directed the
7  program?
8  A.    He could have.
9    Q.    So is that a yes, you don't know?
10 A.    It's a yes, it's a possibility.
11   Q.    Are there any other programs -- social
12 service programs, I mean -- that you think
13 Steven Angelucci may have directed while he was a
14 deputy warden?
15 A.    Not during that time period that I can
16 recall.
17   Q.    Are there any other social service
18 programs that you think Steven Angelucci directed
19 prior to him being promoted to deputy warden on
20 November 16th, 2020?
21 A.    He could have been involved in work
22 assignments, which, again, in concert through a
23 subordinate social work supervisor, to have
24 incarcerated people report to a specific area to

Blanche Carney

Page 18

1  fill the institutional job assignments.
2      Q.   So he could have, but fair to say,
3  you're not sure if he did or not?
4  A.   I don't agree with that. I believe he could
5  have. There's a possibility.
6      Q.   But you're not sure if he did?
7  A.   The likelihood of his job responsibilities,
8  it's likely.
9      Q.   And then, lastly, the third
10  alternative to meet the specific experience
11  requirement for the warden position in place in
12  August 21, 2021 was that, "The equivalent of
13  education and experience determined to be acceptable
14  by the Office of Human Resources," correct?
15  A.   Yes.
16      Q.   The Office of Human Resources is a
17  separate City department than the Philadelphia
18  Department of Prisons, correct?
19  A.   Yes.
20      Q.   The Office of Human Resources did not
21  make a determination that Mr. Angelucci's education,
22  general experience and approximately nine months of
23  specific experience as deputy warden was acceptable
24  for him to have site responsibility of

Page 19

1  Curran-Fromhold Correctional Facility after Warden
2  Giannetta retired, correct?
3          MR. SEIDMAN: Objection to form.
4          If you understand the question.
5  A.   I don't understand the question.
6      Q.   Okay. This prong says that an
7  applicant for warden can meet the specific
8  experience requirement through a determination by
9  the Office of Human Resources, correct?
10  A.   Correct.
11      Q.   Are you aware of any determination
12  made by the Office of Human Resources regarding
13  Steven Angelucci's qualifications for warden?
14  A.   Well, he was assessed, and they believed he
15  met the criteria. I don't have the specifics of
16  their assessment.
17      Q.   When was he assessed?
18  A.   Can you pull up the record? I can't recall.
19  I need to see the record. I can't recall.
20      Q.   Sure. That's fair.
21          So going back to Mr. Angelucci's
22  Work History Detail, is this the record you were
23  referring to?
24  A.   Yes.

Page 20

1      Q.   Okay. So looking at this document,
2  which I believe is marked Carney Exhibit 4, does
3  that help you answer that question?
4  A.   Yes.
5      Q.   Okay. And what is the answer?
6  A.   That he was promoted December 26, 2022. So
7  he met the criteria based on the OHR assessment.
8      Q.   When was that assessment made?
9  A.   I don't know the actual date of the
10  assessment. Based on the effective date of the
11  promotion, however, it's saying December 26, 2022.
12      Q.   Mr. Angelucci did not have to apply to
13  have site responsibility of Curran-Fromhold
14  Correctional Facility after Warden Giannetta's
15  retirement, correct?
16          MR. SEIDMAN: Objection to form.
17  BY MR. COHEN:
18      Q.   You can answer.
19          MR. SEIDMAN: If you understand
20      the question, go ahead.
21  A.   Can you repeat your question?
22      Q.   Sure. Mr. Angelucci did not apply to
23  have site responsibility of Curran-Fromhold
24  Correctional Facility, correct?

Page 21

1  A.   Correct.
2      Q.   You assigned him to that position,
3  correct?
4  A.   Correct.
5      Q.   At the time you assigned him to that
6  position, did you know that Mr. Angelucci did not
7  have two years of experience as a deputy warden?
8  A.   I did not.
9          MR. SEIDMAN: Objection to form.
10  BY MR. COHEN:
11      Q.   Going back to the first provision of
12  directing a social service program through
13  subordinate supervisors, is it your testimony that,
14  as of August 21, 2021, Mr. Angelucci had two years
15  of experience in that capacity?
16  A.   No. Based on the record that you just put
17  up, it is nine months. And just above it,
18  eight years of correctional and/or -- oh, I'm sorry.
19  You took it off the screen.
20      Q.   Sorry.
21  A.   So of the three additional specific
22  experience, it's coupled with the general
23  experience, eight years of correctional and/or
24  rehabilitative experience in a correctional

Blanche Carney

Page 22

1  institution, including six years supervising a staff
2  engaged in such services.
3       Q.    Right. You're referring to the
4  general experience requirement in the warden
5  specification as of August 21, 2021, correct?
6  A.    Correct.
7       Q.    Would you agree with me that the
8  educational requirement, the general experience
9  requirement, and the specific experience all need to
10 be met to meet the qualification?
11 A.    The combination inclusive of "ors" is in
12 there and the assessment by human resources.
13      Q.    Right. If there is an assessment by
14 human resources, they could accept some combination,
15 correct?
16 A.    Correct.
17      Q.    A bit ago I asked you about this first
18 prong, about the two years directing, and you
19 referred to the nine months of experience as a
20 deputy warden. Do you remember that testimony?
21 A.    Yes.
22      Q.    Okay. I'm going to reask my question,
23 because the nine months of experience as
24 deputy warden, would you agree with me, relates to

Page 23

1  this second prong as experience as deputy warden?
2  A.    Yes.
3       Q.    So did you know that, on August 21,
4  2021, Mr. Angelucci did not have two years
5  directing, through subordinate supervisors, a social
6  service program in a correctional institution?
7            MR. SEIDMAN: Objection to form.
8       Are you asking if he can have both? He can
9       have both experiences at one time?
10           MR. COHEN: I'm asking if -- my
11      question, which is, does she know that he did
12      not have this two years of experience under
13      the first prong of the specific experience.
14           MR. SEIDMAN: Well, you're
15      presuming he did not have.
16           MR. COHEN: Yes, I am presuming
17      he did not have. So I have asked her if he
18      had, and she has said she doesn't know. I
19      believe that's the testimony.
20           MR. SEIDMAN: And now you keep
21      on asking the same question over and over
22      again. She said she doesn't know.
23           MR. COHEN: Right. Okay.
24      That's fair.

Page 24

1  BY MR. COHEN:
2       Q.    Did you have any conversations with
3  Deputy Commissioner Clark about the decision to
4  assign Mr. Angelucci to have site responsibility of
5  Curran-Fromhold Correctional Facility upon
6  Warden Giannetta's retirement?
7  A.    Yes.
8       Q.    What was his input?
9  A.    He did not have input. He was my direct
10 report, and I informed him that I needed the
11 facility to be stable and to continue to function,
12 and I directed him to notify Angelucci of that
13 directive.
14      Q.    Did you have any conversations with
15 Deputy Commissioner Beaufort about the decision to
16 assign Mr. Angelucci to have site responsibility of
17 Curran-Fromhold Correctional Facility upon
18 Warden Giannetta's retirement?
19 A.    Yes.
20      Q.    What was his input?
21 A.    He had no input. My directive was to ensure
22 that the information -- because Deputy Commissioner
23 Beaufort is for administration, so he had to ensure
24 that the memorandum was provided and prepared.

Page 25

1       Q.    Who authored the memorandum?
2  A.    The memorandum is prepared by our Office of
3  Human Resources, and it's a transaction memo.
4       Q.    Would Sherell Maxwell have been the
5  person to author that memo?
6  A.    It would have been her, or she could have
7  assigned it.
8       Q.    Did you see the transaction memo?
9  A.    I don't recall.
10      Q.    How do you know that there was a
11 transaction memo?
12 A.    That's normally how it's notified to the
13 facility so that the campus is aware.
14      Q.    And normally, who receives that
15 transaction memo?
16 A.    It's sent out systemwide on our intranet
17 system.
18      Q.    And when you say "systemwide," who
19 would be part of that system?
20 A.    Anyone who has an e-mail address for the
21 prison.
22      Q.    Anyone who has an e-mail address for
23 the prison should have received a memo stating that
24 Steven Angelucci was given site responsibility of

Blanche Carney

Page 26

1  Curran-Fromhold Correctional Facility upon
2  Warden Giannetta's retirement?
3  **A.    Okay.  Thank you.  I just now have in my**
4  **recollection there was not a formal memorandum.  He**
5  **was assigned those facilities as a directive.**
6           **I do remember -- I don't recall**
7  **signing off that he was given interim site**
8  **responsibility.  And this is me recalling to the**
9  **best of my ability, because I don't have the**
10 **document in front of me.  But I'm remembering, I**
11 **don't believe we had a formal transaction memo for**
12 **that.  He just was given that directive.  I'm**
13 **recalling that now, when you stated your question a**
14 **second time.**
15     Q.    Would seeing the document help refresh
16 your recollection?
17 **A.    If you have it, yes.**
18     Q.    Do you know that such a document
19 exists?
20 **A.    Based on my recollection when you stated the**
21 **question again the second time, I'm not recalling**
22 **that there was an actual transaction memo.**
23     Q.    Is there any document that you're
24 aware of referring to Steven Angelucci being given

Page 27

1  site responsibility of Curran-Fromhold Correctional
2  Facility upon Nancy Giannetta's retirement?
3  **A.    I do not believe so.**
4      Q.    And why is that?
5  **A.    When you asked would he have been given that**
6  **interim, or whatever you stated in your question,**
7  **triggered me to say it was not an interim**
8  **transaction memorandum, and that was what brought it**
9  **back to my recollection.  I do not believe I issued**
10 **an interim for him.**
11     Q.    And is it your testimony that you're
12 not aware of any documentation regarding the
13 decision to give Steven Angelucci site
14 responsibility of Curran-Fromhold Correctional
15 Facility upon Nancy Giannetta's retirement?
16 **A.    Yes.**
17     Q.    Did you have any conversations with
18 Deputy Commissioner Bagby about the decision to
19 assign Mr. Angelucci to have site responsibility of
20 Curran-Fromhold Correctional Facility upon
21 Warden Giannetta's retirement?
22 **A.    Yes.**
23     Q.    What was his input?
24 **A.    He did not have any input.  I notified him**

Page 28

1  **of my decision.**
2      Q.    When you assigned Mr. Angelucci site
3  responsibility of Curran-Fromhold Correctional
4  Facility after Warden Giannetta's retirement, what
5  were his job duties?
6  **A.    His job duties were to ensure that the**
7  **safety and security of the facility continued.  He**
8  **continued to instruct and direct staff in its**
9  **operations of all disciplines and to report any**
10 **deficiencies to his direct supervisor at the time,**
11 **who was Deputy Commissioner Clark.**
12     Q.    Anything else?
13 **A.    No.**
14     Q.    Mr. Angelucci is currently the warden
15 of Curran-Fromhold Correctional Facility, correct?
16 **A.    Yes.**
17     Q.    Are there any differences to
18 Mr. Angelucci's job duties as warden of
19 Curran-Fromhold Correctional Facility and when he
20 had site responsibility of Curran-Fromhold
21 Correctional Facility after Warden Giannetta's
22 retirement?
23 **A.    Yes.**
24     Q.    What differences?

Page 29

1  **A.    As a deputy warden, a then-deputy warden**
2  **could not take disciplinary action for fellow**
3  **deputy wardens.**
4      Q.    Anything else?
5  **A.    No.**
6      Q.    Do you know whether during the time
7  Mr. Angelucci had site responsibility of
8  Curran-Fromhold Correctional Facility after
9  Warden Giannetta's retirement he sought to have any
10 deputy wardens disciplined?
11 **A.    No.**
12     Q.    Do you know whether during the time
13 Mr. Angelucci had site responsibility of
14 Curran-Fromhold Correctional Facility after
15 Warden Giannetta's retirement any deputy wardens at
16 Curran-Fromhold Correctional Facility were
17 disciplined?
18 **A.    Can you repeat your question?**
19     Q.    Sure.  And I'll clarify the time frame
20 as well.
21          So looking back at
22 Mr. Angelucci's work history, I think we've
23 established that he was promoted to warden of
24 Curran-Fromhold Correctional Facility on

Blanche Carney

Page 30

1  December 26, 2022, correct?
2  **A.    Yes.**
3       Q.    For the time period of August 21st,
4  2021, through December 25th, 2022, were any
5  deputy wardens of Curran-Fromhold Correctional
6  Facility disciplined?
7  **A.    I cannot say 100 percent with certainty.**
8       Q.    As Commissioner, have you ever put a
9  woman in a position that she did not meet the
10  minimum experience requirement for?
11  **A.    Not to my recollection.**
12      Q.    Cathy Talmadge was the warden of
13  Riverside Correctional Facility at the time of her
14  retirement, correct?
15  **A.    Yes.**
16      Q.    Do you know when Warden Cathy Talmadge
17  retired as warden of Riverside Correctional
18  Facility?
19  **A.    No.**
20           MR. COHEN:  I will share my
21      screen.  And I will mark this as Carney
22      Exhibit 5.
23           (Whereupon Carney-5 was marked for
24      identification.)

Page 31

1  BY MR. COHEN:
2       Q.    Would you agree that this is the
3  Work History Detail for Warden Talmadge?
4  **A.    Yes.**
5       Q.    And that this document shows that
6  Warden Talmadge retired September 24th, 2021?
7  **A.    Yes.**
8       Q.    Do you have any reason to doubt that?
9  **A.    No.**
10      Q.    Was Pierre Lacombe deputy warden of
11  operations at Riverside Correctional Facility when
12  Warden Talmadge retired?
13  **A.    Yes.**
14      Q.    When Warden Cathy Talmadge retired as
15  warden of Riverside Correctional Facility, was
16  Pierre Lacombe given site responsibility for
17  Riverside Correctional Facility?
18  **A.    He was given site responsibility prior to
19  her retirement.**
20      Q.    Who had site responsibility for
21  Riverside Correctional Facility On September 25th,
22  2021, the day after Warden Giannetta's retirement?
23  **A.    Deputy Warden Pierre Lacombe continued site
24  responsibility on that date.**

Page 32

1       Q.    Going back to Carney Exhibit 2, and on
2  the third page, would you agree that these were the
3  specifications for warden in place on
4  September 25th, 2021?
5  **A.    I would need to see the date.  This says
6  9/14 and 11/14.**
7       Q.    Right.  This is the document that we
8  were looking at with regards to the questions about
9  Mr. Angelucci and Curran-Fromhold Correctional
10  Facility, and I think we'd established that the
11  specifications were revised in 2022, correct?
12  **A.    That is correct.**
13      Q.    So based upon that, would you agree
14  that, on September 25th, 2021, these were the
15  specifications in place for warden?
16  **A.    Yes.**
17      Q.    Looking at the third page of the
18  document where it says, "Education," for someone to
19  meet the education requirement to be qualified to be
20  a warden, they need to have completed a bachelor's
21  degree program at an accredited college or
22  university, correct?
23  **A.    Correct.**
24      Q.    Mr. Lacombe has not completed a

Page 33

1  bachelor's degree program at an accredited college
2  or university, correct?
3  **A.    Correct.**
4           MR. COHEN:  Sharing my screen.
5      I will mark this as Carney Exhibit 6.
6           (Whereupon Carney-6 was marked for
7      identification.)
8  BY MR. COHEN:
9       Q.    It is a two-page document.  Let me
10  make is little smaller.  The Bates stamp is on the
11  side.
12           So it's a two-page document,
13  Bates stamped City 1919 and City 1920.  Do you see
14  that?
15  **A.    This is saying 2020.  I see it.**
16      Q.    Do you agree that the first page of
17  the exhibit are the individuals who were approved by
18  the Office of Human Resources ranked by their scores
19  on the warden exam?
20  **A.    Yes.**
21      Q.    And that this is the City of
22  Philadelphia eligible list for warden dated
23  February 21, 2020?
24  **A.    Yes.**

Blanche Carney

Page 34

1      Q.    Being ranked on this list means that
2  the Office of Human Resources has determined that
3  these individuals meet the minimum acceptable
4  training and experience for the warden position,
5  correct?
6  A.    Yes.
7      Q.    And this list of four individuals made
8  up the warden promotional list established on
9  February 21, 2020, correct?
10 A.    Yes.
11     Q.    Did the Office of Human Resources make
12 a mistake in determining who was approved for the
13 warden promotional list established on February 21,
14 2020?
15 A.    They made a determination based on the
16 criteria that they used.
17     Q.    Right.  Was that determination correct
18 or incorrect?
19 A.    Based on their assessment, this is how they
20 were ranked.
21     Q.    And was that determination correct or
22 incorrect?
23 A.    My answer is the same.
24     Q.    So you can't provide an answer to

Page 35

1  whether or not the determination made by the Office
2  of Human Resources was correct or not?
3  A.    I don't know what they used, other than the
4  criteria, and they came up with a final score and
5  ranking.
6      Q.    Do you have any reason to doubt that
7  the Office of Human Resources was correct in their
8  determination on who was deemed acceptable and what
9  their ranking was?
10 A.    Based on their criteria, they came up with
11 the ranking system and a final score.
12     Q.    Right.  Do you have any reason to
13 doubt those rankings and determinations?
14 A.    No, based on that question.
15     Q.    All four of the approved applicants on
16 the established list for warden on February 21, 2020
17 are women, correct?
18 A.    Yes.
19     Q.    And going to the second page of the
20 exhibit, this is the failure list for the same
21 promotional list, correct?
22 A.    Yes.
23     Q.    Being placed on this list means that
24 the Office of Human Resources has determined that

Page 36

1  these individuals did not meet the minimum
2  acceptable training and experience for the warden
3  promotional list established on February 21, 2020,
4  correct?
5  A.    Correct.
6      Q.    Did the Office of Human Resources make
7  a mistake in determining who was placed on the
8  failure list?
9  A.    Based on their criteria, they determined.
10     Q.    Right.  Did they make a mistake in
11 that determination?
12 A.    Based on their criteria, they determined.  I
13 cannot speak to whether or not they made a mistake.
14     Q.    Do you have any reason to doubt that
15 they were correct in their determination regarding
16 who was placed on the failure list?
17         MR. SEIDMAN:  I think she's
18     saying she has no way of knowing one way or
19     the other, she's saying.
20         MR. COHEN:  Are you answering
21     the question, David?
22         MR. SEIDMAN:  Yes.  I'm
23     repeating her answer.
24 BY MR. COHEN:

Page 37

1      Q.    So I will repeat my question.
2         Commissioner, do you have any
3  reason to doubt that the Office of Human Resources
4  was correct in determining who was placed on the
5  failure list on February 21, 2020?
6  A.    My answer is the same.  It's based on their
7  criteria.
8      Q.    Do you have any reason to doubt that
9  they were correct in their determination regarding
10 the failure list?
11         MR. SEIDMAN:  Objection to form,
12     asked and answered.
13         You can answer again, if you'd
14     like.
15 A.    My answer remains the same.
16     Q.    All six of the applicants on the
17 failure list for the warden promotional list
18 established on February 21, 2020 are men, correct?
19 A.    There's an individual on here who I do not
20 recognize the name, so I cannot say 100 percent
21 certain that this entire list is male.
22     Q.    Who is that individual?
23 A.    Roi Greene.
24     Q.    The other five individuals are men?

Blanche Carney

Page 38

1  A.   Yes.
2      Q.   The Office of Human Resources did not
3  make a determination that Mr. Lacombe was acceptable
4  to have site responsibility of Riverside
5  Correctional Facility based upon his education and
6  experience after Warden Talmadge retired, correct?
7  A.   Can you repeat that, please?
8      Q.   Sure.  Am I correct that the Office of
9  Human Resources did not make a determination that
10  Mr. Lacombe was acceptable to have site
11  responsibility of Riverside Correctional Facility
12  based upon his education and experience after
13  Warden Talmadge retired?
14          MR. SEIDMAN:  Objection to form.
15  BY MR. COHEN:
16      Q.   You can answer, Commissioner.
17  A.   They wouldn't have had a determination.  He
18  wasn't applying to be a deputy warden.
19      Q.   Well, he certainly wasn't applying to
20  be a deputy warden at that time because he already
21  was a deputy warden, correct?
22  A.   That is correct.
23      Q.   And he did not apply to have site
24  responsibility of Curran-Fromhold Correctional

Page 39

1  Facility -- of Riverside Correctional Facility upon
2  the retirement of Warden Talmadge, correct?
3  A.   Right.
4          MR. SEIDMAN:  Objection to form.
5          You can answer.
6  A.   Yes, he did not apply.
7      Q.   You assigned him to that position
8  after Warden Talmadge retired, correct?
9  A.   He had that position prior to her
10  retirement, because she was out on extended leave,
11  and he had site responsibility.
12      Q.   So is it incorrect that you assigned
13  him to the position of having site responsibility
14  after Warden Talmadge retired?
15  A.   It is incorrect, because he had site
16  responsibility just by his sheer rank of being a
17  deputy warden during her absence.
18          A deputy warden for operation
19  normally covers in the absence of a warden who is
20  assigned, of which she was out for an extended
21  period of time.  And he continued site
22  responsibility the day after her retirement.
23      Q.   Does a deputy warden normally cover a
24  facility upon the retirement of a warden?

Page 40

1  A.   Yes.
2      Q.   For how long?
3  A.   Until determined.
4      Q.   Prior to 2021, are you aware of any
5  other instance of that occurring?
6  A.   Yes.
7      Q.   How many instances?
8  A.   Two.
9      Q.   What are those instances?
10  A.   Retired Warden William Lawton was out for a
11  period of time and a deputy warden assumed site
12  responsibility in his absence.  And Deputy Warden
13  John Delaney was out for an extended period of time
14  and a deputy warden assumed site responsibility.
15      Q.   Did Warden Lawton eventually retire?
16  A.   Yes.
17      Q.   And who was the deputy warden who
18  assumed site responsibility while Warden Lawton was
19  out prior to his retirement?
20  A.   Edward Miranda.
21      Q.   And upon Warden Lawton's retirement,
22  did Edward Miranda continue to have site
23  responsibility of the facility?
24  A.   No.

Page 41

1          MR. SEIDMAN:  Can we take
2  60 seconds?
3          MR. COHEN:  Sure.
4          (Short recess taken at
5  11:01 a.m.)
6          (Proceedings resumed at
7  11:02 a.m.)
8  BY MR. COHEN:
9      Q.   Who replaced Warden Lawton?
10  A.   Warden Lawton was not replaced.  The
11  facility was closed and depopulated.
12      Q.   Which facility was that?
13  A.   House of Correction.
14      Q.   The other instance you provided was
15  Warden Delaney, correct?
16  A.   Yes.
17      Q.   And when Warden Delaney was out on
18  leave, who assumed site responsibility of his
19  facility?
20  A.   Then-Deputy Warden Gerald May.
21      Q.   And what facility was that?
22  A.   CFCF.
23      Q.   At the time when Warden Delaney
24  retired, did Deputy Warden May continue to have site

Blanche Carney

Page 42

1  responsibility for CFCF?
2  **A.    For a brief period of time.**
3       Q.    How long was that?
4  **A.    I can't recall the actual time period.**
5       Q.    Can you recall when Warden Delaney
6  retired?
7  **A.    I cannot say for certain, but I believe it**
8  **was in 2022.**
9            MR. COHEN:  I will mark this as
10  Commissioner Carney Exhibit 7.
11           (Whereupon Carney-7 was marked for
12  identification.)
13  BY MR. COHEN:
14       Q.    I'm showing you Warden Delaney's
15  Work History Detail.  Do you see that?
16  **A.    Yes, I do.**
17       Q.    And do you see where on this document
18  it shows he retired July 3rd, 2020?
19  **A.    Yes.**
20       Q.    Do you have any reason to doubt that?
21  **A.    No.**
22       Q.    He retired as warden of
23  Curran-Fromhold Correctional Facility, correct?
24  **A.    Yes.**

Page 43

1       Q.    And it's your testimony that, upon his
2  retirement, Deputy Warden May continued having site
3  responsibility of that facility?
4  **A.    Based on my recollection, but not**
5  **100 percent certain.**
6       Q.    Okay.
7  **A.    And it may be -- and this is unfortunate,**
8  **but I believe Deputy Warden May, it was earlier than**
9  **that.  It was in 2018 or '19.  Because Deputy Warden**
10  **May died.  So this is based on my recollection.  I**
11  **believe his having site responsibility precedes this**
12  **effective date, unfortunately.  Based on my**
13  **recollection, I believe that Deputy Warden May was**
14  **deceased at that time.**
15       Q.    When you say "at that time," you're
16  referring to --
17  **A.    Of the July 3rd, 2020.**
18       Q.    Okay.  So in both of the examples you
19  provided where a deputy warden assumed site
20  responsibility upon a warden being out, upon the
21  retirement of that warden, that deputy warden did
22  not continue their site responsibility, correct?
23  **A.    I don't understand your question.**
24       Q.    Sure.  So we were talking before about

Page 44

1  whether or not you assigned Pierre Lacombe to have
2  site responsibility of Riverside Correctional
3  Facility upon the retirement of Warden Talmadge; do
4  you remember that?
5  **A.    Yes.**
6       Q.    And it was your testimony, and please
7  correct me if I'm misstating, that you did not
8  assign him the position upon Warden Talmadge's
9  retirement because he was already in the position of
10  having site responsibility because Warden Talmadge
11  was on leave prior to her retirement; is that
12  correct?
13  **A.    Yes.**
14       Q.    And I asked for some examples, if you
15  had any, of instances where a deputy warden
16  continued to have site responsibility of a facility
17  upon the retirement of the warden.  Do you remember
18  that question?
19  **A.    Yes.**
20       Q.    And you said, yes, there are examples
21  of that, correct?
22  **A.    Yes.**
23       Q.    And I asked you what examples.  And
24  you said you could think of two instances, and we

Page 45

1  have just spoken about those instances, correct?
2  **A.    Yes.**
3       Q.    Would you agree with me that, in
4  neither of those instances that you have just
5  provided, the deputy warden who had site
6  responsibility while the warden was on medical leave
7  continued to have site responsibility of the
8  facility upon the retirement of the warden?
9  **A.    I would not agree.**
10       Q.    Okay.  So let's go per example.
11           So the first example was
12  Warden Lawton, correct?
13  **A.    Yes.**
14       Q.    And Edward Miranda assumed site
15  responsibility while Warden Lawton was on medical
16  leave, correct?
17  **A.    Correct.**
18       Q.    Did Edward Miranda continue to have
19  site responsibility upon Warden Lawton's retirement?
20  **A.    Yes, he did, until the facility closed and**
21  **was depopulated, which was shortly thereafter.  So**
22  **there was a period where he continued to provide**
23  **site responsibility for populated**
24  **House of Correction until its closure.**

Blanche Carney

Page 46

1    Q.    How long was that period?
2    **A.    I would have to see the time period.  We**
3    **closed House of Correction in the spring of 2018.**
4    **So that facility, once we started depopulating, it**
5    **was not a significant period of time, but**
6    **Deputy Warden Miranda remained there for a period of**
7    **time until all of the population was transferred out**
8    **and it was formally decommissioned.**
9          MR. COHEN:  So I'll mark this as
10    Carney Exhibit 8.
11       (Whereupon Carney-8 was marked for
12       identification.)
13   BY MR. COHEN:
14       Q.    This is a 20-page document, Bates
15   stamped City 1573 through 1592.
16          So I think you said that House
17   of Correction was closed in the spring of 2018; is
18   that correct?
19   **A.    Yes.**
20       Q.    Can you provide any more -- and I'm
21   happy to look through these documents if they
22   refresh your recollection as to when the facility
23   was closed.
24          So let me go, I guess, to --

Page 47

1    looking at page 6 of the document, which is
2    Bates stamped 1578, is this helpful to provide you
3    some clarification on when the facility was closed?
4    **A.    This, yes.  Looking at the dates, yes.**
5        Q.    When was the facility closed?  Can you
6    provide that information?
7    **A.    I don't have the exact date, but this is a**
8    **transaction when we started to depopulate and**
9    **transfer correctional staff to other facilities**
10   **because of the impending closure of the House of**
11   **Correction.**
12       Q.    This document says, "Personnel
13   transaction," correct?
14   **A.    Correct.**
15       Q.    And then going to the following page,
16   page 7 of the document, it's also a memorandum
17   regarding personnel transfer?
18   **A.    Yes.**
19       Q.    At the time Warden Lawton retired, did
20   you know you were going to be closing
21   House of Corrections?
22   **A.    Yes.**
23       Q.    Can you provide any estimate for how
24   long Deputy Warden Miranda continued to have site

Page 48

1    responsibility of House of Correction after
2    Warden Lawton's retirement?
3          MR. SEIDMAN:  Objection to form,
4          asked and answered.  She said she couldn't
5          recall exactly.
6          MR. COHEN:  Yes, that's why I
7          asked for an estimate.
8          MR. SEIDMAN:  If you can
9          estimate, Commissioner.
10         THE WITNESS:  I cannot estimate,
11         absent documents in front of me.
12   BY MR. COHEN:
13       Q.    Was a transactional memorandum sent to
14   prison staff regarding Deputy Warden Miranda
15   continuing as to having site responsibility of
16   House of Corrections upon Warden Lawton's
17   retirement?
18   **A.    No.**
19       Q.    Why did you close the
20   House of Corrections?
21   **A.    The goal of Mayor Kenney was to decrease the**
22   **prison population overall.  And that was, in part,**
23   **due to a safety and justice -- the MacArthur Safety**
24   **and Justice Challenge Grant, which looked at jails**

Page 49

1    **and prisons around the country that had a**
2    **significantly high population and address criminal**
3    **justice reform.  And through that grant, we were**
4    **able to work collectively with the criminal justice**
5    **Philadelphia partners to identify individuals, with**
6    **the goal of reducing the population by 50 percent.**
7        Q.    Edward Miranda does not have a
8    bachelor's degree, correct?
9    **A.    I cannot recall that.  I don't have that**
10   **information in front of me.**
11       Q.    Did you ever participate in a meeting
12   with Edward Miranda regarding the requirement for a
13   bachelor's degree for the warden position?
14   **A.    Yes.**
15       Q.    In that meeting, did you learn that he
16   did not have a bachelor's degree?
17   **A.    Based on my recollection of that meeting,**
18   **yes.**
19       Q.    Other than Edward Miranda continuing
20   to have site responsibility of House of Corrections
21   for some period of time before its closure, can you
22   think of any other examples of a deputy warden
23   continuing to have site responsibility of a facility
24   upon the retirement of the warden, before August 21,

Blanche Carney

Page 50

1  2021?
2  **A.    Not that I can recall at this time. And I'm**
3  **thinking on this.**
4      Q.    Was it your decision to have
5  Edward Miranda continue to have site responsibility
6  of House of Corrections after the retirement of
7  Warden Lawton?
8  **A.    Yes. Because he had it prior to the**
9  **retirement of Warden Lawton.**
10     Q.    When you made that decision to have
11 Deputy Warden Miranda to continue having site
12 responsibility upon the retirement of Warden Lawton,
13 did you know that you were going to be closing
14 House of Corrections?
15 **A.    Yes.**
16     Q.    Did you have any conversations with
17 Deputy Commissioner Clark about the decision to
18 assign Mr. Lacombe to have site responsibility of
19 Riverside Correctional Facility upon
20 Warden Talmadge's retirement?
21 **A.    Can you repeat the question, please?**
22     Q.    Sure.
23          MR. COHEN: Actually, I'd like
24     to take a 60-second comfort break, if that's

Page 51

1  all right with everyone.
2          (Short recess taken at
3      11:19 a.m.)
4          (Proceedings resumed at
5      11:22 a.m.)
6  BY MR. COHEN:
7      Q.    I'll repeat the question. Thank you.
8          Did you have any conversations
9  with Deputy Commissioner Clark about the decision to
10 assign Mr. Lacombe to have site responsibility of
11 Riverside Correctional Facility upon
12 Warden Talmadge's retirement?
13 **A.    No.**
14     Q.    Did you have any conversations with
15 Deputy Commissioner Beaufort about the decision to
16 assign Mr. Lacombe to have site responsibility of
17 Riverside Correctional Facility upon
18 Warden Talmadge's retirement?
19 **A.    No.**
20     Q.    Did you have any conversations with
21 Deputy Commissioner Bagby about the decision to
22 assign Mr. Lacombe to have site responsibility of
23 Riverside Correctional Facility upon
24 Warden Talmadge's retirement?

Page 52

1  **A.    No.**
2      Q.    When you assigned Mr. Lacombe site
3  responsibility of Riverside Correctional Facility
4  after Warden Talmadge's retirement, what were his
5  job duties?
6  **A.    I instructed and directed DC Clark that he**
7  **would continue site responsibility, making sure that**
8  **the facility operates efficiently and safely. I**
9  **informed DC Beaufort of my decision for**
10 **administrative purposes. And I informed DC Bagby,**
11 **for notification purposes, that he would continue**
12 **site responsibility to ensure the safety and**
13 **security of the population and to ensure that the**
14 **staff continue to provide services to the**
15 **incarcerated population.**
16     Q.    Is there any documentation you're
17 aware of showing that directive that you gave?
18 **A.    No.**
19     Q.    Mr. Lacombe is currently the warden of
20 Riverside Correctional Facility?
21 **A.    Yes.**
22     Q.    Are there any differences to
23 Mr. Lacombe's job duties as warden of Riverside
24 Correctional Facility and when he had site

Page 53

1  responsibility of Riverside Correctional Facility
2  after Warden Talmadge's retirement?
3  **A.    Yes.**
4      Q.    What are those differences?
5  **A.    Warden Lacombe, at that time, could not take**
6  **any disciplinary action against a fellow**
7  **deputy warden.**
8      Q.    Are there any differences to
9  Mr. Lacombe's job duties from the period where he
10 had site responsibility of Riverside Correctional
11 Facility before Warden Talmadge's retirement and
12 from the period where he had site responsibility of
13 Riverside Correctional Facility after
14 Warden Talmadge's retirement?
15 **A.    Can you repeat that question? I believe I**
16 **answered that.**
17     Q.    I'll repeat it. It's a different
18 question.
19          You answered the question
20 regarding any differences between when he -- now
21 that he is warden and when he had site
22 responsibility. My question is -- so let me start
23 this way.
24          You've said there was some

Blanche Carney

Page 54

1  period of time where Pierre Lacombe had site
2  responsibility of Riverside Correctional Facility
3  before Warden Talmadge retired, correct?
4  A.    Yes.
5      Q.    Do you know how long that was, or can
6  you provide any estimate for how long that period
7  was?
8  A.    I cannot, absent documentation.
9      Q.    Is there any documentation that shows
10  that?
11  A.    I would have to look at the leave record for
12  Warden Talmadge at the time.
13      Q.    My question is, is there any
14  difference in the job duties that Mr. Lacombe had
15  for the period where he had site responsibility of
16  Riverside Correctional Facility prior to
17  Warden Talmadge's retirement and the period where he
18  had site responsibility of Riverside Correctional
19  Facility after Warden Talmadge's retirement?
20  A.    Yes.
21      Q.    What are those differences?
22  A.    The discipline of a fellow deputy warden.
23  Also, he could not make executive financial
24  decisions at that level.

Page 55

1      Q.    Can you explain those two, please?
2  A.    So as a deputy warden, you cannot discipline
3  a fellow deputy warden.  You need a higher rank to
4  effectuate that.
5              And if the facility was in need
6  of any funding decisions, executive that required
7  additional funding or monies beyond overtime, he
8  could not make those executive-level decisions as a
9  deputy warden.
10      Q.    Just so I understand your testimony,
11  that's the difference between -- those differences
12  are from when he had site responsibility prior to
13  Warden Talmadge's retirement and when he had site
14  responsibility after Warden Talmadge's retirement,
15  correct?
16  A.    They are examples.
17      Q.    So when Pierre Lacombe had site
18  responsibility of Riverside Correctional Facility
19  after Warden Talmadge's retirement, he was able to
20  make financial decisions regarding the facility?
21  A.    No.  I said that he could not make those
22  decisions as a deputy warden, as I understood your
23  question.
24      Q.    I think we're talking past each other

Page 56

1  a little bit then.
2              There was a period where Pierre
3  Lacombe had site responsibility of Riverside
4  Correctional Facility before Warden Talmadge
5  retired, correct?
6  A.    Yes.
7      Q.    And then there is a period where he
8  had site responsibility of Riverside Correctional
9  Facility after Warden Talmadge retired, correct?
10  A.    Yes.
11      Q.    And then he was promoted to be the
12  warden on December 26, 2022, correct?
13  A.    Yes.
14      Q.    So I'm asking about the difference in
15  his job duties between the first period and the
16  second period, in other words, the period before
17  Warden Talmadge retired where he had site
18  responsibility and then the period after
19  Warden Talmadge retired where he had site
20  responsibility.
21              Do you understand?
22  A.    Yes.  And there were no differences, because
23  he was doing the same exact thing, just with the
24  exception of her retirement.

Page 57

1      Q.    Prior to Warden Talmadge's retirement,
2  where Pierre Lacombe had site responsibility, did he
3  need her approval for any of his actions?
4  A.    He would have needed approval.  She was out
5  on extended sick.  I would need to know what
6  you're -- operationally, he's safety and security.
7  If there was something as a deputy warden that he
8  needed approval, that would have come through then
9  his direct report supervisor, who was
10  Deputy Commissioner Clark.
11      Q.    As commissioner, have you ever put a
12  woman in a position where she did not meet the
13  minimum education for that position?
14  A.    No.
15      Q.    Michele Farrell was the warden of
16  Philadelphia Industrial Correctional Center at the
17  time of her retirement, correct?
18  A.    Yes.
19      Q.    Do you know when
20  Warden Michele Farrell retired as warden of
21  Philadelphia Industrial Correctional Center?
22  A.    I do not recall the date.
23              MR. COHEN:  I'll mark this as
24  Carney Exhibit 9.

(Whereupon Carney-9 was marked for identification.)

BY MR. COHEN:

Q. And, Commissioner, do you see that this is the Work History Detail for Warden Farrell?

**A. Yes.**

Q. And that, per this document, the effective date of her retirement was May 13th, 2022?

**A. Yes.**

Q. Do you have any reason to doubt that?

**A. No.**

Q. Was Norman Williams deputy warden of operations at Philadelphia Industrial Correctional Center when Warden Michele Farrell retired?

**A. Yes.**

Q. When Warden Michele Farrell retired as warden of Philadelphia Industrial Correctional Center, was Norman Williams given site responsibility for Philadelphia Industrial Correctional Center?

**A. Yes.**

Q. How soon after Warden Farrell's retirement was Norman Williams given site responsibility for Philadelphia Industrial

Correctional Center?

**A. After she retired.**

Q. Who had site responsibility for Philadelphia Industrial Correctional Center on May 14th, 2022, a day after Warden Farrell's retirement?

**A. Norman Williams.**

Q. Was the minimum education requirement to qualify for the warden position changed in 2022?

**A. I believe it was. I would have to refer back to the actual job announcement for certainty.**

Q. Do you agree that any change to a position's specifications has to be done through the advisory board?

**A. No.**

Q. Can a position's specifications be changed through the advisory board?

**A. For clarification, can you specify what advisory board?**

Q. So going back to Carney Exhibit 2, on the last page, here at the end here, do you see where it says, "Latest Spec Revision: CSC - 9/14, Ad. Board - 11/14"?

**A. Yes. Thank you for sharing that, because I**

**have several advisory boards. That's why I asked for clarification, absent this document presented.**

Q. You're welcome.

**A. So according to this document, this advisory board, yes.**

Q. Do you agree that a position's specifications can be changed through this advisory board?

**A. Yes.**

Q. Is there another way that a position's specifications can be changed?

**A. No.**

Q. So then, do you agree that any change to a position's specifications has to be done through the advisory board?

**A. For official promotions. It does not speak to interim or directives for department.**

Q. Can you elaborate on that, please?

**A. My directive for those deputy wardens to continue on, there is no language in this document that would prohibit me from doing that.**

Q. Do you know when the advisory board approved and finalized proposed changes to the minimum education requirement to qualify for the

warden position?

**A. I do not have the exact date, but the update -- the most current should have the date reflected that the advisory board made the decision.**

MR. COHEN: I will share my screen, and I will mark this as Carney Exhibit 10.

(Whereupon Carney-10 was marked for identification.)

BY MR. COHEN:

Q. It is a two-page document, Bates stamped at the bottom City 1562, and then a second page is City 1561. Do you see that?

**A. Yes.**

Q. So I will give you an opportunity to review this document. Please let me know when you'd like me to change the page.

And I guess it probably makes sense to start -- well, you tell me. Where would you like to start?

**A. You want to start at the beginning?**

Q. Sure. The only reason I was potentially doing it that way is because, you know, it's an e-mail thread, so it goes backwards. But

Blanche Carney

Page 62

1  I'm happy to start here.
2          Do you want me to make it
3  bigger?
4  A.    Yes, please.  That would help.  Okay.
5          (Brief pause.)
6          THE WITNESS:  Okay, if you could
7  advance.
8          (Brief pause.)
9          THE WITNESS:  Okay.
10 BY MR. COHEN:
11     Q.    All right.  Are you finished reviewing
12 the document?
13 A.    Yes.
14     Q.    Does looking at this exhibit,
15 Carney Exhibit 10, refresh your recollection as to
16 when the advisory board approved and finalized the
17 proposed changes to the minimum education
18 requirement to qualify for the warden position?
19 A.    Yes.
20     Q.    And when was that done?
21 A.    Can you scroll back?
22          So based on this, therefore, we
23 recommend bringing the spec back to Civil Service at
24 the July public meeting on July 20th, 2022 to

Page 63

1  correct this, the scheduled announcement for
2  7/11/22.
3          So it seems like July 20th,
4  2022, if I'm reading that correctly.
5      Q.    I will direct your attention to the
6  first sentence from Ms. LaBletta, where she says
7  that the requirements revised in May were approved
8  and finalized by the Ad. Board on June 10th.
9  A.    I see that.
10     Q.    Okay.  Is June 10th the date, to your
11 understanding, of when the Ad. Board approved and
12 finalized the proposed changes to the minimum
13 education requirement to qualify for the warden
14 position?
15 A.    Yes.
16     Q.    Until June 10th, 2022, do you agree
17 that, for someone to meet the education requirement
18 to be qualified to be a warden, they needed to have
19 completed a bachelor's degree program at an
20 accredited college or university?
21 A.    Based on OHR's specification at that time.
22     Q.    So is that a yes?
23 A.    Based on their specification.
24     Q.    On May 14th, 2022, had Norman Williams

Page 64

1  completed a bachelor's degree program at an
2  accredited college or university?
3  A.    I don't recall.  I would have to look at his
4  file.  I don't recall with certainty.
5      Q.    The meeting that we spoke about a
6  little bit ago with Mr. Miranda, was Mr. Williams
7  also at that meeting?
8  A.    Yes.
9      Q.    Was Mr. Lacombe at that meeting?
10 A.    Yes.
11     Q.    Was William Vetter at that meeting?
12 A.    Yes.
13     Q.    Was Deputy Commissioner Clark at that
14 meeting?
15 A.    I don't believe he was at that meeting,
16 based on my recollection.
17     Q.    Is there anyone else you can think of
18 that was at that meeting?
19 A.    William Vetter.  I believe Greg Vrato,
20 Miranda, Williams.  That's all I can recall.
21     Q.    At the time of the meeting, was
22 Mr. Miranda a deputy warden?
23 A.    Yes.
24     Q.    Was Mr. Vetter a deputy warden?

Page 65

1  A.    Yes.
2      Q.    Was Mr. Lacombe a deputy warden?
3  A.    Yes.
4      Q.    Was Mr. Williams a deputy warden?
5  A.    Yes.
6      Q.    Was the point of the meeting to try
7  and get rid of the bachelor's degree requirement for
8  the warden position?
9  A.    I don't recall that was the reason for the
10 meeting.  The reason for the meeting, the gentleman
11 referenced, Louis Giorla, did not have a degree and
12 was appointed warden.  That was the former
13 commissioner of the Philadelphia
14 Department of Prisons.  That decision I had nothing
15 to do with.  And he was appointed warden without a
16 degree.  And that was the reason for that meeting.
17 They wanted me to know that.
18     Q.    Do you know when that appointment was
19 made?
20 A.    No, I do not.
21     Q.    Warden is a Civil Service position,
22 correct?
23 A.    Yes.
24     Q.    Can wardens be appointed?

Page 66

1  A.    Yes.  In that case.  And that's above my pay
2  grade, and I don't know who -- how he was appointed
3  or if he took an exam, absent his records.  But I
4  can attest that Louis Giorla was a warden at one
5  point.
6      Q.    Is it your testimony that the Civil
7  Service Regulations permit appointment of wardens?
8  A.    There is a process.  I cannot answer who and
9  what department.
10          I don't have Lou Giorla's
11  records.  I'm attesting he was a warden, and that
12  they -- all of those individuals -- raised that he
13  did not have a degree.
14      Q.    Right.  I'm not asking about him
15  specifically.  I'm asking you whether or not wardens
16  can be appointed.
17  A.    I don't believe they can.  However, based on
18  my knowledge about Warden Giorla, I don't know the
19  specifics and what went into that.
20          They brought that to my
21  attention.  They wanted me to know that.  Based on
22  what I know, the warden's position is a Civil
23  Service position.
24      Q.    And why did they want you to know

Page 67

1  that?
2  A.    I believe they wanted me to know that
3  because they wanted and expressed interest in being
4  a warden, similar to Louis Giorla.
5      Q.    When you say "similar to Louis
6  Giorla," do you mean without having a bachelor's
7  degree from an accredited college or university?
8  A.    Yes.
9      Q.    And am I correct that, during that
10  meeting, you told them that, to be a warden, they
11  needed a bachelor's degree from an accredited
12  college or university?
13  A.    Yes.  Based on the specs at that time.
14      Q.    Was that meeting before the covid
15  pandemic?
16  A.    Yes.
17      Q.    The Office of Human Resources did not
18  make a determination that Mr. Williams was
19  acceptable to have site responsibility of
20  Philadelphia Industrial Correctional Center based
21  upon his education and experience after
22  Warden Farrell retired, correct?
23  A.    They would not have made a determination,
24  because he was not applying for the position.  And

Page 68

1  that can be done at the department level.
2      Q.    You assigned Norman Williams to have
3  site responsibility after Warden Farrell retired,
4  correct?
5  A.    Yes.
6      Q.    Is there any documentation showing
7  that assignment?
8  A.    No.
9      Q.    Did you have any conversations with
10  Deputy Commissioner Clark about the decision to
11  assign Mr. Williams to have site responsibility of
12  Philadelphia Industrial Correctional Center upon
13  Warden Farrell's retirement?
14  A.    Not about my decision, but I gave him the
15  directive that Deputy Warden Williams would retain
16  site responsibility.
17      Q.    Same question regarding
18  Deputy Commissioner Beaufort.
19  A.    Not regarding my input for decision, but
20  that administratively to notify him that
21  Deputy Warden Norman Williams will retain site
22  responsibility.
23      Q.    And same question regarding
24  Deputy Commissioner Bagby.

Page 69

1  A.    Same response, for notification purposes.
2  Not in my decision-making.
3      Q.    Did any of the deputy commissioners
4  provide any input to you?
5  A.    No.
6      Q.    What were Mr. Williams' job duties
7  when he had site responsibility of Philadelphia
8  Industrial Correctional Center after
9  Warden Farrell's retirement?
10  A.    To ensure the continuation of safe and
11  efficient operations of the Philadelphia Industrial
12  Correctional Facility, to direct the staff, and
13  ensure services were provided to the incarcerated
14  population.
15      Q.    Mr. Williams was promoted to be the
16  warden of Philadelphia Industrial Correctional
17  Center effective December 26th, 2022?
18  A.    Correct.
19      Q.    What differences, if any, are there
20  regarding Mr. Williams' job duties as warden of
21  Philadelphia Industrial Correctional Center and when
22  he had site responsibility of Philadelphia
23  Industrial Correctional Center after
24  Warden Farrell's retirement?

Blanche Carney

Page 70

1   A.    He could take corrective action as a warden
2   with his subordinate deputy warden and staff inside
3   the facility.  He could also make financial
4   decisions for the facility.
5       Q.    What type of financial decisions?
6   A.    Financial decisions for additional request
7   for funding for specific projects, new projects.  He
8   could request or make recommendations for new
9   services or technology.  As a warden, as the highest
10  level, you're looking over all operationally, and he
11  could do that as a warden, that he could not have
12  commanded that level of responsibility as a
13  deputy warden.
14      Q.    Who would he make those requests to as
15  a warden?
16  A.    His immediate supervisor, who was then
17  Deputy Commissioner Clark.
18      Q.    And you say "then Deputy Commissioner
19  Clark."  Is that because Norman Williams is no
20  longer the warden of Philadelphia Industrial
21  Correctional Center?
22  A.    He is no longer the warden of Philadelphia
23  Industrial Correctional Center and
24  Deputy Commissioner Clark is retired.

Page 71

1       Q.    Right.  So, as warden, Mr. Williams
2   could make these financial requests to
3   Deputy Commissioner Clark, correct?
4   A.    Yes.
5       Q.    As when he had site responsibility of
6   Philadelphia Industrial Correctional Center after
7   Michele Farrell's retirement on May 13th, 2022, who
8   would he make requests to regarding financial issues
9   for Philadelphia Industrial Correctional Center?
10  A.    Deputy Commissioner Clark.
11      Q.    Same question regarding Pierre Lacombe
12  when he had site responsibility of Riverside
13  Correctional Facility after Warden Talmadge's
14  retirement.
15  A.    Deputy Commissioner Clark.
16      Q.    And same question for Steven Angelucci
17  when he had site responsibility of Curran-Fromhold
18  Correctional Center after Warden Giannetta's
19  retirement.
20  A.    Deputy Commissioner Clark.
21      MR. COHEN:  David, this might be
22  a good time to break.
23          MR. SEIDMAN:  Okay, that would
24  be perfect.

Page 72

1           (Luncheon recess taken at
2   11:55 a.m.)
3           (Proceedings resumed at
4   12:44 p.m.)
5   BY MR. COHEN:
6       Q.    Do you remember from earlier that
7   Warden John Delaney retired on July 3rd, 2020?
8   A.    Yes.
9       Q.    At the time of his retirement, there
10  were four wardens in the Philadelphia
11  Department of Prisons, correct?
12  A.    Yes.
13      Q.    Before Warden Delaney retired, did you
14  take any steps to eliminate one of the four warden
15  positions?
16  A.    Yes.
17      Q.    What were those steps?
18  A.    Based on the reduction, we had reached a
19  50 percent reduction in our population for the
20  overall census.  And we achieved that through the
21  MacArthur Safety and Justice Challenge Grant.
22          Based on that, our female
23  population significantly reduced to roughly 230
24  female incarcerated people at Riverside.  That was

Page 73

1   the lowest we had been in years.
2           At that point, I then decided,
3   based on the data of the low census in the female
4   population, to transfer Cathy Talmadge from the
5   Detention Center over to Riverside Correctional
6   Facility to manage the female population, as well as
7   the male population, to give equity in how the
8   wardens operated.
9           CFCF warden was responsible for
10  roughly 22- to 2300 on average on any given day of
11  incarcerated people at their facility.  The
12  Philadelphia Industrial Correctional Facility could
13  average roughly between 12- and 1600 on any given
14  day.  Warden Talmadge was left with a little less
15  than about 500 adult men.
16          So to assure equity amongst the
17  wardens, that was the data I used to make the
18  decision.
19      Q.    So when was Warden Talmadge
20  transferred to become the warden of the
21  Detention Center?
22  A.    I can't recall.  I would have to review her
23  transaction record.
24      Q.    So my question was, what steps, if

Blanche Carney

Page 74

1  any, did you take before Warden Delaney retired to
2  eliminate one of the four warden positions? So, in
3  other words, before July 3rd of 2020, what steps
4  were taken?
5  A.    I don't believe steps were taken before
6  then, but I would need to review the record.
7  Because as I just shared with you, the reduction in
8  the female incarcerated population was a significant
9  driver for the data point that I used to not have a
10  warden at Riverside overseeing 230 women, as
11  compared to CFCF and PICC, who they were responsible
12  for well over 16- to 2,000 -- or 2200 individuals on
13  any given day.
14          But I would need to see those
15  documents to give you a firm answer.
16  Q.    When you say "those documents," what
17  documents?
18  A.    The transactions that you have, to give me
19  some idea of when they were appointed.
20          I know I did not appoint
21  Warden Talmadge. She was in position prior to my
22  appointment. So I can't speak to when she was
23  assigned to DC. That was your question.
24          And if it is the time frame for

Page 75

1  when I made the change not to fill the position for
2  the Detention Center warden, given the low census, I
3  would have to review our transaction forms for that.
4  Q.    So is it your testimony there should
5  be some form showing when Warden Talmadge became the
6  warden of the Detention Center?
7  A.    There should be. It didn't happen after me,
8  but normally when a warden is promoted, then there
9  is a transaction to show the facility for which that
10  warden will have responsibility.
11  Q.    At the time Warden Talmadge became the
12  warden of the Detention Center, she was already a
13  warden, correct?
14  A.    That is correct.
15  Q.    So that would not be a memorialization
16  of a promotion, correct?
17  A.    It could be a memorialization of a promotion
18  or facility responsibility.
19  Q.    So when an individual takes over
20  responsibility of a facility, is there a document
21  that reflects that?
22  A.    If they are a warden, and then there is site
23  responsibility as a warden, there should be
24  documentation, a transaction memo to that effect.

Page 76

1  Q.    And other than that transaction memo,
2  are there any other documents that would reflect any
3  steps taken to eliminate one of the four warden
4  positions prior to John Delaney's retirement on
5  July 3rd, 2020?
6  A.    No, not necessarily.
7  Q.    How many wardens are there currently?
8  A.    There are three wardens currently.
9  Q.    How many vacancies for warden are
10  there?
11  A.    I have two positions are not filled, and
12  they are for the Detention Center and the House of
13  Correction.
14  Q.    When you say there are two positions
15  that are not filled, is that different than a
16  vacancy?
17  A.    A vacancy is a vacancy, but not filled is at
18  the discretion and can be at the discretion of the
19  department. Just because we have positions, we are
20  not obligated to fill every single vacancy.
21  Q.    So currently, if I'm understanding
22  your testimony, there are three wardens and two
23  facilities that do not have a filled warden
24  position; is that correct?

Page 77

1  A.    That is not correct. Based on our
2  complement for our class 100s, it's easier to keep a
3  position on as a budget line rather than to go back
4  for it and make a request to add that funding back.
5          The Detention Center is under,
6  and was under, Cathy Talmadge when she was warden
7  before her retirement. The House of Corrections was
8  decommissioned and closed. There is no population
9  there.
10  Q.    So is the warden position for the
11  House of Corrections vacant?
12  A.    Yes.
13  Q.    Is there any plan to fill the warden
14  position for the House of Correction?
15  A.    No.
16  Q.    Is the warden position for the
17  Detention Center vacant?
18  A.    Yes. Because that facility is now under the
19  site responsibility of the warden for the Riverside
20  Correctional Facility, and that was put in place at
21  the time that Cathy Talmadge was the warden, given
22  the significant drop in the incarcerated population.
23  Q.    Is there any plan to fill the warden
24  position at the Detention Center?

Blanche Carney

Page 78

1    A.    No.
2        Q.    Did you make the decision to have
3    three instead of four wardens for the department?
4    A.    Yes, based on the 50 percent reduction in
5    the incarcerated population.
6        Q.    When did you make that decision?
7    A.    Based on my recollection, that may have been
8    in 2019, when we saw the population reduction in
9    advance of the covid pandemic.
10       Q.    The department had four wardens until
11   July 3rd of 2020, correct?
12   A.    I believe so, yes.
13       Q.    Are you aware of any documentation
14   showing that you made the decision to have three
15   instead of four wardens in 2019?
16   A.    I would have to review my files.  I believe,
17   based on my recollection, it was in 2019.
18       Q.    As you sit here today, are you aware
19   of any documentation showing when you made that
20   decision?
21   A.    I answered that question.  I would have to
22   take a look to see if I have anything.  I am not
23   recalling it, and I'm not saying it doesn't exist.
24   I don't have it here, but I answered that.

Page 79

1        Q.    Did you get any feedback from any of
2    the deputy commissioners before making the decision
3    to have three instead of four wardens?
4    A.    I did confer, based on the data.  We had
5    been monitoring the population reduction since the
6    House of Corrections.  That was an ongoing data
7    point that we discussed with the goal that it was
8    supposed to reduce the population by half.  The
9    benchmark of the population was 8084 -- or 8031, I
10   believe.  And through our efforts, we were working
11   to decrease that population.
12              So we were constantly monitoring
13   that data point and to show equity amongst our
14   wardens.  So that was an active discussion as part
15   of our planning for the campus of the prisons and
16   utilization of our positions.
17       Q.    What feedback -- and from whom -- do
18   you remember receiving from the deputy commissioners
19   regarding the decision to go from four to three
20   wardens?
21   A.    All of the deputy commissioners, Beaufort,
22   Clark, and Bagby, discussed the reduction,
23   acknowledged it was a step in the right direction,
24   and raised no objection.

Page 80

1        Q.    And when you say --
2    A.    Go ahead.
3        Q.    No, you go ahead.
4    A.    No, no, you go ahead.
5        Q.    Okay.  When you say "a step in the
6    right direction," do you mean the decision to move
7    from four wardens to three wardens?
8    A.    Yes.  And to utilize how we utilize our
9    positions and manage the population.
10       Q.    Does the department submit a yearly
11   budget?
12   A.    Yes.
13       Q.    Have you submitted a budget for 2024?
14   A.    Yes.
15       Q.    How many warden positions were
16   submitted for the 2024 budget?
17   A.    I believe there were still four positions
18   that we submitted as line item.
19       Q.    For the years 2020 through 2023, the
20   Philadelphia Department of Prisons' budget has
21   included four warden positions, correct?
22   A.    Based on my recollection, yes.
23       Q.    And that is because the Philadelphia
24   Department of Prisons operates four facilities;

Page 81

1    namely, Curran-Fromhold Correctional Facility, the
2    Detention Center, Philadelphia Industrial
3    Correctional Center, and Riverside Correctional
4    Facility, correct?
5    A.    That is correct, when we were at full
6    capacity.
7        Q.    The Detention Center has not closed
8    since Warden Delaney's retirement, correct?
9    A.    That is correct.
10       Q.    And it has never closed?
11   A.    It was depopulated completely in 2019 or
12   2020, when we transferred the female population from
13   Riverside over to ASD.  The wing at the
14   Detention Center that never closed was the prison
15   health services wing, and that was because of
16   nearing and approaching the 50 percent reduction in
17   the overall incarcerated population census.
18       Q.    Is there any documentation you're
19   aware of showing that the Detention Center became a
20   satellite of Riverside Correctional Facility?
21   A.    Yes.  I believe I sent around an e-mail to
22   that effect and notifying the parties that Riverside
23   would now have site responsibility for the
24   Detention Center, given that reduction.

Blanche Carney

1  Q.   Warden Talmadge was made warden of
2  Riverside Correctional Facility, the
3  Detention Center, and Alternative and Special
4  Detention, correct?
5  A.   Correct.
6  Q.   Did anyone express their opinion to
7  you that one individual should not be the warden of
8  all three locations?
9  A.   No.  And this is not unique.  When we were
10 at full capacity, meaning we had about 9,000
11 incarcerated people, the warden for the Alternative
12 and Special Detention had site responsibility for
13 two satellite sites that were not located on the
14 prison's campus here.  They were located in the
15 community.  So this is not a unique experience for
16 that to occur.
17 Q.   Prior to Warden Talmadge being the
18 warden of both the Riverside Correctional Facility
19 and the Detention Center, had a warden been warden
20 of more than one facility?
21 A.   Yes.
22 Q.   Who was that?
23 A.   That, at that time, I believe was
24 Arthur Blackman.  Arthur Blackman was a warden who

1  has since retired.  And then subsequent to
2  Arthur Blackman, it was Karen Bryant, who is
3  retired.  And they had responsibility for the
4  Alternative Special Detention, Triple C here,
5  Central Unit, 17th and Cambria in the community, and
6  those were their additional site -- facility site
7  responsibilities.
8       And at one point, we also had a
9  facility at 1600 -- in the southwest -- University
10 Avenue.  And the Alternative and Special Detention
11 warden had site responsibility for that offsite
12 satellite -- well, it was a facility, actually.
13 Q.   What's the difference between a
14 satellite and a facility?
15 A.   A facility is a freestanding, standalone, or
16 sat -- and it can be referred to as a satellite when
17 it has a smaller significant population as compared
18 to the population size here on State Road.  And
19 those populations were much smaller.
20 Q.   Which populations?
21 A.   The 600 University Avenue and 17th and
22 Cambria.
23       MR. COHEN:  I'm sharing my
24 screen and showing you what I'll mark as

1  Carney Exhibit 11.
2       (Whereupon Carney-11 was marked for
3  identification.)
4  BY MR. COHEN:
5  Q.   It is a three-page document, Bates
6  stamped City 1831 through 1833.
7       Looking at this exhibit, this is
8  the eligible list for warden established
9  February 21, 2020, correct?
10 A.   I'm not seeing that here on that
11 transaction.  You said -- okay.  I see 2/21/20 on
12 this document.  It's not on your original e-mail.
13 Q.   Looking at the first page of the
14 exhibit, it states that there is a copy attached to
15 the e-mail of the established list, correct?
16 A.   Correct.
17 Q.   And then if you go up to the top,
18 there is an attachment there, correct?
19 A.   Correct.
20 Q.   And the number corresponding to the
21 attachment is the same number in parenthesis on
22 page 2 of the document, correct?
23 A.   I would need to compare.  I can write it
24 down just -- so give me a moment.

1  Q.   Sure.
2       (Brief pause.)
3       THE WITNESS:  Okay.  If I can
4  see the attachment?
5       MR. COHEN:  Yes.
6       (Brief pause.)
7       THE WITNESS:  The numbers are
8  correct, yes.
9  BY MR. COHEN:
10 Q.   The list was established by the Office
11 of Human Resources, correct?
12 A.   Correct.
13       I'm closing my blinds.  I'm
14 getting sun in my face.
15       MR. SEIDMAN:  Commissioner, if
16 you ever need a break for a drink of water or
17 for comfort, feel free, please.  Okay?
18       THE WITNESS:  Thank you.
19 BY MR. COHEN:
20 Q.   Before the Office of Human Resources
21 established this list, the Philadelphia
22 Department of Prisons asked for the list to be
23 created, correct?
24 A.   Yes.

Blanche Carney

Page 86

1    Q.    Who made the decision to request the
2   warden list established February 21, 2020 to be
3   created?
4   **A.    I believe that would have come from HR,**
5   **because there was an exam.**
6    Q.    When you say "HR --"
7   **A.    Our department, the prison's HR department.**
8    Q.    So it's your understanding that the
9   decision to request the warden list established
10  February 21, 2020, to be created was made by the
11  Human Resources Department for the Philadelphia
12  Department of Prisons?
13  **A.    Yes, that is my understanding, because**
14  **that's the normal process; when there is an exam,**
15  **they request a certification list.**
16   Q.    Would that have been Sherell Maxwell
17  at the time, back in late 2019, early 2020?
18  **A.    I would have to confirm, because Ms. Maxwell**
19  **transferred from another department to become our**
20  **HR.  So I cannot say, absent looking at her actual**
21  **transfer date.**
22   Q.    As Commissioner, were you at all
23  involved in the decision to request the warden list
24  that was established February 21, 2020, to be

Page 87

1   created?
2   **A.    Not to my knowledge.  That's handled through**
3   **my deputy commissioner for administration, who is**
4   **Xavier Beaufort.  And he has site responsibility and**
5   **can also request that list.**
6    Q.    When you say "he has site
7   responsibility," what does he have site
8   responsibility of, in relation to your answer to
9   that last question?
10  **A.    He oversees our human resources, HR, and**
11  **payroll department.  And he stays abreast of the**
12  **day-to-day positions and operations and workings of**
13  **that unit.**
14   Q.    Was there an anticipated need to have
15  a promotional list for warden prior to February 21,
16  2020?
17  **A.    Based on the time, I don't believe so.  We**
18  **were in the throes of Covid-19.  And Covid-19 was**
19  **very challenging.  The years of Covid-19 were very**
20  **challenging.**
21      **During that time, it was not on**
22  **my mind to fill with wardens, because we were**
23  **dealing with something that pretty much shut the**
24  **entire world down and significantly impacted**

Page 88

1   **corrections.**
2       **The people we had in place at**
3   **that time, they were managing those facilities, and**
4   **our day-to-day focus was dealing with Covid-19 and**
5   **every curveball that it threw to us on a daily basis**
6   **and hourly basis.  So that was not at the top of my**
7   **list.**
8    Q.    The Philadelphia Department of Prisons
9   was not impacted by Covid-19 prior to February 21,
10  2020, correct?
11  **A.    That's not true.  The onset of Covid-19 was**
12  **March of 2020.  Okay, go ahead.  You said 2021.  It**
13  **wasn't impacted prior to 2021.  Did I hear that**
14  **correctly?**
15   Q.    No.
16  **A.    Okay.  Can you restate your question?**
17   Q.    Sure.  Prior to February 21, 2020, the
18  Philadelphia Department of Prisons had not been
19  impacted by the Covid-19 pandemic, correct?
20  **A.    February 20th, that's correct.  Shy one**
21  **month.**
22   Q.    And when I asked you whether or not
23  prior to February 21st, 2020 the Philadelphia
24  Department of Prisons had an anticipated need for a

Page 89

1   warden promotional list, your response pertained to
2   the Covid-19 pandemic, correct?
3   **A.    That is correct.  And I misheard your**
4   **question, and I actually articulated that I heard**
5   **you wrong.**
6    Q.    Right.  So I'll reask my question and
7   give you another opportunity to respond.
8       Prior to February 21st, 2020,
9   did the Philadelphia Department of Prisons
10  anticipate needing a promotional list for wardens?
11  **A.    No.  Based on my clear understanding of your**
12  **question, the answer is no.**
13   Q.    Then why was a promotional list
14  requested by the Philadelphia Department of Prisons?
15  **A.    Standard practice, absent me, I would have**
16  **to defer that to Deputy Commissioner Beaufort or**
17  **Ms. Maxwell.**
18   Q.    Promotional lists last two years,
19  correct?
20  **A.    Yes.**
21   Q.    During the two years that the warden
22  promotional list established February 21st, 2020
23  existed, the Philadelphia Department of Prisons went
24  from four to one warden, correct?

Blanche Carney

Page 90

1    A.    Went from four to one warden?  We have three
2    warden positions.
3        Q.    So, on February 21st, 2020, how many
4    wardens did the Philadelphia Department of Prisons
5    have?
6    A.    We had four in 2020.  And then there was
7    one -- or subsequent retirements, and I think
8    Delaney, recalling, was July, 2020.  So that left us
9    with three.
10       Q.    On February 21st, 2022, how many
11   wardens did the Philadelphia Department of Prisons
12   have?
13   A.    I believe we had three in place.
14       Q.    Who were those three?
15   A.    Michele Farrell, Nancy Giannetta, and
16   Cathy Talmadge.
17       Q.    Going back to Carney Exhibit 1, do you
18   agree that Nancy Giannetta retired August 20th,
19   2021?
20   A.    Yes, I do.  And I'm acknowledging I'm off by
21   a year, because I do not have these documents
22   directly in front of me.
23       Q.    Okay.  Looking at Cathy Talmadge's
24   Work History Detail, do you agree that she retired

Page 91

1    September 24th, 2021?
2    A.    Yes.
3        Q.    So am I correct that, on
4    February 21st, 2022, the Philadelphia
5    Department of Prisons had one warden?
6    A.    Can I see Warden Farrell's again?  I believe
7    she did retire in 2022, but for the sake of being
8    accurate, I want to make sure.
9        Q.    Sure.
10   A.    Yes, that is correct, based on her personnel
11   record.
12       Q.    So you testified that, leading up to
13   February 21st, 2022, the Philadelphia
14   Department of Prisons did not have an anticipated
15   need for a warden promotional list, correct?
16   A.    Correct.
17       Q.    Based upon what transpired during that
18   list -- which, as we've discussed, was that the
19   number of wardens in the prison went from four to
20   one -- did the Philadelphia Department of Prisons
21   have a need for a promotional list for warden as of
22   February 21st, 2020?
23   A.    We had two wardens retire, one warden in
24   place.  And based on the information that you

Page 92

1    provided, that's my response.
2        Or can you ask your question
3    differently?  Because I believe I'm answering the
4    same question different ways.
5        So I'm not able to give you
6    anything, and, you know, to be respectful, I don't
7    want to just continue to regurgitate.  I'm just not
8    understanding -- I'm interpreting you're asking me
9    the same question multiple ways.
10       Q.    Fair enough.  So I can ask it a
11   different way.
12       You've said that you did not
13   request a warden promotional list to be created in
14   February of 2020, correct?
15   A.    Correct.
16       Q.    And you were not a part of the process
17   of that list being requested, correct?
18   A.    Correct.
19       Q.    That list was requested by the Office
20   of Human Resources inside the Philadelphia
21   Department of Prisons, correct?
22   A.    Yes.
23       Q.    And the Office of Human Resources is
24   overseen by Deputy Commissioner Beaufort, correct?

Page 93

1    A.    Correct.
2        Q.    Now that we know what transpired
3    during the period from February 21st, 2020, through
4    February 21st, 2022, namely, that the number of
5    wardens in the prison went from four to one, in
6    hindsight, was there a need for a promotional list
7    for warden starting in February of 2020?
8        MR. SEIDMAN:  Objection to form.
9        I don't know how in hindsight you're asking
10       her to speculate.  I mean --
11   BY MR. COHEN:
12       Q.    Well, let me ask it this way,
13   Commissioner.
14       MR. SEIDMAN:  She is here as a
15       fact witness.
16       MR. COHEN:  Yes.
17       MR. SEIDMAN:  And you're asking
18       questions about hindsight.
19       MR. COHEN:  Yes.
20   BY MR. COHEN:
21       Q.    Did you disagree, Commissioner, at the
22   time the request was made to have a promotional list
23   for warden starting February, 2020, did you disagree
24   with that request at the time it was made?

Blanche Carney

Page 94

1  A.    There was no question put before me to
2  disagree.
3      Q.    If it had been put before you, would
4  you have provided your opinion?
5  A.    I can't speak to a hypothetical.  The
6  question is presented or it's not.
7      Q.    So nobody conferred with you about
8  that request to the Office of Human Resources?
9  A.    No.
10         MR. SEIDMAN:  Objection, asked
11     and answered.
12  A.    Excuse me.  I have to shut my other blind.
13     Q.    Is that your answer?  That nobody
14  conferred with you?
15  A.    I answered the question.
16     Q.    And is your answer no?
17  A.    It's my previous answer.
18         (Reporter interruption.)
19         THE WITNESS:  Thank you.
20         No.
21  BY MR. COHEN:
22     Q.    Did you ever have any conversations
23  with Deputy Commissioner Beaufort about his decision
24  to request a promotional list for warden without

Page 95

1  discussing it with you?
2  A.    No.  That falls under his area of
3  responsibility.  He doesn't need my permission to do
4  that.
5      Q.    Would you agree that warden is a
6  critical position for the functioning of the
7  facilities in the Philadelphia Department of
8  Prisons?
9  A.    Yes.
10     Q.    Having a vacancy for the warden
11  position for more than a year is detrimental to the
12  operation of the Philadelphia Department of Prisons,
13  correct?
14  A.    No.
15         MR. SEIDMAN:  Objection to form.
16         You can answer.
17  A.    No.  Because you have deputy wardens that
18  can manage, and had managed, during that time.
19         It would be more detrimental,
20  almost catastrophic, if you put the wrong individual
21  to lead an entire facility.
22         When you make -- the gravity of
23  being a warden is paramount.  And if you put the
24  wrong, inexperienced person in that position, you

Page 96

1  are going to have a catastrophe.  And in this case,
2  one catastrophe is one too many, and you multiply
3  that by two.
4         So the deputy wardens who were
5  managing site responsibility for a significant
6  period of time, when those two wardens were on
7  extended leave, continued to do that.  But given the
8  gravity, the weight, the responsibility of a warden
9  to operate the facility, it's more catastrophic than
10  not if you put an individual in there that does not
11  have strong leadership skills, decision-making, and
12  can manage multiple uniform, civilian, contracted,
13  and visitors, and, ultimately, the incarcerated
14  population.
15         That's not a position you just
16  easily fill.
17     Q.    Once the Office of Human Resources
18  established the eligible list for warden on
19  February 21, 2020, it was then up to the
20  Philadelphia Department of Prisons to request
21  certification of that list, correct?
22  A.    Yes.
23     Q.    Did the Philadelphia Department of
24  Prisons request certification for the warden list

Page 97

1  established on February 21, 2020?
2  A.    Yes.
3      Q.    Why?
4  A.    That's a customary practice.  Any position
5  that is filled -- or vacant, I'm sorry -- or there's
6  a test, HR can actually request that, which is
7  customary practice.
8         Excuse me.  Can you give me one
9  moment, please?
10     Q.    I just ask that the question be
11  finished -- or the answer be finished.
12  Commissioner?
13         MR. SEIDMAN:  I'd give her a
14     moment.  She's a very important person with a
15     lot of important decisions --
16         MR. COHEN:  That's true.
17         (Brief pause.)
18         THE WITNESS:  Thank you.  I
19     apologize.  That was an emergency.
20  BY MR. COHEN:
21     Q.    Understood.  Do you remember the
22  question asked?
23  A.    It's customary practice.  As part of their
24  responsibility, they don't need me or my approval or

Blanche Carney

Page 98

1  direction and request.  It's standard.  You know you
2  have people who took an exam; you can request a
3  certification list.
4      Q.    When did you find out that
5  certification had been requested?
6  A.    That, I cannot recall.
7      Q.    How did you find out that
8  certification had been requested?
9  A.    Deputy Commissioner informed me that he had
10  the certification list.  But I do not recall when he
11  told me that.
12     Q.    Which deputy commissioner?
13  A.    That was Deputy Commissioner Beaufort.
14     Q.    Who made the decision to certify the
15  list?
16  A.    Central HR would have to certify the list.
17     Q.    Well, I asked you a few minutes ago
18  whether or not it was up to the Philadelphia
19  Department of Prisons to request certification,
20  correct?  Do you remember that question?
21  A.    Yes, I do.  And based on how I'm receiving
22  your question, we can request a certification list;
23  however, we can't certify a list.  Only central OHR
24  can certify a list.  We don't have what they use to

Page 99

1  come to their conclusion, but we can certainly
2  request a certification list.
3      Q.    So just so we're clear on the process.
4  The department -- and this is in relation to the
5  list, which is shown in Carney Exhibit 11.  That's
6  what I'm referring to.  Okay?
7            So in terms of this list, the
8  first step would have been that the Philadelphia
9  Department of Prisons requested an exam, correct?
10  A.    Yes.
11     Q.    Okay.  And then the Office of Human
12  Resources did that exam, correct?
13  A.    Yes.
14     Q.    And deemed certain people acceptable
15  and certain people unacceptable for the exam,
16  correct?
17  A.    Yes.
18     Q.    And the four people that were deemed
19  qualified were Adrienne Lyde, Jessica Bowers,
20  Rodica Craescu, and Jennifer Albandoz, correct?
21  A.    Yes, based on the criteria that they
22  utilized.
23     Q.    And the Office of Human Resources
24  ranked those individuals pursuant to the type of

Page 100

1  exam they used, correct?
2  A.    Yes.
3      Q.    And then the Office of Human Resources
4  established the list, correct?
5  A.    Yes.
6      Q.    And the next step is that the
7  department can request that the Office of Human
8  Resources certify the list, correct?
9  A.    So you can request certification, yes.
10     Q.    And in this particular case, the
11  Philadelphia Department of Prisons did request
12  certification of this list, correct?
13  A.    The e-mail is from HR, Central HR, advising
14  him that he can request certification of the
15  established list that they have to do from the very
16  beginning.
17     Q.    Yes, I understand that's what the
18  e-mail says.
19            What I asked you a few moments
20  ago was whether or not the Philadelphia
21  Department of Prisons requested certification of the
22  list.  And your response was yes; is that correct?
23  A.    Based on the process that I'm familiar with,
24  that someone has taken an exam, they can ask for a

Page 101

1  certified list.
2            This is saying certification.
3  My experience has been that they have to establish
4  the certified list, and the department can request
5  that list.
6      Q.    So in this case, the Office of Human
7  Resources, which is a separate department than the
8  Philadelphia Department of Prisons, established the
9  list, correct?
10  A.    Correct.
11     Q.    And the next step was whether or not
12  the Philadelphia Department of Prisons was going to
13  request that this established list be certified,
14  correct?
15  A.    It says, so you can.  I don't see in this
16  e-mail where it says the department requested it.
17            Now, I believe I answered this
18  question, and we're on semantics.  So my answer is
19  going to be the same.
20            If you have a document that you
21  can provide where it shows DC Beaufort requesting
22  certification, because my answer is going to be the
23  same.
24     Q.    Do you know whether the Philadelphia

Blanche Carney

Page 102

1  Department of Prisons requested that this
2  established list, identified by number
3  5H12-20191216-23-00, be certified?
4          MR. SEIDMAN: Objection to form.
5  A.   Again, Mr. Cohen, I answered your question
6  based on how I believe HR and DC Beaufort do regular
7  requests. That's the extent and my knowledge of
8  this. And my answer is the same, unfortunately.
9      Q.   Okay. Just to make sure we're on the
10  same page, because I'm not interested in talking for
11  no reason, I assure you, is it -- and I will ask it
12  as a question and not as a statement.
13              Is it your testimony that you
14  believe Deputy Commissioner Beaufort requested that
15  this established list be certified?
16  A.   It is my testimony that he requested a
17  certified list. This vernacular, I'm not in
18  agreement. My decision -- my response is the same.
19  He's requesting the certified list.
20      Q.   What's the difference between a
21  certified list and an established list, if any?
22  A.   The established -- I don't believe there is
23  a difference. It means that we certified. And
24  we're simply -- or he's simply asking, "Hey, that

Page 103

1  list that you certified, can you give that to me?"
2      Q.   So it's your understanding that the
3  Office of Human Resources certifies lists?
4  A.   Yes. We've talked about this, and they will
5  say, "We'll ask for the certified list."
6              That language has been used as
7  long as I can remember, that our HR says, "Hey,
8  we'll get the certified list."
9              It had never been put that we
10  have to request certification.
11      Q.   Well, you saw this e-mail, correct?
12  And by "this e-mail," I'm referring to the e-mail
13  from Ms. Moore on February 21st, 2020.
14  A.   Yes, after he obtained it.
15      Q.   What, if anything, was done, to your
16  knowledge, regarding this list after receiving this
17  e-mail?
18  A.   Nothing was done with the list.
19      Q.   The Philadelphia Department of Prisons
20  requested a warden exam for February, 2022, correct?
21  A.   Can you pull the document back up? I'm
22  getting bombarded with a lot of dates, and I don't
23  have any of this in front of me.
24      Q.   Well, if you don't know, that's fine.

Page 104

1  But --
2  A.   I can't recall. But that would be my
3  answer. Because the years and the dates, I don't
4  have that with accuracy, and I don't want to provide
5  misleading testimony today.
6      Q.   You were aware that there was a warden
7  promotional list established February 21st, 2020,
8  correct?
9  A.   That is correct.
10      Q.   And you were aware that that list
11  would expire in two years, correct?
12  A.   That is correct. And we're not under any
13  obligation with the list. There's nothing in the
14  Civil Service regs that prohibits us from not going
15  after a list.
16      Q.   Is it important to follow the Civil
17  Service regs?
18  A.   It is. And that's one of the regs that we
19  follow, that you're not under any obligation, so
20  that you don't misstep, because these positions are
21  crucial. So there's nothing barring or unfavorable
22  for us to not have done anything with the list.
23      Q.   Why is it important to follow the
24  Civil Service regs?

Page 105

1  A.   It's important because the City entrusts its
2  commissioners and department leads to put the
3  correct people in position that could fulfill the
4  duties of the position. So we're following not only
5  that there's no obligation in the Civil Service regs
6  that says we have to do anything with a list, it is
7  at the discretion of the department.
8      Q.   Do the Civil Service regs help ensure
9  fairness for promotions?
10  A.   It does. And it did that and continues to
11  evolve, so that you get the best qualified
12  candidates that demonstrate, exemplify the
13  leadership skills necessary for these correctional
14  positions.
15          MR. COHEN: I will share my
16      screen. This I will mark as
17      Carney Exhibit 12.
18          (Whereupon Carney-12 was marked for
19          identification.)
20  BY MR. COHEN:
21      Q.   I'm showing you a Notice of
22  Cancellation. Do you see that?
23  A.   Yes, I do.
24      Q.   Prior to this exam being canceled, it

Blanche Carney

Page 106

1 was requested, correct?
2 **A.    Yes, because there was -- it had to be**
3 **something, because it's a cancellation notice.**
4 Q.    And the Philadelphia Department of
5 Prisons requested this exam, correct?
6 **A.    Yes.**
7 Q.    Who from the Philadelphia Department
8 of Prisons requested the exam?
9 **A.    That could have been Deputy Commissioner**
10 **Beaufort, again, managing, as part of his**
11 **responsibility, through our HR department to get**
12 **this exam scheduled.**
13 Q.    Were you at all involved in the
14 decision to request this exam with exam number
15 5H12-20220207-23-00?
16 **A.    I can't recall the specifics, whether I**
17 **weighed in.**
18          **Any position that he believes**
19 **that we need, he doesn't need my approval to go**
20 **forward with that.  And I raised no objections.**
21          **So this is not ringing a bell**
22 **for me in the scheme of the past -- around this time**
23 **frame.  I was fully engulfed in all things Covid-19.**
24 Q.    As of February of '22, the

Page 107

1 Philadelphia Department of Prisons urgently needed
2 wardens, correct?
3          MR. SEIDMAN:  Objection to form.
4 No one established that it's urgently needed.
5          MR. COHEN:  It's a question.
6 It's a question.
7          MR. SEIDMAN:  No, you made it a
8 statement.  You made a statement.
9 BY MR. COHEN:
10 Q.    Do you understand the question,
11 Commissioner?
12 **A.    I understand your statement.**
13 Q.    You don't believe it's a question
14 either?
15 **A.    I don't.  Because you interjected**
16 **"urgently."**
17 Q.    Well, okay.  What's your response to
18 that, whether you want to call it a question or a
19 statement?
20 **A.    I don't agree that we needed it urgently.  I**
21 **believe we had correctional staff in place that were**
22 **managing the facilities, through one of the most**
23 **challenging times, that had the experience.  They**
24 **had demonstrated it before the pandemic even**

Page 108

1 **approached the country.  And then they were -- they**
2 **stepped up.**
3          **And that, making a warden,**
4 **unlike any other time, it's a pandemic; you don't**
5 **just go ahead and put someone in and they don't have**
6 **strong leadership skills, they're not managing what**
7 **they're currently assigned to do.**
8          **So the decision was, the weight**
9 **of the pandemic, the daily decision-making that had**
10 **to happen with people's lives, both staff and**
11 **incarcerated population, we moved through that most**
12 **challenging time, and that was not the time for**
13 **people on the list that believe they were entitled**
14 **to be promoted.**
15          **I needed the strongest people to**
16 **keep these facilities running.  I didn't have time**
17 **to train people, and they had to hit the ground**
18 **running.**
19          **So during a pandemic is not when**
20 **you decide, in the scheme of things, a global**
21 **pandemic, to do administrative work.  We were**
22 **full-blown operations.  So this was not at the top**
23 **of my list.**
24          **Following CDC guidelines at**

Page 109

1 **9:00 o'clock, the recommendations changed by 10:00.**
2 **It was all hands on deck, all covid.  So this was**
3 **not the time -- just because you have these**
4 **positions, the urgency was our response and**
5 **attentiveness during the covid global pandemic.**
6          **These leaders were demonstrating**
7 **that they were managing the facilities.  And this**
8 **pandemic required all of my attention, and I needed**
9 **to be able to give directives to have them**
10 **understood and executed promptly.**
11          **And this lasted for three years.**
12 **This was not normal correctional practice, where you**
13 **had a process in place, where you could then put**
14 **someone in.  The expectation is, I can't build the**
15 **plane, fly the plane, put the baggage on it, and**
16 **think it's all going to fare well.  The gravity of**
17 **that pandemic stretched everyone, and I needed**
18 **people in place that were demonstrating they could**
19 **do it.**
20          **But when you appoint someone to**
21 **this position, they have to be able to step in and**
22 **hit the ground running and keep it moving and not**
23 **rely on constant instruction and directives.  A**
24 **majority of this work that has to be done with**

Manchello Reporting, L.L.C.
www.ManchelloReporting.com

856-482-7207
loumanchello@manchelloreporting.com

Blanche Carney

Page 110

1   knowledge, experience.
2       Q.    If there was not a need for wardens as
3   of February of 2022, why was an exam requested?
4   A.    We had already two years of the pandemic
5   under our belt.  A lot was gleaned.  A lot was
6   established.  And we came through two very
7   challenging years.  At the point in which that
8   latter exam was announced, pretty much we come
9   through the darkest part.
10      Q.    When you say "at the time it was
11  announced," you're talking about February 7th, 2022?
12  A.    I don't know when it was.  Whenever it was
13  announced.  You would have to give me the document
14  to see when.
15              Again, my full attention was
16  given to Covid-19 pandemic.  Anything that was
17  executed under the rightful authority of a
18  deputy commissioner, who should and does know what
19  he's doing, he's performing that work with HR, this
20  was not at the top of my list because the covid
21  pandemic was the driver.
22              We had three deputy wardens in
23  place.  They had been doing the work even with the
24  wardens out on extended leave.  This was not the

Page 111

1   time to make permanent personnel changes, and
2   definitely during a crisis.
3               So for the specifics for that
4   time frame, I cannot recall, and I would require a
5   need to review any paperwork you have on that to
6   answer the question.
7       Q.    What paperwork would exist that would
8   help you answer the question?
9   A.    I don't know.  You said, "What time frame?"
10  So is there -- can you give me a question that I
11  could try to answer when you say, "What time frame?"
12              As I told you before, my life
13  became engulfed, consumed, 24 hours a day/seven days
14  a week from March, 2020, even to today, and we're
15  almost approaching a year out of covid.
16      Q.    Looking at this document, Carney
17  Exhibit 12, this Notice of Cancellation for the exam
18  is dated February 7th, 2022, correct?
19  A.    That is correct.
20      Q.    Who canceled this exam?
21  A.    Sir, I don't know who canceled the exam.
22  You would have to ask either Deputy
23  Commissioner Beaufort or Ms. Maxwell.  This was not
24  on my radar.

Page 112

1       Q.    Were you at all involved in the
2   decision to cancel this exam?
3   A.    No.
4       Q.    Were you ever told the reason why it
5   was canceled?
6   A.    No.  And I didn't ask.  My direct devotion
7   was for Covid-19, trying to mitigate a spread of a
8   global pandemic and inside correctional institutions
9   where the requirement was just strewn about
10  nationwide, keep people separated, six feet apart.
11  How am I not to feel the weight of that with 46- to
12  4700 people in custody inside facilities where the
13  cell does not accommodate?  And adjusting, pivoting
14  constantly, stop the spread, mitigate the spread.
15              That's the life I lived for the
16  last three years.
17              So excuse me if I'm not into the
18  HR administrative piece of it, sir.  The weight of
19  the world was on my shoulders.
20      Q.    Would you agree that staffing
21  decisions were critical to ensuring that the
22  Philadelphia Department of Prisons was effectively
23  running during the Covid-19 pandemic?
24  A.    Absolutely.  And that was paramount, number

Page 113

1   one.  We were losing staff at record numbers.  Fear
2   had set in.  You were losing line staff, which is
3   necessary.  You were losing sergeants, lieutenants.
4   You were losing captains.  You also lost wardens.
5               It was imperative that you had a
6   person that could, during that time, some
7   unprecedented -- and I just hate to use the word
8   "unprecedented" because it's been overused, but
9   that's what's coming to my mind at this time.  It
10  just wasn't a warden position.  It was everything.
11  And this was not the time for a person that didn't
12  have strong leadership skills, decision-making, and
13  that could walk and work with multiple disciplines
14  to keep these facilities running.
15      Q.    Would you agree that one of the most
16  important staffing decisions to make was who would
17  be the warden of these facilities?
18  A.    That is correct.  And I did not take it
19  lightly and do a knee-jerk reaction.
20              You look for a skill set.  You
21  look for individuals who have demonstrated, under
22  normal circumstances, not even a pandemic, that they
23  can handle the work.  They can handle the weight.
24  They can handle the challenges.

Blanche Carney

Page 114

1    Those positions weren't filled
2  because of that. This was not the time to try to
3  hope I get it right. You're basing it on what are
4  people and what have they shown you. What have they
5  demonstrated. How are they leading pre-pandemic?
6    It would have been catastrophic
7  if I would have did a knee-jerk reaction and made a
8  permanent decision during the pandemic.
9    Q.  Earlier you said there were some
10  differences between, for instance, Pierre Lacombe's
11  job duties, once he became warden on December 26,
12  2022, and when he had site responsibility while he
13  was titled a deputy warden of Riverside Correctional
14  Facility, correct? Do you remember that testimony?
15  A.  Yes, I do. I gave you examples.
16    Q.  Right. Those examples were financial
17  decisions and disciplining deputy wardens, correct?
18  A.  Two examples I gave, correct.
19    Q.  Are there other examples?
20  A.  Examples of directing multiple disciplines,
21  contractors and civilians, to get the work to
22  provide it to incarcerated population. It's
23  heightened as the warden, because now you have
24  oversight responsibility to make sure all of that is

Page 115

1  happening.
2    As a deputy warden, you are
3  responsible for making sure that the
4  multi-disciplines and contractors and visitors
5  inside your facilities are properly performing their
6  duties, providing services to the incarcerated
7  population. But as the warden, it all falls on you,
8  every decision, whether it's going to be a program,
9  whether it's not; whether it will be a change in
10  location, how the provider will access the
11  population. That's the additional. And that's not
12  exhaustive of what a warden does. But a
13  deputy warden, those duties were provided during
14  pre-retirement and post-retirement.
15    Q.  When you say, "those duties were
16  provided during pre- and post-retirement --"
17  A.  The deputy wardens oversaw to make sure that
18  that occurred.
19    Q.  Once Pierre Lacombe, Steven Angelucci,
20  and Norman Williams were promoted to the warden
21  positions in the facilities where they had
22  previously had site responsibility, did they have
23  increased responsibility?
24  A.  Yes.

Page 116

1    Q.  And that increased responsibility
2  helped run the facilities more smoothly, correct?
3  A.  That's not necessarily a yes or no. It
4  depends on whatever circumstances was presented at
5  the facility. Doesn't make it smoother. It matters
6  how they manage and respond.
7    Q.  The increased responsibility that
8  those three men received upon being promoted, was
9  that beneficial to the effective operations of those
10  facilities?
11    MR. SEIDMAN: Objection to form.
12    If you understand the question.
13  A.  Yes, I don't understand that question.
14    Q.  Why did you eventually hire wardens?
15  A.  Because we had come through, as I stated
16  before, the pandemic, the darkest days. We were
17  transitioning out. We had learned a lot. We
18  stabilized. We kept a majority of our units
19  operational. And it was the timing. We had come
20  through.
21    As I stated before, it was not
22  the time to then place people in permanent positions
23  that did not have the proven skill set to lead.
24  During that time, you need leaders. Not the time

Page 117

1  for OJT. This is the time for leaders.
2    And they stood up, and they
3  managed to keep these facilities operationally with
4  everything that I directed, instructed, expected of
5  my workforce. And as we neared out, then we filled
6  those positions.
7    Q.  How was Steven Angelucci's job
8  performance as the individual with site
9  responsibility of Curran-Fromhold Correctional
10  Facility after Warden Giannetta's retirement?
11  A.  It was on pace. It was consistent. He ran
12  the facility. He held staff accountable. He
13  responded whenever there was an emergency. And he
14  worked hand in hand with all of his disciplines. So
15  it was consistent.
16    Q.  Was that job performance used in
17  ultimately making the decision to promote him?
18  A.  No, it was not.
19    The decision to promote was
20  based on when we did our interview panel of every
21  single individual who took the exam. It was not
22  exclusive to how you did. You still had to
23  interview for the position.
24    Under my appointment in 2016, a

Blanche Carney

1  survey was done in August of 2016, I believe, or
2  September. The prison has a long history of legacy
3  and entitlement, and when the few staff who did take
4  the survey, they participated, the three things that
5  came up were nepotism, sexism, and racism. This
6  wasn't a shoo-in. It wasn't that you did the job,
7  and it wasn't because you were a legacy or next in
8  line. You still had to come before an interview
9  panel to get this job.
10      Q.   How was Pierre Lacombe's
11  job performance as the individual with site
12  responsibility of Riverside Correctional Facility
13  after Warden Talmadge's retirement?
14  A.    He was consistent and steady in his
15  performance of operating that facility.
16      Q.   Was his job performance during that
17  time used in deciding to promote him to become
18  warden of Riverside Correctional Facility?
19  A.    No, it was not. He still was required to
20  interview before the panel.
21      Q.   How was Norman Williams'
22  job performance as the individual with site
23  responsibility of the Philadelphia Industrial
24  Correctional Complex after Warden Farrell's

1  retirement?
2  A.    It was consistent.
3      Q.   And was that job performance used in
4  determining that he would be the individual promoted
5  to become the warden of the Philadelphia Industrial
6  Correctional Complex?
7  A.    No, it was not. He still was required to
8  interview with the panel.
9          MR. SEIDMAN: Noah, can we take
10      60 seconds real quick?
11          MR. COHEN: Sure.
12          (Short recess taken at
13      2:02 p.m.)
14          (Proceedings resumed at
15      2:05 p.m.)
16  BY MR. COHEN:
17      Q.   Adrienne Lyde was ranked number one on
18  the 2020 promotional list for warden, correct?
19  A.    Yes.
20      Q.   And sharing my screen and referring
21  back to Exhibit 11, her score on the exam was over a
22  hundred, correct?
23  A.    Correct.
24      Q.   And that was on an oral exam?

1  A.    Yes.
2      Q.   What are the different types of exams?
3  A.    It can be an oral exam before a panel, or it
4  can be time and experience.
5      Q.   How do you know that Ms. Lyde's exam
6  was an oral exam?
7  A.    Based on my recollection, I believe this was
8  an oral exam.
9      Q.   Do you remember when you learned that?
10  A.    I believe this is the first, and I don't
11  have the answer to that.
12      Q.   Does Ms. Lyde's score reflect her
13  fitness for the warden position?
14  A.    No, it does not.
15      Q.   Do you know when Ms. Lyde was promoted
16  to HSPA?
17  A.    No, I do not. I don't recall that.
18          MR. COHEN: I'll mark this as
19      Carney Exhibit 13.
20          (Whereupon Carney-13 was marked for
21      identification.)
22  BY MR. COHEN:
23      Q.   It is a five-page document beginning
24  at Bates stamp City 1068. Looking at the first

1  page of this document, this is a performance report
2  for Ms. Lyde, correct?
3  A.    Correct.
4      Q.   And the date of the report, it says
5  8/29/16; is that correct?
6  A.    Yes.
7      Q.   And as of that date, Ms. Lyde was a
8  Human Services Program Administrator, correct?
9  A.    Yes.
10      Q.   Going through this document, to the
11  second page, this is her evaluation in 2017,
12  correct?
13  A.    Correct.
14      Q.   And then this is her evaluation in
15  2019, correct?
16  A.    Correct.
17      Q.   And this is her evaluation in 2020,
18  correct?
19  A.    Correct.
20      Q.   And then this is her evaluation in
21  2022?
22  A.    Correct.
23      Q.   In all of these examinations, she
24  scored a superior ranking, correct?

Blanche Carney

Page 122

1  A.    Correct.
2      Q.    Do Ms. Lyde's yearly performance
3  evaluations as an HSPA reflect her fitness for the
4  warden position?
5  A.    No, based on the recent accounts of
6  information discovered.  All of Ms. Lyde's
7  performance evaluations are under the direct
8  immediate supervision of a deputy commissioner, who
9  happens to be Deputy Commissioner Bagby.
10  Pre-pandemic, Ms. Lyde received these evaluations.
11  I had no reason to question.  DC Bagby did not raise
12  any objections, as indicated here, and I felt no
13  need to go investigate, and I concurred with his
14  findings.
15          However, an interesting thing
16  happened with the pandemic and going into it.  It
17  reveals vulnerabilities in a lot of work that was
18  not done.
19          But even before the pandemic,
20  Ms. Lyde and Jennifer Albandoz were at each other's
21  throats.  They were both Human Service Program
22  Administrators.  And it was brought to my attention
23  by a subordinate supervisor, for which one of them
24  supervised, and said, "Commissioner, we can't take

Page 123

1  it.
2          "What do you mean?  You can't
3  take what?  It's not off the record.
4          "Ms. Lyde and Ms. Albandoz are
5  fighting, and they're choosing and making staff
6  choose sides."
7          It was so disastrous that I
8  called Ms. Lyde in, along with Ms. Albandoz and
9  DC Bagby and Greg Vrato, as my chief of staff, and I
10  told them it was unacceptable, the fact that a
11  subordinate supervisor came to me acknowledging this
12  unbecoming and unprofessional behavior, to divide a
13  unit of staff, to make them choose, and even at the
14  knowledge of Deputy Commissioner Bagby knowing and
15  not taking action.  I have a lot of responsibility.
16  I shouldn't have had to deal with that.  So that was
17  one.
18          As this pandemic started to
19  progress, the pandemic revealed vulnerabilities.
20  And all these things that were indicated here,
21  because everything was going well.  We had the
22  highest staff fill rate.  We were only at a
23  five percent vacancy rate.  The population was
24  reduced by almost half.  And then the pandemic hit.

Page 124

1  And it started to become apparent that the curtain
2  had been pulled back.
3          Ms. Lyde had not been
4  instructing her staff to perform and provide
5  services to incarcerated people locked in cells,
6  because everyone was afraid of the pandemic.  So all
7  of this predates that and there was no reason for me
8  to go back for it.
9          But even today, we're almost a
10  year out of the pandemic, and Ms. Lyde didn't
11  demonstrate the skill set.  She has one of the
12  smaller units of staff -- less than a hundred, her
13  and Ms. Albandoz -- to manage on State Road, and
14  they can't compel their staff to hold their staff
15  accountable to do the basics to provide to
16  incarcerated people.
17          So did I put my signature here?
18  Yes.  But through revelation and the curtain being
19  pulled back, because of the pandemic exposed a lot,
20  Ms. Lyde couldn't lead.  She could barely lead and
21  even to this day lead the few staff that she had.
22          When you're a warden, you have
23  to lead everyone.  You are the CEO of that facility.
24          Not only are you fighting with a

Page 125

1  colleague, you're divisive.  You can't compel your
2  staff, who the City pays for, by the way, to provide
3  services to an incarcerated population.
4          So these are skill sets that
5  were demonstrated throughout this process, and it
6  was only discovered when the pandemic kicked and you
7  could start to see, based on the data, of what was
8  happening and who was doing what.
9          And under her leadership, the
10  social work unit did the least amount of work.
11  While everyone was charged with coming in this
12  facility day in and day out, my uniform staff, my
13  contracted food staff, my healthcare staff, my
14  contracted behavioral health and medical staff, the
15  contracted maintenance and City workers, took the
16  path of least resistance.  Their unit was the only
17  unit that said, "Oh, we'll work every other week."
18          They worked an entire half a
19  year and got paid for a whole year.  Always the path
20  of least resistance.
21          So prior to this, there was no
22  need for me to go and look for this.  But once you
23  got exposed with the vulnerabilities of the
24  pandemic, it became crystal clear what wasn't

Blanche Carney

Page 126

1  happening.  And if you can't compel a few staff, you
2  can't command many.
3       Q.    The meeting that you had with
4  Ms. Lyde, Ms. Albandoz, and Mr. Vrato, do you know
5  when that meeting was?
6  A.    I do not recall that meeting, but the fact
7  that I had to have it was very troubling for me.
8  But it happened.
9       Q.    Was it before September 2nd, 2022,
10 which is the date of Ms. Lyde's performance report
11 in 2022?
12 A.    I believe it was.
13      Q.    What's the basis of that belief?
14 A.    Because this was -- I know in -- I don't
15 recall having a meeting with them in 2022, based on
16 my memory.  But I know the meeting happened.  But I
17 don't believe it was around this time.
18      Q.    Did Ms. Lyde commit any departmental
19 violations in relation to that incident?
20 A.    Yes.  She could have been charged with
21 conduct unbecoming, which is one of the general
22 orders in professional -- core professional
23 department.
24      Q.    She was not, though, correct?

Page 127

1  A.    She was not.  DC Bagby did not take the
2  appropriate action.  And I'm very careful when
3  directing people to discipline people, because I
4  don't want it to come that the Commissioner said
5  discipline you.  He should have taken the corrective
6  action and addressed that formally.
7             And the fact that I had to meet
8  with him and both administrators says a lot.
9  Because leaders should be able to make the hard
10 decisions.
11             And it's not to be punitive.
12 It's to bring it to someone's attention for them to
13 self-correct.
14      Q.    And you said that Ms. Lyde did not
15 properly compel her direct reports during the
16 pandemic; is that correct?
17 A.    That is correct.  As we were losing staff in
18 record numbers, people were locked in those cells.
19 They would have appreciated just coming out and
20 having access to a social worker.
21             The restorative and transitional
22 social work unit was the only unit that worked half
23 a year and got paid for a full that presented every
24 reason why they couldn't see individuals

Page 128

1  face to face, no matter how much protective
2  equipment we provided, how much Plexiglas we put up.
3  There was always a reason and an excuse.
4             We were all concerned not to
5  return back home with any of this and to keep us,
6  our families, our co-workers and the population
7  safe.  But when you're leading, you take all that
8  into consideration.  But the work still has to get
9  done.  And they simply could not compel their staff
10 to do it.  Always taking the path of least
11 resistance.
12             I had to make a lot of hard,
13 challenging decisions.  I had to draft people when I
14 was severely short.  I had to make sure people had
15 PPE and still was able to come in to provide
16 services to incarcerated people.
17             But they pretty much lamented
18 with the staff as we were working our way through
19 the pandemic, things we didn't know.  There were
20 things that you had to, "Hey, I need this
21 information."
22             We didn't have a system in place
23 pre-pandemic for the population to communicate with
24 their loved ones virtually.  I tasked DC Bagby and

Page 129

1  the HSPAs, "Find me a platform where we could
2  schedule.  We need to get something up and running."
3             This was not a knee jerk.  This
4  was an emergent response in every step of the way.
5  They just missed the mark.  They could not manage
6  and handle the pressure.
7             The platform that they bought me
8  was for a company that had 30 or less employees,
9  called Calendly.  We had 47-, 4800 people in
10 custody.  I had to shut down civilian visits,
11 in-person visits.  We were trying to manage and
12 funnel calls.  They bought me the smallest platform
13 you could think of.  We're a large system.
14             That's just one example.
15             Then we stood up through
16 partnership with the criminal justice partner to
17 facilitate legal phone calls so people could get on
18 the phones with their attorneys, have privacy.  That
19 went on until about six or seven months ago.  That
20 was supposed to be discontinued at the end of the
21 pandemic.  They were still doing it.
22             How did I discover it?  A social
23 work supervisor asked in a meeting and said,
24 "Commissioner, when will we discontinue these

Blanche Carney

Page 130

1 calls?"
2          DC Bagby, Ms. Lyde, Ms. Albandoz
3 in the same meeting as I am. I turned to DC Bagby
4 and said, "DC Bagby, I thought we discontinued
5 that."
6          And the response was, "Oh, yeah,
7 we'll do it."
8          You had that directive a while
9 ago, but rather to inform their staff, instruct
10 their staff, it's always the path of least
11 resistance. They're going to take it every time.
12          Staff pushed back a lot during
13 the Covid-19 pandemic because they were concerned.
14 But we still had a job to do. We're a carceral
15 setting. We still had to provide services to the
16 incarcerated population.
17          How we did it, we were receiving
18 guidance from the CDC and the Health Department, but
19 every step of the way, path of least resistance for
20 RTS.
21          The folks would have liked --
22 the population would have liked to have come out and
23 spoke to another human being that's not their cell,
24 celly mate, cellmate.

Page 131

1          Again, you need leadership to
2 compel people to get the job done when it's most
3 challenging.
4          Another example. We had
5 individuals who are in what we call med lock. That
6 means they are not cooperating with the medical exam
7 so we can ascertain if they have any communicable
8 diseases. You have frontline social workers, and
9 you have social work supervisors. I informed
10 DC Bagby, Ms. Lyde, and Ms. Albandoz, "Make sure you
11 have your staff engaging these folks."
12          That translated into Ms. Lyde --
13 path of least resistance -- coming in, engaging that
14 population. She convinced a few of them to come
15 out. But as an administrator, that should have been
16 delegated and the responsibility of her direct
17 reports.
18          It could have also created a
19 labor dispute. Because now she's performing the
20 work of two positions that report to her.
21          So, again, you have to make the
22 hard decisions.
23          And time and time again, she
24 doesn't have strong skill set. You can't manage

Page 132

1 less than a hundred; now you want me to put you over
2 an entire facility that can have 8- to 900, a
3 thousand people? That creates bedlam for me and
4 chaos.
5          You need a skill set. I need
6 people that -- it's an unpopular decision. I became
7 very unpopular during the Covid-19 pandemic because
8 I had to make the hard decisions. Time and time
9 again, they aren't able to make the hard decisions.
10          And I'm not searching this
11 information out. This was revealed. And it also
12 was reported by their subordinate staff.
13     Q.    Can you point to any documentation
14 showing that Ms. Lyde lacked leadership skills?
15     A.    The access to care meeting is a meeting
16 that -- again, the pandemic exposes it. The access
17 to care meeting is where you see a backlog. If you
18 ask our database to say, how many incarcerated
19 people do not have an intake interview? Do not have
20 a five-day? A 30? A 75-day? A service discharge
21 plan to prepare them for reentry?
22          That data you can pull up. And
23 it may be some minor inconsistencies in our
24 platform, but the population will tell you, "I'm not

Page 133

1 seeing a social worker." That's real data.
2          They're not consistent. They're
3 not providing the service.
4          You need a leader to be able to
5 say, "Listen, I acknowledge you are going through a
6 challenging time. I know you're concerned. This is
7 what we can provide. These are the policies. But
8 we still have a job to do."
9          You had incarcerated people
10 absent a social worker.
11          So when you talk about real
12 numbers, that data is real.
13          Now, the access to care, let me
14 get back to that. My schedule is filled. The
15 access to care is just that. How do I get the
16 population the access of services for City workers
17 for which they are compensated?
18          The HSPAs are responsible for
19 making sure this happens. I called and convened a
20 meeting because the data told me they were so
21 backlogged they weren't seeing people. And when you
22 ask them, it's always an excuse and a reason instead
23 of owning it and saying, "Hey, yeah, we are backed
24 up. We're going to work on it and tackle it here."

Blanche Carney

Page 134

1    Most recently -- CFCF is under
2  Ms. Lyde's leadership. The largest facility. Yes,
3  we do have a decreased number of staff, but you work
4  with the staff and the number that you have. But
5  you create a plan. I have been requesting this plan
6  for the last two years or so. It wasn't until
7  recently I gave the recommendations and guidance to
8  DC Bagby that he implemented it.
9    Ms. Lyde and Ms. Albandoz came
10 up with the fact of working backwards.
11    CFCF is the largest facility and
12 intake facility for men. The lion's share of
13 transfers that transfer out of this facility without
14 those scheduled intake contacts go to the other
15 facilities, which pushed the burden and
16 responsibility on them to complete the work.
17    While they may have done what we
18 call a blitz, unbeknownst to me -- because, again,
19 under the deputy commissioner, I'm believing you can
20 handle it and you're managing it well.
21    Instead of bringing all your
22 staff over to CFCF to tackle the problem, to kind of
23 reduce that transfer of those folks, which has been
24 a longstanding practice, the path of least

Page 135

1  resistance; you have people working at the other
2  facilities to catch up. They started to become
3  overwhelmed, and they started to lament about it and
4  say, "We do a hundred and a hundred more come."
5    You need a person who can think
6  and see the big picture. If I stopped the bleeding
7  and put the Band-Aid on up front, I don't have to
8  worry about the gush at the end.
9    These are just simple, I mean,
10 examples of a unit less than a hundred, and they're
11 pushing back. Now, you multiply that by uniform
12 staff of all ranks, education folks, maintenance
13 folks, volunteers, and civilians, and maintenance,
14 you have to be able to manage all of that. You
15 can't even manage the smallest unit on the campus.
16    Q.    And in terms of documentation
17 supporting your statement that Ms. Lyde cannot
18 manage the smallest unit on the campus, you have
19 identified an access to care meeting, correct?
20 A.    Correct.
21    Q.    Okay. What is the documentation that
22 we could surmise from that meeting?
23 A.    We have signature sheets that we invite the
24 subordinate supervisors, both administrators, the

Page 136

1  wardens, or their deputy wardens if they're not
2  present, and deputy commissioner. And we do not
3  keep record or recording, but certainly you could
4  interview all of those individuals to surmise and
5  come to your own conclusion.
6    Q.    Okay. So there's documentation that a
7  meeting happened, right?
8  A.    Yes.
9    Q.    But no documentation showing what
10 occurred in the meeting, correct?
11 A.    There's some meeting notes that we jot down
12 about the issues we discussed, but I think if you
13 really want to get the impartial report, you have at
14 least eight people you can speak with. So the
15 meeting exists.
16    And again, as the Commissioner,
17 it's a very tedious process that I have to have this
18 meeting now, when I have a deputy and I have
19 administrators.
20    Excuse me. I need to get some
21 water. My throat is dry. Can I take one minute? I
22 need to get some water.
23    MR. SEIDMAN: Can we take five
24    minutes?

Page 137

1    MR. COHEN: Sure.
2    THE WITNESS: Okay. Thank you.
3    (Short recess taken at
4  2:29 p.m.)
5    (Proceedings resumed at
6  2:35 p.m.)
7  BY MR. COHEN:
8    Q.    So Commissioner, you mentioned, in
9  regards to documentation showing Ms. Lyde has a
10 deficiency in leadership, you mentioned that there
11 was an access to care meeting and a sign-in sheet
12 for that meeting, correct?
13 A.    Yes. A sign-in sheet. And as I was trying
14 to get my throat under control, we have what we call
15 a weekly report that I direct to DC Bagby to
16 prepare. And in that report, I have him capturing
17 the backlog.
18    The backlog is the work that
19 needs to get done. Yes, we understand we're
20 short-staffed, but you can manage it and use it as a
21 benchmark to see your progress.
22    And I believe I issued and
23 directed him to do that in October -- the end of
24 October, to get a handle on what RTS is not doing,

Blanche Carney

Page 138

1   which is under his leadership and Lyde and
2   Albandoz's leadership.
3              That backlog report we can
4   provide to you will show you the backlog of those
5   data points that I shared with you.  Because even
6   though we have the sign-in sheet and that, that's
7   real data.  And he's capturing that data and
8   certainly he can provide to show you the backlog,
9   that it's real.
10             Also, we have a federal monitor
11  as a result of Covid-19.  And during their last
12  monitor on-site visit, the monitor reported, "Oh,
13  and by the way, the population wants to see their
14  social worker."
15             That's a federal monitor that
16  has oversight responsibility.  So that's the
17  documentation that I can provide -- in addition to
18  the access to care -- that will show you the
19  backlog.
20             Now, no one is saying that we'll
21  be a hundred percent, because we're short-staffed,
22  but you still have to manage and hold people
23  accountable to perform the work.  So that can be
24  provided to you, if you want that.

Page 139

1        Q.   When you say that there's a federal
2   monitor as a result of Covid-19, isn't it true that
3   the federal monitor is a result of the Remick
4   lawsuit?
5   A.   Yes.  That's the correct title.  But it was
6   related to the Covid-19 and then the conditions.
7              But part of that is you have
8   incarcerated people that should be receiving
9   services from social workers and they're not.  And
10  that's the reason for the backlog.
11             So we agree that, because we're
12  not fully staffed, we have vacancies, but what are
13  you doing?  How are you managing your staff under
14  your leadership to get the work done?  How are you
15  leading with the plan of corrective action?
16             And it didn't start to take
17  shape until I started to have this access to care
18  meeting.  It was, "Okay, well, they don't want to."
19  And everybody's "We're short of staff."  Yes, but
20  that's not appropriate.  You still have to have a
21  plan on how you are going to tackle this backlog.
22       Q.   And fair to say you began this access
23  to care meeting in 2023?
24  A.   Yes.

Page 140

1        Q.   And the other documents you've been
2   referring to, namely, the monitor report, was also
3   in -- that you're referencing is also in 2023,
4   correct?
5   A.   Yes.
6        Q.   Because none of the monitor reports
7   prior to 2023 had any indication that there were
8   leadership deficiencies by anyone in the RTS
9   department?
10  A.   When you roll the curtain back, that's why
11  they're looking at it now.
12       Q.   But prior to --
13  A.   Prior to --
14       Q.   -- 2023, there was nothing?
15  A.   Yes, prior to that, there's nothing.  But
16  now they're on the radar.
17             So, again, the more information,
18  when you start to roll back, now you see what really
19  is happening.
20       Q.   Are you aware of any documentation
21  showing any deficiency for Ms. Lyde from the period
22  in which she was on the promotional list for warden
23  as the first ranked person?
24  A.   I'm not showing that.  DC Bagby didn't feel

Page 141

1   compelled to do and take appropriate action.  And
2   I'm certainly not going to direct him to do that.
3   He's her immediate supervisor.
4        Q.   Ms. Lyde did not receive any
5   discipline as an HSPA during her entire time in that
6   position, correct?
7   A.   I would have to review her file.  I can't
8   say for certain.
9              (Whereupon Carney-14 was marked for
10             identification.)
11  BY MR. COHEN:
12       Q.   Commissioner, I'm showing you what
13  I'll mark as Carney Exhibit 14.  And this is -- has
14  a Bates stamp number of City 1843.  This is a
15  one-page document.
16             Would you agree -- well, you
17  know what?  I'll make this the whole document.  It's
18  a 48-page document, Exhibit 14, which is Bates
19  stamped City 1843 through City 1890.
20             On the first page, do you see
21  the personal profile of Ms. Lyde?
22  A.   Yes.
23       Q.   And that is dated December 2nd, 2022,
24  correct?

Blanche Carney

Page 142

1    A.    Correct.
2         Q.    And this has a reference to the
3    performance reports we looked at earlier that all
4    show superior performance, correct?
5    A.    Correct.
6         Q.    And do you know if any of those
7    performance reports refer to her leadership
8    abilities?
9    A.    Not off the top of my head.  I would have to
10   review them.  But I'll -- for the sake of this,
11   they're saying "Superior."
12        Q.    Are those incorrect, in your opinion,
13   if they say "Superior" for those years?
14   A.    That's how DC Bagby rated her.  I have no
15   other reason to object to them.
16        Q.    But do you disagree with them?
17   A.    I don't necessarily disagree.  He put that
18   in there.
19             I think her -- she's doing what
20   she can.  Is she a major staunch leader if I
21   compared her to one of my strongest leaders?  No.
22   But for his rating, that's how he rated her.
23        Q.    Under Disciplinary Actions, she has no
24   disciplinary actions, correct?

Page 143

1    A.    That's correct here.
2         Q.    Are you aware of any disciplinary
3    action that she has had as an HSPA?
4    A.    Not to my knowledge.  That I can recall at
5    this time.
6         Q.    While Ms. Lyde has been an HSPA, as
7    she continues to be, Deputy Commissioner Bagby has
8    been her supervisor, correct?
9    A.    Yes.
10        Q.    Would you agree that he is in the best
11   position to evaluate her strengths and weaknesses?
12   A.    Yes.  He's her immediate supervisor.
13        Q.    Did you know that he believes Ms. Lyde
14   would make a good warden?
15   A.    No.  He hasn't stated that to me.
16        Q.    Were you part of the conversation
17   regarding who would be promoted to warden in
18   December of 2022?
19   A.    Yes.
20        Q.    In that meeting, did he express any
21   opinion as it relates to Ms. Lyde's suitability for
22   the position?
23   A.    He found her to be appropriate.  There are
24   three ratings:  Appropriate or approved,

Page 144

1    questionable, or rejected.  And that was during the
2    panel discussion.
3         Q.    And did you also know that
4    Deputy Commissioner Bagby has provided the opinion
5    under oath in this case that warden positions should
6    have been filled from the list?  And by "the list,"
7    I'm referring to the 2020 promotional list for
8    warden.
9    A.    I was not aware of that.  He did not express
10   that to me.  And that's his opinion.
11        Q.    Did you have any conversations with
12   Deputy Commissioner Bagby about whether or not to
13   hire from the list for the warden position?
14   A.    No, I did not.
15        Q.    Did you ever ask his opinion for
16   whether or not Ms. Lyde or Ms. Albandoz would be
17   good wardens?
18   A.    No, I did not.  And I expressed and had
19   several conversations with DC Bagby about their
20   lackluster performance and what was required for
21   them.  I repeatedly had conversations with
22   Deputy Commissioner Bagby to let him know RTS is the
23   number one underperforming unit and he needed to
24   address it.  He needed to make sure that, as we're

Page 145

1    putting all the responsibility and accountability on
2    the other staff -- uniform, civilian, contractors --
3    he needed to ensure that RTS was doing the same.
4    And he simply did not hold them accountable.
5         Q.    Is there any correspondence or
6    documentation you're aware of showing that you
7    expressed this belief to Deputy Commissioner Bagby?
8    A.    No.  And as a deputy commissioner and a
9    commissioner, I'm not required to reduce every
10   directive to writing.  It's inappropriate.
11             At his level as a
12   deputy commissioner, you should be able to
13   understand, interpret, and execute, implement,
14   manage, and monitor.  He is not a frontline staff
15   person.
16             And you, as a commissioner,
17   aren't expecting someone to need -- every time you
18   give them a directive that you need to reduce it to
19   writing.
20        Q.    Can you provide any timeline or
21   estimate regarding when you conveyed this belief to
22   Deputy Commissioner Bagby?
23   A.    We meet every Monday, with the exception of
24   a few cancellations and holidays for executive --

Blanche Carney

Page 146

1  for our deputy commissioner meeting, where we
2  discuss issues. And these issues were discussed
3  with DC Bagby, along with any issues concerning the
4  facilities. So he can attest, and I hope he's very
5  honest about that, that we've had these
6  conversations.
7          But I don't have any written
8  dossier about it. I would have to go into a few of
9  my calendar notebooks. I have a book right here I
10 could go through to see if I jotted down notes and
11 when I told him and talked to him about.
12         But it takes a lot for a
13 commissioner to have to stop in the performance of
14 their day and document every single thing. At his
15 level, he should be able to receive and make sure
16 it's executed and he's monitoring, managing it, and
17 taking the proper action.
18     Q.    Do you know whether or not you
19 conveyed your concerns regarding Ms. Albandoz and/or
20 Ms. Lyde to Deputy Commissioner Bagby while they
21 were on the 2020 warden promotional list?
22 A.     Their performance has been ongoing. These
23 are not limited to that time period. These were
24 simply issues that RTS needed to address to make

Page 147

1  sure they were performing. So these are not
2  isolated conversations. These have been ongoing.
3     Q.    Did you speak with anyone about
4  whether or not Ms. Lyde would make a good warden
5  while she was ranked number one on the promotional
6  list?
7  A.    No.
8     Q.    Can an HSPA be a good candidate for
9  warden?
10 A.     Yes, if they demonstrate the skill set.
11         It's not just the title. It's
12 the skill set. You need people that can demonstrate
13 they have leadership skills. They've been here long
14 enough. Everyone's been given an opportunity to
15 demonstrate how they lead. And they are not the
16 most effective assertive leaders. You need
17 leadership in these positions. Everyone is not
18 going to be on the same page and agree. The work
19 still has to get done.
20     Q.    Is there any documentation you can
21 point to showing Steven Angelucci was a better
22 leader than Adrienne Lyde in 2021?
23 A.     I believe we had a shortage of staff and he
24 came in and he led his people. Coming in, being

Page 148

1  present, being visible, directing through
2  subordinate staff how to cover housing units.
3          He also -- when we had a
4  disturbance, he would come right in, take the lead,
5  address it, command the staff, resolve it, get the
6  unit -- or housing unit back in order.
7          So that's been ongoing, just how
8  he responded.
9     Q.    You mentioned a bit ago a concern that
10 lawyer phone calls were ongoing, correct?
11 A.    Yes.
12     Q.    Were those phone calls required as
13 part of the Remick lawsuit?
14 A.     They were not required, but we wanted to be
15 proactive to get ahead of it and say, we only have a
16 limited number of the virtual capacity, so everyone
17 can't, you know, use those time frames that the
18 attorneys were scheduling. So we were using our
19 staff to say, okay, let's get them on the phone
20 line.
21         But as we started to decrease
22 and come out of the pandemic, there were certain
23 things that we were able to discontinue. And they
24 were given the directive, and it went on for

Page 149

1  additional six months.
2          And it was raised by a social
3  work supervisor. The social work supervisor should
4  not have asked me that question had they received
5  accurate information from the HSPAs and
6  Deputy Commissioner Bagby. And the question was at
7  one of those access to care meetings, "When can we
8  discontinue the legal phone calls?"
9     Q.    How long were you an HSPA for?
10 A.     I believe it may be two or three years. I
11 would have to look at my profile. It's been a
12 while.
13     Q.    And you applied to be a warden from
14 the HSPA position, correct?
15 A.     Correct.
16     Q.    At the time you applied to be a
17 warden, did you have any correctional supervisory
18 experience?
19 A.     I did not have direct supervisory
20 experience, but I was involved in a few responses.
21 I worked closely with my uniform team. I was
22 involved in a riot. And I always made sure that I
23 worked hand in hand with my uniform staff. And I've
24 worked at every level. And I fostered it from the

Blanche Carney

Page 150

1    approach of inclusivity.
2        Q.    Should a warden candidate have
3    correctional supervisory experience in order to be
4    hired as a warden?
5    A.    Not necessarily.  But this is when your
6    skill set comes in.  If you have that, that's a
7    plus.  But if you don't, you better be a very strong
8    leader.  Because you still have to command staff to
9    get the work done.  You have to understand the job
10   that they have.  And you have to demonstrate.
11               You're given an opportunity in
12   your career.  People are watching how you lead, how
13   you make decisions, how you deal with challenges.
14   They all had equal -- a level playing field to be
15   observed and to demonstrate their leadership skills.
16   I think it's a plus if they have it.  But if not,
17   leadership.
18       Q.    When did you decide that Adrienne Lyde
19   was not suitable to be a warden?
20   A.    At the panel's decision.  When we
21   interviewed everyone in December of 2022, everyone
22   was given the same set of questions.  Everyone had
23   to interview for the position.  And it was at that
24   time.

Page 151

1               She read from notes on a piece
2    of paper in an interview.  This was not an open book
3    test.
4               She also asked, "If I become
5    warden, then what happens?"
6               You happen.  That means you, the
7    warden, you jump in the position day one, and you
8    run and take it.
9               She couldn't answer the
10   questions clearly regarding security questions and
11   response to an emergency.  And she kept asking from
12   what perspective was the question.
13               You do understand, you were
14   interviewing for a warden.  It wasn't the
15   perspective of an HSPA.  And she did not do well,
16   and she was questionable for me.
17       Q.    Was that the first time you determined
18   Ms. Lyde was not suitable for the warden position?
19   A.    Yes.  Officially, yes.  And when I say that,
20   it's because I didn't give thought during the
21   pandemic.  I went over my responses there.  My mind
22   was not to see who I could -- but she was given the
23   opportunity to present and be compared with her
24   peers for that position, and it was based on how she

Page 152

1    responded and performed during the interview.
2        Q.    Did you not think about whether
3    Ms. Lyde was a suitable warden candidate during the
4    pandemic?
5    A.    I didn't give any thought to it.  I didn't
6    consider anyone.  All I wanted to do was keep these
7    facilities operational, to try to keep the staff
8    safe, the population safe, and anyone else who set
9    foot on the campus.  That was my 100 percent
10   devotion.
11       Q.    Doesn't a promotional list for a
12   vacancy, where a vacancy exists, require you to
13   consider whether those individuals are suitable for
14   the position?
15   A.    I didn't give attention.  The weight of the
16   world for Covid-19, sir.  I ate, slept, and breathed
17   Covid-19.  I didn't have time to think of much else.
18       Q.    Going back to Carney Exhibit 11,
19   Ms. Bowers was ranked number two on the 2020
20   promotional list for warden, correct?
21   A.    Yes.
22       Q.    And her score on the exam was a little
23   over 97, correct?
24   A.    Correct.

Page 153

1        Q.    Does that score and rank reflect her
2    fitness for the warden position?
3    A.    No.
4        Q.    Do you know when Ms. Bowers was
5    promoted to deputy warden?
6    A.    I do not.
7        Q.    Would she have had to have been a
8    deputy warden at least two years in order to qualify
9    for this list?
10   A.    I would have to see the job description.  I
11   mean, I would have to see it.  I can't answer that
12   off the top of my head.
13       Q.    Going back to Carney Exhibit 2.  This
14   has a final page showing approval in 2014 by the
15   advisory board.  And I think we've agreed that, in
16   2021, this was the specification, correct?
17   A.    Yes.
18       Q.    So then, would you agree that also in
19   2020, this would have been the specification?
20   A.    Yes.
21       Q.    So looking at page 3 of the document,
22   would you agree that Ms. Bowers would have had to
23   have at least two years' experience as a
24   deputy warden to qualify for the position back in

Blanche Carney

Page 154

1  2020?
2  **A.    Yes, based on this.**
3      Q.    Do you happen to know how Ms. Bowers'
4  performance evaluations as a deputy warden were?
5  **A.    I do not. That would be two ranks below me,**
6  **and I would not sign off on her performance eval.**
7  **It would have been whoever the warden was, and then**
8  **the deputy commissioner, who would have been Clark,**
9  **countersigned.**
10          MR. COHEN:  We will mark this
11      Carney Exhibit 15. It's a 16-page document,
12      starting on City 924 and ending City 939.
13          (Whereupon Carney-15 was marked for
14          identification.)
15  BY MR. COHEN:
16      Q.    Looking at this first page, would you
17  agree this is an annual performance report for
18  Ms. Bowers, dated August 28th, 2019?
19  **A.    Yes.**
20      Q.    And that she had an outstanding
21  ranking?
22  **A.    Yes.**
23      Q.    Going to the next evaluation for 2018,
24  she also had an outstanding ranking for 2018?

Page 155

1  **A.    Okay.**
2      Q.    And also for 2017?
3  **A.    Yes.**
4      Q.    Do Ms. Bowers' yearly performance
5  evaluations reflect her fitness for the warden
6  position?
7  **A.    No.**
8      Q.    Ms. Bowers did not receive any
9  discipline as a deputy warden, correct?
10  **A.    I would have to see her profile. Again,**
11  **that's two ranks below me, so I can't answer that**
12  **question.**
13      Q.    If Ms. Bowers did not receive any
14  discipline as a deputy warden, does that reflect or
15  impact her fitness for the warden position?
16  **A.    No.**
17      Q.    You knew Ms. Bowers was on the 2020
18  promotional list, correct?
19  **A.    Yes, when it came to -- as you presented.**
20      Q.    Sorry. What --
21  **A.    As you presented the list, it's on there.**
22      Q.    Right. Now you see it.
23          But what I'm asking is, back in
24  2021, let's say fall of 2021, did you know that

Page 156

1  Ms. Bowers was on the promotional list for warden?
2  **A.    Yes.**
3      Q.    How did you know that?
4  **A.    In that e-mail that you put up that**
5  **DC Beaufort sent me.**
6      Q.    Did you speak with anybody about
7  whether or not Ms. Bowers would be a good warden?
8  **A.    No, I did not.**
9      Q.    Is there any documentation you are
10  aware of reflecting Ms. Bowers' leadership skills?
11  **A.    There's no documentation, but a few direct**
12  **observables about her leadership skills.**
13          **Ms. Bowers was the A&D manager.**
14  **That's our admission and release manager. Before**
15  **covid hit, she was romantically involved with a**
16  **subordinate and was troubled by his conduct -- which**
17  **was very unbecoming -- and didn't know how to handle**
18  **it. And it was brought to my attention that she was**
19  **upset.**
20          **And I saw her in the lobby,**
21  **pulled her to the side, and said, "Hey, is something**
22  **going on you need help with?**
23          **"Oh, no."**
24          **I said, "Well, let me tell you**

Page 157

1  **what has been brought to my attention."**
2          **She was a deputy warden. This**
3  **was a subordinate correctional officer. And she**
4  **didn't know how to handle it.**
5          **And as a deputy warden -- I**
6  **remarked earlier in my testimony about the survey,**
7  **where it was sexism, racism, and nepotism. I'm not**
8  **proud to say, but that was the department's response**
9  **on how they viewed the department. And in trying to**
10  **change the culture, you have to tackle those issues**
11  **head on.**
12          **It's not about legacy. I'm not**
13  **going to allow sexual harassment. I have zero**
14  **tolerance for it.**
15          **She didn't know how to handle**
16  **it. I instructed her what to do. She filed a**
17  **report with the Office of Professional Compliance.**
18  **And I defended my decision to terminate that**
19  **individual.**
20          **Now, this was an individual that**
21  **was three ranks below her. If this is what the**
22  **survey results said, she couldn't manage if someone**
23  **else was bringing that to her.**
24          **Then during Covid-19 -- again,**

Blanche Carney

Page 158

1  it all comes back when the curtains are rolled
2  back -- our protocols were changing rapidly daily,
3  sometimes hourly. That was the time to be visible
4  with your command staff, to show a presence, to walk
5  in that area, to assure them, to see what services
6  or supports or PPE they needed.
7          She would come right from her
8  car, clock in, go right to her office. The staff
9  would never see her.
10          And the intake area, they felt
11  the most vulnerable, the correctional officers and
12  staff, because they were having firsthand contact.
13  They were the first point of contact. She didn't
14  tour the area. She didn't meet with them. And it
15  just continued. Their frustration and anxiety
16  continued to fester.
17          As we were progressing through
18  this process to mitigate the spread, while
19  acknowledging the concerns that the staff had and
20  all the steps we put in place, she just wouldn't
21  leave her office.
22          That's not a leader. You get in
23  the fray. You get in the mix. People should know
24  you are here.

Page 159

1          We started offering the vaccine.
2  We stood up a Covid-19 fully vaccinated housing
3  unit. So that meant anyone who accepted voluntarily
4  the covid vaccine would be housed on this unit.
5          During that time, we remained
6  24 hours a day, seven days a week. We did not stop
7  accepting admissions.
8          She knew the gravity of it, and
9  she buckled under the pressure and couldn't do it
10  and started placing people on a fully vaccinated
11  housing unit that weren't vaccinated. That could
12  have upended everything.
13          Because she couldn't manage.
14  You're the A&D manager. You're supposed to manage
15  under stress. You're supposed to manage operations.
16  Staff should see how you're handling it. And her
17  response was, "I don't know what to do with these
18  people."
19          "These people"? That shouldn't
20  be coming from a leader.
21          Not too long after she went out
22  for an extended period of time, she responded to one
23  disruption. We were all here. She did come to that
24  one incident. We assigned the staff to come in and

Page 160

1  quell it. Then she went out on extended leave.
2          And within weeks of
3  Warden Giannetta announcing her retirement, then she
4  comes back. And she expressed, because DC Clark
5  told me, that she talked to him and said, "I'm up
6  next."
7          Again, that's that legacy. The
8  entitlement to think that, you almost
9  single-handedly upended up in the pandemic, didn't
10  show leadership, didn't support your staff, didn't
11  even come out of your office, then you go out, and
12  then you come back when you think it's over. That
13  was not on my radar.
14          I said, "We're not doing
15  promotion." We are in the thick of this. And she
16  decided to resign.
17          Now, I don't know what the
18  extent of their conversation was, but he did raise
19  that to me. But she decided. So she removed
20  herself from the equation. She resigned. No one
21  told her or forced her. She came to the decision,
22  based on whatever conversation.
23          So she didn't even sit for the
24  exam. I mean after this, in the 2022.

Page 161

1      Q.  What is your basis -- let me ask you
2  this way. Do you have personal knowledge that
3  Ms. Bowers would not leave her office? That she
4  would just be in her office and not interact with
5  anyone outside of her office?
6      A.  Yes. Because we had to continue to
7  reiterate the staff at that supervisory level,
8  "Be visible on the floor. Make sure you're
9  answering people's questions, their concerns."
10          We were getting so many
11  questions from B Unit, which was the intake unit and
12  her area of responsibility. And being able to
13  delegate to the staff, "Hey, listen, I need you to
14  do A, B, C, and D. I need you to do it as safely as
15  possible."
16          That wasn't happening. A lot of
17  those complaints were coming from that unit. You're
18  to manage that as a manager. And she just wasn't
19  able to.
20      Q.  So specifically to the issue you've
21  raised about her only being in her office, did
22  people tell you that?
23      A.  We saw that on video. We have cameras.
24  You're not coming out.

Blanche Carney

Page 162

1  If you're saying -- where's the
2  log book? Document where she was when she toured --
3  are there any log books which shows her consistently
4  touring these areas?
5  Any time a supervisor comes on
6  the housing unit, they should be entered into the
7  electronic log book. Her name was rarely there.
8  Q.   Did you personally look for
9  Ms. Bowers' name in the electronic log book at
10  various times?
11  A.   No. That would not fall under me. I have a
12  deputy commissioner to work with, you know, that
13  team, to say, "Hey, give me your information."
14  That was the report. And based
15  on the ongoing exchanges we were having with our
16  workforce, people were telling what was happening.
17  "Hey, no one is here but us."
18  And in a correctional culture,
19  people have to know that there is somebody there for
20  them.
21  And then she became frustrated
22  and just started housing people haphazardly.
23  Q.   Who, if anyone, told you that
24  Ms. Bowers was not coming outside of her office?

Page 163

1  A.   So we had Deputy Commissioner Clark. You
2  had -- when we would speak to the receiving room
3  staff, you would speak to correctional officers.
4  Those other the people in those areas.
5  Now, are we walking around
6  keeping a log book of everyone who said that?
7  Absolutely not. We're in a pandemic. We're not,
8  you know, taking those copious notes. We're trying
9  to get people out there. But there was no push-back
10  to say, "No, I'm there."
11  Q.   So Deputy Commissioner Clark expressed
12  concerns to you regarding Ms. Bowers?
13  A.   Yes. We talked about it. And that's how we
14  were able to see, "Hey, wait a minute."
15  When I tell you we're in the
16  trenches, you have people watching every day. "Did
17  this person get the vaccine? Yes or no?"
18  And we discovered, "Hey, wait,
19  why is this guy even here?"
20  And that started to, "Hey, where
21  is Bowers on this?"
22  So she was brought to his
23  attention.
24  Q.   Did you speak with Deputy Commissioner

Page 164

1  Clark about Ms. Bowers' leadership abilities?
2  A.   Yes. I said, "If she is not present, you
3  need to direct her and instruct her on what to do.
4  It's all hands on deck."
5  Q.   You said that Ms. Bowers nearly
6  single-handedly upended the whole thing, right?
7  A.   For that vaccination housing unit, yes.
8  Q.   Is there any documentation reflecting
9  this concern or issue?
10  A.   Yes. We would have to go back into the
11  record to show.
12  When medical was providing and
13  confirming, this was a meticulous process. It was
14  all eyes on it. Medical had to tell us, "Is this
15  person vaccinated? Yes or no?"
16  When you started seeing "noes"
17  on there, Clark engaged Bowers to say, "Hey, you put
18  that guy on there.
19  "Oh, I don't know what to do"
20  and threw up her hands.
21  That was reported to me. That
22  can't be.
23  Q.   Was that a violation of a directive?
24  A.   Yes. Failure to perform your duties

Page 165

1  properly while on duty.
2  You knew the gravity of
3  Covid-19. We were all stretched. That doesn't mean
4  you just throw up your hands and start housing
5  people haphazardly. You have people's lives at
6  stake. That could have been an epidemic -- a
7  breakout.
8  We managed considerably well to
9  mitigate inside our facilities. And you got tired
10  and just said, "Oh, wow, put them on there."
11  You could have had an outbreak.
12  That's the gravity of it.
13  Q.   Should Ms. Bowers have been
14  disciplined for that incident?
15  A.   She could have. But again, DC -- whatever
16  he did. I don't know if he took action on it.
17  But I'm not going to direct a
18  subordinate. They have to do their job and make
19  that decision.
20  Q.   Do you have an opinion on whether or
21  not Rodica Craescu was suitable to be a warden in
22  2020 or 2021?
23  A.   No, I do not. She was a deputy warden, and
24  then she retired. I don't have an opinion one way

Blanche Carney

Page 166

1  or the other.
2      Q.   Do you know what Ms. Albandoz's
3  performance evaluations reflect as an HSPA?
4  A.    Similar to Ms. Lyde.  And my response is the
5  same.  Deputy Commissioner Bagby has oversight.
6  Prior to the curtain being pulled back, they are --
7  you have reflected on that sheet.  I didn't have a
8  reason to not.  When I, you know, talked to you
9  about the incident when they were at each other's
10 throats, being very divisive.  But for those
11 performance evals, if we didn't have that pandemic
12 to expose the vulnerability and what was not
13 happening, I may not have found out.
14     Q.   When was the curtain pulled back?
15 A.    The curtain started to be pulled back in
16 '20, when we had Covid-19, the onset of it.  And as
17 we started to roll out, everyone -- it was all hands
18 on deck.
19          We caught a lot of pressure.
20 Because we were one of the public safety
21 departments.  And while other departments were
22 allowed to work a hybrid schedule, they were -- the
23 social services wanted that, but the key here, they
24 don't work in a carceral setting.

Page 167

1          We're responsible for the care,
2  custody, control, feeding, medical, and behavioral
3  and social health of individuals committed to our
4  custody.  They are not asking to come here.
5          So while other departments, that
6  was appropriate for their leadership because they
7  didn't house their population.  Here, I tasked Bagby
8  and the HSPAs to come up with how social service
9  would provide services.
10          Keep in mind, you still have to
11 feed, medically clothe, get people the services, the
12 basics that they need.  Their whole approach was,
13 "Oh, we'll come up with a hybrid."
14          By the time we got to the
15 point -- how did you come up with a hybrid when
16 we're a carceral setting?
17          You can't provide services from
18 your sofa to the population.  But, again,
19 demonstrating the path of least resistance.
20          Their staff weren't the only
21 staff who had concerns.  And we rolled out, through
22 communication, PPE, how you could get it.  We
23 outfitted their offices with Plexiglas.  We
24 installed hand sanitizers, put markings all

Page 168

1  throughout the jail, six feet, keep your distance.
2          Path of least resistance.
3  They're the only unit who came up with a hybrid
4  approach to provide services to a population that's
5  already marginalized.
6          Now they're housed in their
7  cells, limited to no contact with the outside.
8  Really?  That's what we came up with?  So they went
9  against the grain.
10          The uniform staff who showed up,
11 commendable.  Medical staff, commendable.
12 Behavioral health staff, commendable.  Food service,
13 commendable.  City maintenance and contracted
14 maintenance, commendable.
15          The only people that didn't show
16 up was social workers under their three leadership.
17          When you talk about
18 decision-making, you have to work and walk people
19 through the process, get them to buy in.  There was
20 no buying in.  "We will just do this, and, you know,
21 we don't want the make any waves."
22     Q.   Did Ms. Albandoz or Ms. Lyde direct
23 how much time inmates spent in their cells?
24 A.    No, they did not.  However, they should have

Page 169

1  been readily really available when -- again, when I
2  said Covid-19, very unpredictable, and when you had
3  the opportunity, you wanted to have people in their
4  place.  But in their case, you didn't.
5          So they couldn't determine the
6  time they spent in the cell.  However, if there was
7  an emergency or emergent, where they needed to be
8  seen, you can get the person and walk them, at
9  least, down to medical, walk them to behavioral
10 health, or do it at cell side.  RTS wasn't
11 available.
12     Q.   What were the major concerns brought
13 forth in the Remick lawsuit that led to the federal
14 monitoring?
15 A.    It was the conditions to which I talked
16 about and that are public knowledge.
17          When we lost staff in droves, we
18 lost the experience.  We lost people that could
19 command like that.  You didn't have that.  You
20 needed people in place that could keep the facility
21 running.
22          So we lost record numbers of
23 staff in a carceral setting.  But for those of us
24 who stayed and did the hard work and did the best we

Blanche Carney

Page 170

1  could, RTS wasn't part of it.
2          And so you know what the Remick
3  litigation is.  We put it publicly on our website
4  for everyone to see, to be transparent.  But the
5  more they come in and roll back that curtain, now we
6  are seeing RTS information.
7          Now we are hearing a monitor
8  say, "Hey, and by the way, guys, the population
9  wants to see social workers."
10         Now, we're looking to say, "Hey,
11 you have a backlog.  You need to tackle that and
12 address it."
13         So it's one thing to be wrong.
14 It's another thing to stay wrong and do nothing
15 about it.
16         The moment at which I became
17 aware of it, I'm tasking Bagby, Lyde, and Albandoz
18 to do the same thing that I tasked every other unit.
19     Q.    And the moment you became aware of it,
20 is that when you set up the access care meeting?
21     A.    No.  We started having these conversations
22 for which I said I'm not, as the Commissioner, going
23 to stop and keep a little black book and jot down.
24 Once I give it to you as a deputy commissioner, you

Page 171

1  execute.  You understand.  You ask questions.  You
2  execute, monitor, and manage.
3          But at the point, again, seeing
4  no change and still hearing that people aren't being
5  seen, now I need to bring everyone in -- not just
6  Bagby and the HSPAs -- because I need to see what
7  the supervisor are doing.  "What are you doing?"
8          The wardens are now in that same
9  meeting.  And all along the way, I tasked them to
10 sit down, meet with the wardens, work out a system
11 by which -- this was not the first time.
12         Albandoz, Lyde, and Bagby were
13 all tasked before these access to care meetings, sit
14 down with your wardens, see what you can come up
15 with so that you can provide services to
16 incarcerated people.  Their response is always this:
17 We have these programs.
18         These programs provide services
19 to less than one percent of the population.  These
20 programs cherrypick individuals to participate in.
21 These programs are from outside providers, which we
22 don't command and supervise their staff.  It's
23 always the path of least resistance.
24         I've talked to Bagby, "Yes, it's

Page 172

1  good you're bringing in outside programs, but what
2  about the City worker for which they are receiving a
3  paycheck and they're not providing services?"
4          So they keep coming with
5  thinking that's okay.
6          Yes, it's great that these
7  academias have our inside-out programs.  That's
8  great.  That's less than one percent of the
9  population.  What about the other 99 percent that
10 need a social worker?
11         Motivate and get your people to
12 work.  Support your people.  Give them a plan on how
13 to provide services to incarcerated people.
14     Q.    Going back to Carney Exhibit -- I
15 believe it's 14, the 48-page document, starting at
16 City 1843 and going to 1890; going to page 7, this
17 is Ms. Albandoz's personal profile, dated
18 December 2nd, 2022.  Do you see that?
19     A.    Yes.
20     Q.    Would you agree that her performance
21 reports for '19, '20, and '22 are all outstanding,
22 correct?
23     A.    Yes, as reported here.
24     Q.    Do you have some reason to doubt that

Page 173

1  these are the correct evaluations for her?
2     A.    No, no doubt.  I was just basing it on, at
3  the time, this is what he rated her as.
4     Q.    At the time, this is what
5  Deputy Commissioner Bagby rated her, correct?
6     A.    Yes.
7     Q.    And how long has Deputy Commissioner
8  Bagby been your deputy commissioner?
9     A.    I appointed Deputy Commissioner Bagby in
10 late 2016.  And at the -- go ahead.
11    Q.    No, go ahead.
12    A.    At that time, we were in a good position as
13 far as staffing, had less than the five percent
14 vacancy rate.  The population was reduced, and it
15 was status quo.
16         Since I left that position --
17 and you would have to -- I believe in 2015, I left
18 the HSPA position and I promoted up to
19 deputy commissioner.
20         RTS, those positions, there's
21 nothing innovative that's happened.  It's almost
22 like they are stuck in time.  So it's just the
23 status quo of it.
24         I couldn't have imagined a

Blanche Carney

Page 174

1  pandemic was coming.  So I don't see any lion's
2  share of innovation happening.  It's just the status
3  quo.
4           And I appointed him in late
5  2016.  I don't have the exact date, though.
6      Q.    Are you aware of any discipline that
7  Ms. Albandoz has received as an HSPA?
8      A.    I don't believe she received any formal
9  discipline, but she was cited for retaliation
10  against an employee in a lawsuit.
11      Q.    And are allegations in lawsuits
12  relevant to your considerations on who to promote?
13      A.    No.  I was just answering your question.
14      Q.    Do you consider allegations in a
15  lawsuit to be discipline?
16      A.    No.  But when you asked me if I had
17  knowledge of it, it wasn't that.  I don't know if
18  she was disciplined for that, but I'm aware of it.
19  I just have to be transparent.
20      Q.    What are you aware of in relation to
21  the allegations in a lawsuit?
22      A.    There was a lawsuit that the jury found that
23  she had harassed -- retaliated against an employee.
24  And that was the outcome.  That's the extent that I

Page 175

1  know of.
2      Q.    Was that Deanna Pierce?  Was that the
3  plaintiff in that matter?
4      A.    Yes.
5      Q.    Was Ms. Albandoz a defendant in that
6  matter?
7      A.    I believe she was.  I was the defendant, but
8  it called into question and they ruled that she
9  retaliated against.  So I would have to see, but I
10  believe it was that she was one of them.  Or maybe
11  one of the witnesses that resulted in that award.
12      Q.    Did the jury finding in that matter
13  impact your decision not to promote Ms. Albandoz to
14  one of the vacant warden positions?
15      A.    Absolutely not.
16      Q.    Outstanding is the highest ranking --
17  correct? -- for evaluations?
18      A.    Yes.
19      Q.    Having outstanding evaluations, does
20  that impact one's fitness for promotion in the
21  Philadelphia Department of Prisons?
22      A.    No.  It's taken in consideration for the
23  totality, but the person still has to interview for
24  the position.

Page 176

1      Q.    What if the individual is not offered
2  an opportunity to interview?
3      A.    I'm not sure why they wouldn't be.  Did they
4  decline?  In this case, she was offered an
5  opportunity to interview in December of 2022.
6      Q.    Am I correct that there was not an
7  opportunity for Ms. Albandoz, Ms. Lyde, or
8  Ms. Bowers to interview for the warden position in
9  August or September of 2021 when Warden Giannetta
10  and Warden Talmadge retired?
11      A.    You're correct.  And I responded.  That was
12  not -- I'm not under any obligation, under the Civil
13  Service rules, to do anything with the list.
14      Q.    And per the Civil Service rules, would
15  you be the appointing authority?  Is that the term
16  of art that has relevance to you?
17      A.    Yes.
18      Q.    You, as the Commissioner, would you be
19  the appointing authority?
20      A.    I would sign off, yes.
21      Q.    In order to remove someone from a
22  certified list, do you need approval from the Office
23  of Human Resources to do that?
24      A.    I believe I would have to.  I've never had

Page 177

1  that encounter.  So I'm basing it, under my
2  understanding, I would not have the ability to just
3  remove someone.  I would have to engage them for the
4  process.  I've never had to do that, though.
5      Q.    Is there any difference, in terms of
6  its effect on the applicants on a promotional list,
7  for whether you choose not to interview or attempt
8  to remove someone from a list?
9      A.    I can't speak to their frame of mind, sir.
10      Q.    Well, not referencing its effect on
11  their frame of mind, but referencing its effect on
12  their ability to be considered for the position.
13           MR. SEIDMAN:  Objection to form.
14           If you understand the question.
15      A.    We're not under any obligation -- that's my
16  answer -- to do anything with the list.
17      Q.    Are you under an obligation to
18  consider them?
19      A.    No.  I shared with you there's nothing in
20  the Civil Service that tells me I have to do that.
21  And so, if my -- if it was in a position where I was
22  working to fill it, yes.  But I expressed to you
23  where my attention -- my full attention.
24           I had 4,700 people's lives in my

Blanche Carney

1  hands. I had a limited workforce. We are trying to
2  keep these facilities operating to the best of our
3  ability.
4          No commissioner has ever managed
5  through a pandemic. And I'm not proud to wear that
6  badge of honor. But we came through it. And so the
7  day-to-day that we really were able to rest in good
8  times, that wasn't it. The decision was made to
9  keep these facilities running. I did not give
10  attention to it.
11      Q.    Do the Civil Service Regulations have
12  a process for temporary promotions?
13  A.    They do.
14      Q.    And do you know what that process is?
15  A.    Yes. You can do temporary promotions, for a
16  defined period of time, for positions.
17      Q.    What process do you have to abide by
18  in order to make temporary promotions?
19  A.    If there is an active list, you would pull
20  from that list and make a temporary appointment.
21  However, that gives the individuals who are serving
22  as a temporary an unfair advantage for when you do
23  go to apply, because they can then count that
24  towards their experience.

1          And as I stated before, this was
2  not the time for me to play around and see who had
3  the skill set to lead during the pandemic. That
4  wasn't the time. It was not an option for me.
5          I had to keep these facilities
6  running, open. I couldn't keep them locked down
7  forever. I had to deal with every challenge that
8  that pandemic presented.
9          So I was not going to compound
10  the issue, make it disastrous, by doing a temporary
11  appointment, pulling people out, bringing people in
12  that would have asked a myriad of questions on where
13  we are.
14          I don't have time to sit down
15  and give you a crash course on this. I made the
16  calculated decision that's not the time to do this.
17  A pandemic is never the time.
18      Q.    You did promote other positions in
19  2020, correct?
20  A.    You would have to bring it back to my
21  recollection.
22          MR. COHEN: I will mark this as
23  Carney Exhibit 16.
24          (Whereupon Carney-16 was marked for

1          identification.)
2  BY MR. COHEN:
3      Q.    This is an eight-page document from
4  City 1601 through City 1608.
5          Going to the top, would you
6  agree this is the Work History Detail for
7  Earicka Patterson?
8  A.    Yes.
9      Q.    And that it shows Ms. Patterson was
10  promoted to deputy warden November 16, 2020?
11  A.    Yes.
12      Q.    Going to the next individual, on Bates
13  stamped 1603, Edwin Cruz was also promoted to
14  deputy warden on November 16th, 2020?
15  A.    Yes.
16      Q.    As was Steven Angelucci?
17  A.    Yes.
18      Q.    As was Robert Rose?
19  A.    Yes.
20      Q.    Do you know of any other supervisory
21  positions that were hired from promotional lists in
22  2020 and 2021?
23  A.    Not without looking at the files. And these
24  promotions, when I told and testified earlier, we

1  had droves of people leaving, and these were
2  experienced people with corrections. The workload,
3  the gravity of managing a facility, no one person
4  can do it alone. So these deputy wardens were
5  crucial.
6          Earicka Patterson replaced
7  retired Deputy Warden Marco Giannetta. That was a
8  crucial stand-alone unit that handled our rosters,
9  that handled overtime, that handled deployment. It
10  was nonnegotiable that you could leave that position
11  open. Unacceptable. So the position and the
12  decisions were made.
13          Here, there was no way that you
14  could have that few deputy wardens in these
15  facilities. They needed counterparts because of the
16  intricacy and the work assignments, the workloads,
17  the overall operation. You can't put that on the
18  back of one deputy warden and think that's going to
19  fare well. So that's why these promotions were
20  made.
21          Because even your most
22  experienced person would have crumbled under the
23  pressure. You simply needed additional staff to
24  attack. And any promotion would create a vacancy,

Blanche Carney

Page 182

1    but I had to do the key ones.
2             You had enough deputy wardens
3    that could stabilize leadership for a facility.  But
4    what you could not have is one deputy warden for
5    each facility.  Unacceptable.  You're talking
6    something totally that I don't even want to imagine
7    how that would have fared.
8             So we filled those positions
9    because you needed that level.  So these were the
10   folks.
11       Q.    Was filling those deputy warden
12   potions that we've just spoken about more important
13   than filling the warden positions that were vacant
14   during the Covid-19 pandemic?
15       A.    Yes.  And my answer is the same.
16            You can have a warden, but you
17   if you don't have any deputy wardens, that's not
18   going to serve you well.  And if you have an
19   ill-prepared or inexperienced warden, it's
20   catastrophic.
21            You can't just put in a head and
22   think it's all going to go well.  They need to be
23   able, the same way I expect with deputy wardens, as
24   having overall responsibility for operations.

Page 183

1             If I don't have a
2    deputy commissioner to execute and to direct, all
3    that falls on me.  So it's in the best interest to
4    have as many deputy wardens at that time and to make
5    a thorough, calculated decision for the best
6    individual to serve as warden.
7             You don't take these positions
8    lightly.
9        Q.    In February of 2022, if you could have
10   hired Steven Angelucci to be the warden of CFCF,
11   would you have?
12       A.    I'm not going to go on a hypothetical.
13   Everyone has an opportunity.  Take the test.  Let
14   OHR do what they're supposed to do.  If there's a
15   list, I want to do something with the list.  That's
16   how it goes.  I cannot go into a hypothetical.
17       Q.    Same question regarding Pierre Lacombe
18   in February of '22 as it relates to Riverside
19   Correctional Facility.
20       A.    Same answer.
21       Q.    How many times has Warden
22   Pierre Lacombe been arrested?
23       A.    Zero, to my knowledge.
24            MR. COHEN:  I will mark this as

Page 184

1    Carney Exhibit 17.
2             (Whereupon Carney-17 was marked for
3    identification.)
4    BY MR. COHEN:
5        Q.    Going to the first page, this is a
6    14-page document entitled Defendant's Objections and
7    Responses to Plaintiffs' First Set of Requests for
8    Admissions, and the Defendant in this case being the
9    City of Philadelphia.  Do you see that?
10       A.    Yes.
11       Q.    And then, on the final page, this is a
12   verification signed by Gregory Vrato dated
13   November 3rd, 2023.
14            And Mr. Vrato is the
15   Philadelphia Department of Prisons' chief of staff,
16   correct?
17       A.    Yes.
18       Q.    So going to Request Number 21, it
19   states, "Admit that Pierre Lacombe was cited in
20   Florida for driving under the influence of alcoholic
21   beverages in 2016 in Florida," correct?
22       A.    Yes.
23       Q.    And the response, after an objection
24   based on relevance and proportionality, is that the

Page 185

1    request is admitted, correct?
2        A.    Correct.
3        Q.    Were you aware of Warden Lacombe's
4    citation for driving under the influence of alcohol?
5        A.    No, I was not.
6        Q.    Would that impact his suitability for
7    the warden position?
8        A.    Not necessarily.  I would have to see the
9    facts of the case.  I don't have no knowledge of
10   this -- any knowledge of this.  This is my first
11   time.  But I would have to review the case in
12   totality.
13       Q.    And the next request is, "Admit that
14   Pierre Lacombe was arrested for domestic violence in
15   2013 in Florida," correct?
16       A.    Correct.
17       Q.    And after an objection based upon
18   relevance and proportionality, that request is
19   admitted, correct?
20       A.    Correct.
21       Q.    Would his arrest for domestic violence
22   in 2013 in Florida impact his suitability for the
23   warden position?
24       A.    I would have to see the case in totality.  I

Blanche Carney

Page 186

1  can't render a decision. This is the first time I'm
2  hearing of either of these. So absent those
3  documents, I'm not going to make that decision. I
4  have to look at the totality of what was involved.
5  And this what was in 2016 and 2013? First I'm
6  hearing about it.
7      Q.    And should he have reported these
8  incidents to the department?
9  A.    Yes, per our policy.
10     Q.    And if he had reported them, what is
11 the process for evaluating the next step?
12 A.    The totality of all documents relating to
13 this would have been reviewed. He would be
14 scheduled for a hearing, and then the case would
15 have been heard. He would have provided any
16 evidence, and then a final decision would have made.
17     Q.    Do wardens have to have Pennsylvania
18 driver's licenses?
19 A.    Yes.
20     Q.    Why is that?
21 A.    They operate and are issued City vehicles
22 for use, for take-home privileges, for the express
23 purpose of getting to and from and responding to
24 emergencies at the facility.

Page 187

1      Q.    Should Pierre Lacombe's driver's
2  license be on file with the City of Philadelphia?
3  A.    It should be.
4      Q.    Do you know if it is?
5  A.    That, I don't know. I have no reason to
6  look for it to bring it to my attention.
7          MR. COHEN: So going to what I
8  will mark as Carney Exhibit 18.
9          (Whereupon Carney-18 was marked for
10         identification.)
11 BY MR. COHEN:
12     Q.    This is an 11-page document titled
13 Defendant's Objections and Responses to Plaintiffs'
14 Second Request for Production of Documents.
15         And on the fifth page, the
16 request is for Pierre Lacombe's driver's license.
17 And after objections, the response is, "By way of
18 further response, upon reasonable investigation and
19 review of its records, the City is not in possession
20 of documents that are responsive to this request."
21 Do you see that?
22 A.    Yes.
23     Q.    If you wanted Pierre Lacombe's
24 driver's license, how would you go about getting it?

Page 188

1  A.    I would submit that through my chief of
2  staff if there was reason for me to put that on my
3  radar. He would work with our Office of
4  Professional Compliance, who would research and see
5  what's the status and get the document.
6      Q.    Have allegations of sexual harassment
7  ever been brought against Pierre Lacombe, to your
8  knowledge?
9  A.    Not to my knowledge.
10     Q.    Would allegations of sexual harassment
11 potentially impact Pierre Lacombe's suitability for
12 warden?
13 A.    I would have to review the documents. I
14 can't make a blanket response or absolute decision
15 absent documentation.
16     Q.    Do you know if Pierre Lacombe
17 submitted a diploma from a company called
18 Almeda University?
19         MR. SEIDMAN: Objection.
20 A.    I don't know.
21         MR. SEIDMAN: You can answer.
22 A.    I don't know if he submitted that.
23     Q.    Are you familiar with Civil Service
24 Regulation Chapter 10.0923 regarding deception in an

Page 189

1  application for a Civil Service examination?
2  A.    Can you pull that up? I don't want to
3  assume, please.
4          MR. COHEN: Sure. And I will
5  mark this as Carney Exhibit 19.
6          (Whereupon Carney-19 was marked for
7          identification.)
8  BY MR. COHEN:
9      Q.    It is an 11-page document Bates
10 stamped Plaintiffs 1226 through Plaintiffs 36.
11         I will go to page 6, which is
12 Bates stamped Plaintiffs 1231. Here it says,
13 "Practice or attempt to practice any deception or
14 fraud in his or her application, in his or her
15 declarations and securing eligibility to compete in
16 a Civil Service examination process under
17 Subsection 10.0923."
18         Do you see that?
19 A.    Yes, I do.
20     Q.    Would submitting a diploma showing
21 grades received for courses taken where the
22 individual submitting that diploma did not attend
23 any classes or take a single test for any of the
24 courses be a deceptive practice, in your opinion?

Blanche Carney

Page 190

1          MR. SEIDMAN:  Objection to form.
2     You can answer, if you know.
3 A.     That, I can't attest whether he attended
4 classes or what have you.  I am familiar that that
5 school, along with several others, had their
6 accreditation revoked.  That's the most I can speak
7 to that.  But I can't attest if he, in fact, did or
8 did not.  But if he was issued that, that's the most
9 I could speak to.  But I remember that this was one
10 of the schools that ran into accreditation issues.
11     Q.   I will tell you that, in a deposition
12 in this case, under oath, Mr. Lacombe testified that
13 he did not attend any courses or take any tests for
14 any of the classes submitted on his diploma.
15          So, based upon that
16 representation, can you give an opinion with regards
17 to whether he violated this Civil Service regulation
18 in submitting that diploma?
19          MR. SEIDMAN:  Objection to form.
20     He didn't say that he didn't disclose any of
21     this.
22          MR. COHEN:  I didn't say not
23     disclosure.
24          MR. SEIDMAN:  But it's a charged

Page 191

1     hypothetical in which it assumes that he did
2     this, you know, duplicitously.
3          MR. COHEN:  Well, I submitted
4     what his testimony was.
5          MR. SEIDMAN:  No.  You submitted
6     part of his testimony.
7          MR. COHEN:  What other --
8          MR. SEIDMAN:  I am not going to
9     get into his testimony.  I object to the
10     form.  It's on the record.
11          MR. COHEN:  Okay.
12 BY MR. COHEN:
13     Q.   Can you answer the question,
14 Commissioner?
15 A.     No, because I don't have the testimony.  I'm
16 going to defer -- my attorney said you didn't
17 provide the full statement.  I can't make decisions
18 on hypotheticals.
19     Q.   Did you know that Deputy Commissioner
20 Clark also submitted a diploma from
21 Almeda University as part of an application for
22 warden?
23 A.     Yes.
24     Q.   How did you know that?

Page 192

1 A.     Because when I needed to fill the
2 deputy commissioner for operations, I reached out to
3 Deputy Commissioner Clark.  I instructed him to meet
4 me the following day in my office at 8:00 a.m.  And
5 he did.
6          And I asked his interest.  And
7 he said, "Commissioner I have something I have to
8 tell you."
9          I said, "Okay.  Go ahead."
10          And he told me about the Almeda.
11          I did not appoint him as warden.
12 So that was under the former commissioner.
13          He was forthcoming.  He informed
14 me that he was enrolled in West Chester University.
15 And I accepted that.
16     Q.   And was an investigation done by the
17 Office of Human Resources regarding his submission
18 of the diploma from Almeda University?
19 A.     I don't know whether the former commissioner
20 conducted an investigation.
21          At the point in which he
22 informed me, it was a moot point because he was
23 already serving in the warden's position.  So I am
24 not going to go back after he's come on forward or

Page 193

1 telling me this is what's happened and then
2 supplying me with, "By the way, I'm enrolled in
3 West Chester University."
4          And that was the point at
5 which -- because he already admitted there was
6 something wrong with Almeda and a certificate.  I
7 was not going to go back for that.  And he had
8 already used that and had been in a warden's
9 position for some time.
10     Q.   So are you aware of any determination
11 by the Office of Human Resources regarding
12 Deputy Commissioner Clark's submission of that
13 diploma?
14 A.     I am not.
15          MR. SEIDMAN:  Can we take
16     60 seconds real quick?
17          MR. COHEN:  Sure.
18          (Short recess taken at
19     4:01 p.m.)
20          (Proceedings resumed at
21     4:07 p.m.)
22 BY MR. COHEN:
23     Q.   Going back, for a moment, to the
24 performance evaluations for Ms. Albandoz -- and it's

Blanche Carney

Page 194

1  a seven-page document starting at City 180 through
2  City 186 -- looking through the document, which of
3  these evaluations did you sign off on?
4  A.    That's my signature there.
5        Q.    And this is on the one dated 9/1/22?
6  A.    Yes. Yes.
7        Q.    And also your signature on the report
8  dated 9/1/20, correct?
9  A.    Correct.
10       Q.    Also your signature on the one dated
11  9/1/19?
12  A.    Yes.
13       Q.    And also your signature on the one
14  dated 9/1/18?
15  A.    Yes.
16       Q.    Did you review these evaluations
17  before signing them?
18  A.    Yes, I did.  And again, based on the
19  immediate supervisor who is rating it, I had no
20  reason to believe he wasn't accurate.
21            But again, my response is
22  consistent.  It's when you pull back and the data
23  shows people weren't doing what they are supposed to
24  do.

Page 195

1            If you could go back to that
2  first one you showed for '22.  Okay, this one.
3            "During this performance period,
4  you took leadership in increasing college course
5  offerings for the population, offered tax
6  preparation for the population, implementing ORAS
7  risk assessments and evidence-based thinking for a
8  change."
9            As recent as yesterday, in
10  regard to a program that is in hiatus right now, one
11  of the staff person's requests that,
12  Temple University, we made an agreement that any
13  person assigned -- this was just yesterday --
14  assigned to participate in this program would have
15  the ORAS risk assessment.  That's included in his
16  performance evaluation.  Standing issue at our
17  deputy commissioner's meeting to make sure staff are
18  doing just that.  That's a risk assessment tool.
19  The person -- the staff person said it didn't
20  happen.  Again, rolling back the curtain.
21            Had they not presented that
22  information -- which DC Bagby did not object.  His
23  response is, "Okay, we'll take care of it."
24            I reiterated that yesterday at

Page 196

1  our executive staff meeting, verbally, to say,
2  "DC Bagby, HSPA Lyde, and Albandoz, ensure your
3  staff are doing and providing the work."
4            ORAS, I mentioned ORAS
5  specifically.  I shouldn't, as the
6  deputy commissioner, have to continue to go behind
7  staff to make sure they're doing the work.  They
8  should know what the data points are, what the
9  expectations are, identify the backlog and what they
10  are doing about it.
11            The fact that all of them
12  attested that it was being done, it wasn't.  And it
13  lacks leadership and accountability.  Because, you
14  know, we were supposed to have done this.
15            This is a whole year signed off
16  on.  You're saying you've implemented it.  It's not
17  happening.
18            Again, at this time I signed off
19  on it, I had no reason to believe it wasn't
20  happening.  But the more this curtain is pulled
21  back, that's it.  They are not doing and providing
22  the work for which they are compensated and holding
23  subordinate staff accountable to do the same.
24            That's just one example.  Just

Page 197

1  recent as yesterday.
2        Q.    If you were aware of the leadership
3  deficiencies that you've testified Ms. Albandoz has
4  at the time you signed this evaluation on
5  August 31st, 2022, fair to say you would not have
6  signed this evaluation?
7  A.    That is correct.  And that's why you don't
8  see an evaluation dated for August of 2023.
9            DC Bagby submitted these glowing
10  evaluations.  Again, understanding now I have the
11  data, the backlog of what's not happening, he
12  submitted the same exact evaluations for Ms. Lyde
13  and Ms. Albandoz, and I refused to sign.  Because
14  once I became aware of the deficiencies, I'm not
15  going to go along just to get along.
16            The moment in which that data
17  became known to me, I returned them back to DC Bagby
18  and I told him, "I will not being signing off on
19  this because you and I both know there are
20  deficiencies, there are leadership issues, and they
21  are not providing and ensuring that subordinate
22  staff are providing services to the incarcerated
23  population."
24            DC Bagby submitted their two

Blanche Carney

Page 198

1  evaluations along with other subordinates that I did
2  sign off on.
3         Now, I didn't write that down.
4  I handed it back to you with your pile.  And he
5  should testify correctly, yes, they were included in
6  the performance evals that I returned back to him
7  that were signed off because I had no reason to
8  believe otherwise for those employees.
9     Q.   And since you signed off on
10 Ms. Albandoz's evaluation, she has sued the
11 department for gender discrimination, correct?
12 **A.**   **I believe her --**
13         MR. SEIDMAN:  Objection to form.
14 **A.**   **Yes, I hadn't been informed --**
15 **performance evals are due September the 1st.  Unless**
16 **she filed her lawsuit -- I had no knowledge that she**
17 **had filed a lawsuit.**
18     Q.   I'm referring to the lawsuit for which
19 you are giving your deposition today.
20 **A.**   **Right.  But that predates.  But still, she's**
21 **saying gender discrimination.  Gender, I'm a female;**
22 **I don't know where that is.  I identify as a female.**
23     Q.   Is it your testimony that because you
24 identify as a female, you cannot discriminate

Page 199

1 against other women?
2 **A.**   **No, that's not my testimony.  I'm just**
3 **responding to what you just shared with me.  That's**
4 **your testimony.  I'm not testifying to that.**
5         **When you said "gender**
6 **discrimination," I'm just letting you know how I**
7 **identify, because you raised that issue.**
8     Q.   Understood.
9 **A.**   **Okay.**
10     Q.   Norman Williams has recently been sued
11 for sexual harassment for his actions as a
12 department, correct?
13 **A.**   **I just discovered that.  I was not aware.**
14 **That did not come to me.  He was disciplined.  I**
15 **disciplined him for his conduct.  But it had no**
16 **mention of sexual harassment.**
17     Q.   The alleged conduct by the woman who
18 is suing him is the same conduct for which he was
19 disciplined for, correct?
20 **A.**   **That is not correct.  He was disciplined for**
21 **conduct unbecoming.  He was meeting with two female**
22 **shift commanders.  And --**
23         MR. SEIDMAN:  I wouldn't mention
24    anybody's names.  I don't know if these

Page 200

1 investigations are confidential.  I know
2 there has been a lawsuit.  I don't know how
3 much it has been disclosed at this point.  I
4 don't know what was agreed to be kept
5 confidential or not.  But if there are
6 certain items that are confidential, then I
7 would prefer that you don't disclose them.
8 But you can certainly talk generally about
9 the allegations.
10       THE WITNESS:  Thank you.  I
11 appreciate that.
12       And the allegations in no way
13 included sexual harassment.
14       This is the first time I'm
15 hearing about these allegations.
16 BY MR. COHEN:
17     Q.   When you say, "This is the first
18 time," you mean this deposition is the first time
19 you're hearing of any sexual harassment allegations
20 against Mr. Williams?
21 **A.**   **Yes, based on today, this, and then just**
22 **this morning I received this lawsuit, knowledge of**
23 **this lawsuit.**
24       **To my knowledge, in my capacity**

Page 201

1 **as the Commissioner, I had not received any**
2 **allegation of sexual harassment against**
3 **Norman Williams.  First I'm hearing about it.**
4     Q.   The discipline that Norman Williams
5 received for his conduct towards Shanti Lewis -- is
6 that the name of the woman who made the complaint
7 against him?
8         MR. SEIDMAN:  You can answer.
9 **A.**   **Yes.**
10     Q.   (Continuing) -- that was for a
11 departmental violation, correct?
12 **A.**   **That she received.  This is the first time**
13 **that I'm hearing that a Ms. Lewis lodged a**
14 **sexual harassment complaint.**
15       **That was not why he was**
16 **disciplined.  So this is the first time I'm hearing**
17 **this allegation.**
18     Q.   Was he disciplined for intimidating
19 Ms. Lewis with a knife?
20 **A.**   **Yes.  He had a box cutter.**
21     Q.   And Ms. Lewis is his subordinate
22 officer, correct?  Or I don't know if that's the
23 correct term.  But she was below him in the
24 hierarchical structure of the department, correct?

Blanche Carney

Page 202

1  A.    Correct.
2      Q.    And that allegation by Ms. Lewis was
3  sustained, correct?
4  A.    Yes.
5      Q.    And that allegation was sustained
6  prior to the decision to promote Mr. Williams to
7  warden, correct?
8  A.    That's correct. And I believe he admitted
9  to having that in his hand, which played a part in
10 upholding that. His admission, while he was
11 speaking with them, he had that in his hand.
12         (Whereupon Carney-20 was marked for
13         identification.)
14 BY MR. COHEN:
15     Q.    So I'm showing you what's has been
16 marked as a Carney Exhibit 20. Is a 19-page
17 document. It is a complaint brought by Shanti Lewis
18 and Melinda Medina against the City of Philadelphia
19 Department of Prisons and Norman Williams. And then
20 at the end it is verified by Ms. Lewis, here on page
21 16, and by Ms. Medina on page 18.
22             I think you said you received
23 notice of this lawsuit this morning?
24 A.    Yes.

Page 203

1      Q.    Did you have a chance to review it?
2  A.    No, I did not.
3      Q.    I'm going to the factual allegations
4  by Ms. Lewis and going just to Averment 14. It
5  says, "From the beginning of her assignment to PICC,
6  Williams showed hostility and discrimination towards
7  Plaintiff Lewis due to her sex. He made it clear,
8  through his words and actions as pled herein, that
9  he did not want women to serve as shift commanders
10 in PICC. By way of example, on the first day of her
11 reassignment to PICC, Williams told Lewis, 'You
12 belong to me now.'"
13             Do you see that?
14 A.    Yes, I do.
15     Q.    Had you ever heard Ms. Lewis'
16 allegations against Mr. Williams in this averment
17 prior to me just reading it to you?
18 A.    No, I have not. And if you have the
19 disciplinary -- formal disposition for Williams,
20 that would be helpful. This is the first time I'm
21 hearing this.
22     Q.    And what about in the statement -- did
23 Ms. Lewis give a statement that resulted in
24 Mr. Williams' discipline?

Page 204

1  A.    You will have to provide that with me before
2  I can attest to that. Do you have that?
3      Q.    No, I've not been provided that. But
4  I'm asking you if you know whether or not there was
5  a statement made by Ms. Lewis in regards to the
6  discipline that Mr. Williams received.
7  A.    I believe she made a statement, but I don't
8  believe it was regarding Williams.
9             To my recollection, Ms. Lewis
10 was disciplined by Deputy Warden Vetter for her
11 conduct. So this is the first time I'm hearing
12 this. And absent those documents, I'm really
13 stretching my memory. But this is the first time
14 I'm hearing about this sexual allegation.
15     Q.    Would you agree that Averment 14 is an
16 allegation of sexual harassment?
17 A.    Yes, I agree, based on how she is reporting
18 it. But I have no knowledge of it. It is her
19 report of the allegation.
20     Q.    Averment 22 states, "On or about
21 June 15th, 2022, Williams called Plaintiff Lewis
22 into his office. Williams said, 'Sit down. I'm
23 about to do some things to you.' Plaintiff Lewis
24 was so upset, she left the office and went into the

Page 205

1  bathroom. This was a severe incident of harassment
2  and discrimination."
3             Prior to me just reading that to
4  you right now, had you ever been made aware of this
5  allegation from Ms. Lewis against Mr. Williams?
6  A.    No.
7      Q.    Is that an allegation of
8  sexual harassment?
9             MR. SEIDMAN: Objection to form.
10        She is not a lawyer to determine what is
11        sexual harassment in a legal sense.
12 BY MR. COHEN:
13     Q.    You can answer, Commissioner.
14        MR. SEIDMAN: You can answer.
15 A.    It doesn't say anything in here about sex.
16 That's a comment. I don't know the context of it.
17 I can't answer that.
18     Q.    The document sustaining Ms. Lewis'
19 claim against Mr. Williams, do you know if that
20 document contains all of the allegations
21 Mr. Williams made regarding Mr. Williams -- sorry.
22 That's a terrible question.
23             Did anyone express their opinion
24 during the conversation on who to promote made in

Blanche Carney

Page 206

1  December of 2022 that Mr. Williams should not be
2  promoted on account of his discipline?
3  **A.     No.  We met as a panel.  Everyone who**
4  **interviewed, the panelists reviewed all disciplinary**
5  **records.  They reviewed the discipline.  And I**
6  **believe, if I recall correctly, two people had**
7  **discipline, one more severe than others.  And the**
8  **panel concluded that that would not stop the**
9  **deputy warden from this promotion.  And that was a**
10 **panel decision.  And I believe people put and**
11 **attested that they found him acceptable.**
12     Q.     Did you provide an opinion on whether
13 or not then-Deputy Warden Williams' discipline made
14 him acceptable or questionable as it pertained to
15 the promotion to warden?
16 **A.     The panel discussed.  And this was not --**
17 **okay, this -- the panel ruled that he was found to**
18 **be acceptable.**
19     Q.     Were you part of the panel discussion?
20 **A.     Yes.**
21     Q.     In that discussion, did you provide
22 your opinion to whether or not Norman Williams'
23 discipline in October of 2022 deemed him acceptable
24 for the promotion to warden?

Page 207

1  **A.     I, in my response, found him acceptable,**
2  **based on what I affixed at the top of his interview**
3  **record.**
4      Q.     Philadelphia Industrial Correctional
5  Center was found noncompliant in 2022 with state
6  regulations, correct?
7  **A.     Correct.**
8      Q.     At the time of that finding,
9  Norman Williams had site responsibility for
10 Philadelphia Industrial Correctional Center,
11 correct?
12 **A.     He did, with the lion's share of**
13 **Warden Farrell retiring in May of 2022, I believe if**
14 **I'm recalling.  So the lion's share of the facility**
15 **at that time, she would have been responsible for**
16 **ensuring that her facility did not fall under**
17 **violation.  And during that time, deputy warden was**
18 **performing.  And once it was discovered, he was**
19 **given direct, clear instruction.**
20         **So this wasn't a situation where**
21 **he was there longer than the other folks.  The**
22 **warden was still in place in May of 2023, I believe.**
23 **If you go could back to her record to see when she**
24 **retired.**

Page 208

1      Q.     I believe it's 2022, correct?
2  **A.     2022.**
3      Q.     So, yes.  And that's correct.
4  Warden Farrell retired May 13th, 2022.
5  **A.     Okay.**
6      Q.     And she was out on leave from the end
7  of 2021, correct?
8  **A.     That you would have to bring up so I could**
9  **review it, but that was the last facility with a**
10 **warden in place.  So based on his performance,**
11 **until, again, that's consistent with what I said is,**
12 **once you find out there's a deficiency and it's no**
13 **longer what you believe it is, you take the**
14 **appropriate action.**
15         MR. SEIDMAN:  Noah, I've got to
16 jump on that 4:30.
17         MR. COHEN:  Okay.
18         MR. SEIDMAN:  I will do my best
19 to get back here in 15 minutes, okay?
20         MR. COHEN:  All right.
21         (Short recess taken at
22 4:30 p.m.)
23         (Proceedings resumed at
24 4:48 p.m.)

Page 209

1          MR. COHEN:  Commissioner Carney,
2  I will share my screen, and I will show you a
3  document Bates stamped Plaintiffs 1007
4  through 1010.  I will mark this as Carney
5  Exhibit 21.
6          (Whereupon Carney-21 was marked for
7  identification.)
8  BY MR. COHEN:
9      Q.     Looking at the final page, where it
10 says "Ad. Board - 11/14," would this have been the
11 deputy prisons commissioner specifications in place
12 when you appointed Deputy Commissioner Clark?
13 **A.     Yes.**
14     Q.     At the time you appointed
15 Deputy Commissioner Clark, did he have a graduate
16 degree?
17 **A.     No.  He was enrolled.**
18     Q.     And would you agree that, on Page 3 of
19 the document, the minimum educational requirement is
20 a completion of a graduate degree to be a
21 deputy commissioner of the Philadelphia
22 Department of Prisons?
23 **A.     Yes.  Based on this spec, yes.**
24     Q.     And you also appointed

Blanche Carney

Page 210

1  Deputy Commissioner Beaufort, correct?
2  **A.   Correct.**
3       Q.   And that was in 2019, correct?
4  **A.   I would need you to confirm that date with**
5  **me.**
6            MR. COHEN:  Mark this as Carney
7       Exhibit 22.
8            (Whereupon Carney-22 was marked for
9            identification.)
10  BY MR. COHEN:
11      Q.   It's at seven-page document Bates
12  stamped City 1540 through 1546.
13            The first page here at the
14  bottom here -- and I will make it a little bigger --
15  has a date of February 7th, 2019.  Can you see that,
16  Commissioner?
17  **A.   Yes.**
18      Q.   And if you look up here, as of that
19  date, Deputy Commissioner Beaufort was not yet on
20  the organizational hierarchical chart, correct?
21  **A.   Correct.**
22      Q.   Going to the next page, in this, on
23  the second page, Deputy Commissioner Beaufort is on
24  the chart, correct?

Page 211

1  **A.   Correct.**
2       Q.   The date of that chart is
3  September 10th, 2019, correct?
4  **A.   Correct.**
5       Q.   Do you have any reason to doubt the
6  dates on these hierarchical organizational charts?
7  **A.   No.**
8       Q.   So based upon that, would you agree
9  that you appointed Deputy Commissioner Beaufort in
10  2019?
11  **A.   Yes.**
12      Q.   And would these same specifications in
13  Carney Exhibit 21 have been applicable at the time
14  you appointed Deputy Commissioner Beaufort as well?
15  **A.   Yes.**
16      Q.   And at the time you appointed
17  Deputy Commissioner Beaufort, he did not have a
18  graduate degree, correct?
19  **A.   Correct.  He was enrolled as well in a**
20  **graduate program.**
21      Q.   Have you ever appointed a woman to a
22  position?
23  **A.   Yes.**
24      Q.   Who is that?

Page 212

1  **A.   Natalie Payne, who is our training academy**
2  **director, which was once held by a male.  Captain**
3  **Sharlise Forman, who -- that position was for -- to**
4  **replace Earicka Patterson when she was promoted to**
5  **the position of warden from deployment.  I had a**
6  **public information officer, Mary -- Molly Salerno**
7  **that was appointed.**
8       Q.   Were those -- sorry.
9  **A.   No, go ahead.  I'm just trying off the top**
10  **of my head.**
11            **And Earicka Patterson, who is a**
12  **woman that's been appointed to the position of**
13  **warden for Philadelphia Industrial Correctional**
14  **Center.**
15      Q.   What's the difference between hired
16  and being appointed?  Is there a difference as
17  terminology?
18  **A.   The hired, they are already here, with the**
19  **exception of the folks that are my executive exempt**
20  **positions.  In the case with Earicka Patterson, she**
21  **was promoted from deputy warden to the warden when**
22  **Norman Williams was demoted as warden during the**
23  **probationary period.**
24      Q.   So there are certain positions that

Page 213

1  the Commissioner can appoint, correct?
2  **A.   That is correct.  And the**
3  **deputy commissioner positions are considered exempt**
4  **positions.  And based on the talent and the**
5  **skill set that I had readily available, those**
6  **decisions were made to appoint those**
7  **deputy commissioners.**
8       Q.   The women that you just testified to
9  that were appointed, how many of those were to
10  exempt positions?
11  **A.   Two.  That was Molly Salerno, who served as**
12  **my public information director, and Natalie Payne,**
13  **who trains as the training academy director.**
14      Q.   Have you ever appointed a woman to a
15  position that she did not have the minimum
16  educational requirement for?
17  **A.   That would be Captain Forman.**
18  **Captain Forman, that position is held initially by**
19  **Marco Giannetta.  And then that was**
20  **Earicka Patterson.  That resulted in a vacancy.**
21            **And then as the captain, she had**
22  **some experience -- pretty much a lot of good**
23  **experience to do that position.  She just needed to**
24  **be -- I don't think it was an educational**

Page 214

1  requirement with her for that position.  And I don't
2  think that's a separate stand-alone -- that's an
3  internal post that we created.
4           So in that case, I would have to
5  say no, without the specifics for her.  Because I
6  don't think that's a deployment lieutenant -- I mean
7  to deployment deputy warden.  It's just a unit that
8  they cover.
9       Q.    So when you appointed
10 Deputy Commissioner Beaufort to the
11 deputy commissioner position, he was a deputy warden
12 at the time, correct?
13 A.    Yes.
14      Q.    Are you aware of any other individuals
15 who have been appointed deputy commissioner directly
16 from deputy warden?
17 A.    Not that I can recall.
18      Q.    At the time --
19 A.    Wait.  From deputy warden to
20 deputy commissioner?
21      Q.    Yes.
22 A.    Yes.  Gerald May.  Gerald May was a
23 deputy warden, and, based on his skill set, he was
24 promoted.  Yes.

Page 215

1       Q.    And when was that?
2  A.    I can't recall.  I previously testified to
3  that.  And that's a little heavy for me, because
4  he's deceased.  So I would need the information.
5       Q.    Was Gerald May ever a warden?
6  A.    No.
7       Q.    At the time you appointed
8  Deputy Commissioner Beaufort, there were four
9  wardens, correct?
10 A.    Yes.
11      Q.    Which of the four wardens expressed an
12 interest in become deputy commissioner, if any?
13 A.    They all expressed, I believe, at that time
14 interest in becoming a deputy commissioner.
15      Q.    Did Warden Delaney express an interest
16 in becoming deputy commissioner?
17 A.    Yes.
18      Q.    Did Warden Delaney receive any
19 discipline while he was a warden?
20 A.    Yes.
21      Q.    Did Warden Giannetta receive any
22 discipline while she was a warden?
23 A.    Yes.
24      Q.    Did Warden Farrell receive any

Page 216

1  discipline while she was a warden?
2  A.    Yes.
3       Q.    Did Warden Talmadge receive any
4  discipline while she was a warden?
5  A.    Yes.
6       Q.    Have you ever disciplined
7  Deputy Commissioner Clark?
8  A.    No.
9       Q.    During your employment with the
10 Philadelphia Department of Prisons, have you and
11 Deputy Commissioner Clark ever been intimate?
12 A.    No.
13      Q.    Is there any documentation reflecting
14 the leadership skills of Norman Williams?
15 A.    There is documentation.  When he was
16 promoted to warden, not one, but two incarcerated
17 people escaped on his watch.  That was documented
18 publicly.  And he was demoted back from warden to
19 deputy warden.
20      Q.    Is there any documentation showing
21 positive leadership skills for Norman Williams?
22 A.    Other than what you would have access to,
23 which would be his evaluation, which I would not be
24 the countersigner of.

Page 217

1       Q.    Other than that, none?
2  A.    No.
3       Q.    Is there any documentation reflecting
4  leadership skills of Steven Angelucci?
5  A.    No, other than his performance evaluations
6  and his direct observable leadership skill for the
7  incidents that I previously testified to.
8       Q.    When you say "his direct observable
9  leadership skills for the incidents you've
10 previously testified to," is there documentation
11 you're aware of for those incidents?
12 A.    Not to my knowledge.
13      Q.    Is there any documentation reflecting
14 leadership skills of Pierre Lacombe?
15 A.    Not to my knowledge.  Other than the
16 performance evaluations that they have.  And I'm not
17 the co-signer on those.
18      Q.    Does receiving discipline as a warden
19 hinder one's ability to be promoted to
20 deputy commissioner?
21 A.    No.  It's taken, again, in the totality and
22 review of the circumstances.
23           MR. COHEN:  I will mark this as
24 Commissioner Exhibit 23.  It's a four-page

Blanche Carney

Page 218

1      document Bates stamped Plaintiffs 1011
2      through 1014.
3           (Whereupon Carney-23 was marked for
4      identification.)
5  BY MR. COHEN:
6      Q.   On the fourth page, it's signed and
7  dated by Warden Farrell.  Do you see that?
8  **A.   Yes.**
9      Q.   On the third page, Paragraph 25
10  states, "Commissioner Carney targeted myself for
11  unwarranted discipline in order to keep me from
12  being promoted to deputy commissioner and to instead
13  promote unqualified men to the position."
14           Do you see that?
15  **A.   Yes, I do.**
16      Q.   And then in Paragraph 31, she states,
17  "The three times I received discipline during my
18  employment with the PDP was from Commissioner Carney
19  or upon her orders and was unjustified."
20           Do you disagree with that
21  allegation?
22  **A.   Yes, I do.**
23      Q.   Under Paragraph 32, it states, "The
24  first discipline I received from her was when I was

Page 219

1  warden at CFCF preparing for the Pope's visit."
2           Did she receive discipline from
3  you while she was warden at CFCF preparing for the
4  money's visit?
5  **A.   I don't recall that discipline.**
6      Q.   Do you know if prior to being warden
7  under your command she had ever received discipline?
8  **A.   I don't know.**
9      Q.   Is it fair to say that you and
10  Warden Farrell had conflict?
11  **A.   Not initially.  Warden Farrell and I were**
12  **once assigned to the transition team for Riverside**
13  **Correctional Facility, and we were assigned to a**
14  **trailer on the campus to prepare to open that**
15  **facility.**
16  **       And Warden Farrell didn't have**
17  **much friends.  The staff over there would not engage**
18  **with her.**
19  **       And because we sat across from**
20  **each other, we became good co-workers, because I was**
21  **one the only staff who would engage with her.  We**
22  **had a good working relationship up until we both**
23  **came up for the deputy commissioner position.**
24  **       And, again, going back to the**

Page 220

1  **survey of nepotism, racism, and sexism, the prison**
2  **has a longstanding history of "I'm up next" of**
3  **entitlement, and she believed she was up next.**
4  **       We both tested for the oral**
5  **exam.  We were scored.  We had an interview panel**
6  **here at the prison, and I was selected.  And our**
7  **relationship went sour from there.**
8  **       She had a very difficult time**
9  **accepting that I was promoted to deputy commissioner**
10  **and not her.**
11  **       And she did not mince words**
12  **about it.  She would express that to staff, "How did**
13  **she get it job?"  So that's when it went sour.**
14      Q.   And that was in 2015; is that correct?
15  **A.   Yes.**
16      Q.   So fair to say for the next
17  seven years or so, until her retirement, there was
18  conflict between the two of you?
19  **A.   There was no conflict on my part.  I'm the**
20  **Commissioner.  I'm going to hold you accountable to**
21  **perform your duties.**
22      Q.   Is an oral examination a good way of
23  determining rank for a promotion?
24  **A.   It's a tool you can utilize to ascertain the**

Page 221

1  **knowledge of the applicant, but it's not a sole**
2  **indicator.  You can have an T&E as well.**
3      Q.   Comparing a T&E and an oral exam, what
4  are the strengths of each?
5  **A.   I would refer that to the Office of Human**
6  **Resources that ranks that.  Because we don't serve**
7  **as the panel for oral exams.  They hire folks that**
8  **are subject matter experts to be on that panel to**
9  **assess, and they use criteria scoring.  And as far**
10  **as T&E, I defer to Central HR, because I don't know**
11  **what assessment they are using to come up with their**
12  **ranking system.**
13      Q.   The promotional exam for warden that
14  was done in 2022 was initially an oral exam,
15  correct?
16  **A.   I can't recall for certain.  I'm not sure.**
17  **If you know it was, if you could share that.**
18          MR. COHEN:  Sure.  This is a
19      nine-page document, starting at Plaintiffs 13
20      through Plaintiffs 21.
21          (Whereupon Carney-24 was marked for
22      identification.)
23  BY MR. COHEN:
24      Q.   And going to the first page.  And I

Blanche Carney

Page 222

1  will mark this as Carney Exhibit 24.
2          It states, "Applicant Portal,
3  Warden."  And then on the second page, it shows
4  "Announcement Details, Exam Announcement Details."
5          Do you see that?
6  A.    Yes.
7      Q.    And is this the announcement for the
8  warden that led to the promotions of Warden Lacombe,
9  Warden Williams, and Williams Angelucci?
10  A.    I would have to see when that was announced.
11  I see a date, but I can't confirm that.  I know they
12  were interviewed in December.  So the likelihood,
13  yes, but I need documentation.  A lot of dates
14  running around.
15      Q.    Fair enough.  See if we can do it this
16  way.  Under exam number -- I will make this a little
17  bigger.
18          Do you see the exam number for
19  this exam is 5H12-20220711-23-00?
20  A.    Yes.
21          MR. COHEN:  And I will mark this
22  as Carney Exhibit 25.
23          (Whereupon Carney-25 was marked for
24          identification.)

Page 223

1  BY MR. COHEN:
2      Q.    It's a three-page document Bates
3  stamped City 1834 through 1836.
4          Looking at page 3 of
5  Carney Exhibit 25 and looking at the rank of who is
6  on this list, would you agree that this is the list
7  that Wardens Williams, Angelucci, and Lacombe were
8  promoted from?
9  A.    Yes.
10      Q.    And that this list number is the same,
11  5H12-20220711-23-00, as this number here on Carney
12  Exhibit 24?
13  A.    Yes.
14      Q.    And then, going to page 19, that this
15  announcement was for an oral exam, correct?
16  A.    A virtual oral exam, yes.
17      Q.    No oral exam was given for this
18  promotional list, right?
19  A.    I don't know that to be certain.  You would
20  have to confirm it.  I don't want to guess and say
21  yes or no.  I want to provide accurate testimony.
22      Q.    Do you know whether a decision was
23  made by the Philadelphia Department of Prisons to
24  have the exam done by a T&E instead of an exam

Page 224

1  program?
2  A.    I cannot recall.
3      Q.    If that decision were to be made, who
4  would make it?
5  A.    That would be either myself, Deputy Warden
6  Beaufort, and then HR would submit it.  But I cannot
7  recall is it a T&E or an oral exam.
8      Q.    Which type of exam would be better for
9  ensuring that certain individuals were ranked higher
10  than others?
11  A.    It's not an either/or.  They are both
12  acceptable forms.
13          Ultimately, the applicant has to
14  pass and excel in that interview with the panel.
15  This is just ranking you.
16          In this case, everyone on this
17  list had an opportunity to present and be
18  interviewed.  No one was excluded.
19          So either -- I don't have an
20  either/or.  Both of them are acceptable versus Civil
21  Service.  They will rate these candidates as they
22  normally do, and then we get that information.
23          No one was excluded from an
24  interview on this list, regardless of if it was oral

Page 225

1  or a T&E.
2      Q.    Does a higher ranking benefit the
3  applicant in regards to this specific list I'm
4  referring, the one that's 5H12-20220711-23-00?
5  A.    No.  Because the City changed the
6  Rule of Two.  The Rule of Two was to ensure that
7  cronyism, years ago, they were able to address.
8          So before you had the
9  Rule of Two, you had to take and choose from one of
10  the top two or work your way through the list.  The
11  new process is to ensure that you go the best
12  applicant for the job.
13          So under this list, everyone --
14  this was no longer a Rule of Two.  It was you go
15  into this interview.  You show what you know.  You
16  do your best.  You shine above the rest, to say,
17  "Ah, this position's for me.  I can do this job."
18          No one was excluded.  No longer
19  the Rule of Two.
20          Because people were held to --
21  you had to force one or two.  That didn't get you to
22  the best candidate.  That's why the City changed the
23  Civil Service rules.
24      Q.    So you've said you were part of the

Blanche Carney

Page 226

1  conversation regarding who to promote from this
2  list, correct?
3  A.    I was on the panel, correct.
4      Q.    Once the interviews were done, did you
5  and the other panel members discuss who to hire?
6  A.    Yes. We discussed how people were rated,
7  whatever it was, and was there any reason not to
8  accept people based on how they interviewed.
9      Q.    And of these eight individuals on the
10 list, was anyone excluded from being promoted from
11 your conversation with the other panel members?
12 A.    Yes. That was William Vetter, who also had
13 discipline, and he did not do exceptionally well in
14 the interview, as compared to the other seven
15 applicants.
16     Q.    Were any of the other applicants
17 excluded?
18 A.    No.
19     Q.    How did you pick Norman Williams,
20 Steven Angelucci, and Pierre Lacombe out of the
21 seven applicants that were left after William Vetter
22 was excluded?
23 A.    Based on the panel forms and how the panel
24 rated the individuals, they found them to be

Page 227

1  acceptable for the position when comparing all eight
2  individuals on this list.
3      Q.    Once William Vetter was excluded, were
4  the other seven candidates rated against each other?
5  A.    They were not rated against each other. It
6  was -- again, you no longer have the Rule of Two.
7  It was their performance in the interview.
8          This is no longer a Rule of Two.
9  It's the performance and how they presented in the
10 interview.
11     Q.    So you said that the seven
12 individuals, other than William Vetter, on this list
13 were all deemed acceptable, correct?
14 A.    No. That wasn't the question you asked me.
15 You asked me if I excluded anyone. No one was
16 excluded.
17     Q.    Okay. Then let me ask you that
18 question.
19          Of these seven individuals,
20 other than William Vetter, how many were deemed
21 acceptable by the panel?
22 A.    I believe five were acceptable by the panel.
23     Q.    Which five?
24 A.    That would be Norman Williams,

Page 228

1  Steven Angelucci, Pierre Lacombe, Earicka Patterson,
2  Robert Rose. And I don't believe -- myself, I did
3  not find Jennifer Albandoz or Adrienne Lyde
4  acceptable. They were both questionable, based on
5  their performance for the interview.
6      Q.    When you say you made that decision,
7  is it ultimately your decision to make who is
8  acceptable and who is questionable?
9  A.    No. Because the panel list, each weigh in
10 and share their observation. And then, ultimately,
11 based on the totality of it, there was another rater
12 or who did not find Albandoz or Lyde acceptable as
13 well.
14         If everyone is acceptable, okay,
15 that makes it okay. But when you have questionable
16 or unacceptable, that doesn't make them now meeting
17 the criteria where they are acceptable. So that's
18 not going to be just on me.
19         There was another rater. I
20 believe it was Mr. Vrato. And he found them
21 questionable as well.
22         So in that case, this is not
23 group think here. Everyone has their own ability to
24 make a decision, to render a comment, and this is

Page 229

1  not group think.
2          So they too, myself and
3  Mr. Vrato, found them questionable based on their
4  performance.
5          They were reading from notes.
6  They kept asking questions, "Is this in regards to
7  what position?" They struggled to answer
8  security-related questions.
9          So when you are put up against
10 not Rule of Two but six other individuals, you have
11 to demonstrate what you know. And they weren't able
12 to do that. And they were questionable for me.
13     Q.    I understand they were questionable
14 for you.
15 A.    And Mr. Vrato.
16     Q.    And Mr. Vrato.
17         What I'm trying to understand is
18 the process by which you came to Norman Williams,
19 Steven Angelucci, and Pierre Lacombe.
20         So I understand that initially
21 William Vetter is excluded, correct?
22 A.    Correct.
23     Q.    And then you've got seven people left.
24         Was there a second winnowing,

Blanche Carney

Page 230

1  where you excluded, as a group, Jennifer Albandoz
2  and Adrienne Lyde before you got to the final five?
3    A.    No. The panelists expressed that Norman
4  Williams, Steven Angelucci, and Pierre Lacombe were
5  acceptable. We went through every single applicant.
6  Everyone found them acceptable. No objection.
7    Q.    Right. And as you've testified, under
8  Rule of List, you don't just look at the top people,
9  right? You look at the whole list; am I correct?
10   A.    Yes, we looked at the whole list. And it's
11  based on how people present. They just happened to
12  be the top three.
13          They could have been four, five,
14  and six. But if they excel during the interview --
15  this is, again, not entitlement, not legacy, not
16  "I'm supposed to be up next." This is based on
17  performance and how well the individual interviewed.
18          And this goes to the City's
19  process to make sure that, even though someone
20  scores this way, your best candidate could have came
21  in at four, five, and six. That removes the
22  Rule of Two.
23          So the panelists found them
24  acceptable and didn't just say, "Oh, he's number 1.

Page 231

1  He's number 2. He's number 3."
2          No. They indicated they were
3  acceptable. And then they compared them against the
4  other applicants.
5    Q.    So are you testifying that their
6  ranking had no impact on whether or not they were
7  hired?
8    A.    That's what I'm saying. Because we no
9  longer are bound by the Rule of Two. The Rule Of
10  Two made you bound by that ranking.
11          This now, you are trying to get
12  the best applicants for the job. And they still
13  have to come in and do well.
14   Q.    Did the entire group find
15  Earicka Patterson acceptable?
16   A.    Yes.
17   Q.    Did the entire group find Robert Rose,
18  Junior acceptable?
19   A.    Yes.
20   Q.    Did the entire group find
21  Jennifer Albandoz questionable?
22   A.    No.
23   Q.    Did the entire group make a
24  determination, as a group, of whether or not

Page 232

1  Jennifer Albandoz was acceptable or questionable?
2    A.    Yes.
3    Q.    What was that determination?
4    A.    That, because she had two questionables,
5  that would not override the applicants that all had
6  acceptables.
7    Q.    Same question regarding Adrienne Lyde.
8    A.    Same answer.
9    Q.    And you said that the other individual
10  on the panel who rated Ms. Lyde and Ms. Albandoz
11  questionable was Chief of Staff Vrato, correct?
12   A.    Correct.
13   Q.    The reason he rated them questionable
14  was because they lacked supervisory experience on
15  the correctional side, correct?
16   A.    You would have to show me his rating sheet.
17  I can't take a stab at that.
18   Q.    Well, do you remember from talking
19  about it?
20   A.    No. You are asking me to really dig deep.
21  If you have the form, that would be helpful.
22   Q.    So this is the form Mr. Vrato filled
23  out regarding Ms. Albandoz. It's Bates stamped
24  City 1854.

Page 233

1    A.    Okay.
2    Q.    Did Mr. Vrato, based upon this, deem
3  Ms. Albandoz questionable because she lacked
4  supervisory security experience?
5    A.    Yes. And that's also going back to your
6  job description, where it's "or, or, or."
7          Now, you would have to ask him
8  how he came up, but I'm reading it here, but it does
9  say "or, or, or." It doesn't say "and, and, and."
10  So he rated her based on that document you showed me
11  with the job description. But I see that he rated
12  her as such.
13          And again, this attests to this
14  isn't group think. You have individuals serving as
15  panelists, and what's important to him, he rendered
16  a decision.
17   Q.    Is that a valid basis to deem
18  Ms. Albandoz questionable for the warden position?
19         MR. SEIDMAN: Objection to form.
20  Valid in terms of the Civil Service
21  Regulations or her personal belief?
22  BY MR. COHEN:
23   Q.    Can you answer the question,
24  Commissioner, without a clarification?

Blanche Carney

Page 234

1  A.    I can't speak for Mr. Vrato. You have to
2  ask him that question. You're asking me to override
3  and interpret what he was thinking. Now, I'm not
4  supposed to have influence on him. I can't --
5  please let me finish.
6         In this case, I cannot answer
7  that question. This was his comments in his own
8  handwriting.
9     Q.    Are you testifying that the lack of
10 supervisory security experience is a legitimate
11 basis to deem an applicant for warden questionable?
12 A.    That is not legitimate. I can speak to my
13 comments. When asked the same security question of
14 all applicants, Ms. Albandoz couldn't answer the
15 question for me. She floundered. She was making a
16 joke. She was reviewing notes. She simply could
17 not answer the question.
18          Now, this is Mr. Vrato's. You
19 would have to ask Mr. Vrato his thought. I'm only
20 speaking for my rating.
21          But she had an opportunity to
22 answer the question fully, to the best of her
23 ability. And that same question was presented to
24 the rest of the applicants.

Page 235

1     Q.    Going back to the list, if
2  Ms. Albandoz and Ms. Lyde were deemed not to be as
3  worthy of being promoted because of two individuals
4  on the panel dealing them questionable, the other
5  five members left were rated against each other,
6  correct?
7  A.    The best applicants were selected. This is
8  not where you're saying one, two, and three. You
9  compared and said who did well, who answered the
10 questions, who performed, who demonstrated
11 leadership, ability, knowledge, all of that. You
12 had five other people who were all acceptable.
13          And I can't keep going back.
14 This is not a group think. Everyone does not have
15 to agree. It's based on the individual applicant.
16 And those individuals were identified as acceptable
17 and two were not, of the panelists.
18          The majority of those folks all
19 had acceptables. Ms. Albandoz and Ms. Lyde had
20 questionables.
21    Q.    Mr. Williams had a questionable.
22 A.    Did he? If you can bring it up. But that
23 wasn't something you asked me. And I don't have it
24 in front of me. Certainly, if you have the

Page 236

1  document, please present it.
2     Q.    Sure. So going to Mr. Vrato's
3  evaluation of Mr. Williams, he deemed Mr. Williams
4  questionable, correct?
5  A.    Yes. "Major Williams is an otherwise
6  qualified candidate, but his current discipline
7  makes him questionable. He has the extensive
8  experience, exhibits and has problem-solving,
9  communicates clearly, motivated professional."
10          So he rated that on his
11 discipline.
12          Was he the only other one that
13 had that?
14    Q.    Why was that insufficient to
15 disqualify Mr. Williams from being warden?
16 A.    The panel agreed that was not sufficient
17 enough. That discipline -- what his performance at
18 the interview -- I mean, he did exceptionally well
19 as compared to Albandoz and Lyde without discipline.
20          They were still -- they could
21 not answer the questions. So now you're looking at
22 the system working the way it's supposed to. You
23 are not excluding people based on discipline. They
24 still have to show up and perform. But even having

Page 237

1  no discipline, they still failed in comparison to
2  Williams.
3          MR. COHEN: I'd like to go to
4  six. Then I think we should be done. That's
5  seven hours.
6          THE WITNESS: Okay.
7          MR. COHEN: Commissioner, I will
8  mark this as Carney Exhibit 26.
9          (Whereupon Carney-26 was marked for
10 identification.)
11 BY MR. COHEN:
12    Q.    It's a six-page document Bates stamped
13 Plaintiffs 1015 through 1020, signed by
14 Warden Giannetta on page 6.
15          And going to page 5,
16 Warden Giannetta states, "Given that Warden John
17 Delaney retired a few months later, all three
18 wardens who were qualified for the
19 deputy commissioner position were female:
20 Warden Talmadge, Warden Farrell, and myself.
21 Instead of promoting a woman, however,
22 Commissioner Carney chose instead to promote
23 Deputy Warden Xavier Beaufort to the
24 deputy commissioner position. I believe not

Blanche Carney

Page 238

1  considering Warden Talmadge, Warden Farrell, or
2  myself for the position was discriminatory on the
3  basis of our sex."
4          Did you consider
5  Warden Talmadge, Warden Farrell, or Warden Giannetta
6  for the position of deputy commissioner?
7  A.    No, I did not.  And it was based on their
8  performance.  They were all underperforming as
9  wardens.  It was that entitlement.
10         When the City began doing their
11 diversity, equity, and inclusion work -- and
12 Nolan Atkinson was the director of that unit for the
13 City -- the departments were tasked to make sure
14 that nepotism, sexism, and racism were no longer
15 supported.
16         The DEI work, which is, I just
17 explained, diversity, equity, and inclusion, we had
18 our initial meeting here at the CFCF, third floor
19 conference room.  Nancy Giannetta remarked at that
20 time, "They're taking our jobs."  "They."
21         That is totally what the City
22 was trying to do away with.  And that reinforced the
23 results of the survey, which were sexism, racism,
24 nepotism.

Page 239

1          Now, Nancy Giannetta, lackluster
2  performance, didn't know how to command.
3          We had staff who would just walk
4  off their post.  I instructed DC Clark for the
5  warden to address roll call, to address her
6  workforce for the expectations, to acknowledge their
7  challenges and their frustrations.
8          She stood right at the area of
9  the facility where staff came out and were leaving
10 their posts in record numbers without being properly
11 relieved and said, "I don't know what difference
12 this makes.  It's not going to help."
13         You're the warden of the
14 facility.
15         So her performance was
16 lackluster.
17         Then she also became
18 intoxicated, her and her husband, where
19 Deputy Commissioner Clark called her husband,
20 Marco Giannetta, to ask a question or ask her a
21 question, and, on their time off, they were having
22 cocktails, and they cursed at the
23 deputy commissioner.  He disciplined them, and the
24 case the charges were upheld.

Page 240

1          At these positions,
2  Nancy Giannetta had become accustomed and thought it
3  would be entitlement.  As people historically
4  promoted up at the prison, the higher you got, the
5  less work you did.  And she was part of that thought
6  process.
7          But corrections was changing.
8  It was criminal justice reform, and there was a lot
9  more emphasis placed on the warden's leadership to
10 get new initiatives, programs, activities for the
11 population.  She didn't subscribe to that.
12         Cathy Talmadge, who has
13 discipline for providing a false statement before I
14 was appointed, under my appointment did the same
15 thing.  She had a correctional officer and provided
16 a false statement, and when she was caught in that
17 lie, she couldn't do much with it and tried to back
18 her way out of it.
19         She had a correctional officer
20 intentionally assigned to a housing unit to cover
21 the incarcerated population where none existed,
22 again, consistent with providing false statements,
23 and subscribed to the higher you get, the less work
24 you do.

Page 241

1          That's corrections back in the
2  '80s and the '90s.  Criminal justice reform requires
3  so much of your wardens now.
4          Warden Farrell had an issue
5  with me being promoted and was lackluster and made
6  no qualms about being as resistant as possible and
7  subscribed to not always moving forward with
8  criminal justice reform.
9          Criminal justice reform means
10 that people should be treated with dignity and
11 respect, and they should be given what they're due.
12         These wardens had legacy here.
13 And just because they thought they were next in
14 line, they were not the best candidates.  And that
15 is why Deputy Commissioner Beaufort was promoted to
16 deputy commissioner.
17         I considered them based on how
18 they were operating their facilities.  Did they
19 subscribe to criminal justice reform?  And they
20 still were just in that mindset, "I'm up next.  I
21 can sit at any desk, put my feet up and let it go."
22         So much more is required of a
23 warden.  And they didn't demonstrate it.
24         And each time they were

Blanche Carney

Page 242

1  disciplined, it was warranted.
2      Q.    What discipline had Warden Talmadge
3  received prior to being under your leadership?
4  A.    Warden Talmadge, I believe, received
5  discipline when she provided a false statement that
6  she was not in an area.  It was reported by
7  Deputy Warden Vetter that she was taking and
8  removing items from the facility.  When he brought
9  that to attention of the leadership, she provided
10  the false statement and said, "It wasn't me.  I
11  wasn't even there."
12          But her swipe card indicated
13  otherwise.  And she was -- the charges were upheld,
14  and she was found guilty.
15      Q.    Is it fair to say you had conflict
16  with Warden Talmadge while she was a warden under
17  your leadership?
18  A.    No, I had no conflict with her.
19      Q.    Is it fair to say you had conflict
20  with Warden Giannetta when she was a warden under
21  your leadership?
22  A.    No.  This was holding people accountable.
23  This was making sure, as a warden, you just weren't
24  the warden of old days.  You had to work.  And if

Page 243

1  holding you accountable, requiring you to perform,
2  was interpreted as conflict, that's their
3  interpretation, but I held them accountable to do
4  the job.
5      Q.    What role did you play in changing the
6  requirement that a warden needs a bachelor's degree?
7  A.    We were at the forefront with criminal
8  justice reform.  And now most, if not all, of your
9  public safety clusters are doing what we did two or
10  three years ago.  Because, again, data is driving
11  your decisions.  We knew that our workforce who were
12  to meet those requirements would be slim to none.
13          You just recently had the
14  Pennsylvania State Troopers remove their requirement
15  and adjust.  You just recently had the Philadelphia
16  Police Department remove some of their requirements
17  and adjust.  Because you can no longer get the
18  numbers that you want once attracted to these
19  positions.
20          Based on the data, we were at
21  the forefront.  And I didn't want to be in a
22  position where you only had one or two people and
23  you had multiple positions.
24          These positions are serious

Page 244

1  positions.  They were crucial to efficient and safe
2  operations.
3          So if you know and you can
4  forecast that in advance -- which it's documented,
5  we were at the forefront.  Other public safety
6  departments are just now doing that -- that was the
7  right decision to make, because the workforce had
8  changed.  So you knew that, based on the data, who
9  you had in your workforce.
10      Q.    So what did you do to effectuate that
11  change, in other words, to remove the bachelor's
12  degree requirement from the warden specifications?
13  A.    So that was to expand our applicant
14  potential pool.  And I worked closely with the
15  Office of Human Resources, who is responsible for
16  managing that.  There were several meetings back and
17  forth.  And ultimately, the rationale was accepted.
18          And the rationale is now
19  supported by the Philadelphia Police Department on
20  what changes they made, the Pennsylvania State
21  Troopers, the decisions that they make.
22          And you're seeing more of this.
23  Because when you're looking at data, your existing
24  pool, looking at who is going to retire or who has

Page 245

1  the potential, you should position yourself to be
2  ready so you are not looking at the slimmest of
3  selection.
4          Because, again, you cannot
5  simply put someone in this position because they
6  think they are next or they are legacy.  That would
7  create a bedlam for me and five times the work as a
8  commissioner.
9      Q.    Eliminating that bachelor's degree
10  retirement benefitted Norman Williams, correct?
11  A.    It didn't benefit any particular individual.
12  Eliminating and removing that and revising that made
13  it accessible to people who would not have had that
14  opportunity but had a skill set and had experience.
15  So that expanded the pool.  That was not designed to
16  cherrypick for any individual.
17      Q.    Were you happy with the job
18  Norman Williams was doing at PICC with oversight
19  responsibilities prior to his promotion?
20  A.    He was status quo and it was acceptable.
21      Q.    Cancelling the February, 2022,
22  promotional exam for warden benefitted
23  Norman Williams, correct?
24  A.    No.  I gave no thought to the cancellation.

Blanche Carney

Page 246

1  **Again, my answer, I've testified. I did not have**
2  **time to sit down and think of who would be**
3  **benefitted and who wouldn't. I was maintaining**
4  **operations during a pandemic, for which you don't**
5  **have any idea of what it took to lead this**
6  **department during a pandemic that set the global**
7  **population down.**
8       Q.    Cancelling the February, 2022,
9  promotional exam for warden let Steven Angelucci
10 qualify for the promotional list when it occurred
11 later on that same year, correct?
12          MR. SEIDMAN: Let him? Object
13      to form. No. It allowed him to take an
14      exam.
15              MR. COHEN: Sure. Let's ask
16      that question.
17 BY MR. COHEN:
18      Q.    If the 2022 promotional exam for
19 warden had been given in February, would
20 Steven Angelucci have been able to take it?
21              MR. SEIDMAN: Objection to form.
22      I don't think she can answer that question.
23          MR. COHEN: I'll ask it.
24          MR. SEIDMAN: Civil Service

Page 247

1      could decide.
2  BY MR. COHEN:
3      Q.    Can you answer the question,
4  Commissioner?
5  A.    **No, I cannot.**
6      Q.    Okay. Did he meet the requirements
7  for the warden position that were in place in
8  February of 2022?
9  A.    **Yes.**
10     Q.    How so?
11          Let me ask it this way: Did he
12 have the specific experience to meet the minimum
13 requirements for warden in February, 2022?
14 A.    **OHR determined that he met the requirements.**
15     Q.    They made that determination for the
16 exam that was given in September, correct?
17 A.    **September of what?**
18     Q.    2022.
19 A.    **Yes.**
20     Q.    Right. I'm asking about in February,
21 did he meet the --
22 A.    **OHR didn't render a decision on him, did**
23 **they? I'm not sure if he applied for it.**
24     Q.    Well, it was canceled, right? So

Page 248

1  there was no application.
2  A.    **Okay. I don't have that in front of me.**
3  **And we've been talking about a lot of dates, and you**
4  **know I'm asking for information so I can answer it**
5  **correctly.**
6      Q.    So we have been talking about a lot of
7  dates and a lot of information. So I will
8  reiterate, Ms. Lyde was ranked one on the 2020
9  February exam, correct?
10 A.    Yes.
11     Q.    And then, looking at the 2022 exam,
12 she's ranked last, right?
13 A.    Yes.
14     Q.    Did changing the exam structure from
15 an oral exam to a T&E negatively affect Ms. Lyde's
16 ranking?
17 A.    **I can't answer that question. I previously**
18 **answered you have to ask OHR. Both of these are**
19 **acceptable methods. I don't know the full context**
20 **of what they used to arrive here. You would have to**
21 **ask OHR.**
22     Q.    Was the Philadelphia Department of
23 Prisons involved in the training and experience
24 grading criteria?

Page 249

1  A.    **No, we were not. That is done by OHR under**
2  **the Civil Service guidelines. A department cannot**
3  **rate and grade its -- we wouldn't even know where to**
4  **begin. We are not proficient in OHR certification**
5  **and the skills required to certify a list.**
6      Q.    How long have you worked for the
7  Philadelphia Department of Prisons?
8  A.    **Twenty-eight years.**
9      Q.    In that time, do you know of any
10 promotional lists for warden that existed where
11 vacancies existed for the warden position that were
12 not filled from an active promotional list?
13 A.    **I do not know. There have been several**
14 **commissioners in place during that time, and I do**
15 **not know. I don't have access to that information.**
16     Q.    During your time as commissioner, have
17 you let any other promotional lists expire where
18 vacancies existed for the position without promoting
19 from the list?
20 A.    **Yes. Not as commissioner, but as a Human**
21 **Service Program Administrator. In 2014, then former**
22 **Commissioner Louis Giorla, we had about 30-plus**
23 **applicants for social work service manager, and we**
24 **were not able to onboard those folks. Those folks**

Blanche Carney

Page 250

1    went and accepted other positions, and the list
2    ultimate just expired.  So that was the time that I
3    can recall.
4                But not as the Commissioner.
5    Because, as I testified before, you can't have one
6    deputy -- I mean one deputy warden running an entire
7    facility.
8                So based on my recollection, I
9    don't believe that's the case.
10    Q.    And you have been Commissioner, at
11    this point, for seven years, correct?
12    A.    It's eight years.  Seven and a half.
13    Q.    How many promotional lists have
14    existed -- can you estimate? -- during the seven and
15    a half years you have been commissioner?
16    A.    I cannot estimate and wouldn't try.
17                MR. COHEN:  I think we are up to
18    27.  I will mark this as Carney Exhibit 27.
19            (Whereupon Carney-27 was marked for
20            identification.)
21    BY MR. COHEN:
22    Q.    I am showing you a two-page document
23    Bates stamped City 1551 and 1552.
24                Have you ever seen this document

Page 251

1    before?
2    A.    It's not readily coming to my memory that
3    I've seen it.
4    Q.    On the first page here, it says, "As
5    of today, the Department of Prisons requested four
6    certifications for the warden position.  Below are
7    the associated exam numbers that correspond with
8    each certification number."
9                Do you see that?
10    A.    Yes.
11    Q.    Would you agree with me that the 2020
12    February list, on which Ms. Lyde, Ms. Bowers,
13    Ms. Craescu, and Ms. Albandoz were on, is not
14    listed?
15    A.    I would have to refer back to that document
16    that gives me their exact number.  I can't say that
17    just glancing here.
18    Q.    Okay.  So looking at the number in
19    which they are on, 5H12-20191216-23-00, and then
20    going back to Carney Exhibit 27, do you agree that
21    number is not listed here?
22    A.    I agree that number is not listed.  And I
23    would -- there is something coming to my memory that
24    a deputy warden who was on the list, but no action

Page 252

1    was taken.
2                Adrian Christmas was a
3    deputy warden at some point.  And then she retired.
4    I believe she was on one of those lists that
5    expired.  And her name is just coming to me.
6                And you asked me that question,
7    and I'm saying I don't recall.  But I believe she
8    was on a list that expired, and then she opted to
9    retire.  Adrian Christmas.  And that's been some
10    time.  But that would have been during my
11    appointment years.
12    Q.    Okay.  My question is, the list that
13    Ms. Lyde --
14    A.    I answered your question.  I don't see it
15    here.  But you asked me prior to bringing this did I
16    ever have that, and that's a recollection that I'm
17    having.  I don't know the accuracy.
18                But I believe, if I'm
19    remembering correctly, there was a list that
20    Adrian Christmas, who was a female deputy warden,
21    was on and it expired.
22    Q.    Okay.
23    A.    Okay, I'm just, as it's coming to me, trying
24    to answer your question.

Page 253

1    Q.    Okay.  Per this document, at least,
2    the list that Ms. Lyde, Ms. Bowers, Ms. Craescu, and
3    Ms. Albandoz were on for the warden promotion was
4    not certified by the Department of Prisons, correct?
5    A.    I don't know that to be true.  I don't know
6    why it's not on here, and I don't know who provided
7    this document.  So I can't answer your question.
8                I see it's not on here.  That I
9    can answer.
10    Q.    Right.  And do you know of any
11    document that shows that the list established
12    February 21st, 2020 was certified by the Office of
13    Human Resources?
14    A.    You referenced an e-mail earlier that said
15    it was established and that the prison could request
16    a certification.  That's my extent involving that
17    list.
18    Q.    Okay.  I'm going to go to the second
19    page of this document.  Here it says, "Number of
20    warden vacancies:  2020, 0 of four; 2021, 0 of 3,
21    2022, 2 of 3; 2023, 0 of 3."
22                Do you agree with what is stated
23    there?
24    A.    No, I cannot 100 percent.  I need documents

Blanche Carney

Page 254

1  side by side.
2          As we've testified, as documents
3  you've provided, people had various times in which
4  they retired, and I want to -- you know, I can't
5  just look at this and say yes. So if you can
6  reference those documents back, I can give you a
7  clear answer.
8      Q.   Okay.
9  A.     But I can't recall all of their dates of
10 retirement.
11     Q.   Fair enough. I will pull them all
12 out, just so we can look at it quicker.
13          So per Ms. Farrell's
14 Work History Detail, she retired May 13th, 2022.
15 Per Ms. Talmadge's Work History Detail, she retired
16 September 24th, 2021. And per Ms. Giannetta's
17 Work History Detail, she retired August 20th, 2021.
18          So based upon that information,
19 is this information here at the bottom of Carney
20 Exhibit 27 regarding number of warden vacancies
21 accurate?
22 A.     2021 should be two of -- well, no, that's
23 when they retired. But that's 2021.
24          Cathy Talmadge and

Page 255

1  Michele Farrell retired in 2021. And then in
2  2022 -- no. Yes, it's two. It's Nancy Giannetta
3  and Cathy who retired in 2021. And then
4  Michele Farrell retired 5/13/2022.
5      Q.   Okay. So should 2021 say two of three
6  vacancies?
7  A.     Yes. Because they retired --
8  Nancy Giannetta retired 8/20/21. Cathy Talmadge
9  retired 9/24/2021. And I don't know who prepared
10 this document. So ...
11     Q.   And should 2022 say three of three
12 vacancies?
13 A.     As of 5/13/2022. This doesn't tell the
14 totality because you still had people in place,
15 given their actual month of retirement.
16 Michele Farrell was in place until 5/13/2022.
17          MR. COHEN: I am just about
18 done. I appreciate all of your time.
19          Mark this as Carney Exhibit 28.
20          (Whereupon Carney-28 was marked for
21 identification.)
22 BY MR. COHEN:
23     Q.   Do you recognize this document or this
24 directory?

Page 256

1  A.     No.
2      Q.   Do you know what the County
3  Commissioners Association of Pennsylvania is?
4  A.     Yes.
5      Q.   And what is that?
6  A.     This is the agency that we, as a third-party
7  vendor, utilize to manage our Medicaid costs for
8  incarcerated individuals who become hospitalized and
9  who bears the costs during their hospitalization
10 stay.
11     Q.   It's a 48-page document. I'm going to
12 the 29th page. Here it states, "Acting Warden
13 Steven Angelucci," correct?
14 A.     That's correct.
15     Q.   Was Steven Angelucci ever the acting
16 warden for Curran-Fromhold Correctional Facility?
17 A.     No, he was not. And I don't know who is the
18 author of this that would give him that title.
19     Q.   It also lists Pierre Lacombe as acting
20 warden of Riverside Correctional Facility, correct?
21 A.     That is correct. I'm not the author of this
22 document, and they were not assigned that title by
23 me. They remained -- they maintain their title as
24 deputy warden.

Page 257

1      Q.   And if they had been acting warden,
2  there would have been certain processes that were
3  required to go through -- correct? -- in order to
4  accomplish that?
5  A.     That is correct.
6      Q.   Did you ever tell Deputy Commissioner
7  Clark in 2021 that you did not intend to promote any
8  wardens?
9  A.     Yes. I told him there are no promotions.
10 I'm in the thick of Covid-19. You know where my
11 attention lies. And I attested to the reasons why.
12 You wanted me to divert attention during a pandemic.
13 No, that's not how that works.
14          I had no wiggle room. I had to
15 keep moving. I didn't have the luxury of stopping
16 and training and being able to bring someone up.
17 The decision was made. Those individuals remained
18 as deputy warden status, site responsibility, and we
19 worked tirelessly over those three years.
20          I've testified. It has not
21 changed. The answer is the same. Making that
22 appointment was the least on my priorities.
23     Q.   And I just have three more questions.
24 I appreciate your time.

Blanche Carney

Page 258

1          You testified earlier that you
2   directed Deputy Wardens Williams, Lacombe, and
3   Angelucci to continue to have site responsibility of
4   the facilities after the wardens retired because you
5   needed the facilities to be stable and to continue
6   to function, correct?
7   A.    Correct.
8          Q.    Would hiring a warden from the
9   established February 21, 2020 promotional list have
10  made any of the facilities unstable?
11  A.    Yes.
12         Q.    How so?
13  A.    **They could barely manage their current**
14  **duties at that time. Now you are asking me -- you**
15  **have a small unit. You can't manage them. Now I'm**
16  **going to put you in charge of an entire unit, which**
17  **your workforce responsibility is going to increase**
18  **by five times almost. You were demonstrating you**
19  **were treading water there.**
20         **So based on that, no, that was**
21  **not the best decision to make.**
22         **You didn't have the skill set.**
23  **You didn't have the skill set for a strong leader.**
24  **Difficult decisions. Unpopular decisions. People**

Page 259

1   **not understanding the virus and how you had to**
2   **continue to communicate that. That's not the time**
3   **to lament.**
4          **You can acknowledge, but you**
5   **still got to move the work forward. The work still**
6   **has to get done. And based on the performance of**
7   **that current position, no. It would have been**
8   **catastrophic.**
9          Q.    Can you point to any documents that
10  support the decision that you made to not hire from
11  the established February 21, 2020 list?
12  A.    **No, I cannot. I explained that. My answer**
13  **is the same.**
14         **I was dealt leadership during a**
15  **pandemic which no one knew, not even the CDC, and**
16  **they were giving us information on a daily basis.**
17  **That was my full attention. So I have no document**
18  **where I sat down and said, "I'm not going to make**
19  **this list."**
20         **I kept focus at the task at**
21  **hand, and that was to lead through the darkest time**
22  **in the world, which was a pandemic. And I did just**
23  **that.**
24         **Anything that didn't have**

Page 260

1   **anything to do with covid was secondary, and it just**
2   **continued to go down the list.**
3          **I have 47-plus lives in my hands**
4   **before they even knew that they'd give us masks. We**
5   **had a large carceral setting. I can't take time and**
6   **divert to say, "Okay, what about this list?"**
7          **No. The task at hand was to**
8   **manage a large carceral setting, with staff leaving**
9   **in droves, along with experienced staff, and trying**
10  **to keep it staffed. That was my priority.**
11         MR. COHEN:  That's all the
12  questions I have.  Thank you.
13         (Deposition concluded at 6:10
14  p.m.)
15          - - - - -
16
17
18
19
20
21
22
23
24

Page 261

1                    C E R T I F I C A T E

2              I, LOUIS A. MANCHELLO, a Certified Court

3    Reporter (N.J. License No. 30XI00141800) and Notary

4    Public of Pennsylvania, do hereby certify that the

5    deposition of BLANCHE CARNEY was duly taken on

6    December 14, 2023 and at the time noted above before

7    me.  The said BLANCHE CARNEY was first duly sworn

8    (or affirmed) by me according to law to tell the

9    truth, the whole truth and nothing but the truth and

10   thereupon did testify as set forth in the above

11   transcript of testimony.  The testimony was taken

12   down by me stenographically.

13             I do further certify that the above

14   deposition is a full, complete, and true record of

15   all the testimony given by the said witness, to the

16   best of my knowledge and ability.

17                  Electronically signed by Louis A.

18   Manchello, Certified Court Reporter (N.J. License

19   Number 30XI00141800) on January 7, 2024.

20                  (This transcript may contain quoted

     material.  Such material is reproduced as read or

21   quoted by the speaker and may not be a verbatim

     replication of the printed material.)

22

                    (This certification does not apply to

23   any reproduction of this transcript, unless under the

     direct supervision of the certifying reporter.)

24

**A**

abide 178:17
abilities 142:8 164:1
ability 26:9 177:2,12
   178:3 217:19
   228:23 234:23
   235:11 261:16
able 49:4 55:19 92:5
   109:9,21 127:9
   128:15 132:9
   133:4 135:14
   145:12 146:15
   148:23 161:12,19
   163:14 178:7
   182:23 225:7
   229:11 246:20
   249:24 257:16
abreast 87:11
absence 39:17,19
   40:12
absent 48:11 54:8
   60:2 66:3 86:20
   89:15 133:10
   186:2 188:15
   204:12
absolute 188:14
Absolutely 112:24
   163:7 175:15
academias 172:7
academy 212:1
   213:13
accept 22:14 226:8
acceptable 18:13,23
   34:3 35:8 36:2
   38:3,10 67:19
   99:14 206:11,14
   206:18,23 207:1
   224:12,20 227:1
   227:13,21,22
   228:4,8,12,14,17
   230:5,6,24 231:3
   231:15,18 232:1
   235:12,16 245:20
   248:19
acceptables 232:6
   235:19
accepted 159:3
   192:15 244:17
   250:1
accepting 159:7
   220:9
access 115:10 127:20
   132:15,16 133:13
   133:15,16 135:19
   137:11 138:18
   139:17,22 149:7
   170:20 171:13
   216:22 249:15

accessible 245:13
accommodate
   112:13
accomplish 257:4
account 206:2
accountability 145:1
   196:13
accountable 117:12
   124:15 138:23
   145:4 196:23
   220:20 242:22
   243:1,3
accounts 122:5
accreditation 190:6
   190:10
accredited 32:21
   33:1 63:20 64:2
   67:7,11
accuracy 104:4
   252:17
accurate 91:8 149:5
   194:20 223:21
   254:21
accustomed 240:2
achieved 72:20
acknowledge 133:5
   239:6 259:4
acknowledged 79:23
acknowledging
   90:20 123:11
   158:19
acting 256:12,15,19
   257:1
action 29:2 53:6 70:1
   123:15 127:2,6
   139:15 141:1
   143:3 146:17
   165:16 208:14
   251:24
actions 57:3 142:23
   142:24 199:11
   203:8
active 79:14 178:19
   249:12
activities 240:10
actual 20:9 26:22
   42:4 59:11 86:20
   255:15
Ad 59:23 63:8,11
   209:10
add 77:4
addition 138:17
additional 21:21
   55:7 70:6 83:6
   115:11 149:1
   181:23
address 12:1 25:20
   25:22 49:2 144:24

146:24 148:5
   170:12 225:7
   239:5,5
addressed 127:6
adjust 243:15,17
adjusting 112:13
administration
   24:23 87:3
administrative 52:10
   108:21 112:18
administratively
   68:20
administrator 121:8
   131:15 249:21
administrators
   11:24 122:22
   127:8 135:24
   136:19
admission 156:14
   202:10
admissions 159:7
   184:8
Admit 184:19
   185:13
admitted 185:1,19
   193:5 202:8
Adrian 252:2,9,20
Adrienne 1:3 2:11
   5:7 99:19 119:17
   147:22 150:18
   228:3 230:2 232:7
adult 15:12 73:15
advance 62:7 78:9
   244:4
advantage 178:22
advising 100:13
advisory 59:14,17,19
   60:1,4,7,15,22
   61:4 62:16 153:15
affect 248:15
affirmed 5:2 261:8
affixed 207:2
afraid 124:6
agency 256:6
ago 11:3 22:17 64:6
   98:17 100:20
   129:19 130:9
   148:9 225:7
   243:10
agree 8:24 9:10,15
   9:20,23 10:3 14:1
   18:4 22:7,24 31:2
   32:2,13 33:16 45:3
   45:9 59:12 60:6,13
   63:16 90:18,24
   95:5 107:20
   112:20 113:15
   139:11 141:16

143:10 147:18
   153:18,22 154:17
   172:20 180:6
   204:15,17 209:18
   211:8 223:6
   235:15 251:11,20
   251:22 253:22
agreed 153:15 200:4
   236:16
agreement 102:18
   195:12
Ah 225:17
ahead 20:20 80:2,3,4
   88:12 108:5
   148:15 173:10,11
   192:9 212:9
al 1:3
Albandoz 2:11 5:8
   99:20 122:20
   123:4,8 124:13
   126:4 130:2
   131:10 134:9
   144:16 146:19
   168:22 170:17
   171:12 174:7
   175:5,13 176:7
   193:24 196:2
   197:3,13 228:3,12
   230:1 231:21
   232:1,10,23 233:3
   233:18 234:14
   235:2,19 236:19
   251:13 253:3
Albandoz's 138:2
   166:2 172:17
   198:10
alcohol 185:4
alcoholic 184:20
allegation 201:2,17
   202:2,5 204:14,16
   204:19 205:5,7
   218:21
allegations 174:11
   174:14,21 188:6
   188:10 200:9,12
   200:15,19 203:3
   203:16 205:20
alleged 199:17
allow 157:13
allowed 166:22
   246:13
Almeda 188:18
   191:21 192:10,18
   193:6
alternative 13:9
   18:10 82:3,11 83:4
   83:10
alternatives 10:4

amount 125:10
and/or 21:18,23
   146:19
Angelucci 3:10 6:24
   7:6,10,19 10:13,23
   11:16 12:7,14 13:3
   13:13,23 14:2,6
   15:23,24 16:7
   17:13,18 20:12,22
   21:6,14 23:4 24:4
   24:12,16 25:24
   26:24 27:13,19
   28:2,14 29:7,13
   32:9 71:16 115:19
   147:21 180:16
   183:10 217:4
   222:9 223:7
   226:20 228:1
   229:19 230:4
   246:9,20 256:13
   256:15 258:3
Angelucci's 18:21
   19:13,21 28:18
   29:22 117:7
announced 110:8,11
   110:13 222:10
announcement
   59:11 63:1 222:4,4
   222:7 223:15
announcing 160:3
annual 3:20 154:17
answer 11:1,12,13
   16:17,19,20 20:3,5
   20:18 34:23,24
   36:23 37:6,13,15
   38:16 39:5 66:8
   74:15 87:8 89:12
   94:13,16,17 95:16
   97:11 101:18,22
   102:8 104:3 111:6
   111:8,11 120:11
   151:9 153:11
   155:11 177:16
   182:15 183:20
   188:21 190:2
   191:13 201:8
   205:13,14,17
   229:7 232:8
   233:23 234:6,14
   234:17,22 236:21
   246:1,22 247:3
   248:4,17 252:24
   253:7,9 254:7
   257:21 259:12
answered 5:13 16:15
   16:18 37:12 48:4
   53:16,19 78:21,24
   94:11,15 101:17

102:5 235:9
248:18 252:14
answering 36:20
92:3 161:9 174:13
anticipate 89:10
anticipated 87:14
88:24 91:14
anxiety 158:15
anybody 156:6
anybody's 199:24
apart 112:10
apologize 97:19
apparent 124:1
applicable 211:13
applicant 19:7 221:1
222:2 224:13
225:3,12 230:5
234:11 235:15
244:13
applicants 35:15
37:16 177:6
226:15,16,21
231:4,12 232:5
234:14,24 235:7
249:23
application 189:1,14
191:21 248:1
applied 149:13,16
247:23
apply 20:12,22 38:23
39:6 178:23
261:22
applying 38:18,19
67:24
appoint 74:20
109:20 192:11
213:1,6
appointed 65:12,15
65:24 66:2,16
74:19 173:9 174:4
209:12,14,24
211:9,14,16,21
212:7,12,16 213:9
213:14 214:9,15
215:7 240:14
appointing 176:15
176:19
appointment 65:18
66:7 74:22 117:24
178:20 179:11
240:14 252:11
257:22
appreciate 200:11
255:18 257:24
appreciated 127:19
approach 150:1
167:12 168:4
approached 108:1

approaching 81:16
111:15
appropriate 127:2
139:20 141:1
143:23,24 167:6
208:14
approval 57:3,4,8
97:24 106:19
153:14 176:22
approved 33:17
34:12 35:15 60:23
62:16 63:7,11
143:24
approximately 1:14
18:22
area 17:24 95:2
158:5,10,14
161:12 239:8
242:6
areas 162:4 163:4
arrest 185:21
arrested 183:22
185:14
arrive 248:20
art 176:16
Arthur 82:24,24
83:2
articulated 89:4
ascertain 131:7
220:24
ASD 81:13
asked 12:19 22:17
23:17 27:5 37:12
44:14,23 48:4,7
60:1 85:22 88:22
94:10 97:22 98:17
100:19 129:23
149:4 151:4
174:16 179:12
192:6 227:14,15
234:13 235:23
252:6,15
asking 23:8,10,21
56:14 66:14,15
92:8 93:9,17
102:24 151:11
155:23 167:4
204:4 229:6
232:20 234:2
247:20 248:4
258:14
assertive 147:16
assess 221:9
assessed 19:14,17
assessment 19:16
20:7,8,10 22:12,13
34:19 195:15,18
221:11

assessments 195:7
assign 24:4,16 27:19
44:8 50:18 51:10
51:16,22 68:11
assigned 17:5 21:2,5
25:7 26:5 28:2
39:7,12,20 44:1
52:2 68:2 74:23
108:7 159:24
195:13,14 219:12
219:13 240:20
256:22
assignment 68:7
203:5
assignments 17:22
18:1 181:16
assisted 11:22
associated 251:7
Association 256:3
assume 189:3
assumed 40:11,14,18
41:18 43:19 45:14
assumes 191:1
assure 73:16 102:11
158:5
ate 152:16
Atkinson 238:12
attached 84:14
attachment 84:18,21
85:4
attack 181:24
attempt 177:7
189:13
attend 189:22
190:13
attended 190:3
attending 1:18
attention 63:5 66:21
109:8 110:15
122:22 127:12
152:15 156:18
157:1 163:23
177:23,23 178:10
187:6 242:9
257:11,12 259:17
attentiveness 109:5
attest 9:3 66:4 146:4
190:3,7 204:2
attested 196:12
206:11 257:11
attesting 66:11
attests 233:13
attorney 5:6 191:16
attorneys 129:18
148:18
attracted 243:18
at-risk 15:21
August 5:23 6:19

7:17 8:24 9:21
10:13,22 11:5,8
12:7 14:5 18:12
21:14 22:5 23:3
30:3 49:24 90:18
118:1 154:18
176:9 197:5,8
254:17
author 25:5 256:18
256:21
authored 25:1
authority 110:17
176:15,19
available 15:20
169:1,11 213:5
Avenue 83:10,21
average 73:10,13
averment 203:4,16
204:15,20
award 175:11
aware 19:11 25:13
26:24 27:12 40:4
52:17 78:13,18
81:19 104:6,10
140:20 143:2
144:9 145:6
156:10 170:17,19
174:6,18,20 185:3
193:10 197:2,14
199:13 205:4
214:14 217:11
A&D 156:13 159:14
a.m 1:15 41:5,7 51:3
51:5 72:2 192:4

B
B 3:5 4:1 161:11,14
bachelor's 32:20
33:1 49:8,13,16
63:19 64:1 65:7
67:6,11 243:6
244:11 245:9
back 9:18 13:1 14:9
19:21 21:11 27:9
29:21 32:1 59:11
59:20 62:21,23
77:3,4 86:17 90:17
103:21 119:21
124:2,8,19 128:5
130:12 133:14
135:11 140:10,18
148:6 152:18
153:13,24 155:23
158:1,2 160:4,12
164:10 166:6,14
166:15 170:5
172:14 179:20
181:18 192:24

193:7,23 194:22
195:1,20 196:21
197:17 198:4,6
207:23 208:19
216:18 219:24
233:5 235:1,13
240:17 241:1
244:16 251:15,20
254:6
backed 133:23
backlog 132:17
137:17,18 138:3,4
138:8,19 139:10
139:21 170:11
196:9 197:11
backlogged 133:21
backwards 61:24
134:10
badge 178:6
Bagby 27:18 51:21
52:10 68:24 79:22
122:9,11 123:9,14
127:1 128:24
130:2,3,4 131:10
134:8 137:15
140:24 142:14
143:7 144:4,12,19
144:22 145:7,22
146:3,20 149:6
166:5 167:7
170:17 171:6,12
171:24 173:5,8,9
195:22 196:2
197:9,17,24
baggage 109:15
Band-Aid 135:7
barely 124:20
258:13
barring 104:21
based 8:23 20:7,10
21:16 26:20 32:13
34:15,19 35:10,14
36:9,12 37:6 38:5
38:12 43:4,10,12
49:17 62:22 63:21
63:23 64:16 66:17
66:21 67:13,20
72:18,22 73:3 77:1
78:4,7,17 79:4
80:22 87:17 89:11
91:10,17,24 98:21
99:21 100:23
102:6 117:20
120:7 122:5 125:7
126:15 151:24
154:2 160:22
162:14 184:24
185:17 190:15

194:18 200:21 204:17 207:2 208:10 209:23 211:8 213:4 214:23 226:8,23 228:4,11 229:3 230:11,16 233:2 233:10 235:15 236:23 238:7 241:17 243:20 244:8 250:8 254:18 258:20 259:6
**basics** 124:15 167:12
**basing** 114:3 173:2 177:1
**basis** 88:5,6 126:13 161:1 233:17 234:11 238:3 259:16
**Bates** 3:12,14,16,17 3:19,19 4:5,7,8,9 4:10,11,12,13 8:2 9:14,19 10:2 33:10 33:13 46:14 47:2 61:11 84:5 120:24 141:14,18 180:12 189:9,12 209:3 210:11 218:1 223:2 232:23 237:12 250:23
**bathroom** 205:1
**bears** 256:9
**Beaufort** 24:15,23 51:15 52:9 68:18 79:21 87:4 89:16 92:24 94:23 98:13 101:21 102:6,14 106:10 111:23 156:5 210:1,19,23 211:9,14,17 214:10 215:8 224:6 237:23 241:15
**becoming** 15:8,13 215:14,16
**bedlam** 132:3 245:7
**began** 139:22 238:10
**beginning** 1:14 3:18 61:21 100:16 120:23 203:5
**behavior** 123:12
**behavioral** 125:14 167:2 168:12 169:9
**belief** 126:13 145:7 145:21 233:21
**believe** 5:22 7:13 12:11 15:17 16:20 18:4 20:2 23:19 26:11 27:3,9 42:7 43:8,11,13 53:15 59:10 64:15,19 66:17 67:2 74:5 78:12,16 79:10 80:17 81:21 82:23 86:4 87:17 90:13 91:6 92:3 101:17 102:6,14,22 107:13,21 108:13 118:1 120:7,10 126:12,17 137:22 147:23 149:10 172:15 173:17 174:8 175:7,10 176:24 194:20 196:19 198:8,12 202:8 204:7,8 206:6,10 207:13 207:22 208:1,13 215:13 227:22 228:2,20 237:24 242:4 250:9 252:4 252:7,18
**believed** 19:14 220:3
**believes** 106:18 143:13
**believing** 134:19
**bell** 106:21
**belong** 203:12
**belt** 110:5
**benchmark** 79:9 137:21
**beneficial** 116:9
**benefit** 225:2 245:11
**benefitted** 245:10,22 246:3
**best** 26:9 105:11 143:10 169:24 178:2 183:3,5 208:18 225:11,16 225:22 230:20 231:12 234:22 235:7 241:14 258:21 261:16
**better** 147:21 150:7 224:8
**beverages** 184:21
**beyond** 55:7
**big** 135:6
**bigger** 6:6 62:3 210:14 222:17
**bit** 14:1 22:17 56:1 64:6 148:9
**black** 170:23
**Blackman** 82:24,24 83:2
**BLANCHE** 1:13 3:3 5:1 261:5,7
**blanket** 188:14
**bleeding** 135:6
**blind** 94:12
**blinds** 85:13
**blitz** 134:18
**board** 59:14,17,19 59:23 60:5,8,15,22 61:4 62:16 63:8,11 153:15 209:10
**boards** 60:1
**bombarded** 103:22
**book** 16:1,24 146:9 151:2 162:2,7,9 163:6 170:23
**books** 162:3
**bottom** 61:12 210:14 254:19
**bought** 129:7,12
**bound** 231:9,10
**Bowers** 2:12 3:21 5:8 99:19 152:19 153:4,22 154:3,18 155:4,8,13,17 156:1,7,10,13 161:3 162:9,24 163:12,21 164:1,5 164:17 165:13 176:8 251:12 253:2
**box** 201:20
**break** 5:13 50:24 71:22 85:16
**breakout** 165:7
**breathed** 152:16
**brief** 42:2 62:5,8 85:2,6 97:17
**bring** 15:10 127:12 171:5 179:20 187:6 208:8 235:22 257:16
**bringing** 62:23 134:21 157:23 172:1 179:11 252:15
**brought** 27:8 66:20 122:22 156:18 157:1 163:22 169:12 188:7 202:17 242:8
**Bryant** 83:2
**buckled** 159:9
**budget** 77:3 80:11 80:13,16,20
**build** 109:14
**burden** 134:15
**buy** 168:19
**buying** 168:20

C

**C** 2:1 83:4 161:14 261:1,1
**calculated** 179:16 183:5
**calendar** 146:9
**Calendly** 129:9
**call** 107:18 131:5 134:18 137:14 239:5
**called** 123:8 129:9 133:19 175:8 188:17 204:21 239:19
**calls** 129:12,17 130:1 148:10,12 149:8
**Cambria** 83:5,22
**cameras** 161:23
**campus** 25:13 79:15 82:14 135:15,18 152:9 219:14
**cancel** 112:2
**canceled** 105:24 111:20,21 112:5 247:24
**cancellation** 3:18 105:22 106:3 111:17 245:24
**cancellations** 145:24
**Cancelling** 245:21 246:8
**candidate** 147:8 150:2 152:3 225:22 230:20 236:6
**candidates** 105:12 224:21 227:4 241:14
**capacity** 21:15 81:6 82:10 148:16 200:24
**captain** 212:2 213:17,18,21
**captains** 113:4
**capturing** 137:16 138:7
**car** 158:8
**carceral** 130:14 166:24 167:16 169:23 260:5,8
**card** 242:12
**care** 132:15,17 133:13,15 135:19 137:11 138:18 139:17,23 149:7 167:1 170:20 171:13 195:23
**career** 11:2 150:12
**careful** 127:2
**Carney** 1:13 3:3 5:1 6:1,14 7:21 9:6,18 13:17 14:9 20:2 30:21 32:1 33:5 42:10 46:10 57:24 59:20 61:6 62:15 84:1 90:17 99:5 105:17 111:16 120:19 141:13 152:18 153:13 154:11 172:14 179:23 184:1 187:8 189:5 202:16 209:1,4 210:6 211:13 218:10,18 222:1 222:22 223:5,11 237:8,22 250:18 251:20 254:19 255:19 261:5,7
**Carney-1** 3:7 6:2
**Carney-10** 3:16 61:8
**Carney-11** 3:17 84:2
**Carney-12** 3:18 105:18
**Carney-13** 3:18 120:20
**Carney-14** 3:19 141:9
**Carney-15** 3:20 154:13
**Carney-16** 3:22 179:24
**Carney-17** 4:3 184:2
**Carney-18** 4:4 187:9
**Carney-19** 4:5 189:6
**Carney-2** 3:8 7:23
**Carney-20** 4:6 202:12
**Carney-21** 4:7 209:6
**Carney-22** 4:8 210:8
**Carney-23** 4:9 218:3
**Carney-24** 4:10 221:21
**Carney-25** 4:11 222:23
**Carney-26** 4:12 237:9
**Carney-27** 4:13 250:19
**Carney-28** 4:14 255:20
**Carney-3** 3:9 9:7
**Carney-4** 3:10 13:19

**Carney-5** 3:11 30:23
**Carney-6** 3:12 33:6
**Carney-7** 3:13 42:11
**Carney-8** 3:14 46:11
**Carney-9** 3:15 58:1
**carried** 10:20
**carry** 16:10
**case** 5:7 66:1 96:1
  100:10 101:6
  144:5 169:4 176:4
  184:8 185:9,11,24
  186:14 190:12
  212:20 214:4
  224:16 228:22
  234:6 239:24
  250:9
**catastrophe** 96:1,2
**catastrophic** 95:20
  96:9 114:6 182:20
  259:8
**catch** 135:2
**Cathy** 3:11 15:4
  30:12,16 31:14
  73:4 77:6,21 90:16
  90:23 240:12
  254:24 255:3,8
**caught** 166:19
  240:16
**CDC** 108:24 130:18
  259:15
**cell** 112:13 130:23
  169:6,10
**cellmate** 130:24
**cells** 124:5 127:18
  168:7,23
**celly** 130:24
**census** 72:20 73:3
  75:2 81:17
**Center** 57:16,21
  58:14,18,20 59:1,4
  67:20 68:12 69:8
  69:17,21,23 70:21
  70:23 71:6,9,18
  73:5,21 75:2,6,12
  76:12 77:5,17,24
  81:2,3,7,14,19,24
  82:3,19 207:5,10
  212:14
**central** 83:5 98:16
  98:23 100:13
  221:10
**CEO** 124:23
**certain** 37:21 42:7
  43:5 99:14,15
  141:8 148:22
  200:6 212:24
  221:16 223:19
  224:9 257:2

**certainly** 38:19 99:1
  136:3 138:8 141:2
  200:8 235:24
**certainty** 30:7 59:11
  64:4
**certificate** 193:6
**certification** 86:15
  96:21,24 98:3,5,8
  98:10,19,22 99:2
  100:9,12,14,21
  101:2,22 103:10
  249:4 251:8
  253:16 261:22
**certifications** 251:6
**certified** 1:15 101:1
  101:4,13 102:3,15
  102:17,19,21,23
  103:1,5,8 176:22
  253:4,12 261:2,18
**certifies** 103:3
**certify** 98:14,16,23
  98:24 100:8 249:5
  261:4,13
**certifying** 261:23
**CFCF** 41:22 42:1
  73:9 74:11 134:1
  134:11,22 183:10
  219:1,3 238:18
**challenge** 48:24
  72:21 179:7
**challenges** 113:24
  150:13 239:7
**challenging** 87:19,20
  107:23 108:12
  110:7 128:13
  131:3 133:6
**chance** 203:1
**change** 59:12 60:13
  61:17 75:1 115:9
  157:10 171:4
  195:8 244:11
**changed** 59:9,17
  60:7,11 109:1
  225:5,22 244:8
  257:21
**changes** 60:23 62:17
  63:12 111:1
  244:20
**changing** 158:2
  240:7 243:5
  248:14
**chaos** 132:4
**Chapter** 188:24
**charge** 258:16
**charged** 125:11
  126:20 190:24
**charges** 239:24
  242:13

**chart** 210:20,24
  211:2
**charts** 211:6
**cherrypick** 171:20
  245:16
**Chester** 192:14
  193:3
**Chestnut** 2:3
**chief** 123:9 184:15
  188:1 232:11
**choose** 123:6,13
  177:7 225:9
**choosing** 123:5
**chose** 237:22
**Christmas** 252:2,9
  252:20
**circumstances**
  113:22 116:4
  217:22
**citation** 185:4
**cited** 174:9 184:19
**City** 1:6 3:12,12,14
  3:16,17,19,19 4:8
  4:11,13 8:3 9:19
  10:2 18:17 33:13
  33:13,21 46:15
  61:12,13 84:6
  105:1 120:24
  125:2,15 133:16
  141:14,19,19
  154:12,12 168:13
  172:2,16 180:4,4
  184:9 186:21
  187:2,19 194:1,2
  202:18 210:12
  223:3 225:5,22
  232:24 238:10,13
  238:21 250:23
**City's** 8:8 230:18
**Civil** 62:23 65:21
  66:6,22 104:14,16
  104:24 105:5,8
  176:12,14 177:20
  178:11 188:23
  189:1,16 190:17
  224:20 225:23
  233:20 246:24
  249:2
**civilian** 96:12 129:10
  145:2
**civilians** 114:21
  135:13
**claim** 205:19
**clarification** 47:3
  59:18 60:2 233:24
**clarify** 29:19
**Clark** 2:6 24:3 28:11
  50:17 51:9 52:6

  57:10 64:13 68:10
  70:17,19,24 71:3
  71:10,15,20 79:22
  154:8 160:4 163:1
  163:11 164:1,17
  191:20 192:3
  209:12,15 216:7
  216:11 239:4,19
  257:7
**Clark's** 193:12
**class** 77:2
**classes** 189:23 190:4
  190:14
**clear** 89:11 99:3
  125:24 203:7
  207:19 254:7
**clearly** 151:10 236:9
**clock** 158:8
**close** 48:19
**closed** 41:11 45:20
  46:3,17,23 47:3,5
  77:8 81:7,10,14
**closely** 149:21
  244:14
**closing** 47:20 50:13
  85:13
**closure** 45:24 47:10
  49:21
**clothe** 167:11
**clusters** 243:9
**cocktails** 239:22
**Cohen** 2:2 3:3 5:4,6
  6:4 7:20 8:1 9:9
  12:20,23 13:8,16
  13:21 16:16 20:17
  21:10 23:10,16,23
  24:1 30:20 31:1
  33:4,8 36:20,24
  38:15 41:3,8 42:9
  42:13 46:9,13 48:6
  48:12 50:23 51:6
  57:23 58:3 61:5,10
  62:10 71:21 72:5
  83:23 84:4 85:5,9
  85:19 93:11,16,19
  93:20 94:21 97:16
  97:20 102:5
  105:15,20 107:5,9
  119:11,16 120:18
  120:22 137:1,7
  141:11 154:10,15
  179:22 180:2
  183:24 184:4
  187:7,11 189:4,8
  190:22 191:3,7,11
  191:12 193:17,22
  200:16 202:14
  205:12 208:17,20

**college** 32:21 33:1
  63:20 64:2 67:7,12
  195:4
**combination** 22:11
  22:14
**come** 15:11 57:8
  86:4 99:1 110:8
  116:15,19 118:8
  127:4 128:15
  130:22 131:14
  135:4 136:5 148:4
  148:22 158:7
  159:23,24 160:11
  160:12 167:4,8,13
  167:15 170:5
  171:14 192:24
  199:14 221:11
  231:13
**comes** 150:6 158:1
  160:4 162:5
**comfort** 50:24 85:17
**coming** 113:9 125:11
  127:19 131:13
  147:24 159:20
  161:17,24 162:24
  172:4 174:1 251:2
  251:23 252:5,23
**command** 126:2
  148:5 150:8 158:4
  169:19 171:22
  219:7 239:2
**commanded** 70:12
**commanders** 199:22
  203:9
**commendable**
  168:11,11,12,13
  168:14
**comment** 205:16
  228:24
**comments** 234:7,13
**commissioner** 5:5
  16:17 24:3,15,22
  27:18 28:11 30:8
  37:2 38:16 42:10
  48:9 50:17 51:9,15
  51:21 57:10,11
  58:4 64:13 65:13
  68:10,18,24 70:17

**colleague** 125:1
**collectively** 49:4
  209:1,8 210:6,10
  217:23 218:5
  221:18,23 222:21
  223:1 233:22
  237:3,7,11 246:15
  246:17,23 247:2
  250:17,21 255:17
  255:22 260:11

70:18,24 71:3,10
71:15,20 85:15
86:22 87:3 89:16
92:24 93:13,21
94:23 97:12 98:9
98:12,13 102:14
106:9 107:11
110:18 111:23
122:8,9,24 123:14
127:4 129:24
134:19 136:2,16
137:8 141:12
143:7 144:4,12,22
145:7,8,9,12,16,22
146:1,13,20 149:6
154:8 162:12
163:1,11,24 166:5
170:22,24 173:5,7
173:8,9,19 176:18
178:4 183:2
191:14,19 192:2,3
192:7,12,19
193:12 196:6
201:1 205:13
209:1,11,12,15,21
210:1,16,19,23
211:9,14,17 213:1
213:3 214:10,11
214:15,20 215:8
215:12,14,16
216:7,11 217:20
217:24 218:10,12
218:18 219:23
220:9,20 233:24
237:7,19,22,24
238:6 239:19,23
241:15,16 245:8
247:4 249:16,20
249:22 250:4,10
250:15 257:6
**commissioners** 69:3
79:2,18,21 105:2
213:7 249:14
256:3
**commissioner's**
195:17
**commit** 126:18
**committed** 167:3
**communicable** 131:7
**communicate** 128:23
259:2
**communicates** 236:9
**communication**
167:22
**community** 82:15
83:5
**company** 129:8
188:17

**compare** 84:23
**compared** 74:11
83:17 142:21
151:23 226:14
231:3 235:9
236:19
**comparing** 221:3
227:1
**comparison** 237:1
**compel** 124:14 125:1
126:1 127:15
128:9 131:2
**compelled** 141:1
**compensated** 133:17
196:22
**compete** 189:15
**complaint** 4:6 201:6
201:14 202:17
**complaints** 161:17
**complement** 77:2
**complete** 134:16
261:14
**completed** 32:20,24
63:19 64:1
**completely** 81:11
**completion** 89:20
**Complex** 118:24
119:6
**Compliance** 157:17
188:4
**compound** 179:9
**concern** 148:9 164:9
**concerned** 128:4
130:13 133:6
**concerning** 146:3
**concerns** 146:19
158:19 161:9
163:12 167:21
169:12
**concert** 16:2 17:22
**concluded** 206:8
260:13
**conclusion** 99:1
136:5
**concurred** 122:13
**conditions** 139:6
169:15
**conduct** 126:21
156:16 199:15,17
199:18,21 201:5
204:11
**conducted** 192:20
**confer** 79:4
**conference** 238:19
**Conferencing** 1:18
**conferred** 94:7,14
**confidential** 200:1,5
200:6

**confirm** 86:18 210:4
222:11 223:20
**confirming** 164:13
**conflict** 219:10
220:18,19 242:15
242:18,19 243:2
**consider** 152:6,13
174:14 177:18
238:4
**considerably** 165:8
**consideration** 128:8
175:22
**considerations**
174:12
**considered** 177:12
213:3 241:17
**considering** 238:1
**consistent** 117:11,15
118:14 119:2
133:2 194:22
208:11 240:22
**consistently** 162:3
**constant** 109:23
**constantly** 79:12
112:14
**consumed** 111:13
**contact** 158:12,13
168:7
**contacts** 134:14
**contain** 261:20
**contains** 205:20
**context** 205:16
248:19
**continuation** 69:10
**continue** 24:11 40:22
41:24 43:22 45:18
50:5,11 52:7,11,14
60:20 92:7 161:6
196:6 258:3,5
259:2
**continued** 3:24 4:1
28:7,8 31:23 39:21
43:2 44:16 45:7,22
47:24 96:7 158:15
158:16 260:2
**continues** 105:10
143:7
**continuing** 48:15
49:19,23 201:10
**contracted** 96:12
125:13,14,15
168:13
**contractors** 114:21
115:4 145:2
**control** 137:14 167:2
**convened** 133:19
**conversation** 143:16
160:18,22 205:24

226:1,11
**conversations** 24:2
24:14 27:17 50:16
51:8,14,20 68:9
94:22 144:11,19
144:21 146:6
147:2 170:21
**conveyed** 145:21
146:19
**convinced** 131:14
**cooperating** 131:6
**coordinate** 15:7 16:5
**coordination** 17:4
**copious** 163:8
**copy** 84:14
**core** 126:22
**correct** 5:17 10:11
10:15 11:5 12:10
13:11 14:7 18:14
18:18 19:2,9,10
20:15,24 21:1,3,4
22:5,6,15,16 28:15
30:1,14 32:11,12
32:22,23 33:2,3
34:5,9,17,21 35:2
35:7,17,21 36:4,5
36:15 37:4,9,18
38:6,8,21,22 39:2
39:8 41:15 42:23
43:22 44:7,12,21
45:1,12,16,17
46:18 47:13,14
49:8 54:3 55:15
56:5,9,12 57:17
63:1 65:22 67:9,22
68:4 69:18 71:3
72:11 75:13,14,16
76:24 77:1 78:11
80:21 81:4,5,8,9
82:4,5 84:9,15,16
84:18,19,22 85:8
85:11,12,23 88:10
88:19,20 89:2,3,19
89:24 91:3,10,15
91:16 92:14,15,17
92:18,21,24 93:1
95:13 96:21 98:20
99:9,12,16,20
100:1,4,8,12,22
101:9,10,14
103:11,20 104:8,9
104:11,12 105:3
106:1,5 107:2
111:18,19 113:18
114:14,17,18
116:2 119:18,22
119:23 121:2,3,5,8
121:12,13,15,16

121:18,19,22,24
122:1 126:24
127:16,17 135:19
135:20 136:10
137:12 139:5
140:4 141:6,24
142:1,4,5,24 143:1
143:8 148:10
149:14,15 152:20
152:23,24 153:16
155:9,18 172:22
173:1,5 175:17
176:6,11 179:19
184:16,21 185:1,2
185:15,16,19,20
194:8,9 197:7
198:11 199:12,19
199:20 201:11,22
201:23,24 202:1,3
202:7,8 207:6,7,11
208:1,3,7 210:1,2
210:3,20,21,24
211:1,3,4,18,19
213:1,2 214:12
215:9 220:14
221:15 223:15
226:2,3 227:13
229:21,22 230:9
232:11,12,15
235:6 236:4
245:10,23 246:11
247:16 248:9
250:11 253:4
256:13,14,20,21
257:3,5 258:6,7
**Correction** 41:13
45:24 46:3,17
47:11 48:1 76:13
77:14
**correctional** 5:16,21
7:1,5,7,11,16
10:11 11:20 12:10
12:16 13:5 14:13
14:21 15:7 19:1
20:14,24 21:18,23
21:24 23:6 24:5,17
26:1 27:1,14,20
28:3,15,19,21 29:8
29:14,16,24 30:5
30:13,17 31:11,15
31:17,21 32:9 38:5
38:11,24 39:1
42:23 44:2 47:9
50:19 51:11,17,23
52:3,20,24 53:1,10
53:13 54:2,16,18
55:18 56:4,8 57:16
57:21 58:13,17,20

59:1,4 67:20 68:12
69:8,12,16,21,23
70:21,23 71:6,9,13
71:18 73:5,12
77:20 81:1,3,3,20
82:2,18 105:13
107:21 109:12
112:8 114:13
117:9 118:12,18
118:24 119:6
149:17 150:3
157:3 158:11
162:18 163:3
183:19 207:4,10
212:13 219:13
232:15 240:15,19
256:16,20
**corrections** 47:21
48:16,20 49:20
50:6,14 77:7,11
79:6 88:1 181:2
240:7 241:1
**corrective** 70:1
127:5 139:15
**correctly** 63:4 88:14
198:5 206:6 248:5
252:19
**correspond** 251:7
**correspondence**
145:5
**corresponding** 84:20
**costs** 256:7,9
**Counsel** 2:5,9
**count** 11:17 178:23
**counterparts** 181:15
**countersigned** 154:9
**countersigner**
216:24
**country** 49:1 108:1
**County** 256:2
**coupled** 21:22
**course** 179:15 195:4
**courses** 189:21,24
190:13
**court** 1:1,15 13:1
261:2,18
**cover** 39:23 148:2
214:8 240:20
**covers** 39:19
**covid** 67:14 78:9
109:2,5 110:20
111:15 156:15
159:4 260:1
**Covid-19** 87:18,18
87:19 88:4,9,11,19
89:2 106:23
110:16 112:7,23
130:13 132:7

138:11 139:2,6
152:16,17 157:24
159:2 165:3
166:16 169:2
182:14 257:10
**co-signer** 217:17
**co-workers** 128:6
219:20
**Craescu** 99:20
165:21 251:13
253:2
**crash** 179:15
**create** 134:5 181:24
245:7
**created** 85:23 86:3
86:10 87:1 92:13
131:18 214:3
**creates** 132:3
**criminal** 15:9 49:2,4
129:16 240:8
241:2,8,9,19 243:7
248:24
**crisis** 111:2
**criteria** 14:14 19:15
20:7 34:16 35:4,10
36:9,12 37:7 99:21
221:9 228:17
248:24
**critical** 95:6 112:21
**cronyism** 225:7
**crucial** 104:21 181:5
181:8 244:1
**crumbled** 181:22
**Cruz** 180:13
**crystal** 125:24
**CSC** 59:22
**culture** 157:10
162:18
**Curran-Fromhold**
5:16,20 7:1,5,7,11
7:16 19:1 20:13,23
24:5,17 26:1 27:1
27:14,20 28:3,15
28:19,20 29:8,14
29:16,24 30:5 32:9
38:24 42:23 71:17
81:1 117:9 256:16
**current** 61:3 236:6
258:13 259:7
**currently** 11:15
12:13 13:2 28:14
52:19 76:7,8,21
108:7
**cursed** 239:22
**curtain** 124:1,18
140:10 166:6,14
166:15 170:5
195:20 196:20
**curtains** 158:1

**curveball** 88:5
**custody** 112:12
129:10 167:2,4
**customary** 97:4,7,23
**cutter** 201:20

_____
        **D**
_____

**D** 3:1 161:14
**daily** 88:5 108:9
158:2 259:16
**darkest** 110:9
116:16 259:21
**data** 73:3,17 74:9
79:4,6,13 125:7
132:22 133:1,12
133:20 138:5,7,7
194:22 196:8
197:11,16 243:10
243:20 244:8,23
**database** 132:18
**date** 1:14 8:13 9:3,22
20:9,10 31:24 32:5
43:12 47:7 57:22
58:8 61:2,3 63:10
86:21 121:4,7
126:10 174:5
210:4,15,19 211:2
222:11
**dated** 3:21 33:22
111:18 141:23
154:18 172:17
184:12 194:5,8,10
194:14 197:8
218:7
**dates** 47:4 103:22
104:3 211:6
222:13 248:3,7
254:9
**David** 2:6 36:21
71:21
**day** 7:17 31:22 39:22
59:5 73:10,14
74:13 124:21
125:12,12 146:14
151:7 159:6
163:16 192:4
203:10
**days** 111:13 116:16
159:6 242:24
**day-to-day** 87:12
88:4 178:7
**day/seven** 111:13
**DC** 52:6,9,10 74:23
101:21 102:6
122:11 123:9
127:1 128:24
130:2,3,4 131:10
134:8 137:15

140:24 142:14
144:19 146:3
156:5 160:4
165:15 195:22
196:2 197:9,17,24
239:4
**deal** 123:16 150:13
179:7
**dealing** 87:23 88:4
235:4
**dealt** 259:14
**Deanna** 175:2
**deceased** 43:14
215:4
**December** 1:10
11:16 12:13 13:2
20:6,11 30:1,4
56:12 69:17
114:11 141:23
143:18 150:21
172:18 176:5
206:1 222:12
261:6
**deception** 188:24
189:13
**deceptive** 189:24
**decide** 108:20
150:18 247:1
**decided** 73:2 160:16
160:19
**deciding** 118:17
**decision** 24:3,15
27:13,18 28:1 50:4
50:10,17 51:9,15
51:21 52:9 61:4
65:14 68:10,14,19
73:18 78:2,6,14,20
79:2,19 80:6 86:1
86:9,23 94:23
98:14 102:18
106:14 108:8
112:2 114:8 115:8
117:17,19 132:6
150:20 157:18
160:21 165:19
175:13 178:8
179:16 183:5
186:1,3,16 188:14
202:6 206:10
223:22 224:3
228:6,7,24 233:16
244:7 247:22
257:17 258:21
259:10
**decisions** 54:24 55:6
55:8,20,22 70:4,5
70:6 97:15 112:21
113:16 114:17

127:10 128:13
131:22 132:8,9
150:13 181:12
191:17 213:6
243:11 244:21
258:24,24
**decision-making**
69:2 96:11 108:9
113:12 168:18
**deck** 109:2 164:4
166:18
**declarations** 189:15
**decline** 176:4
**decommissioned**
46:6 77:8
**decrease** 48:21 79:11
148:21
**decreased** 134:3
**deem** 233:2,17
234:11
**deemed** 35:8 99:14
99:18 206:23
227:13,20 235:2
236:3
**deep** 232:20
**defendant** 175:5,7
184:8
**Defendants** 2:9
**Defendant's** 4:3,4
184:6 187:13
**Defendant(s)** 1:7
**defended** 157:18
**defer** 89:16 191:16
221:10
**deficiencies** 28:10
140:8 197:3,14,20
**deficiency** 137:10
140:21 208:12
**defined** 178:16
**definitely** 111:2
**degree** 32:21 33:1
49:8,13,16 63:19
64:1 65:7,11,16
66:13 67:7,11
209:16,20 211:18
243:6 244:12
245:9
**DEI** 238:16
**Delaney** 3:13 40:13
41:15,17,23 42:5
72:7,13 74:1 90:8
215:15,18 237:17
**Delaney's** 42:14 76:4
81:8
**delegate** 161:13
**delegated** 131:16
**demonstrate** 105:12
124:11 147:10,12

147:15 150:10,15
229:11 241:23
**demonstrated**
107:24 113:21
114:5 125:5
235:10
**demonstrating** 109:6
109:18 167:19
258:18
**demoted** 212:22
216:18
**department** 16:3
18:17,18 60:17
65:14 66:9 68:1
72:11 76:19 78:3
78:10 80:10,20,24
85:22 86:7,7,11,12
86:19 87:11 88:8
88:18,24 89:9,14
89:23 90:4,11 91:5
91:14,20 92:21
95:7,12 96:20,23
98:19 99:4,9 100:7
100:11,21 101:4,7
101:8,12,16 102:1
103:19 105:2,7
106:4,7,11 107:1
112:22 130:18
140:9 157:9
175:21 184:15
186:8 198:11
199:12 201:24
202:19 209:22
216:10 223:23
243:16 244:19
246:6 248:22
249:2,7 251:5
253:4
**departmental**
126:18 201:11
**departments** 166:21
166:21 167:5
238:13 244:6
**department's** 157:8
**depends** 116:4
**deployment** 181:9
212:5 214:6,7
**depopulate** 47:8
**depopulated** 41:11
45:21 81:11
**depopulating** 46:4
**deportment** 126:23
**deposed** 5:9
**deposition** 1:13 3:6
4:2 190:11 198:19
200:18 260:13
261:5,14
**depositions** 8:19

**deputy** 6:24 10:18
11:22 13:10,14
14:2,7,16,23 16:4
16:5 17:14,19
18:23 21:7 22:20
22:24 23:1 24:3,15
24:22 27:18 28:11
29:1,3,10,15 30:5
31:10,23 38:18,20
38:21 39:17,18,23
40:11,12,14,17
41:24 43:2,8,9,13
43:19,21 44:15
45:5 46:6 47:24
48:14 49:22 50:11
50:17 51:9,15,21
53:7 54:22 55:2,3
55:9,22 57:7,10
58:12 60:19 64:13
64:22,24 65:2,4
68:10,15,18,21,24
69:3 70:2,13,17,18
70:24 71:3,10,15
71:20 79:2,18,21
87:3 89:16 92:24
94:23 95:17 96:4
98:9,12,13 102:14
106:9 110:18,22
111:22 114:13,17
115:2,13,17 122:8
122:9 123:14
134:19 136:1,2,18
143:7 144:4,12,22
145:7,8,12,22
146:1,20 149:6
153:5,8,24 154:4,8
155:9,14 157:2,5
162:12 163:1,11
163:24 165:23
166:5 170:24
173:5,7,8,9,19
180:10,14 181:4,7
181:14,18 182:2,4
182:11,17,23
183:2,4 191:19
192:2,3 193:12
195:17 196:6
204:10 206:9
207:17 209:11,12
209:15,21 210:1
210:19,23 211:9
211:14,17 212:21
213:3,7 214:7,10
214:11,11,15,16
214:19,20,23
215:8,12,14,16
216:7,11,19
217:20 218:12

219:23 220:9
224:5 237:19,23
237:24 238:6
239:19,23 241:15
241:16 242:7
250:6,6 251:24
252:3,20 256:24
257:6,18 258:2
**description** 3:8 8:8
8:11 153:10 233:6
233:11
**designed** 245:15
**desk** 241:21
**Detail** 3:7,10,11,13
3:15,22 6:15 13:23
19:22 31:3 42:15
58:5 90:24 180:6
254:14,15,17
**Details** 222:4,4
**Detention** 73:5,21
75:2,6,12 76:12
77:5,17,24 81:2,7
81:14,19,24 82:3,4
82:12,19 83:4,10
**determination** 18:21
19:8,11 34:15,17
34:21 35:1,8 36:11
36:15 37:9 38:3,9
38:17 67:18,23
193:10 231:24
232:3 247:15
**determinations**
35:13
**determine** 169:5
205:10
**determined** 18:13
34:2 35:24 36:9,12
40:3 151:17
247:14
**determining** 34:12
36:7 37:4 119:4
220:23
**detrimental** 95:11
95:19
**devotion** 112:6
152:10
**died** 43:10
**difference** 54:14
55:11 56:14 83:13
102:20,23 177:5
212:15,16 239:11
**differences** 28:17,24
52:22 53:4,8,20
54:21 55:11 56:22
69:19 114:10
**different** 53:17
76:15 92:4,11
120:2

**differently** 92:3
**difficult** 220:8
258:24
**dig** 232:20
**dignity** 241:10
**diploma** 188:17
189:20,22 190:14
190:18 191:20
192:18 193:13
**direct** 10:19 15:4
16:8,12 17:3 24:9
28:8,10 57:9 63:5
69:12 112:6 122:7
127:15 131:16
137:15 141:2
149:19 156:11
164:3 165:17
168:22 183:2
207:19 217:6,8
261:23
**directed** 14:24 15:23
16:9 17:6,13,18
24:12 52:6 117:4
137:23 258:2
**directing** 10:9,14,23
11:4,9,19 12:8,14
13:4 14:11,19
21:12 22:18 23:5
114:20 127:3
148:1
**direction** 79:23 80:6
98:1
**directive** 24:13,21
26:5,12 52:17
60:19 68:15 130:8
145:10,18 148:24
164:23
**directives** 60:17
109:9,23
**directly** 17:2 90:22
214:15
**director** 212:2
213:12,13 238:12
**directory** 4:14
255:24
**disagree** 93:21,23
94:2 142:16,17
218:20
**disastrous** 123:7
179:10
**discharge** 132:20
**disciplinary** 29:2
53:6 142:23,24
143:2 203:19
206:4
**discipline** 54:22 55:2
127:3,5 141:5
155:9,14 174:6,9

174:15 201:4
203:24 204:6
206:2,5,7,13,23
215:19,22 216:1,4
217:18 218:11,17
218:24 219:2,5,7
226:13 236:6,11
236:17,19,23
237:1 240:13
242:2,5
**disciplined** 29:10,17
30:6 165:14
174:18 199:14,15
199:19,20 201:16
201:18 204:10
216:6 239:23
242:1
**disciplines** 28:9
113:13 114:20
117:14
**disciplining** 114:17
**disclose** 190:20
200:7
**disclosed** 200:3
**disclosure** 190:23
**discontinue** 129:24
148:23 149:8
**discontinued** 129:20
130:4
**discourage** 15:13
**discover** 129:22
**discovered** 122:6
125:6 163:18
199:13 207:18
**discretion** 76:18,18
105:7
**discriminate** 198:24
**discrimination**
198:11,21 199:6
203:6 205:2
**discriminatory**
238:2
**discuss** 146:2 226:5
**discussed** 79:7,22
91:18 136:12
146:2 206:16
226:6
**discussing** 95:1
**discussion** 79:14
144:2 206:19,21
**diseases** 131:8
**disposition** 203:19
**dispute** 131:19
**disqualify** 236:15
**disruption** 159:23
**distance** 168:1
**DISTRICT** 1:1,1
**disturbance** 148:4

**diversity** 238:11,17
**divert** 257:12 260:6
**divide** 123:12
**divisive** 125:1
  166:10
**document** 3:12,14,16
  3:17,18,19 4:5,7,8
  4:9,10,11,12,13
  6:18 8:2,4,11 9:5
  10:2 20:1 26:10,15
  26:18,23 31:5 32:7
  32:18 33:9,12
  42:17 46:14 47:1
  47:12,16 58:7 60:2
  60:4,20 61:11,16
  62:12 75:20 84:5
  84:12,22 101:20
  103:21 110:13
  111:16 120:23
  121:1,10 141:15
  141:17,18 146:14
  153:21 154:11
  162:2 172:15
  180:3 184:6
  187:12 188:5
  189:9 194:1,2
  202:17 205:18,20
  209:3,19 210:11
  218:1 221:19
  223:2 233:10
  236:1 237:12
  250:22,24 251:15
  253:1,7,11,19
  255:10,23 256:11
  256:22 259:17
**documentation**
  27:12 52:16 54:8,9
  68:6 75:24 78:13
  78:19 81:18
  132:13 135:16,21
  136:6,9 137:9
  138:17 140:20
  145:6 147:20
  156:9,11 164:8
  188:15 216:13,15
  216:20 217:3,10
  217:13 222:13
**documented** 216:17
  244:4
**documents** 46:21
  48:11 74:15,16,17
  76:2 90:21 140:1
  186:3,12 187:14
  187:20 188:13
  204:12 253:24
  254:2,6 259:9
**doing** 56:23 60:21
  61:23 110:19,23

125:8 129:21
137:24 139:13
142:19 145:3
160:14 171:7,7
179:10 194:23
195:18 196:3,7,10
196:21 238:10
243:9 244:6
245:18
**domestic** 185:14,21
**dossier** 146:8
**doubt** 6:22 31:8 35:6
  35:13 36:14 37:3,8
  42:20 58:10
  172:24 173:2
  211:5
**draft** 128:13
**drink** 85:16
**driver** 74:9 110:21
**driver's** 186:18
  187:1,16,24
**driving** 184:20 185:4
  243:10
**drop** 77:22
**droves** 169:17 181:1
  260:9
**dry** 136:21
**due** 48:23 198:15
  203:7 241:11
**duly** 5:1 261:5,7
**duplicitously** 191:2
**duties** 28:5,6,18 52:5
  52:23 53:9 54:14
  56:15 69:6,20
  105:4 114:11
  115:6,13,15
  164:24 220:21
  258:14
**duty** 165:1

**E**
**E** 2:1,1,10,10 3:1,5
  4:1 261:1,1
**Earicka** 3:22 180:7
  181:6 212:4,11,20
  213:20 228:1
  231:15
**earlier** 43:8 72:6
  114:9 142:3 157:6
  180:24 253:14
  258:1
**early** 86:17
**easier** 77:2
**easily** 96:16
**EASTERN** 1:1
**education** 18:13,21
  32:18,19 38:5,12
  57:13 59:8 60:24

62:17 63:13,17
67:21 135:12
**educational** 22:8
  209:19 213:16,24
**Edward** 40:20,22
  45:14,18 49:7,12
  49:19 50:5
**Edwin** 180:13
**effect** 75:24 81:22
  177:6,10,11
**effective** 20:10 43:12
  58:8 69:17 116:9
  147:16
**effectively** 112:22
**effectuate** 55:4
  244:10
**efficient** 69:11 244:1
**efficiently** 52:8
**efforts** 79:10
**eight** 21:18,23
  136:14 226:9
  227:1 250:12
**eight-page** 180:3
**either** 107:14 111:22
  186:2 224:5,19
**either/or** 224:11,20
**elaborate** 10:17
  60:18
**electronic** 162:7,9
**Electronically**
  261:17
**eligibility** 189:15
**eligible** 33:22 84:8
  96:18
**eliminate** 72:14 74:2
  76:3
**Eliminating** 245:9
  245:12
**emergencies** 186:24
**emergency** 97:19
  117:13 151:11
  169:7
**emergent** 129:4
  169:7
**emphasis** 240:9
**employee** 174:10,23
**employees** 129:8
  198:8
**employment** 216:9
  218:18
**encounter** 177:1
**engage** 177:3 219:17
  219:21
**engaged** 22:2 164:17
**engaging** 131:11,13
**engulfed** 106:23
  111:13
**enlarge** 6:8

**enrolled** 192:14
  193:2 209:17
  211:19
**ensure** 24:21,23 28:6
  52:12,13 69:10,13
  105:8 145:3 196:2
  225:6,11
**ensuring** 10:19
  112:21 197:21
  207:16 224:9
**entered** 162:6
**entire** 37:21 87:24
  95:21 125:18
  132:2 141:5
  231:14,17,20,23
  250:6 258:16
**entitled** 108:13
  184:6
**entitlement** 118:3
  160:8 220:3
  230:15 238:9
  240:3
**entrusts** 105:1
**epidemic** 165:6
**equal** 150:14
**equation** 160:20
**equipment** 128:2
**equity** 73:7,16 79:13
  238:11,17
**equivalent** 18:12
**escaped** 216:17
**ESQUIRE** 2:2,6
**establish** 101:3
**established** 8:20
  29:23 32:10 34:8
  34:13 35:16 36:3
  37:18 84:8,15
  85:10,21 86:2,9,24
  89:22 96:18 97:1
  100:4,15 101:8,13
  102:2,15,21,22
  104:7 107:4 110:6
  253:11,15 258:9
  259:11
**estimate** 47:23 48:7
  48:9,10 54:6
  145:21 250:14,16
**et** 1:3
**eval** 154:6
**evals** 166:11 198:6
  198:15
**evaluate** 143:11
**evaluating** 186:11
**evaluation** 121:11
  121:14,17,20
  154:23 195:16
  197:4,6,8 198:10
  216:23 236:3

**evaluations** 122:3,7
  122:10 154:4
  155:5 166:3 173:1
  175:17,19 193:24
  194:3,16 197:10
  197:12 198:1
  217:5,16
**eventually** 40:15
  116:14
**everybody's** 139:19
**Everyone's** 147:14
**evidence** 186:16
**evidence-based**
  195:7
**evolve** 105:11
**exact** 9:3 47:7 56:23
  61:2 174:5 197:12
  251:16
**exactly** 48:5
**exam** 33:19 66:3
  86:5,14 98:2 99:9
  99:12,15 100:1,24
  103:20 105:24
  106:5,8,12,14,14
  110:3,8 111:17,20
  111:21 112:2
  117:21 119:21,24
  120:3,5,6,8 131:6
  152:22 160:24
  220:5 221:3,13,14
  222:4,16,18,19
  223:15,16,17,24
  223:24 224:7,8
  245:22 246:9,14
  246:18 247:16
  248:9,11,14,15
  251:7
**examination** 189:1
  189:16 220:22
**examinations** 121:23
**examined** 3:2 5:2
**example** 17:1 45:10
  45:11 129:14
  131:4 196:24
  203:10
**examples** 43:18
  44:14,20,23 49:22
  55:16 114:15,16
  114:18,19,20
  135:10
**exams** 120:2 221:7
**excel** 224:14 230:14
**exception** 56:24
  145:23 212:19
**exceptionally** 226:13
  236:18
**exchanges** 162:15
**excluded** 224:18,23

225:18 226:10,17
226:22 227:3,15
227:16 229:21
230:1
**excluding** 236:23
**exclusive** 117:22
**excuse** 94:12 97:8
112:17 128:3
133:22 136:20
**execute** 145:13 171:1
171:2 183:2
**executed** 109:10
110:17 146:16
**executive** 54:23 55:6
145:24 196:1
212:19
**executive-level** 55:8
**exemplify** 105:12
**exempt** 212:19 213:3
213:10
**exhaustive** 115:12
**exhibit** 6:1,14 7:22
9:6,18 13:18 14:10
20:2 30:22 32:1
33:5,17 35:20
42:10 46:10 57:24
59:20 61:7 62:14
62:15 84:1,7,14
90:17 99:5 105:17
111:17 119:21
120:19 141:13,18
152:18 153:13
154:11 172:14
179:23 184:1
187:8 189:5
202:16 209:5
210:7 211:13
217:24 222:1,22
223:5,12 237:8
250:18 251:20
254:20 255:19
**exhibits** 3:6,24 4:2
236:8
**exist** 78:23 111:7
**existed** 89:23 240:21
249:10,11,18
250:14
**existing** 244:23
**exists** 26:19 136:15
152:12
**expand** 244:13
**expanded** 245:15
**expect** 182:23
**expectation** 109:14
**expectations** 196:9
239:6
**expected** 117:4
**expecting** 145:17

**experience** 10:3,5,14
10:23 11:4,8,14,17
11:18,21 14:7,17
18:10,13,22,23
19:8 21:7,15,22,23
21:24 22:4,8,9,19
22:23 23:1,12,13
30:10 34:4 36:2
38:6,12 67:21
82:15 101:3
107:23 110:1
120:4 149:18,20
150:3 153:23
169:18 178:24
213:22,23 232:14
233:4 234:10
236:8 245:14
247:12 248:23
**experienced** 181:2
181:22 260:9
**experiences** 23:9
**experts** 221:8
**expire** 104:11 249:17
**expired** 250:2 252:5
252:8,21
**explain** 55:1
**explained** 238:17
259:12
**expose** 166:12
**exposed** 124:19
125:23
**exposes** 132:16
**express** 82:6 143:20
144:9 186:22
205:23 215:15
220:12
**expressed** 67:3
144:18 145:7
160:4 163:11
177:22 215:11,13
230:3
**extended** 39:10,20
40:13 57:5 96:7
110:24 159:22
160:1
**extensive** 11:2 236:7
**extent** 102:7 160:18
174:24 253:16
**eyes** 164:14
**e-mail** 25:20,22
61:24 81:21 84:12
84:15 100:13,18
101:16 103:11,12
103:12,17 156:4
253:14

———————
**F**
**F** 261:1

**face** 85:14 128:1,1
**facilitate** 129:17
**facilities** 26:5 47:9
76:23 80:24 88:3
95:7 107:22
108:16 109:7
112:12 113:14,17
115:5,21 116:2,10
117:3 134:15
135:2 146:4 152:7
165:9 178:2,9
179:5 181:15
241:18 258:4,5,10
**facility** 5:16,21 7:1,5
7:7,12,16 10:18
19:1 20:14,24 24:5
24:11,17 25:13
26:1 27:2,15,20
28:4,7,15,19,21
29:8,14,16,24 30:6
30:13,18 31:11,15
31:17,21 32:10
38:5,11 39:1,1,24
40:23 41:11,12,19
41:21 42:23 43:3
44:3,16 45:8,20
46:4,22 47:3,5
49:23 50:19 51:11
51:17,23 52:3,8,20
52:24 53:1,11,13
54:2,16,19 55:5,18
55:20 56:4,9 69:12
70:3,4 71:13 73:6
73:11,12 75:9,18
75:20 77:18,20
81:1,4,20 82:2,18
82:20 83:6,9,12,14
83:15 95:21 96:9
114:14 116:5
117:10,12 118:12
118:15,18 124:23
125:12 132:2
134:2,11,12,13
169:20 181:3
182:3,5 183:19
186:24 207:14,16
208:9 219:13,15
239:9,14 242:8
250:7 256:16,20
**fact** 93:15 123:10
126:6 127:7
134:10 190:7
196:11
**facts** 185:9
**factual** 203:3
**failed** 237:1
**failure** 35:20 36:8,16
37:5,10,17 164:24

**fair** 18:2 19:20 23:24
92:10 139:22
197:5 219:9
220:16 222:15
242:15,19 254:11
**fairness** 105:9
**fall** 155:24 162:11
207:16
**falls** 95:2 115:7
183:3
**false** 240:13,16,22
242:5,10
**familiar** 100:23
188:23 190:4
**families** 128:6
**far** 7:9 173:13 221:9
**fare** 109:16 181:19
**fared** 182:7
**Farrell** 3:15 57:15
57:20 58:5,14,16
67:22 68:3 90:15
207:13 208:4
215:24 218:7
219:10,11,16
237:20 238:1,5
241:4 255:1,4,16
**Farrell's** 58:22 59:5
68:13 69:9,24 71:7
91:6 118:24
254:13
**Fear** 113:1
**February** 33:23 34:9
34:13 35:16 36:3
37:5,18 84:9 86:2
86:10,24 87:15
88:9,17,20,23 89:8
89:22 90:3,10 91:4
91:13,22 92:14
93:3,4,7,23 96:19
97:1 103:13,20
104:7 106:24
110:3,11 111:18
183:9,18 210:15
245:21 246:8,19
247:8,13,20 248:9
251:12 253:12
258:9 259:11
**federal** 138:10,15
139:1,3 169:13
**feed** 167:11
**feedback** 79:1,17
**feeding** 167:2
**feel** 85:17 112:11
140:24
**feet** 112:10 168:1
241:21
**fellow** 29:2 53:6
54:22 55:3

**felt** 122:12 158:10
**female** 72:22,24 73:3
73:6 74:8 81:12
198:21,22,24
199:21 237:19
252:20
**fester** 158:16
**field** 150:14
**fifth** 187:15
**fighting** 123:5
124:24
**file** 64:4 141:7 187:2
**filed** 157:16 198:16
198:17
**files** 78:16 180:23
**fill** 181:5 75:1 76:20
77:13,23 87:22
96:16 123:22
177:22 192:1
**filled** 76:11,15,17,23
97:5 114:1 117:5
133:14 144:6
182:8 232:22
249:12
**filling** 182:11,13
**final** 9:13 35:4,11
153:14 184:11
186:16 209:9
230:2
**finalized** 60:23 62:16
63:8,12
**financial** 54:23
55:20 70:3,5,6
71:2,8 114:16
**find** 98:4,7 129:1
208:12 228:3,12
231:14,17,20
**finding** 175:12 207:8
**findings** 122:14
**fine** 103:24
**finish** 234:5
**finished** 62:11 97:11
97:11
**firm** 74:15
**first** 10:8 11:17
21:11 22:17 23:13
33:16 45:11 56:15
63:6 84:13 99:8
120:10,24 140:23
141:20 151:17
154:16 158:13
171:11 184:5,7
185:10 186:1,5
195:2 200:14,17
200:18 201:3,12
201:16 203:10,20
204:11,13 210:13
218:24 221:24

251:4 261:7
**firsthand** 158:12
**fitness** 120:13 122:3
153:2 155:5,15
175:20
**five** 37:24 123:23
136:23 173:13
227:22,23 230:2
230:13,21 235:5
235:12 245:7
258:18
**five-day** 132:20
**five-page** 3:18
120:23
**floor** 161:8 238:18
**Florida** 184:20,21
185:15,22
**floundered** 234:15
**fly** 109:15
**focus** 88:4 259:20
**folks** 130:21 131:11
134:23 135:12,13
182:10 207:21
212:19 221:7
235:18 249:24,24
**follow** 104:16,19,23
**following** 47:15
105:4 108:24
192:4
**follows** 5:3 13:2
**food** 125:13 168:12
**foot** 152:9
**force** 225:21
**forced** 160:21
**forecast** 244:4
**forefront** 243:7,21
244:5
**forever** 179:7
**form** 11:11 12:17
16:14 19:3 20:16
21:9 23:7 37:11
38:14 39:4 48:3
75:5 93:8 95:15
102:4 107:3
116:11 177:13
190:1,19 191:10
198:13 205:9
232:21,22 233:19
246:13,21
**formal** 26:4,11 174:8
203:19
**formally** 46:8 127:6
**Forman** 212:3
213:17,18
**former** 65:12 192:12
192:19 249:21
**forms** 75:3 224:12
226:23

**forth** 169:13 244:17
261:10
**forthcoming** 192:13
**forward** 106:20
192:24 241:7
259:5
**fostered** 149:24
**found** 143:23 166:13
174:22 206:11,17
207:1,5 226:24
228:20 229:3
230:6,23 242:14
**four** 34:7 35:15
72:10,14 74:2 76:3
78:3,10,15 79:3,19
80:7,17,21,24
89:24 90:1,6 91:19
93:5 99:18 215:8
215:11 230:13,21
251:5 253:20
**fourth** 218:6
**four-page** 8:2
217:24
**frame** 29:19 74:24
106:23 111:4,9,11
177:9,11
**frames** 148:17
**fraud** 189:14
**fray** 158:23
**free** 85:17
**freestanding** 83:15
**friends** 219:17
**front** 26:10 48:11
49:10 90:22
103:23 135:7
235:24 248:2
**frontline** 131:8
145:14
**frustrated** 162:21
**frustration** 158:15
**frustrations** 239:7
**fulfill** 105:3
**full** 81:5 82:10
110:15 127:23
177:23 191:17
248:19 259:17
261:14
**fully** 11:1 106:23
139:12 159:2,10
234:22
**full-blown** 108:22
**function** 24:11 258:6
**functioning** 95:6
**funding** 55:6,7 70:7
77:4
**funnel** 129:12
**further** 187:18
261:13

**G**
**gender** 198:11,21,21
199:5
**general** 18:22 21:22
22:4,8 126:21
**generally** 200:8
**gentleman** 65:10
**Gerald** 41:20 214:22
214:22 215:5
**getting** 85:14 103:22
161:10 186:23
187:24
**Giannetta** 3:8 5:15
5:20 6:16 7:2,4
19:2 90:15,18
160:3 176:9 181:7
213:19 215:21
237:14,16 238:5
238:19 239:1,20
240:2 242:20
255:2,8
**Giannetta's** 7:9,17
20:14 24:6,18 26:2
27:2,15,21 28:4,21
29:9,15 31:22
71:18 117:10
254:16
**Giorla** 65:11 66:4,18
67:4,6 249:22
**Giorla's** 66:10
**give** 11:13 27:13
61:15 73:7 74:15
74:18 84:24 89:7
92:5 97:8,13 103:1
109:9 110:13
111:10 145:18
151:20 152:5,15
162:13 170:24
172:12 178:9
179:15 190:16
203:23 254:6
256:18 260:4
**given** 7:6,10 25:24
26:7,12,24 27:5
31:16,18 58:18,23
73:10,13 74:13
75:2 77:21 81:24
96:7 110:16
147:14 148:24
150:11,22 151:22
207:19 223:17
237:16 241:11
246:19 247:16
255:15 261:15
**gives** 178:21 251:16
**giving** 198:19 259:16
**glancing** 251:17
**gleaned** 110:5

**global** 108:20 109:5
112:8 246:6
**glowing** 197:9
**go** 20:20 45:10 46:24
77:3 79:19 80:2,3
80:4 84:17 88:12
106:19 108:5
122:13 124:8
125:22 134:14
146:8,10 158:8
160:11 164:10
173:10,11 178:23
182:22 183:12,16
187:24 189:11
192:9,24 193:7
195:1 196:6
197:15 207:23
212:9 225:11,14
237:3 241:21
253:18 257:3
260:2
**goal** 48:21 49:6 79:7
**goes** 61:24 183:16
230:18
**going** 9:18 14:1,9
19:21 21:11 22:22
32:1 35:19 47:15
47:20 50:13 59:20
90:17 96:1 101:12
101:19,22 104:14
109:16 115:8
121:10 122:16
123:21 130:11
133:5,24 139:21
141:2 147:18
152:18 153:13
154:23 156:22
157:13 165:17
170:22 172:14,16
172:16 179:9
180:5,12 181:18
182:18,22 183:12
184:5,18 186:3
187:7 191:8,16
192:24 193:7,23
197:15 203:3,4
210:22 219:24
220:20 221:24
223:14 228:18
233:5 235:1,13
236:2 237:15
239:12 244:24
251:20 253:18
256:11 258:16,17
259:18
**good** 5:5 71:22
143:14 144:17
147:4,8 156:7

172:1 173:12
178:7 213:22
219:20,22 220:22
**grade** 66:2 249:3
**grades** 189:21
**grading** 248:24
**graduate** 209:15,20
211:18,20
**grain** 168:9
**grant** 48:24 49:3
72:21
**gravity** 95:22 96:8
109:16 159:8
165:2,12 181:3
**great** 172:6,8
**GREENBLATT** 2:2
**Greene** 37:23
**Greg** 64:19 123:9
**Gregory** 184:12
**ground** 108:17
109:22
**group** 15:10 228:23
229:1 230:1
231:14,17,20,23
231:24 233:14
235:14
**guess** 46:24 61:18
223:20
**guidance** 130:18
134:7
**guidelines** 108:24
249:2
**guilty** 242:14
**gush** 135:8
**guy** 163:19 164:18
**guys** 170:8

**H**
**H** 2:6 3:5 4:1
**half** 79:8 123:24
125:18 127:22
250:12,15
**hand** 11:23,23 15:18
15:18 117:14,14
149:23,23 167:24
202:9,11 259:21
260:7
**handed** 198:4
**handle** 113:23,23,24
129:6 134:20
137:24 156:17
157:4,15
**handled** 87:2 181:8
181:9,9
**handling** 159:16
**hands** 109:2 164:4
164:20 165:4
166:17 178:1

260:3
**handwriting** 234:8
**haphazardly** 162:22
    165:5
**happen** 75:7 108:10
    151:6 154:3
    195:20
**happened** 122:16
    126:8,16 136:7
    173:21 193:1
    230:11
**happening** 115:1
    125:8 126:1
    140:19 161:16
    162:16 166:13
    174:2 196:17,20
    197:11
**happens** 122:9
    133:19 151:5
**happy** 6:7 46:21
    62:1 245:17
**harassed** 174:23
**harassment** 157:13
    188:6,10 199:11
    199:16 200:13,19
    201:2,14 204:16
    205:1,8,11
**hard** 127:9 128:12
    131:22 132:8,9
    169:24
**hate** 113:7
**head** 142:9 153:12
    157:11 182:21
    212:10
**health** 81:15 125:14
    130:18 167:3
    168:12 169:10
**healthcare** 125:13
**hear** 88:13
**heard** 89:4 186:15
    203:15
**hearing** 170:7 171:4
    186:2,6,14 200:15
    200:19 201:3,13
    201:16 203:21
    204:11,14
**heavy** 215:3
**heightened** 114:23
**held** 1:17 117:12
    212:2 213:18
    225:20 243:3
**help** 20:3 26:15 62:4
    105:8 111:8
    156:22 239:12
**helped** 116:2
**helpful** 47:2 203:20
    232:21
**Hey** 102:24 103:7

128:20 133:23
    156:21 161:13
    162:13,17 163:14
    163:18,20 164:17
    170:8,10
**hiatus** 195:10
**hierarchical** 201:24
    210:20 211:6
**high** 49:2
**higher** 55:3 224:9
    225:2 240:4,23
**highest** 70:9 123:22
    175:16
**HILL** 2:6
**hinder** 217:19
**hindsight** 93:6,9,18
    221:7 226:5
    259:10
**hired** 150:4 180:21
    183:10 212:15,18
    231:7
**hiring** 258:8
**historically** 240:3
**history** 3:7,10,11,13
    3:15,22 6:15 13:23
    19:22 29:22 31:3
    42:15 58:5 90:24
    118:2 180:6 220:2
    254:14,15,17
**hit** 108:17 109:22
    123:24 156:15
**hold** 124:14 138:22
    145:4 220:20
**holding** 196:22
    242:22 243:1
**holidays** 145:24
**home** 128:5
**honest** 146:5
**honor** 178:6
**hope** 114:3 146:4
**hospitalization**
    256:9
**hospitalized** 256:8
**hostility** 203:6
**hourly** 88:6 158:3
**hours** 111:13 159:6
    237:5
**house** 41:13 45:24
    46:3,16 47:10,21
    48:1,16,20 49:20
    50:6,14 76:12 77:7
    77:11,14 79:6
    167:7
**housed** 159:4 168:6
**housing** 148:2,6
    159:2,11 162:6,22
    164:7 165:4

240:20
**HR** 86:4,6,7,20
    87:10 97:6 98:16
    100:13,13 102:6
    103:7 106:11
    110:19 112:18
    221:10 224:6
**HSPA** 14:14 120:16
    122:3 141:5 143:3
    143:6 147:8 149:9
    149:14 151:15
    166:3 173:18
    174:7 196:2
**HSPAs** 129:1 133:18
    149:5 167:8 171:6
**human** 11:23 18:14
    18:16,20 19:9,12
    22:12,14 25:3
    33:18 34:2,11 35:2
    35:7,24 36:6 37:3
    38:2,9 67:17 85:11
    85:20 86:11 87:10
    92:20,23 94:8
    96:17 99:11,23
    100:3,7 101:6
    103:3 121:8
    122:21 130:23
    176:23 192:17
    193:11 221:5
    244:15 249:20
    253:13
**hundred** 119:22
    124:12 132:1
    135:4,4,10 138:21
**husband** 239:18,19
**hybrid** 166:22
    167:13,15 168:3
**hypothetical** 94:5
    183:12,16 191:1
**hypotheticals** 191:18

_____
**I**
**idea** 74:19 246:5
**identification** 6:3
    7:24 9:8 13:20
    30:24 33:7 42:12
    46:12 58:2 61:9
    84:3 105:19
    120:21 141:10
    154:14 180:1
    184:3 187:10
    189:7 202:13
    209:7 210:9 218:4
    221:22 222:24
    237:10 250:20
    255:21
**identified** 102:2
    135:19 235:16

**identify** 15:19 49:5
    196:9 198:22,24
    199:7
**ill-prepared** 182:19
**imagine** 182:6
**imagined** 173:24
**immediate** 70:16
    122:8 141:3
    143:12 194:19
**impact** 155:15
    175:13,20 185:6
    185:22 188:11
    231:6
**impacted** 87:24 88:9
    88:13,19
**impartial** 136:13
**impending** 47:10
**imperative** 113:5
**implement** 145:13
**implemented** 134:8
    196:16
**implementing** 195:6
**important** 97:14,15
    104:16,23 105:1
    113:16 182:12
    233:15
**inappropriate**
    145:10
**incarcerated** 12:2
    15:19 17:24 52:15
    69:13 72:24 73:11
    74:8 77:22 78:5
    81:17 82:11 96:13
    108:11 114:22
    115:6 124:5,16
    125:3 128:16
    130:16 132:18
    133:9 139:8
    171:16 172:13
    197:22 216:16
    240:21 256:8
**incident** 126:19
    159:24 165:14
    166:9 205:1
**incidents** 186:8
    217:7,9,11
**included** 80:21
    195:15 198:5
    200:13
**including** 22:1
**inclusion** 238:11,17
**inclusive** 22:11
**inclusivity** 150:1
**inconsistencies**
    132:23
**incorrect** 34:18,22
    39:12,15 142:12
**increase** 258:17

**increased** 115:23
    116:1,7
**increasing** 195:4
**indicated** 122:12
    123:20 231:2
    242:12
**indication** 140:7
**indicator** 221:2
**individual** 10:8
    13:10 14:14 37:19
    37:22 75:19 82:7
    95:20 96:10 117:8
    117:21 118:11,22
    119:4 157:19,20
    176:1 180:12
    183:6 189:22
    230:17 232:9
    235:15 245:11,16
**individuals** 33:17
    34:3,7 36:1 37:24
    49:5 66:12 74:12
    99:24 113:21
    127:24 131:5
    136:4 152:13
    167:3 171:20
    178:21 214:14
    224:9 226:9,24
    227:2,12,19
    229:10 233:14
    235:3,5,16 256:8
    257:17
**Industrial** 57:16,21
    58:13,17,19,24
    59:4 67:20 68:12
    69:8,11,16,21,23
    70:20,23 71:6,9
    73:12 81:2 118:23
    119:5 207:4,10
    212:13
**inexperienced** 95:24
    182:19
**influence** 184:20
    185:4 234:4
**inform** 130:9
**information** 24:22
    47:6 49:10 91:24
    122:6 128:21
    132:11 140:17
    149:5 162:13
    170:6 195:22
    212:6 213:12
    215:4 224:22
    248:4,7 249:15
    254:18,19 259:16
**informed** 24:10 52:9
    52:10 98:9 131:9
    192:13,22 198:14
**initial** 238:18

**initially** 213:18
    219:11 221:14
    229:20
**initiatives** 240:10
**inmates** 168:23
**innovation** 174:2
**innovative** 173:21
**input** 24:8,9,20,21
    27:23,24 68:19
    69:4
**inside** 15:11 70:2
    92:20 112:8,12
    115:5 165:9
**inside-out** 172:7
**installed** 167:24
**instance** 40:5 41:14
    114:10
**instances** 40:7,9
    44:15,24 45:1,4
**institution** 10:11
    11:20 12:10,16
    13:6 14:13,21 22:1
    23:6
**institutional** 18:1
**institutions** 112:8
**instruct** 28:8 130:9
    164:3
**instructed** 52:6
    117:4 157:16
    192:3 239:4
**instructing** 124:4
**instruction** 109:23
    207:19
**insufficient** 236:14
**intake** 132:19 134:12
    134:14 158:10
    161:11
**intend** 257:7
**intentionally** 240:20
**interact** 161:4
**interest** 67:3 183:3
    192:6 215:12,14
    215:15
**interested** 102:10
**interesting** 122:15
**interim** 26:7 27:6,7
    27:10 60:17
**interjected** 107:15
**internal** 214:3
**interpret** 145:13
    234:3
**interpretation** 243:3
**interpreted** 243:2
**interpreting** 92:8
**interruption** 94:18
**interview** 117:20,23
    118:8,20 119:8
    132:19 136:4

150:23 151:2
    152:1 175:23
    176:2,5,8 177:7
    207:2 220:5
    224:14,24 225:15
    226:14 227:7,10
    228:5 230:14
    236:18
**interviewed** 150:21
    206:4 222:12
    224:18 226:8
    230:17
**interviewing** 151:14
**interviews** 226:4
**intimate** 216:11
**intimidating** 201:18
**intoxicated** 239:18
**intranet** 25:16
**intricacy** 181:16
**investigate** 122:13
**investigation** 187:18
    192:16,20
**investigations** 200:1
**invite** 135:23
**involved** 15:8,14
    17:2,21 86:23
    106:13 112:1
    149:20,22 156:15
    186:4 248:23
**involving** 253:16
**in-person** 129:11
**isolated** 147:2
**issue** 161:20 164:9
    179:10 195:16
    199:7 241:4
**issued** 27:9 137:22
    186:21 190:8
**issues** 71:8 136:12
    146:2,2,3,24
    157:10 190:10
    197:20
**item** 80:18
**items** 200:6 242:8

_____
                J
_____
**jail** 168:1
**jails** 48:24
**January** 261:19
**Jennifer** 2:11 5:7
    99:20 122:20
    228:3 230:1
    231:21 232:1
**jerk** 129:3
**Jersey** 1:16
**Jessica** 2:12 5:8
    99:19
**job** 3:8 8:8,11 18:1,7
    28:5,6,18 52:5,23

53:9 54:14 56:15
    59:11 69:6,20
    114:11 117:7,16
    118:6,9,11,16,22
    119:3 130:14
    131:2 133:8 150:9
    153:10 165:18
    220:13 225:12,17
    231:12 233:6,11
    243:4 245:17
**jobs** 238:20
**John** 40:13 72:7 76:4
    237:16
**joke** 234:16
**jot** 136:11 170:23
**jotted** 146:10
**July** 42:18 43:17
    62:24,24 63:3 72:7
    74:3 76:5 78:11
    90:8
**jump** 151:7 208:16
**June** 63:8,10,16
    204:21
**Junior** 231:18
**jury** 174:22 175:12
**justice** 15:9,14 48:23
    48:24 49:3,4 72:21
    129:16 240:8
    241:2,8,9,19 243:8

_____
                K
_____
**Karen** 83:2
**keep** 23:20 77:2
    108:16 109:22
    112:10 113:14
    117:3 128:5 136:3
    152:6,7 167:10
    168:1 169:20
    170:23 172:4
    178:2,9 179:5,6
    218:11 235:13
    257:15 260:10
**keeping** 163:6
**Kenney** 48:21
**kept** 116:18 151:11
    200:4 229:6
    259:20
**key** 166:23 182:1
**kicked** 125:6
**kind** 134:22
**knee** 129:3
**knee-jerk** 113:19
    114:7
**knew** 155:17 159:8
    165:2 243:11
    244:8 259:15
    260:4
**knife** 201:19

**know** 5:19 6:6 9:2
    11:7 13:13 16:12
    17:6,9 20:9 21:6
    23:3,11,18,22
    25:10 26:18 29:6
    29:12 30:16 35:3
    47:20 50:13 54:5
    57:5,19 60:22
    61:16,23 65:17,18
    66:2,18,21,22,24
    67:2 74:20 92:6
    93:2,9 98:1 101:24
    103:24 110:12,18
    111:9,21 120:5,15
    126:4,14,16
    128:19 133:6
    141:17 142:6
    143:13 144:3,22
    146:18 148:17
    153:4 154:3
    155:24 156:3,17
    157:4,15 158:23
    159:17 160:17
    162:12,19 163:8
    164:19 165:16
    166:2,8 168:20
    170:2 174:17
    175:1 178:14
    180:20 187:4,5
    188:16,20,22
    190:2 191:2,19,24
    192:19 196:8,14
    197:19 198:22
    199:6,24 200:1,2,4
    201:22 204:4
    205:16,19 219:6,8
    221:10,17 222:11
    223:19,22 225:15
    229:11 239:2,11
    244:3 248:4,19
    249:3,9,13,15
    252:17 253:5,5,6
    253:10 254:4
    255:9 256:2,17
    257:10
**knowing** 36:18
    123:14
**knowledge** 66:18
    87:2 102:7 103:16
    110:1 123:14
    143:4 161:2
    169:16 174:17
    183:23 185:9,10
    188:8,9 198:16
    200:22,24 204:18
    217:12,15 221:1
    235:11 261:16
**known** 197:17

_____
                L
_____
**L** 2:10
**LaBletta** 63:6
**labor** 131:19
**lack** 234:9
**lacked** 132:14
    232:14 233:3
**lackluster** 144:20
    239:1,16 241:5
**lacks** 196:13
**Lacombe** 31:10,16
    31:23 32:24 38:3
    38:10 44:1 50:18
    51:10,16,22 52:2
    52:19 53:5 54:1,14
    55:17 56:3 57:2
    64:9 65:2 71:11
    115:19 183:17,22
    184:19 185:14
    188:7,16 190:12
    217:14 222:8
    223:7 226:20
    228:1 229:19
    230:4 256:19
    258:2
**Lacombe's** 52:23
    53:9 114:10
    118:10 185:3
    187:1,16,23
    188:11
**lament** 135:3 259:3
**lamented** 128:17
**language** 60:20
    103:6
**large** 129:13 260:5,8
**largest** 134:2,11
**lasted** 109:11
**lastly** 18:9
**late** 86:17 173:10
    174:4
**Latest** 59:22
**law** 261:8
**lawsuit** 139:4 148:13
    169:13 174:10,15
    174:21,22 198:16
    198:17,18 200:2
    200:22,23 202:23
**lawsuits** 174:11
**Lawton** 40:10,15,18
    41:9,10 45:12,15
    47:19 50:7,9,12
**Lawton's** 40:21
    45:19 48:2,16
**lawyer** 148:10
    205:10
**lead** 95:21 116:23
    124:20,20,21,23
    147:15 148:4

150:12 179:3
246:5 259:21
**leader** 133:4 142:20
147:22 150:8
158:22 159:20
258:23
**leaders** 109:6 116:24
117:1 127:9
142:21 147:16
**leadership** 96:11
105:13 108:6
113:12 125:9
131:1 132:14
134:2 137:10
138:1,2 139:14
140:8 142:7
147:13,17 150:15
150:17 156:10,12
160:10 164:1
167:6 168:16
182:3 195:4
196:13 197:2,20
216:14,21 217:4,6
217:9,14 235:11
240:9 242:3,9,17
242:21 259:14
**leading** 91:12 114:5
128:7 139:15
**leads** 105:2
**learn** 49:15
**learned** 116:17
120:9
**leave** 39:10 41:18
44:11 45:6,16
54:11 96:7 110:24
158:21 160:1
161:3 181:10
208:6
**leaving** 181:1 239:9
260:8
**led** 147:24 169:13
222:8
**left** 73:14 90:8
173:16,17 204:24
226:21 229:23
235:5
**legacy** 118:2,7
157:12 160:7
230:15 241:12
245:6
**legal** 129:17 149:8
205:11
**legitimate** 234:10,12
**letting** 199:6
**let's** 45:10 148:19
155:24 246:15
**level** 54:24 68:1
70:10,12 145:11

146:15 149:24
150:14 161:7
182:9
**Lewis** 4:6 201:5,13
201:19,21 202:2
202:17,20 203:4,7
203:11,15,23
204:5,9,21,23
205:5,18
**Lic** 1:16
**license** 187:2,16,24
261:3,18
**licenses** 186:18
**lie** 240:17
**lies** 257:11
**lieutenant** 214:6
**lieutenants** 113:3
**life** 111:12 112:15
**lightly** 113:19 183:8
**liked** 130:21,22
**likelihood** 18:7
222:12
**limited** 12:12 146:23
148:16 168:7
178:1
**line** 77:3 80:18 113:2
118:8 148:20
241:14
**lion's** 134:12 174:1
207:12,14
**list** 33:22 34:1,7,8,13
35:16,20,21,23
36:3,8,16 37:5,10
37:17,17,21 84:8
84:15 85:10,21,22
86:2,9,15,23 87:5
87:15 88:7 89:1,10
89:13,22 91:15,18
91:21 92:13,17,19
93:6,22 94:24
96:18,21,24 98:3
98:10,15,16,22,23
98:24 99:2,5,7
100:4,8,12,15,22
101:1,4,5,9,13
102:2,15,17,19,21
102:21 103:1,5,8
103:16,18 104:7
104:10,13,15,22
105:6 108:13,23
110:20 119:18
140:22 144:6,6,7
144:13 146:21
147:6 152:11,20
153:9 155:18,21
156:1 176:13,22
177:6,8,16 178:19
178:20 183:15,15

223:6,6,10,18
224:17,24 225:3
225:10,13 226:2
226:10 227:2,12
228:9 230:8,9,10
235:1 246:10
249:5,12,19 250:1
251:12,24 252:8
252:12,19 253:2
253:11,17 258:9
259:11,19 260:2,6
**listed** 251:14,21,22
**listen** 133:5 161:13
**lists** 89:18 103:3
180:21 249:10,17
250:13 252:4
256:19
**litigation** 170:3
**little** 6:10,11 14:6
33:10 56:1 64:6
73:14 152:22
170:23 210:14
215:3 222:16
**lived** 112:15
**lives** 108:10 165:5
177:24 260:3
**lobby** 156:20
**located** 82:13,14
**location** 115:10
**locations** 82:8
**lock** 131:5
**locked** 124:5 127:18
179:6
**lodged** 201:13
**log** 162:2,3,7,9 163:6
**long** 40:2 42:3 46:1
47:24 54:5,6 103:7
118:2 147:13
149:9 159:21
173:7 249:6
**longer** 15:6 70:20,22
207:21 208:13
225:14,18 227:6,8
231:9 238:14
243:17
**longstanding** 134:24
220:2
**look** 46:21 54:11
64:3 78:22 113:20
113:21 125:22
149:11 162:8
186:4 187:6
210:18 230:8,9
254:5,12
**looked** 48:24 142:3
230:10
**looking** 8:4,10 9:13
10:1 20:1 29:21

32:8,17 47:1,4
62:14 70:10 84:7
84:13 86:20 90:23
111:16 120:24
140:11 153:21
154:16 170:10
180:23 194:2
209:9 223:4,5
236:21 244:23,24
245:2 248:11
251:18
**losing** 113:1,2,3,4
127:17
**lost** 113:4 169:17,18
169:18,22
**lot** 97:15 103:22
110:5,5 116:17
122:17 123:15
124:19 127:8
128:12 130:12
146:12 161:16
166:19 213:22
222:13 240:8
248:3,6,7
**Lou** 12:22,23 66:10
**Louis** 1:15 65:11
66:4 67:4,5 249:22
261:2,17
**loved** 128:24
**low** 73:3 75:2
**lowest** 73:1
**Luncheon** 72:1
**luxury** 257:15
**Lyde** 1:21 5:7
99:19 119:17
120:15 121:2,7
122:10,20 123:4,8
124:3,10,20 126:4
126:18 127:14
130:2 131:10,12
132:14 134:9
135:17 137:9
138:1 140:21
141:4,21 143:6,13
144:16 146:20
147:4,22 150:18
151:18 152:3
166:4 168:22
170:17 171:12
176:7 196:2
197:12 228:3,12
230:2 232:7,10
235:2,19 236:19
248:8 251:12
252:13 253:2
**Lyde's** 120:5,12
122:2,6 126:10
134:2 143:21

248:15

_____

**M**

**MacArthur** 48:23
72:21
**maintain** 256:23
**maintaining** 246:3
**maintenance** 125:15
135:12,13 168:13
168:14
**major** 142:20 169:12
236:5
**majority** 109:24
116:18 235:18
**making** 52:7 79:2
108:3 115:3
117:17 123:5
133:19 234:15
242:23 257:21
**male** 37:21 73:7
212:2
**manage** 73:6 80:9
95:18 96:12 116:6
124:13 129:5,11
131:24 135:14,15
135:18 137:20
138:22 145:14
157:22 159:13,14
159:15 161:18
171:2 256:7
258:13,15 260:8
**managed** 95:18
117:3 165:8 178:4
**manager** 156:13,14
159:14 161:18
249:23
**managing** 88:3 96:5
106:10 107:22
108:6 109:7
134:20 139:13
146:16 181:3
244:16
**Manchello** 1:15
261:2,18
**March** 88:12 111:14
**Marco** 181:7 213:19
239:20
**marginalized** 168:5
**mark** 6:1 7:21 9:6
13:17 30:21 33:5
42:9 46:9 57:23
61:6 83:24 105:16
120:18 129:5
141:13 154:10
179:22 183:24
187:8 189:5 209:4
210:6 217:23
222:1,21 237:8

250:18 255:19
**marked** 3:6 4:2 6:2
  6:13 7:23 9:7
  13:19 20:2 30:23
  33:6 42:11 46:11
  58:1 61:8 84:2
  105:18 120:20
  141:9 154:13
  179:24 184:2
  187:9 189:6
  202:12,16 209:6
  210:8 218:3
  221:21 222:23
  237:9 250:19
  255:20
**Market** 2:7
**markings** 167:24
**Mary** 212:6
**masks** 260:4
**mate** 130:24
**material** 261:20,20
  261:21
**matter** 128:1 175:3,6
  175:12 221:8
**matters** 116:5
**Maxwell** 25:4 86:16
  86:18 89:17
  111:23
**Mayor** 48:21
**mean** 17:12 67:6
  80:6 93:10 123:2
  135:9 153:11
  160:24 165:3
  200:18 214:6
  236:18 250:6
**meaning** 82:10
**means** 34:1 35:23
  102:23 131:6
  151:6 241:9
**meant** 159:3
**med** 131:5
**Medicaid** 256:7
**medical** 45:6,15
  125:14 131:6
  164:12,14 167:2
  168:11 169:9
**medically** 167:11
**Medina** 4:6 202:18
  202:21
**meet** 10:4 14:15
  18:10 19:7 22:10
  30:9 32:19 34:3
  36:1 57:12 63:17
  127:7 145:23
  158:14 171:10
  192:3 243:12
  247:6,12,21
**meeting** 49:11,15,17

62:24 64:5,7,9,11
  64:14,15,18,21
  65:6,10,10,16
  67:10,14 126:3,5,6
  126:15,16 129:23
  130:3 132:15,15
  132:17 133:20
  135:19,22 136:7
  136:10,11,15,18
  137:11,12 139:18
  139:23 143:20
  146:1 170:20
  171:9 195:17
  196:1 199:21
  228:16 238:18
**meetings** 149:7
  171:13 244:16
**Melinda** 4:6 202:18
**members** 226:5,11
**memo** 25:3,5,8,11,15
  25:23 26:11,22
  75:24 76:1
**memorandum** 24:24
  25:1,2 26:4 27:8
  47:16 48:13
**memorialization**
  75:15,17
**memory** 126:16
  204:13 251:2,23
**men** 37:18,24 73:15
  116:8 134:12
  218:13
**mention** 199:16,23
**mentioned** 137:8,10
  148:9 196:4
**met** 19:15 20:7 22:10
  206:3 247:14
**methods** 248:19
**meticulous** 164:13
**Michele** 57:15,20
  58:14,16 71:7
  90:15 255:1,4,16
**mince** 220:11
**mind** 87:22 113:9
  151:21 167:10
  177:9,11
**mindset** 241:20
**minimum** 30:10 34:3
  36:1 57:13 59:8
  60:24 62:17 63:12
  209:19 213:15
  247:12
**minor** 132:23
**minute** 136:21
  163:14
**minutes** 98:17
  136:24 208:19
**Miranda** 40:20,22

45:14,18 46:6
  47:24 48:14 49:7
  49:12,19 50:5,11
  64:6,20,22
**misheard** 89:3
**misleading** 104:5
**missed** 129:5
**misstating** 44:7
**misstep** 104:20
**mistake** 34:12 36:7
  36:10,13
**mitigate** 112:7,14
  158:18 165:9
**mix** 158:23
**Molly** 212:6 213:11
**moment** 11:3 84:24
  97:9,14 170:16,19
  193:23 197:16
**moments** 100:19
**Monday** 145:23
**money's** 219:4
**monies** 55:7
**monitor** 138:10,12
  138:12,15 139:2,3
  140:2,6 145:14
  170:7 171:2
**monitoring** 79:5,12
  146:16 169:14
**month** 88:21 255:15
**months** 14:6 18:22
  21:17 22:19,23
  129:19 149:1
  237:17
**Moore** 103:13
**moot** 192:22
**morning** 5:5 200:22
  202:23
**Motivate** 172:11
**motivated** 236:9
**move** 80:6 259:5
**moved** 108:11
**moving** 109:22 241:7
  257:15
**multiple** 92:9 96:12
  113:13 114:20
  243:23
**multiply** 96:2 135:11
**multi-disciplines**
  115:4
**myriad** 179:12

——————————
         **N**
——————————

**N** 2:1,10 3:1
**name** 5:5 14:16
  37:20 162:7,9
  201:6 252:5
**names** 199:24
**Nancy** 3:7 5:15,19

6:15 7:2,4 27:2,15
  90:15,18 238:19
  239:1 240:2 255:2
  255:8
**Natalie** 212:1 213:12
**nationwide** 112:10
**neared** 117:5
**nearing** 81:16
**nearly** 164:5
**necessarily** 76:6
  116:3 142:17
  150:5 185:8
**necessary** 105:13
  113:3
**need** 9:2,22 19:19
  22:9 32:5,20 55:3
  55:5 57:3,5 74:6
  74:14 84:23 85:16
  87:14 88:24 91:15
  91:21 93:6 95:3
  97:24 106:19,19
  110:2 111:5
  116:24 122:13
  125:22 128:20
  129:2 131:1 132:5
  132:5 133:4 135:5
  136:20,22 145:17
  145:18 147:12,16
  156:22 161:13,14
  164:3 167:12
  170:11 171:5,6
  172:10 176:22
  182:22 210:4
  215:4 222:13
  253:24
**needed** 24:10 57:4,8
  63:18 67:11 107:1
  107:4,20 108:15
  109:8,17 144:23
  144:24 145:3
  146:24 158:6
  169:7,20 181:15
  181:23 182:9
  192:1 213:23
  258:5
**needing** 89:10
**needs** 137:19 243:6
**negatively** 248:15
**neither** 45:4
**nepotism** 118:5
  157:7 220:1
  238:14,24
**never** 81:10,14 103:9
  158:9 176:24
  177:4 179:17
**new** 1:16 70:7,8
  225:11 240:10
**nine** 14:6 18:22

21:17 22:19,23
**nine-page** 221:19
**Noah** 2:2 5:6 119:9
  208:15
**noes** 164:16
**Nolan** 238:12
**noncompliant** 207:5
**nonnegotiable**
  181:10
**normal** 86:14 109:12
  113:22
**normally** 25:12,14
  39:19,23 75:8
  224:22
**Norman** 58:12,18,23
  59:7 63:24 68:2,21
  70:19 115:20
  118:21 199:10
  201:3,4 202:19
  206:22 207:9
  212:22 216:14,21
  226:19 227:24
  229:18 230:3
  245:10,18,23
**Notary** 1:17 261:3
**notebooks** 146:9
**noted** 261:6
**notes** 136:11 146:10
  151:1 163:8 229:5
  234:16
**notice** 3:18 105:21
  106:3 111:17
  202:23
**notification** 52:11
  69:1
**notified** 25:12 27:24
**notify** 24:12 68:20
**notifying** 81:22
**November** 8:21 14:3
  17:20 180:10,14
  184:13
**number** 15:24 84:20
  84:21 91:19 93:4
  102:2 106:14
  112:24 119:17
  134:3,4 141:14
  144:23 147:5
  148:16 152:19
  184:18 222:16,18
  223:10,11 230:24
  231:1,1 251:8,16
  251:18,21,22
  253:19 254:20
  261:19
**numbers** 85:7 113:1
  127:18 133:12
  169:22 239:10
  243:18 251:7

**N.J** 261:3,18

**O**

**O** 2:10
**oath** 144:5 190:12
**object** 142:15 191:9
  195:22 246:12
**objection** 11:11
  12:17 16:14 19:3
  20:16 21:9 23:7
  37:11 38:14 39:4
  48:3 79:24 93:8
  94:10 95:15 102:4
  107:3 116:11
  177:13 184:23
  185:17 188:19
  190:1,19 198:13
  205:9 230:6
  233:19 246:21
**objections** 4:3,4
  106:20 122:12
  184:6 187:13,17
**obligated** 76:20
**obligation** 104:13,19
  105:5 176:12
  177:15,17
**observable** 217:6,8
**observables** 156:12
**observation** 228:10
**observed** 150:15
**obtained** 103:14
**occur** 82:16
**occurred** 9:16
  115:18 136:10
  246:10
**occurring** 40:5
**October** 137:23,24
  206:23
**offered** 176:1,4
  195:5
**offering** 159:1
**offerings** 159:1
**office** 18:14,16,20
  19:9,12 25:2 33:18
  34:2,11 35:1,7,24
  36:6 37:3 38:2,8
  67:17 85:10,20
  92:19,23 94:8
  96:17 99:11,23
  100:3,7 101:6
  103:3 157:17
  158:8,21 160:11
  161:3,4,5,21
  162:24 176:22
  188:3 192:4,17
  193:11 204:22,24
  221:5 244:15
  253:12

**officer** 157:3 201:22
  212:6 240:15,19
**officers** 158:11
  163:3
**offices** 167:23
**official** 60:16
**Officially** 151:19
**offsite** 83:11
**oh** 12:21,23 21:18
  125:17 130:6
  138:12 156:23
  164:19 165:10
  167:13 230:24
**OHR** 20:7 98:23
  183:14 247:14,22
  248:18,21 249:1,4
**OHR's** 63:21
**OJT** 117:1
**okay** 5:11,13 6:7,12
  8:21,22 9:4,13,23
  19:6 20:1,5 22:22
  23:23 26:3 43:6,18
  45:10 62:4,6,9
  63:10 71:23 80:5
  84:11 85:3,17
  88:12,16 90:23
  99:6,11 102:9
  107:17 135:21
  136:6 137:2
  139:18 148:19
  155:1 172:5
  191:11 192:9
  195:2,23 199:9
  206:17 208:5,17
  208:19 227:17
  228:14,15 233:1
  237:6 247:6 248:2
  251:18 252:12,22
  252:23 253:1,18
  254:8 255:5 260:6
**old** 242:24
**onboard** 249:24
**once** 46:4 96:17
  114:11 115:19
  125:22 170:24
  197:14 207:18
  208:12 212:2
  219:12 226:4
  227:3 243:18
**ones** 128:24 182:1
**one's** 175:20 217:19
**one-page** 141:15
**ongoing** 79:6 146:22
  147:2 148:7,10
  162:15
**onset** 88:11 166:16
**on-site** 138:12
**open** 151:2 179:6

  181:11 219:14
**operate** 96:9 186:21
**operated** 73:8
**operates** 52:8 80:24
**operating** 118:15
  178:2 241:18
**operation** 15:6 39:18
  95:12 181:17
**operational** 116:19
  152:7
**operationally** 57:6
  70:10 117:3
**operations** 7:1 28:9
  31:11 58:13 69:11
  87:12 108:22
  116:9 159:15
  182:24 192:2
  244:2 246:4
**opinion** 82:6 94:4
  142:12 143:21
  144:4,10,15
  165:20,24 189:24
  190:16 205:23
  206:12,22
**opportunity** 61:15
  89:7 147:14
  150:11 151:23
  169:3 176:2,5,7
  183:13 224:17
  234:21 245:14
**opted** 252:8
**option** 179:4
**oral** 1:13 119:24
  120:3,6,8 220:4,22
  221:3,7,14 223:15
  223:16,17 224:7
  224:24 248:15
**ORAS** 195:6,15
  196:4,4
**order** 14:13 148:6
  150:3 153:8
  176:21 178:18
  218:11 257:3
**orders** 126:22
  218:19
**organizational**
  210:20 211:6
**original** 84:12
**ors** 22:11
**other's** 122:20 166:9
**outbreak** 165:11
**outcome** 174:24
**outfitted** 167:23
**outside** 161:5 162:24
  168:7 171:21
  172:1
**outstanding** 154:20
  154:24 172:21

  175:16,19
**overall** 48:22 72:20
  81:17 181:17
  182:24
**override** 232:5 234:2
**oversaw** 115:17
**overseeing** 74:10
**overseen** 92:24
**oversees** 87:10
**oversight** 114:24
  138:16 166:5
  245:18
**overtime** 55:7 181:9
**overused** 113:8
**overwhelmed** 135:3
**owning** 133:23
**o'clock** 109:1

**P**

**P** 2:1,1,10
**pace** 117:11
**page** 3:2 8:10 9:14
  9:14 10:1 14:9
  32:2,17 33:16
  35:19 47:1,15,16
  59:21 61:13,17
  84:13,22 102:10
  121:1,11 141:20
  147:18 153:14,21
  154:16 172:16
  184:5,11 187:15
  189:11 202:20,21
  209:9,18 210:13
  210:22,23 218:6,9
  221:24 222:3
  223:4,14 237:14
  237:15 251:4
  253:19 256:12
**paid** 125:19 127:23
**pandemic** 12:12
  67:15 78:9 88:19
  89:2 107:24 108:4
  108:9,19,21 109:5
  109:8,17 110:4,16
  110:21 112:8,23
  113:22 114:8
  116:16 122:16,19
  123:18,19,24
  124:6,10,19 125:6
  125:24 127:16
  128:19 129:21
  130:13 132:7,16
  148:22 151:21
  152:4 160:9 163:7
  166:11 174:1
  178:5 179:3,8,17
  182:14 246:4,6
  257:12 259:15,22

**panel** 117:20 118:9
  118:20 119:8
  120:3 144:2 206:3
  206:8,10,16,17,19
  220:5 221:7,8
  224:14 226:3,5,11
  226:23,23 227:21
  227:22 228:9
  232:10 235:4
  236:16
**panelists** 206:4
  230:3,23 233:15
  235:17
**panel's** 150:20
**paper** 151:2
**paperwork** 111:5,7
**Paragraph** 218:9,16
  218:23
**paramount** 95:23
  112:24
**parenthesis** 84:21
**part** 10:16 15:16
  25:19 48:22 79:14
  92:16 97:23
  106:10 110:9
  139:7 143:16
  148:13 170:1
  191:6,21 202:9
  206:19 220:19
  225:24 240:5
**participate** 49:11
  171:20 195:14
**participated** 118:4
**particular** 100:10
  245:11
**parties** 1:17 81:22
**partner** 129:16
**partners** 49:5
**partnership** 129:16
**pass** 224:14
**path** 125:16,19
  128:10 130:10,19
  131:13 134:24
  167:19 168:2
  171:23
**Patterson** 3:22 180:7
  180:9 181:6 212:4
  212:11,20 213:20
  228:1 231:15
**pause** 62:5,8 85:2,6
  97:17
**pay** 66:1
**paycheck** 172:3
**Payne** 212:1 213:12
**payroll** 87:11
**pays** 125:2
**PDP** 218:18
**peers** 151:24

**pending** 5:12
**Pennsylvania** 1:1,17
    2:4,8 186:17
    243:14 244:20
    256:3 261:4
**people** 12:2 17:24
    72:24 73:11 82:11
    88:2 98:2 99:14,15
    99:18 105:3
    108:13,15,17
    109:18 112:10,12
    114:4 116:22
    124:5,16 127:3,3
    127:18 128:13,14
    128:16 129:9,17
    131:2 132:3,6,19
    133:9,21 135:1
    136:14 138:22
    139:8 147:12,24
    150:12 158:23
    159:10,18,19
    161:2 162:16,19
    162:22 163:4,9,16
    165:5 167:11
    168:15,18 169:3
    169:18,20 171:4
    171:16 172:11,12
    172:13 179:11,11
    181:1,2 194:23
    206:6,10 216:17
    225:20 226:6,8
    229:23 230:8,11
    235:12 236:23
    240:3 241:10
    242:22 243:22
    245:13 254:3
    255:14 258:24
**people's** 108:10
    161:9 165:5
    177:24
**percent** 30:7 37:20
    43:5 49:6 72:19
    78:4 81:16 123:23
    138:21 152:9
    171:19 172:8,9
    173:13 253:24
**perfect** 71:24
**perform** 124:4
    138:23 164:24
    220:21 236:24
    243:1
**performance** 3:20
    117:8,16 118:11
    118:15,16,22
    119:3 121:1 122:2
    122:7 126:10
    142:3,4,7 144:20
    146:13,22 154:4,6

154:17 155:4
166:3,11 172:20
193:24 195:3,16
198:6,15 208:10
217:5,16 227:7,9
228:5 229:4
230:17 236:17
238:8 239:2,15
259:6
**performed** 152:1
    235:10
**performing** 110:19
    115:5 131:19
    147:1 207:18
**period** 17:15 30:3
    39:21 40:11,13
    42:2,4 45:22 46:1
    46:2,5,6 49:21
    53:9,12 54:1,6,15
    54:17 56:2,7,15,16
    56:16,18 93:3 96:6
    140:21 146:23
    159:22 178:16
    195:3 212:23
**permanent** 111:1
    114:8 116:22
**permission** 95:3
**permit** 66:7
**person** 15:7 25:5
    95:24 97:14 113:6
    113:11 135:5
    140:23 145:15
    163:17 164:15
    169:8 175:23
    181:3,22 195:13
    195:19,19
**personal** 141:21
    161:2 172:17
    233:21
**personally** 162:8
**personnel** 47:12,17
    91:10 111:1
**person's** 195:11
**perspective** 151:12
    151:15
**pertained** 89:1
    206:14
**phase** 12:12
**Philadelphia** 1:6 2:4
    2:8 18:17 33:22
    49:5 57:16,21
    58:13,17,19,24
    59:4 65:13 67:20
    68:12 69:7,11,16
    69:21,22 70:20,22
    71:6,9 72:10 73:12
    80:20,23 81:2
    85:21 86:11 88:8

88:18,23 89:9,14
89:23 90:4,11 91:4
91:13,20 92:20
95:7,12 96:20,23
98:18 99:8 100:11
100:20 101:8,12
101:24 103:19
106:4,7 107:1
112:22 118:23
119:5 175:21
184:9,15 187:2
202:18 207:4,10
209:21 212:13
216:10 223:23
243:15 244:19
248:22 249:7
**phone** 129:17 148:10
    148:12,19 149:8
**phones** 129:18
**PICC** 74:11 203:5
    203:10,11 245:18
**pick** 226:19
**picture** 135:6
**piece** 112:18 151:1
**Pierce** 2:2 175:2
**Pierre** 31:10,16,23
    44:1 54:1 55:17
    56:2 57:2 71:11
    114:10 115:19
    118:10 183:17,22
    184:19 185:14
    187:1,16,23 188:7
    188:11,16 217:14
    226:20 228:1
    229:19 230:4
    256:19
**pile** 198:4
**pivoting** 112:13
**place** 9:21 10:20
    18:11 32:3,15
    77:20 88:2 90:13
    91:24 107:21
    109:13,18 110:23
    116:22 128:22
    158:20 169:4,20
    207:22 208:10
    209:11 247:7
    249:14 255:14,16
**placed** 35:23 36:7,16
    37:4 240:9
**placing** 159:10
**plaintiff** 2:5 175:3
    203:7 204:21,23
**plaintiffs** 4:5,7,9,10
    4:12 5:7 9:15
    184:7 187:13
    189:10,10,12
    209:3 218:1

221:19,20 237:13
**Plaintiff(s)** 1:4
**plan** 77:13,23 132:21
    134:5,5 139:15,21
    172:12
**plane** 109:15,15
**planning** 79:15
**platform** 129:1,7,12
    132:24
**play** 179:2 243:5
**played** 202:9
**playing** 150:14
**please** 6:6,8 38:7
    44:6 50:21 55:1
    60:18 61:16 62:4
    85:17 97:9 189:3
    234:5 236:1
**pled** 203:8
**Plexiglas** 128:2
    167:23
**plus** 150:7,16
**point** 15:3 65:6 66:5
    73:2 74:9 79:7,13
    83:8 110:7 132:13
    147:21 158:13
    167:15 171:3
    192:21,22 193:4
    200:3 250:11
    252:3 259:9
**points** 138:5 196:8
**Police** 243:16 244:19
**policies** 133:7
**policy** 186:9
**pool** 244:14,24
    245:15
**Pope's** 219:1
**populated** 45:23
**population** 15:13,19
    16:11 46:7 48:22
    49:2,6 52:13,15
    69:14 72:19,23
    73:4,6,7 74:8 77:8
    77:22 78:5,8 79:5
    79:8,9,11 80:9
    81:12,17 83:17,18
    96:14 108:11
    114:22 115:7,11
    123:23 125:3
    128:6,23 130:16
    130:22 131:14
    132:24 133:16
    138:13 152:8
    167:7,18 168:4
    170:8 171:19
    172:9 173:14
    195:5,6 197:23
    240:11,21 246:7
**populations** 83:19

83:20
**Portal** 222:2
**portion** 14:10
**position** 3:8 8:9
    18:11 21:2,6 30:9
    34:4 39:7,9,13
    44:8,9 49:13 57:12
    57:13 59:9 61:1
    62:18 63:14 65:8
    65:21 66:22,23
    67:24 74:21 75:1
    76:24 77:3,10,14
    77:16,24 95:6,11
    95:24 96:15 97:4
    105:3,4 106:18
    109:21 113:10
    117:23 120:13
    122:4 141:6
    143:11,22 144:13
    149:14 150:23
    151:7,18,24
    152:14 153:2,24
    155:6,15 173:12
    173:16,18 175:24
    176:8 177:12,21
    181:10,11 185:7
    185:23 192:23
    193:9 211:22
    212:3,5,12 213:15
    213:18,23 214:1
    214:11 218:13
    219:23 227:1
    229:7 233:18
    237:19,24 238:2,6
    243:22 245:1,5
    247:7 249:11,18
    251:6 259:7
**positions** 72:15 74:2
    76:4,11,14,19
    79:16 80:9,15,17
    80:21 87:12 90:2
    104:20 105:14
    109:4 114:1
    115:21 116:22
    117:6 131:20
    144:5 147:17
    173:20 175:14
    178:16 179:18
    180:21 182:8,13
    183:7 212:20,24
    213:3,4,10 240:1
    243:19,23,24
    244:1 250:1
**position's** 59:13,16
    60:6,10,14 225:17
**positive** 216:21
**possession** 187:19
**possibility** 12:5

17:10 18:5
**possible** 161:15
    241:6
**post** 214:3 239:4
**posts** 239:10
**post-retirement**
    115:14,16
**potential** 244:14
    245:1
**potentially** 61:23
    188:11
**potions** 182:12
**PPE** 128:15 158:6
    167:22
**practice** 89:15 97:4
    97:7,23 109:12
    134:24 189:13,13
    189:24
**pre** 115:16
**precedes** 43:11
**predates** 124:7
    198:20
**prefer** 200:7
**preparation** 195:6
**prepare** 132:21
    137:16 219:14
**prepared** 24:24 25:2
    255:9
**preparing** 219:1,3
**presence** 158:4
**present** 136:2 148:1
    151:23 164:2
    224:17 230:11
    236:1
**presented** 60:2 94:6
    116:4 127:23
    155:19,21 179:8
    195:21 227:9
    234:23
**pressure** 129:6 159:9
    166:19 181:23
**presuming** 23:15,16
**pretty** 87:23 110:8
    128:17 213:22
**previous** 94:17
**previously** 115:22
    215:2 217:7,10
    248:17
**pre-pandemic** 114:5
    122:10 128:23
**pre-retirement**
    115:14
**printed** 261:21
**prior** 7:13 8:19
    17:19 31:18 39:9
    40:4,19 44:11 50:8
    54:16 55:12 57:1
    74:21 76:4 82:17

**87:15** 88:9,13,17
    88:23 89:8 105:24
    125:21 140:7,12
    140:13,15 166:6
    202:6 203:17
    205:3 219:6 242:3
    245:19 252:15
**priorities** 257:22
**priority** 260:10
**prison** 25:21,23
    48:14,22 81:14
    91:19 93:5 118:2
    220:1,6 240:4
    253:15
**prisons** 15:11 18:18
    49:1 65:14 72:11
    79:15 80:20,24
    85:22 86:12 88:8
    88:18,24 89:9,14
    89:23 90:4,11 91:5
    91:14,20 92:21
    95:8,12 96:20,24
    98:19 99:9 100:11
    100:21 101:8,12
    102:1 103:19
    106:5,8 107:1
    112:22 175:21
    184:15 202:19
    209:11,22 216:10
    223:23 248:23
    249:7 251:5 253:4
**prison's** 82:14 86:7
**privacy** 129:18
**privileges** 116:22
**proactive** 148:15
**probably** 61:18
**probationary** 212:23
**problem** 134:22
**problem-solving**
    236:8
**Proceedings** 41:6
    51:4 72:3 119:14
    137:5 193:20
    208:23
**process** 66:8 86:14
    92:16 99:3 100:23
    109:13 125:5
    136:17 158:18
    164:13 168:19
    177:4 178:12,14
    178:17 186:11
    189:16 225:11
    229:18 230:19
    240:6
**processes** 257:2
**Production** 187:14
**professional** 126:22
    126:22 157:17

**188:4** 236:9
**proficient** 249:4
**profile** 141:21
    149:11 155:10
    172:17
**program** 10:10,15
    10:20,24 11:5,9,20
    11:23 12:1,9,12,16
    13:5 14:12,20,24
    15:5,16,22 16:8,8
    16:13,22,23 17:3,7
    21:12 23:6 32:21
    33:1 63:19 64:1
    115:8 121:8
    122:21 195:10,14
    211:20 224:1
    249:21
**programs** 16:1,1,1
    16:24 17:1,11,12
    17:18 171:17,18
    171:20,21 172:1,7
    240:10
**progress** 123:19
    137:21
**progressing** 158:17
**prohibit** 60:21
**prohibits** 104:14
**projects** 70:7,7
**promote** 117:17,19
    118:17 174:12
    175:13 179:18
    202:6 205:24
    218:13 226:1
    237:22 257:7
**promoted** 13:14
    14:18 17:19 20:6
    29:23 56:11 69:15
    75:8 108:14
    115:20 116:8
    119:4 120:15
    143:17 153:5
    173:18 180:10,13
    206:2 212:4,21
    214:24 216:16
    217:19 218:12
    220:9 223:8
    226:10 235:3
    240:4 241:5,15
**promoting** 237:21
    249:18
**promotion** 20:11
    75:16,17 160:15
    175:20 181:24
    206:9,15,24
    220:23 245:19
    253:3
**promotional** 34:8,13
    35:21 36:3 37:17

**87:15** 89:1,10,13
    89:18,22 91:15,21
    92:13 93:6,22
    94:24 104:7
    119:18 140:22
    144:7 146:21
    147:5 152:11,20
    155:18 156:1
    177:6 180:21
    221:13 223:18
    245:22 246:9,10
    246:18 249:10,12
    249:17 250:13
    258:9
**promotions** 60:16
    105:9 178:12,15
    178:18 180:24
    181:19 222:8
    257:9
**promptly** 109:10
**prong** 11:17 19:6
    22:18 23:1,13
**proper** 146:17
**properly** 115:5
    127:15 165:1
    239:10
**proportionality**
    184:24 185:18
**proposed** 60:23
    62:17 63:12
**protective** 128:1
**protocols** 158:2
**proud** 157:8 178:5
**proven** 116:23
**provide** 16:10 34:24
    45:22 46:20 47:2,6
    47:23 52:14 54:6
    69:4 101:21 104:4
    114:22 124:4,15
    125:2 128:15
    130:15 133:7
    138:4,8,17 145:20
    167:9,17 168:4
    171:15,18 172:13
    191:17 204:1
    206:12,21 223:21
**provided** 12:2 15:20
    15:24 16:6,8 24:24
    41:14 43:19 45:5
    69:13 92:1 94:4
    115:13,16 128:2
    138:24 144:4
    186:15 204:3
    240:15 242:5,9
    253:6 254:3
**provider** 115:10
**providers** 171:21
**providing** 115:6

**133:3** 164:12
    172:3 196:3,21
    197:21,22 240:13
    240:22
**provision** 14:19
    21:11
**public** 1:17 62:24
    166:20 169:16
    212:6 213:12
    243:9 244:5 261:4
**publicly** 170:3
    216:18
**pull** 19:18 103:21
    132:22 178:19
    189:2 194:22
    254:11
**pulled** 124:2,19
    156:21 166:6,14
    166:15 196:20
**pulling** 179:11
**punitive** 127:11
**purpose** 186:23
**purposes** 52:10,11
    69:1
**pursuant** 99:24
**pushed** 130:12
    134:15
**pushing** 135:11
**push-back** 163:9
**put** 21:16 30:8 57:11
    77:20 94:1,3 95:20
    95:23 96:10 103:9
    105:2 108:5
    109:13,15 124:17
    128:2 132:1 135:7
    142:17 156:4
    158:20 164:17
    165:10 167:24
    170:3 181:17
    182:21 188:2
    206:10 229:9
    241:21 245:5
    258:16
**putting** 145:1
**p.m** 72:4 119:13,15
    137:4,6 193:19,21
    208:22,24 260:14

---
**Q**
---

**qualification** 22:10
**qualifications** 19:13
**qualified** 10:5 14:17
    32:19 63:18 99:19
    105:11 236:6
    237:18
**qualify** 59:9 60:24
    62:18 63:13 153:8
    153:24 246:10

**qualms** 241:6
**quell** 160:1
**question** 5:12,13
  11:7 12:4,18,19,22
  16:15,18 19:4,5
  20:3,20,21 22:22
  23:11,21 26:13,21
  27:6 29:18 35:14
  36:21 37:1 43:23
  44:18 50:21 51:7
  53:15,18,19,22
  54:13 55:23 68:17
  68:23 71:11,16
  73:24 74:23 78:21
  87:9 88:16 89:4,6
  89:12 92:2,4,9
  94:1,6,15 97:10,22
  98:20,22 101:18
  102:5,12 107:5,6
  107:10,13,18
  111:6,8,10 116:12
  116:13 122:11
  149:4,6 151:12
  155:12 174:13
  175:8 177:14
  183:17 191:13
  205:22 227:14,18
  232:7 233:23
  234:2,7,13,15,17
  234:22,23 239:20
  239:21 246:16,22
  247:3 248:17
  252:6,12,14,24
  253:7
**questionable** 144:1
  151:16 206:14
  228:4,8,15,21
  229:3,12,13
  231:21 232:1,11
  232:13 233:3,18
  234:11 235:4,21
  236:4,7
**questionables** 232:4
  235:20
**questions** 32:8 93:18
  150:22 151:10,10
  161:9,11 171:1
  179:12 229:6,8
  235:10 236:21
  257:23 260:12
**quick** 119:10 193:16
**quicker** 254:12
**quo** 173:15,23 174:3
  245:20
**quoted** 261:20,21

_____
**R**
**R** 2:1,10 261:1

**racism** 118:5 157:7
  220:1 238:14,23
**radar** 111:24 140:16
  160:13 188:3
**raise** 122:11 160:18
**raised** 66:12 79:24
  106:20 149:2
  161:21 199:7
**ran** 117:11 190:10
**rank** 39:16 55:3
  153:1 220:23
  223:5
**ranked** 33:18 34:1
  34:20 99:24
  119:17 140:23
  147:5 152:19
  224:9 248:8,12
**ranking** 35:5,9,11
  121:24 154:21,24
  175:16 221:12
  224:15 225:2
  231:6,10 248:16
**rankings** 35:13
**ranks** 135:12 154:5
  155:11 157:21
  221:6
**rapidly** 158:2
**rarely** 162:7
**rate** 123:22,23
  173:14 224:21
  249:3
**rated** 142:14,22
  173:3,5 226:6,24
  227:4,5 232:10,13
  233:10,11 235:5
  236:10
**rater** 228:11,19
**rating** 142:22 194:19
  232:16 234:20
**ratings** 143:24
**rationale** 244:17,18
**reached** 72:18 192:2
**reaction** 113:19
  114:7
**read** 13:1 151:1
  261:20
**readily** 169:1 213:5
  251:2
**reading** 16:1,22 63:4
  203:17 205:3
  229:5 233:8
**ready** 245:2
**real** 119:10 133:1,11
  133:12 138:7,9
  193:16
**really** 136:13 140:18
  168:8 169:1 178:7
  204:12 232:20

**reask** 22:22 89:6
**reason** 6:22 31:8
  35:6,12 36:14 37:3
  37:8 42:20 58:10
  61:22 65:9,10,16
  102:11 112:4
  122:11 124:7
  127:24 128:3
  133:22 139:10
  142:15 166:8
  172:24 187:5
  188:2 194:20
  196:19 198:7
  211:5 226:7
  232:13
**reasonable** 187:18
**reasons** 257:11
**reassignment** 203:11
**recall** 13:15 14:22
  17:16 19:18,19
  25:9 26:6 42:4,5
  48:5 49:9 50:2
  57:22 64:3,4,20
  65:9 73:22 98:6,10
  104:2 106:16
  111:4 120:17
  126:6,15 143:4
  206:6 214:17
  215:2 219:5
  221:16 224:2,7
  250:3 252:7 254:9
**recalling** 26:8,13,21
  78:23 90:8 207:14
**receive** 141:4 146:15
  155:8,13 215:18
  215:21,24 216:3
  219:2
**received** 25:23 116:8
  122:10 149:4
  174:7,8 189:21
  200:22 201:1,5,12
  202:22 204:6
  218:17,24 219:7
  242:3,4
**receives** 25:14
**receiving** 79:18
  98:21 103:16
  130:17 139:8
  163:2 172:2
  217:18
**recess** 41:4 51:2 72:1
  119:12 137:3
  193:18 208:21
**recognize** 37:20
  255:23
**recollection** 15:3
  26:4,16,20 27:9
  30:11 43:4,10,13

46:22 49:17 62:15
  64:16 78:7,17
  80:22 120:7
  179:21 204:9
  250:8 252:16
**recommend** 62:23
**recommendations**
  70:8 109:1 134:7
**record** 19:18,19,22
  21:16 54:11 73:23
  74:6 91:11 113:1
  123:3 127:18
  136:3 164:11
  169:22 191:10
  207:3,23 239:10
  261:14
**recording** 136:3
**records** 66:3,11
  187:19 206:5
**reduce** 79:8 134:23
  145:9,18
**reduced** 72:23
  123:24 173:14
**reducing** 49:6
**reduction** 72:18,19
  74:7 78:4,8 79:5
  79:22 81:16,24
**reentry** 132:21
**refer** 59:10 142:7
  221:5 251:15
**reference** 142:2
  254:6
**referenced** 65:11
  253:14
**referencing** 140:3
  177:10,11
**referred** 22:19 83:16
**referring** 19:23 22:3
  26:24 43:16 99:6
  103:12 119:20
  140:2 144:7
  198:18 225:4
**reflect** 76:2 120:12
  122:3 153:1 155:5
  155:14 166:3
**reflected** 61:4 166:7
**reflecting** 156:10
  164:8 216:13
  217:3,13
**reflects** 75:21
**reform** 49:3 240:8
  241:2,8,9,19 243:8
**refresh** 26:15 46:22
  62:15
**refused** 197:13
**regard** 195:10
**regarding** 19:12
  27:12 36:15 37:9

47:17 48:14 49:12
  53:20 55:20 68:17
  68:19,23 69:20
  71:8,11 79:19
  103:16 143:17
  145:21 146:19
  151:10 163:12
  183:17 188:24
  192:17 193:11
  204:8 205:21
  226:1 232:7,23
  254:20
**regardless** 224:24
**regards** 32:8 137:9
  190:16 204:5
  225:3 229:6
**regs** 104:14,17,18,24
  105:5,8
**regular** 102:6
**regulation** 188:24
  190:17
**regulations** 66:7
  178:11 207:6
  233:21
**regurgitate** 92:7
**rehabilitative** 21:24
**reinforced** 238:22
**reiterate** 161:7
  248:8
**reiterated** 195:24
**rejected** 144:1
**related** 139:6
**relates** 22:24 143:21
  183:18
**relating** 186:12
**relation** 87:8 99:4
  126:19 174:20
**relationship** 219:22
  220:7
**release** 156:14
**relevance** 176:16
  184:24 185:18
**relevant** 174:12
**relieved** 239:11
**rely** 109:23
**remained** 46:6 159:5
  256:23 257:17
**remains** 37:15
**remarked** 157:6
  238:19
**remember** 22:20
  26:6 44:4,17 72:6
  79:18 97:21 98:20
  103:7 114:14
  120:9 190:9
  232:18
**remembering** 26:10
  252:19

**Remick** 139:3
148:13 169:13
170:2
**remove** 176:21 177:3
177:8 243:14,16
244:11
**removed** 160:19
**removes** 230:21
**removing** 242:8
245:12
**render** 186:1 228:24
247:22
**rendered** 233:15
**repeat** 12:18,22
20:21 29:18 37:1
38:7 50:21 51:7
53:15,17
**repeatedly** 144:21
**repeating** 36:23
**replace** 212:4
**replaced** 41:9,10
181:6
**replication** 261:21
**report** 3:20 17:24
24:10 28:9 57:9
121:1,4 126:10
131:20 136:13
137:15,16 138:3
140:2 154:17
157:17 162:14
194:7 204:19
**reported** 15:15,17
132:12 138:12
164:21 172:23
186:7,10 242:6
**reporter** 1:16 13:1
94:18 261:3,18,23
**reporting** 204:17
**reports** 127:15
131:17 140:6
142:3,7 172:21
**represent** 8:18
**representation** 8:23
190:16
**reproduced** 261:20
**reproduction** 261:23
**request** 70:6,8 77:4
86:1,9,15,23 87:5
92:13 93:22,24
94:8,24 96:20,24
97:6 98:1,2,19,22
99:2 100:7,9,11,14
101:4,13 103:10
106:14 184:18
185:1,13,18
187:14,16,20
253:15
**requested** 89:14

92:17,19 98:5,8
99:9 100:21
101:16 102:1,14
102:16 103:20
106:1,5,8 110:3
251:5
**requesting** 101:21
102:19 134:5
**requests** 70:14 71:2
71:8 102:7 184:7
195:11
**require** 111:4 152:12
**required** 14:18 55:6
109:8 118:19
119:7 144:20
145:9 148:12,14
241:22 249:5
257:3
**requirement** 10:5
18:11 19:8 22:4,8
22:9 30:10 32:19
49:12 59:8 60:24
62:18 63:13,17
65:7 112:9 209:19
213:16 214:1
243:6,14 244:12
**requirements** 63:7
243:12,16 247:6
247:13,14
**requires** 241:2
**requiring** 243:1
**research** 188:4
**resign** 160:16
**resigned** 160:20
**resistance** 125:16,20
128:11 130:11,19
131:13 135:1
167:19 168:2
171:23
**resistant** 241:6
**resolve** 148:5
**resources** 18:14,16
18:20 19:9,12
22:12,14 25:3
33:18 34:2,11 35:2
35:7,24 36:6 37:3
38:2,9 67:17 85:11
85:20 86:11 87:10
92:20,23 94:8
96:17 99:12,23
100:3,8 101:7
103:3 176:23
192:17 193:11
221:6 244:15
253:13
**respect** 241:11
**respectful** 92:6
**respond** 89:7 116:6

**responded** 117:13
148:8 152:1
159:22 176:11
**responding** 186:23
199:3
**response** 69:1 89:1
92:1 100:22
102:18 107:17
109:4 129:4 130:6
151:11 157:8
159:17 166:4
171:16 184:23
187:17,18 188:14
194:21 195:23
207:1
**responses** 4:3,4
149:20 151:21
184:7 187:13
**responsibilities** 18:7
83:7 245:19
**responsibility** 7:6,11
7:13,15 10:19 15:5
18:24 20:13,23
24:4,16 25:24 26:8
27:1,14,19 28:3,20
29:7,13 31:16,18
31:20,24 38:4,11
38:24 39:11,13,16
39:22 40:12,14,18
40:23 41:18 42:1
43:3,11,20,22 44:2
44:10,16 45:6,7,15
45:19,23 48:1,15
49:20,23 50:5,12
50:18 51:10,16,22
52:3,7,12 53:1,10
53:12,22 54:2,15
54:18 55:12,14,18
56:3,8,18,20 57:2
58:19,24 59:3
67:19 68:3,11,16
68:22 69:7,22
70:12 71:5,12,17
75:10,18,20,23
77:19 81:23 82:12
83:3,11 87:4,7,8
95:3 96:5,8 97:24
106:11 114:12,24
115:22,23 116:1,7
117:9 118:12,23
123:15 131:16
134:16 138:16
145:1 161:12
182:24 207:9
257:18 258:3,17
**responsible** 73:9
74:11 115:3
133:18 167:1

207:15 244:15
**responsive** 187:20
**rest** 178:7 225:16
234:24
**restate** 88:16
**restorative** 16:3
127:21
**result** 138:11 139:2
139:3
**resulted** 175:11
203:23 213:20
**results** 157:22
238:23
**resumed** 41:6 51:4
72:3 119:14 137:5
193:20 208:23
**retain** 68:15,21
**retaliated** 174:23
175:9
**retaliation** 174:9
**retire** 40:15 91:7,23
244:24 252:9
**retired** 5:20 7:2,4
19:2 30:17 31:6,12
31:14 38:6,13 39:8
39:14 40:10 41:24
42:6,18,22 47:19
54:3 56:5,9,17,19
57:20 58:14,16
59:2 67:22 68:3
70:24 72:7,13 74:1
83:1,3 90:18,24
165:24 176:10
181:7 207:24
208:4 237:17
252:3 254:4,14,15
254:17,23 255:1,3
255:4,7,8,9 258:4
**retirement** 5:17 6:19
7:10,14,18 20:15
24:6,18 26:2 27:2
27:15,21 28:4,22
29:9,15 30:14
31:19,22 39:2,10
39:22,24 40:19,21
43:2,21 44:3,9,11
44:17 45:8,19 48:2
48:17 49:24 50:6,9
50:12,20 51:12,18
51:24 52:4 53:2,11
53:14 54:17,19
55:13,14,19 56:24
57:1,17 58:8,23
59:6 68:13 69:9,24
71:7,14,19 72:9
76:4 77:7 81:8
117:10 118:13
119:1 160:3

220:17 245:10
254:10 255:15
**retirements** 90:7
**retiring** 207:13
**return** 128:5
**returned** 197:17
198:6
**revealed** 123:19
132:11
**reveals** 122:17
**revelation** 124:18
**review** 61:16 73:22
74:6 75:3 78:16
111:5 141:7
142:10 185:11
187:19 188:13
194:16 203:1
208:9 217:22
**reviewed** 186:13
206:4,5
**reviewing** 62:11
234:16
**revised** 8:12,21
32:11 63:7
**revising** 245:12
**revision** 8:13 9:3,15
59:22
**revoked** 190:6
**rid** 65:7
**right** 22:3,13 23:23
32:7 34:17 35:12
36:10 39:3 51:1
62:11 66:14 71:1
79:23 80:6 89:6
114:3,16 136:7
146:9 148:4
155:22 158:7,8
164:6 195:10
198:20 205:4
208:20 223:18
230:7,9 239:8
244:7 247:20,24
248:12 253:10
**rightful** 110:17
**ringing** 106:21
**riot** 149:22
**risk** 15:8 195:7,15,18
**Riverside** 30:13,17
31:11,15,17,21
38:4,11 39:1 44:2
50:19 51:11,17,23
52:3,20,23 53:1,10
53:13 54:2,16,18
55:18 56:3,8 71:12
72:24 73:5 74:10
77:19 81:3,13,20
81:22 82:2,18
114:13 118:12,18

183:18 219:12
256:20
**Road** 83:18 124:13
**Robert** 180:18 228:2
231:17
**Rodica** 99:20 165:21
**Roi** 37:23
**role** 243:5
**roll** 140:10,18
166:17 170:5
239:5
**rolled** 158:1 167:21
**rolling** 195:20
**romantically** 156:15
**room** 163:2 238:19
257:14
**Rose** 180:18 228:2
231:17
**rosters** 181:8
**roughly** 72:23 73:10
73:13
**RTS** 130:20 137:24
140:8 144:22
145:3 146:24
169:10 170:1,6
173:20
**Rule** 225:6,6,9,14,19
227:6,8 229:10
230:8,22 231:9,9
**ruled** 175:8 206:17
**rules** 176:13,14
225:23
**run** 116:2 151:8
**running** 108:16,18
109:22 112:23
113:14 129:2
169:21 178:9
179:6 222:14
250:6

**S**

**S** 2:1,2,10,10 3:5 4:1
**safe** 69:10 128:7
152:8,8 244:1
**safely** 52:8 161:14
**safety** 28:7 48:23,23
52:12 57:6 72:21
166:20 243:9
244:5
**sake** 91:7 142:10
**Salerno** 212:6
213:11
**sanitizers** 167:24
**sat** 83:16 219:19
259:18
**satellite** 81:20 82:13
83:12,14,16
**saw** 78:8 103:11

156:20 161:23
**saying** 8:15 20:11
33:15 36:18,19
78:23 101:2
133:23 138:20
142:11 162:1
196:16 198:21
231:8 235:8 252:7
**says** 10:3 11:18
13:23 14:10 19:6
32:5,18 47:12
59:22 63:6 100:18
101:15,16 103:7
105:6 121:4 127:8
189:12 203:5
209:10 251:4
253:19
**Scared** 15:5
**schedule** 129:2
133:14 166:22
**scheduled** 63:1
106:12 134:14
186:14
**scheduling** 148:18
**scheme** 106:22
108:20
**school** 190:5
**schools** 190:10
**score** 35:4,11 119:21
120:12 152:22
153:1
**scored** 121:24 220:5
**scores** 33:18 230:20
**scoring** 221:9
**screen** 5:24 7:21 9:4
13:17 21:19 30:21
33:4 61:6 83:24
105:16 119:20
209:2
**scroll** 62:21
**searching** 132:10
**second** 13:9 23:1
26:14,21 35:19
56:16 61:12
121:11 187:14
210:23 222:3
229:24 253:18
**secondary** 260:1
**seconds** 41:2 119:10
193:16
**securing** 189:15
**security** 28:7 52:13
57:6 151:10 233:4
234:10,13
**security-related**
229:8
**see** 6:15,18 9:2,22
13:22 19:19 25:8

32:5 33:13,15
42:15,17 46:2 58:4
59:21 61:13 63:9
74:14 78:22 84:11
85:4 91:6 101:15
105:22 110:14
125:7 127:24
132:17 135:6
137:21 138:13
140:18 141:20
146:10 151:22
153:10,11 155:10
155:22 158:5,9
159:16 163:14
170:4,9 171:6,14
172:18 174:1
175:9 179:2 184:9
185:8,24 187:21
188:4 189:18
197:8 203:13
207:23 210:15
218:7,14 222:5,10
222:11,15,18
233:11 251:9
252:14 253:8
**seeing** 26:15 84:10
133:1,21 164:16
170:6 171:3
244:22
**seen** 169:8 171:5
250:24 251:3
**SEIDMAN** 2:6
11:11 12:17,21
16:14 19:3 20:16
20:19 21:9 23:7,14
23:20 36:17,22
37:11 38:14 39:4
41:1 48:3,8 71:23
85:15 93:8,14,17
94:10 95:15 97:13
102:4 107:3,7
116:11 119:9
136:23 177:13
188:19,21 190:1
190:19,24 191:5,8
193:15 198:13
199:23 201:8
205:9,14 208:15
208:18 233:19
246:12,21,24
**selected** 220:6 235:7
**selection** 245:3
**self-correct** 127:13
**semantics** 101:18
**sense** 61:19 205:11
**sent** 25:16 48:13
81:21 156:5
**sentence** 63:6

**separate** 18:17 101:7
214:2
**separated** 112:10
**September** 5:22 31:6
31:21 32:4,14 91:1
118:2 126:9 176:9
198:15 211:3
247:16,17 254:16
**sergeants** 113:3
**serious** 243:24
**serve** 182:18 183:6
203:9 221:6
**served** 213:11
**service** 10:10,14,24
11:4,9,20,23 12:9
12:15 13:5 14:12
14:20,24 15:16,22
16:13 17:12,17
21:12 23:6 62:23
65:21 66:7,23
104:14,17,24
105:5,8 122:21
132:20 133:3
167:8 168:12
176:13,14 177:20
178:11 188:23
189:1,16 190:17
224:21 225:23
233:20 246:24
249:2,21,23
**services** 16:3,6 22:2
52:14 69:13 70:9
81:15 115:6 121:8
124:5 125:3
128:16 130:15
133:16 139:9
158:5 166:23
167:9,11,17 168:4
171:15,18 172:3
172:13 197:22
**serving** 178:21
192:23 233:14
**set** 113:2,20 116:23
124:11 131:24
132:5 147:10,12
150:6,22 152:8
170:20 179:3
184:7 213:5
214:23 245:14
246:6 258:22,23
261:10
**sets** 125:4
**setting** 130:15
166:24 167:16
169:23 260:5,8
**seven** 129:19 159:6
220:17 226:14,21
227:4,11,19

229:23 237:5
250:11,12,14
**seven-page** 194:1
210:11
**severe** 205:1 206:7
**severely** 128:14
**sex** 203:7 205:15
238:3
**sexism** 118:5 157:7
220:1 238:14,23
**sexual** 157:13 188:6
188:10 199:11,16
200:13,19 201:2
201:14 204:14,16
205:8,11
**Shanti** 4:6 201:5
202:17
**shape** 139:17
**share** 5:24 7:20 9:4
13:16 30:20 61:5
105:15 134:12
174:2 207:12,14
209:2 221:17
228:10
**shared** 74:7 138:5
177:19 199:3
**sharing** 33:4 59:24
83:23 119:20
**Sharlise** 212:3
**sheer** 39:16
**sheet** 137:11,13
138:6 166:7
232:16
**sheets** 135:23
**Sherell** 25:4 86:16
**shift** 199:22 203:9
**shine** 225:16
**shoo-in** 118:6
**short** 41:4 51:2
119:12 128:14
137:3 139:19
193:18 208:21
**shortage** 147:23
**shortly** 45:21
**short-staffed** 137:20
138:21
**shoulders** 112:19
**show** 9:5 75:9 79:13
138:4,8,18 142:4
158:4 160:10
164:11 168:15
209:2 225:15
232:16 236:24
**showed** 168:10
195:2 203:6
233:10
**showing** 6:13 8:13
42:14 52:17 68:6

75:5 78:14,19
81:19 83:24
105:21 132:14
136:9 137:9
140:21,24 141:12
145:6 147:21
153:14 189:20
202:15 216:20
250:22
shown 99:5 114:4
shows 6:19 31:5
42:18 54:9 101:21
162:3 180:9
194:23 222:3
253:11
shut 87:23 94:12
129:10
Shy 88:20
sick 57:5
side 33:11 156:21
169:10 232:15
254:1,1
sides 123:6
sign 154:6 176:20
194:3 197:13
198:2
signature 124:17
135:23 194:4,7,10
194:13
signed 184:12
196:15,18 197:4,6
198:7,9 218:6
237:13 261:17
significant 46:5 74:8
77:22 83:17 96:5
significantly 49:2
72:23 87:24
signing 26:7 194:17
197:18
sign-in 137:11,13
138:6
similar 67:4,5 166:4
simple 135:9
simply 102:24,24
128:9 145:4
146:24 181:23
234:16 245:5
single 76:20 117:21
146:14 189:23
230:5
single-handedly
160:9 164:6
sir 111:21 112:18
152:16 177:9
sit 78:18 160:23
171:10,13 179:14
204:22 241:21
246:2

site 7:6,10,13,15
18:24 20:13,23
24:4,16 25:24 26:7
27:1,13,19 28:2,20
29:7,13 31:16,18
31:20,23 38:4,10
38:23 39:11,13,15
39:21 40:11,14,18
40:22 41:18,24
43:2,11,19,22 44:2
44:10,16 45:5,7,14
45:19,23 47:24
48:15 49:20,23
50:5,11,18 51:10
51:16,22 52:2,7,12
52:24 53:10,12,21
54:1,15,18 55:12
55:13,17 56:3,8,17
56:19 57:2 58:18
58:23 59:3 67:19
68:3,11,16,21 69:7
69:22 71:5,12,17
75:22 77:19 81:23
82:12 83:6,6,11
87:4,6,7 96:5
114:12 115:22
117:8 118:11,22
207:9 257:18
258:3
sites 82:13
situation 207:20
six 22:1 37:16
112:10 129:19
149:1 168:1
229:10 230:14,21
237:4
six-page 237:12
size 83:18
skill 113:20 116:23
124:11 125:4
131:24 132:5
147:10,12 150:6
179:3 213:5
214:23 217:6
245:14 258:22,23
skills 96:11 105:13
108:6 113:12
132:14 147:13
150:15 156:10,12
216:14,21 217:4,9
217:14 249:5
slept 152:16
slim 243:12
slimmest 245:2
small 258:15
smaller 6:6 33:10
83:17,19 124:12
smallest 129:12

135:15,18
smoother 116:5
smoothly 116:2
social 10:10,14,24
11:4,9,19,24 12:9
12:15 13:5 14:12
14:20,24 15:16,18
15:22 16:13 17:5
17:11,17,23 21:12
23:5 125:10
127:20,22 129:22
131:8,9 133:1,10
138:14 139:9
149:2,3 166:23
167:3,8 168:16
170:9 172:10
249:23
sofa 167:18
sole 221:1
somebody 162:19
someone's 127:12
soon 58:22
sorry 21:18,20 97:5
155:20 205:21
212:8
sought 29:9
sour 220:7,13
southwest 83:9
space 10:19
speak 15:12,20
36:13 60:16 74:22
94:5 136:14 147:3
156:6 163:2,3,24
177:9 190:6,9
234:1,12
speaker 261:21
speaking 202:11
234:20
spec 59:22 62:23
209:23
Special 82:3,12 83:4
83:10
specific 10:3,5 11:18
14:17 17:24 18:10
18:23 19:7 21:21
22:9 23:13 70:7
225:3 247:12
specifically 66:15
161:20 196:5
specification 3:9
9:11,20 22:5 63:21
63:23 153:16,19
specifications 8:20
9:1 32:3,11,15
59:13,16 60:7,11
60:14 209:11
211:12 244:12
specifics 19:15 66:19

106:16 111:3
214:5
specify 59:18
specs 67:13
speculate 93:10
spent 168:23 169:6
spoke 64:5 130:23
spoken 45:1 182:12
spread 112:7,14,14
158:18
spring 46:3,17
stab 232:17
stabilize 182:3
stabilized 116:18
stable 24:11 258:5
staff 10:20 22:1 28:8
47:9 48:14 52:14
69:12 70:2 107:21
108:10 113:1,2
117:12 118:3
123:5,9,13,22
124:4,12,14,14,21
125:2,12,13,13,14
126:1 127:17
128:9,18 130:9,10
130:12 131:11
132:12 134:3,4,22
135:12 139:13,19
145:2,14 147:23
148:2,5,19 149:23
150:8 152:7 158:4
158:8,12,19
159:16,24 160:10
161:7,13 163:3
167:20,21 168:10
168:11,12 169:17
169:23 171:22
181:23 184:15
188:2 195:11,17
195:19 196:1,3,7
196:23 197:22
219:17,21 220:12
232:11 239:3,9
260:8,9
staffed 139:12
260:10
staffing 112:20
113:16 173:13
stake 165:6
stamp 3:19 10:2
33:10 120:24
141:14
stamped 3:12,14,16
3:17,19 4:5,7,8,9
4:10,11,12,13 8:3
9:14,19 33:13
46:15 47:2 61:12
84:6 141:19

180:13 189:10,12
209:3 210:12
218:1 223:3
232:23 237:12
250:23
standalone 83:15
standard 89:15 98:1
Standing 195:16
stand-alone 181:8
214:2
start 53:22 61:19,20
61:21 62:1 125:7
139:16 140:18
165:4
started 46:4 47:8
123:18 124:1
135:2,3 139:17
148:21 159:1,10
162:22 163:20
164:16 166:15,17
170:21
starting 93:7,23
154:12 172:15
194:1 221:19
state 83:18 124:13
207:5 243:14
244:20
stated 26:13,20 27:6
116:15,21 143:15
179:1 253:22
statement 102:12
107:8,8,12,19
135:17 191:17
203:22,23 204:5,7
240:13,16 242:5
242:10
statements 240:22
states 1:1 84:14
184:19 204:20
218:10,16,23
222:2 237:16
256:12
stating 25:23
status 173:15,23
174:2 188:5
245:20 257:18
staunch 142:20
stay 170:14 256:10
stayed 169:24
stays 87:11
steady 118:14
stenographically
261:12
step 79:23 80:5 99:8
100:6 101:11
109:21 129:4
130:19 186:11
stepped 108:2

**steps** 72:14,17 73:24
74:3,5 76:3 158:20
**Steven** 3:10 6:24 7:6
7:10,19 10:23
11:16 12:14 13:3
13:13,23 15:23,24
16:7 17:13,18
19:13 25:24 26:24
27:13 71:16
115:19 117:7
147:21 180:16
183:10 217:4
226:20 228:1
229:19 230:4
246:9,20 256:13
256:15
**stood** 117:2 129:15
159:2 239:8
**stop** 112:14 146:13
159:6 170:23
206:8
**stopped** 135:6
**stopping** 257:15
**Straight** 15:5
**Street** 2:3,7
**strengths** 143:11
221:4
**stress** 159:15
**stretched** 109:17
165:3
**stretching** 204:13
**strewn** 112:9
**strong** 96:11 108:6
113:12 131:24
150:7 258:23
**strongest** 108:15
142:21
**structure** 201:24
248:14
**struggled** 229:7
**stuck** 173:22
**subject** 221:8
**submission** 192:17
193:12
**submit** 80:10 188:1
224:6
**submitted** 80:13,16
80:18 188:17,22
190:14 191:3,5,20
197:9,12,24
**submitting** 189:20
189:22 190:18
**subordinate** 10:9
11:19 12:9,15 13:4
14:11,20 16:2
17:23 21:13 23:5
70:2 122:23
123:11 132:12

135:24 148:2
156:16 157:3
165:18 196:23
197:21 201:21
**subordinates** 198:1
**subscribe** 240:11
241:19
**subscribed** 240:23
241:7
**Subsection** 189:17
**subsequent** 83:1
90:7
**sued** 198:10 199:10
**sufficient** 236:16
**suing** 199:18
**suitability** 143:21
185:6,22 188:11
**suitable** 150:19
151:18 152:3,13
165:21
**Suite** 2:3,7
**sun** 85:14
**superior** 121:24
142:4,11,13
**supervise** 171:22
**supervised** 122:24
**supervising** 22:1
**supervision** 122:8
261:23
**supervisor** 17:5,23
28:10 57:9 70:16
122:23 123:11
129:23 141:3
143:8,12 149:3,3
162:5 171:7
194:19
**supervisors** 10:10
11:19,24 12:9,15
13:4 14:12,20
15:15,19 16:2,10
21:13 23:5 131:9
135:24
**supervisory** 149:17
149:19 150:3
161:7 180:20
232:14 233:4
234:10
**supplying** 193:2
**support** 160:10
172:12 259:10
**supported** 238:15
244:19
**supporting** 135:17
**supports** 158:6
**supposed** 79:8
129:20 159:14,15
183:14 194:23
196:14 230:16

234:4 236:22
**sure** 6:9,11 12:23,24
18:3,6 19:20 20:22
29:19 38:8 41:3
43:24 50:22 52:7
61:22 85:1 88:17
91:8,9 102:9
114:24 115:3,17
119:11 128:14
131:10 133:19
137:1 144:24
146:15 147:1
149:22 161:8
176:3 189:4
193:17 195:17
196:7 221:16,18
230:19 236:2
238:13 242:23
246:15 247:23
**surmise** 135:22
136:4
**survey** 118:1,4 157:6
157:22 220:1
238:23
**sustained** 202:3,5
**sustaining** 205:18
**swipe** 242:12
**sworn** 5:1 261:7
**system** 15:9 25:17,19
35:11 128:22
129:13 171:10
221:12 236:22
**systemwide** 25:16,18

———————
**T**
———————
**T** 2:10 3:5 4:1 261:1
261:1
**tackle** 133:24 134:22
139:21 157:10
170:11
**take** 29:2 41:1 50:24
53:5 70:1 72:14
74:1 78:22 113:18
118:3 119:9
122:24 123:3
127:1 128:7
130:11 136:21,23
139:16 141:1
148:4 151:8 183:7
183:13 189:23
190:13 193:15
195:23 208:13
225:9 232:17
246:13,20 260:5
**taken** 41:4 51:2 72:1
74:4,5 76:3 100:24
119:12 127:5
137:3 175:22

189:21 193:18
208:21 217:21
252:1 261:5,11
**takes** 75:19 146:12
**take-home** 186:22
**talent** 213:4
**talk** 133:11 168:17
200:8
**talked** 103:4 146:11
160:5 163:13
166:8 169:15
171:24
**talking** 43:24 55:24
102:10 110:11
182:5 232:18
248:3,6
**Talmadge** 3:11 15:4
30:12,16 31:3,6,12
31:14 38:6,13 39:2
39:8,14 44:3,10
54:3,12 56:4,9,17
56:19 73:4,14,19
74:21 75:5,11 77:6
77:21 82:1,17
90:16 176:10
216:3 237:20
238:1,5 240:12
242:2,4,16 254:24
255:8
**Talmadge's** 44:8
50:20 51:12,18,24
52:4 53:2,11,14
54:17,19 55:13,14
55:19 57:1 71:13
90:23 118:13
254:15
**targeted** 218:10
**task** 259:20 260:7
**tasked** 128:24 167:7
170:18 171:9,13
238:13
**tasking** 170:17
**tax** 195:5
**team** 149:21 162:13
219:12
**technology** 70:9
**tedious** 136:17
**tell** 8:5,14 61:19
132:24 156:24
161:22 163:15
164:14 190:11
192:8 255:13
257:6 261:8
**telling** 162:16 193:1
**tells** 177:20
**Temple** 195:12
**temporary** 178:12
178:15,18,20,22

179:10
**term** 176:15 201:23
**terminate** 157:18
**terminology** 212:17
**terms** 99:7 135:16
177:5 233:20
**terrible** 205:22
**test** 97:6 151:3
183:13 189:23
**tested** 220:4
**testified** 5:3 12:3
91:12 180:24
190:12 197:3
213:8 215:2 217:7
217:10 230:7
246:1 250:5 254:2
257:20 258:1
**testify** 198:5 261:10
**testifying** 199:4
231:5 234:9
**testimony** 11:15
21:13 22:20 23:19
27:11 43:1 44:6
55:10 66:6 75:4
76:22 102:13,16
104:5 114:14
157:6 191:4,6,9,15
198:23 199:2,4
223:21 261:11,11
261:15
**tests** 190:13
**Thank** 26:3 51:7
59:24 85:18 94:19
97:18 137:2
200:10 260:12
**then-deputy** 29:1
41:20 206:13
**they'd** 260:4
**thick** 160:15 257:10
**thing** 5:11 56:23
122:15 146:14
164:6 170:13,14
170:18 240:15
**things** 106:23 108:20
118:4 123:20
128:19,20 148:23
204:23
**think** 11:3 14:23
17:12,18 29:22
32:10 36:17 44:24
46:16 49:22 55:24
64:17 90:7 109:16
129:13 135:5
136:12 142:19
150:16 152:2,17
153:15 160:8,12
181:18 182:22
202:22 213:24

214:2,6 228:23
229:1 233:14
235:14 237:4
245:6 246:2,22
250:17
**thinking** 50:3 172:5
195:7 234:3
**third** 10:1 18:9 32:2
32:17 218:9
238:18
**third-party** 256:6
**thorough** 183:5
**thought** 130:4
151:20 152:5
234:19 240:2,5
241:13 245:24
**thousand** 132:3
**thread** 61:24
**three** 10:4 21:21
76:8,22 78:3,14
79:3,19 80:7 82:8
90:1,9,13,14
109:11 110:22
112:16 116:8
118:4 143:24
149:10 157:21
168:16 218:17
230:12 235:8
237:17 243:10
255:5,11,11
257:19,23
**three-page** 84:5
223:2
**threw** 88:5 164:20
**throat** 136:21
137:14
**throats** 122:21
166:10
**throes** 87:18
**throw** 165:4
**Thursday** 1:10
**time** 5:16 15:11
17:15 21:5 23:9
26:14,21 28:10
29:6,12,19 30:3,13
38:20 39:21 40:11
40:13 41:23 42:2,4
43:14,15 46:2,5,7
47:19 49:21 50:2
53:5 54:1,12 57:17
63:21 64:21 67:13
71:22 72:9 74:24
75:11 77:21 82:23
86:17 87:17,21
88:3 93:22,24
95:18 96:6 106:22
108:4,12,12,16
109:3 110:10

111:1,4,9,11 113:6
113:9,11 114:2
116:22,24,24
117:1 118:17
120:4 126:17
130:11 131:23,23
132:8,8 133:6
141:5 143:5
145:17 146:23
148:17 149:16
150:24 151:17
152:17 158:3
159:5,22 162:5
167:14 168:23
169:6 171:11
173:3,4,12,22
178:16 179:2,4,14
179:16,17 183:4
185:11 186:1
193:9 196:18
197:4 200:14,18
200:18 201:12,16
203:20 204:11,13
207:8,15,17
209:14 211:13,16
214:12,18 215:7
215:13 220:8
238:20 239:21
241:24 246:2
249:9,14,16 250:2
252:10 255:18
257:24 258:14
259:2,21 260:5
261:6
**timeline** 145:20
**times** 107:23 162:10
178:8 183:21
218:17 245:7
254:3 258:18
**timing** 116:19
**tired** 165:9
**tirelessly** 257:19
**title** 139:5 147:11
256:18,22,23
**titled** 114:13 187:12
**today** 78:18 104:5
111:14 124:9
198:19 200:21
251:5
**told** 67:10 98:11
111:12 112:4
123:10 133:20
146:11 160:5,21
162:23 180:24
192:10 197:18
203:11 257:9
**tolerance** 157:14
**tool** 195:18 220:24

**top** 6:14 13:22 84:17
88:6 108:22
110:20 142:9
153:12 180:5
207:2 212:9
225:10 230:8,12
**total** 11:13
**totality** 175:23
185:12,24 186:4
186:12 217:21
228:11 255:14
**totally** 182:6 238:21
**tour** 158:14
**toured** 162:2
**touring** 162:4
**trailer** 219:14
**train** 108:17
**training** 34:4 36:2
212:1 213:13
248:23 257:16
**trains** 213:13
**transaction** 25:3,8
25:11,15 26:11,22
27:8 47:8,13 73:23
75:3,9,24 76:1
84:11
**transactional** 48:13
**transactions** 74:18
**transcript** 261:11,20
261:23
**transfer** 47:9,17
73:4 86:21 134:13
134:23
**transferred** 46:7
73:20 81:12 86:19
**transfers** 134:13
**transition** 219:12
**transitional** 16:3
127:21
**transitioning** 116:17
**translated** 131:12
**transparent** 170:4
174:19
**transpired** 91:17
93:2
**treading** 258:19
**treated** 241:10
**trenches** 163:16
**tried** 240:17
**triggered** 27:7
**Triple** 83:4
**Troopers** 243:14
244:21
**troubled** 156:16
**troubling** 126:7
**true** 88:11 97:16
139:2 253:5
261:14

**truth** 261:9,9,9
**try** 15:13 65:6
111:11 114:2
152:7 250:16
**trying** 112:7 129:11
137:13 157:9
163:8 178:1 212:9
229:17 231:11
238:22 252:23
260:9
**turned** 130:3
**Twenty-eight** 249:8
**two** 10:9 11:18 12:8
12:14 13:3,10
14:11,19 21:7,14
22:18 23:4,12 40:8
44:24 55:1 76:11
76:14,22 82:13
89:18,21 91:23
96:3,6 104:11
110:4,6 114:18
131:20 134:6
149:10 152:19
153:8,23 154:5
155:11 197:24
199:21 206:6
213:11 216:16
220:18 225:6,6,9
225:10,14,19,21
227:6,8 229:10
230:22 231:9,10
232:4 235:3,8,17
243:9,22 254:22
255:2,5
**two-page** 3:12 33:9
33:12 61:11
250:22
**type** 70:5 99:24
224:8
**types** 120:2
**T&E** 221:2,3,10
223:24 224:7
225:1 248:15

_____

**U**

**ultimate** 250:2
**ultimately** 16:4
96:13 117:17
224:13 228:7,10
244:17
**unacceptable** 99:15
123:10 181:11
182:5 228:16
**unbecoming** 123:12
126:21 156:17
199:21
**unbeknownst** 134:18
**underperforming**

144:23 238:8
**understand** 11:12
19:4,5 20:19 43:23
55:10 56:21
100:17 107:10,12
116:12,13 137:19
145:13 150:9
151:13 171:1
177:14 229:13,17
229:20
**understanding** 63:11
76:21 86:8,13
89:11 92:8 103:2
177:2 197:10
259:1
**understood** 55:22
97:21 109:10
199:8
**unfair** 178:22
**unfavorable** 104:21
**unfortunate** 43:7
**unfortunately** 43:12
102:8
**uniform** 96:12
125:12 135:11
145:2 149:21,23
168:10
**unique** 82:9,15
**unit** 83:5 87:13
123:13 125:10,16
125:17 127:22,22
135:10,15,18
144:23 148:6,6
159:3,4,11 161:11
161:11,17 162:6
164:7 168:3
170:18 181:8
214:7 238:12
240:20 258:15,16
**UNITED** 1:1
**units** 116:18 124:12
148:2
**university** 32:22
33:2 63:20 64:2
67:7,12 83:9,21
188:18 191:21
192:14,18 193:3
195:12
**unjustified** 218:19
**unpopular** 132:6,7
258:24
**unprecedented**
113:7,8
**unpredictable** 169:2
**unprofessional**
123:12
**unqualified** 218:13
**unstable** 258:10

unwarranted 218:11
update 61:3
upended 159:12
    160:9 164:6
upheld 239:24
    242:13
upholding 202:10
upset 156:19 204:24
urgency 109:4
urgently 107:1,4,16
    107:20
use 98:24 113:7
    137:20 148:17
    186:22 221:9
utilization 79:16
utilize 80:8,8 220:24
    256:7
utilized 99:22

                V
vacancies 76:9
    139:12 249:11,18
    253:20 254:20
    255:6,12
vacancy 76:16,17,17
    76:20 95:10
    123:23 152:12,12
    173:14 181:24
    213:20
vacant 77:11,17 97:5
    175:14 182:13
vaccinated 159:2,10
    159:11 164:15
vaccination 164:7
vaccine 159:1,4
    163:17
valid 233:17,20
various 16:24
    162:10 254:3
vehicles 186:21
vendor 256:7
verbally 196:1
verbatim 261:21
verification 184:12
verified 202:20
vernacular 102:17
versus 224:20
Vetter 64:11,19,24
    204:10 226:12,21
    227:3,12,20
    229:21 242:7
video 1:18 161:23
Videoconferencing
    1:11
viewed 157:9
violated 190:17
violation 164:23
    201:11 207:17

violations 126:19
violence 185:14,21
virtual 148:16
    223:16
virtually 128:24
virus 259:1
visible 148:1 158:3
    161:8
visit 138:12 219:1,4
visitors 96:13 115:9
visits 129:10,11
voluntarily 159:3
volunteers 135:13
Vrato 64:19 123:9
    126:4 184:12,14
    228:20 229:3,15
    229:16 232:11,22
    233:2 234:1,19
Vrato's 234:18
    236:2
vs 1:5
vulnerabilities
    122:17 123:19
    125:23
vulnerability 166:12
vulnerable 158:11

                W
wait 5:12 163:14,18
    214:19
walk 113:13 158:4
    168:18 169:8,9
    239:3
walking 163:5
want 6:5 61:21 62:2
    66:24 91:8 92:7
    104:4 107:18
    127:4 132:1
    136:13 138:24
    139:18 168:21
    182:6 183:15
    189:2 203:9
    223:20,21 243:18
    243:21 254:4
wanted 65:17 66:21
    67:2,3 148:14
    152:6 166:23
    169:3 187:23
    257:12
wants 138:13 170:9
warden 3:9,9,13,15
    5:15,19,20 6:24
    7:2,4,5,9,17 8:9
    9:1,10,20 10:6,18
    11:22 12:1 13:10
    13:14 14:2,7,18,18
    16:4 17:14,19
    18:11,23 19:1,7,13

20:14 21:7 22:4,20
22:24 23:1 24:6,18
26:2 27:21 28:4,14
28:18,21 29:1,1,9
29:15,23 30:12,16
30:17 31:3,6,10,12
31:14,15,22,23
32:3,15,20 33:19
33:22 34:4,8,13
35:16 36:2 37:17
38:6,13,18,20,21
39:2,8,14,17,18,19
39:23,24 40:10,11
40:12,14,15,17,18
40:21 41:9,10,15
41:17,20,23,24
42:5,14,22 43:2,8
43:9,13,19,20,21
43:21 44:3,8,10,15
44:17 45:5,6,8,12
45:15,19 46:6
47:19,24 48:2,14
48:16 49:13,22,24
50:7,9,11,12,20
51:12,18,24 52:4
52:19,23 53:2,5,7
53:11,14,21 54:3
54:12,17,19,22
55:2,3,9,13,14,19
55:22 56:4,9,12,17
56:19 57:1,7,15,20
57:20 58:5,12,14
58:16,17,22 59:5,9
61:1 62:18 63:13
63:18 64:22,24
65:2,4,8,12,15,21
66:4,11,18 67:4,10
67:22 68:3,13,15
68:21 69:9,16,20
69:24 70:1,2,9,11
70:13,15,20,22
71:1,13,18 72:7,13
72:14 73:9,14,19
73:20 74:1,2,10,21
75:2,5,6,8,10,11
75:12,13,22,23
76:3,9,23 77:6,10
77:13,16,19,21,23
80:15,21 81:8 82:1
82:1,7,11,17,18,19
82:19,24 83:11
84:8 86:2,9,23
87:15 89:1,21,24
90:1,2 91:5,6,15
91:21,23 92:13
93:7,23 94:24 95:5
95:10,23 96:8,18
96:24 103:20

104:6 108:3
113:10,17 114:11
114:13,23 115:2,7
115:12,13,20
117:10 118:13,18
118:24 119:5,18
120:13 122:4
124:22 140:22
143:14,17 144:5,8
144:13 146:21
147:4,9 149:13,17
150:2,4,19 151:5,7
151:14,18 152:3
152:20 153:2,5,8
153:24 154:4,7
155:5,9,14,15
156:1,7 157:2,5
160:3 165:21,23
175:14 176:8,9,10
180:10,14 181:7
181:18 182:4,11
182:13,16,19
183:6,10,21 185:3
185:7,23 188:12
191:22 192:11
202:7 204:10
206:9,13,15,24
207:13,17,22
208:4,10 212:5,13
212:21,21,22
214:7,11,16,19,23
215:5,15,18,19,21
215:22,24 216:1,3
216:4,16,18,19
217:18 218:7
219:1,3,6,10,11,16
221:13 222:3,8,8,9
224:5 233:18
234:11 236:15
237:14,16,16,20
237:20,23 238:1,1
238:5,5,5 239:5,13
241:4,23 242:2,4,7
242:16,16,20,20
242:23,24 243:6
244:12 245:22
246:9,19 247:7,13
249:10,11 250:6
251:6,24 252:3,20
253:3,20 254:20
256:12,16,20,24
257:1,18 258:8
wardens 14:16,23
    16:5 29:3,10,15
    30:5 60:19 65:24
    66:7,15 72:10 73:8
    73:17 76:7,8,22
    78:3,10,15 79:3,14

79:20 80:7,7 87:22
89:10 90:4,11
91:19,23 93:5
95:17 96:4,6 107:2
110:2,22,24 113:4
114:17 115:17
116:14 136:1,1
144:17 171:8,10
171:14 181:4,14
182:2,17,23 183:4
186:17 215:9,11
223:7 237:18
238:9 241:3,12
257:8 258:2,4
warden's 8:20 66:22
    192:23 193:8
    240:9
warranted 242:1
wasn't 38:18,19
    88:13 113:10
    118:6,6,7 125:24
    134:6 151:14
    161:16,18 169:10
    170:1 174:17
    178:8 179:4
    194:20 196:12,19
    207:20 227:14
    235:23 242:10,11
watch 216:17
watching 150:12
    163:16
water 85:16 136:21
    136:22 258:19
waves 168:21
way 36:18,18 53:23
    60:10 61:23 92:11
    93:12 125:2
    128:18 129:4
    130:19 138:13
    161:2 165:24
    170:8 171:9
    181:13 182:23
    187:17 193:2
    200:12 203:10
    220:22 222:16
    225:10 230:20
    236:22 240:18
    247:11
ways 92:4,9
weaknesses 143:11
wear 178:5
website 170:3
week 111:14 125:17
    159:6
weekly 137:15
weeks 160:2
weigh 228:9
weighed 106:17

**weight** 96:8 108:8
  112:11,18 113:23
  152:15
**WEIR** 2:2
**welcome** 60:3
**went** 66:19 89:23
  90:1 91:19 93:5
  129:19 148:24
  151:21 159:21
  160:1 168:8
  204:24 220:7,13
  230:5 250:1
**weren't** 114:1
  133:21 159:11
  167:20 194:23
  229:11 242:23
**West** 192:14 193:3
**we'll** 103:5,8 125:17
  130:7 138:20
  167:13 195:23
**we're** 55:24 99:3
  101:18 102:9,24
  104:12 105:4
  111:14 124:9
  129:13 130:14
  133:24 137:19
  138:21 139:11,19
  144:24 160:14
  163:7,7,8,15 167:1
  167:16 170:10
  177:15
**we've** 29:22 91:18
  103:4 146:5
  153:15 182:12
  248:3 254:2
**wiggle** 257:14
**William** 40:10 64:11
  64:19 226:12,21
  227:3,12,20
  229:21
**Williams** 58:12,18
  58:23 59:7 63:24
  64:6,20 65:4 67:18
  68:2,11,15,21 69:6
  69:15,20 70:19
  71:1 115:20
  118:21 199:10
  200:20 201:3,4
  202:6,19 203:6,11
  203:16,19,24
  204:6,8,21,22
  205:5,19,21,21
  206:1,13,22 207:9
  212:22 216:14,21
  222:9,9 223:7
  226:19 227:24
  229:18 230:4
  235:21 236:3,3,5

236:15 237:2
245:10,18,23
258:2
**wing** 81:13,15
**winnowing** 229:24
**witness** 3:2 5:2 13:7
  48:10 62:6,9 85:3
  85:7,18 93:15
  94:19 97:18 137:2
  200:10 237:6
  261:15
**witnesses** 175:11
**woman** 30:9 57:12
  199:17 201:6
  211:21 212:12
  213:14 237:21
**women** 35:17 74:10
  199:1 203:9 213:8
**word** 113:7
**words** 56:16 74:3
  203:8 220:11
  244:11
**work** 3:7,10,11,13
  3:15,22 6:15 11:24
  13:23 15:18 16:6
  17:5,21,23 19:22
  29:22 31:3 42:15
  49:4 58:5 90:24
  108:21 109:24
  110:19,23 113:13
  113:23 114:21
  122:17 125:10,10
  125:17 127:22
  128:8 129:23
  131:9,20 133:24
  134:3,16 137:18
  138:23 139:14
  147:18 149:3,3
  150:9 162:12
  166:22,24 168:18
  169:24 171:10
  172:12 180:6
  181:16 188:3
  196:3,7,22 225:10
  238:11,16 240:5
  240:23 242:24
  245:7 249:23
  254:14,15,17
  259:5,5
**worked** 11:22 15:18
  117:14 125:18
  127:22 149:21,23
  149:24 244:14
  249:6 257:19
**worker** 127:20 133:1
  133:10 138:14
  172:2,10
**workers** 125:15

131:8 133:16
139:9 168:16
170:9
**workforce** 117:5
  162:16 178:1
  239:6 243:11
  244:7,9 258:17
**working** 79:10
  128:18 134:10
  135:1 177:22
  219:22 236:22
**workings** 87:12
**workload** 181:2
**workloads** 181:16
**works** 257:13
**world** 87:24 112:19
  152:16 259:22
**worry** 135:8
**worthy** 235:3
**wouldn't** 38:17
  158:20 176:3
  199:23 246:3
  249:3 250:16
**wow** 165:10
**write** 84:23 198:3
**writing** 145:10,19
**written** 146:7
**wrong** 89:5 95:20,24
  170:13,14 193:6

**X**

**X** 3:1,5 4:1
**Xavier** 87:4 237:23

**Y**

**yeah** 130:6 133:23
**year** 8:14 90:21
  95:11 111:15
  124:10 125:19,19
  127:23 196:15
  246:11
**yearly** 80:10 122:2
  155:4
**years** 10:9 11:18
  12:8,14 13:3,10
  14:11,19 21:7,14
  21:18,23 22:1,18
  23:4,12 73:1 80:19
  87:19 89:18,21
  104:3,11 109:11
  110:4,7 112:16
  134:6 142:13
  149:10 153:8,23
  220:17 225:7
  243:10 249:8
  250:11,12,15
  252:11 257:19
**yesterday** 195:9,13

195:24 197:1
**youth** 15:8,11,21

**Z**

**zero** 157:13 183:23
**Zoom** 1:11,18

**0**

**0** 253:20,20,21
**0025** 9:15

**1**

**1** 6:1,14 90:17
  230:24
**1st** 198:15
**10** 61:7 62:15
**10th** 63:8,10,16
  211:3
**10.0923** 188:24
  189:17
**10:00** 1:14 109:1
**100** 30:7 37:20 43:5
  152:9 253:24
**100s** 77:2
**1007** 4:7 209:3
**1010** 4:7 209:4
**1011** 4:9 218:1
**1014** 4:9 218:2
**1015** 4:12 237:13
**1020** 4:12 237:13
**105** 3:18
**1068** 3:19 120:24
**11** 84:1 99:5 119:21
  152:18
**11-page** 187:12
  189:9
**11/14** 8:14,15 32:6
  59:23 209:10
**11:01** 41:5
**11:02** 41:7
**11:19** 51:3
**11:22** 51:5
**11:55** 72:2
**12** 73:13 105:17
  111:17
**12:44** 72:4
**120** 3:18
**1226** 4:5 189:10
**1231** 189:12
**1236** 4:5
**13** 3:10 4:10 120:19
  221:19
**13th** 58:8 71:7 208:4
  254:14
**1339** 2:3
**14** 1:10 141:13,18
  172:15 203:4
  204:15 261:6

**14th** 11:16 12:13
  13:2 59:5 63:24
**14-page** 184:6
**141** 3:19
**15** 154:11 208:19
**15th** 204:21
**154** 3:20
**1540** 4:8 210:12
**1546** 4:8 210:12
**1551** 4:13 250:23
**1552** 4:13 250:23
**1561** 3:16 61:13
**1562** 3:16 61:12
**1573** 3:14 46:15
**1578** 47:2
**1592** 3:14 46:15
**16** 74:12 179:23
  180:10 202:21
**16th** 14:3 17:20
  180:14
**16-page** 154:11
**1600** 73:13 83:9
**1601** 180:4
**1603** 180:13
**1608** 180:4
**17** 184:1
**17th** 83:5,21 111:18
**179** 3:22
**18** 187:8 202:21
**180** 194:1
**1831** 3:17 84:6
**1833** 3:17 84:6
**1834** 4:11 223:3
**1836** 4:11 223:3
**184** 4:3
**1843** 3:19 141:14,19
  172:16
**1854** 232:24
**186** 194:2
**187** 4:4
**189** 4:5
**1890** 3:20 141:19
  172:16
**19** 43:9 172:21 189:5
  223:14
**19-page** 202:16
**19103** 2:8
**19107** 2:4
**1919** 3:12 33:13
**1920** 3:12 33:13
**1941** 8:3 9:19
**1943** 10:2
**1944** 8:3 9:19

**2**

**2** 7:22 9:18 14:10
  32:1 59:20 84:22
  153:13 231:1

| | | | | |
|---|---|---|---|---|
| 253:21 | 18:12 21:14 22:5 | **22** 5:23 73:10 106:24 | **46** 3:14 112:11 | **9/1/22** 194:5 |
| **2nd** 126:9 141:23 | 23:4 30:4 31:6,22 | 172:21 183:18 | **47** 129:9 | **9/14** 8:13,15 32:6 |
| 172:18 | 32:4,14 40:4 50:1 | 195:2 204:20 | **47-plus** 260:3 | 59:22 |
| **2,000** 74:12 | 88:12,13 90:19 | 210:7 | **4700** 112:12 | **9/24/2021** 255:9 |
| **2/21/20** 84:11 | 91:1 147:22 | **2200** 74:12 | **48-page** 141:18 | **9:00** 109:1 |
| **2:02** 119:13 | 153:16 155:24,24 | **221** 4:10 | 172:15 256:11 | **90s** 241:2 |
| **2:05** 119:15 | 165:22 176:9 | **222** 4:11 | **4800** 129:9 | **900** 132:2 |
| **2:22-cv-03965-M...** | 180:22 208:7 | **23** 217:24 | | **924** 3:21 154:12 |
| 1:4 | 253:20 254:16,17 | **230** 72:23 74:10 | ——————— | **939** 3:21 154:12 |
| **2:29** 137:4 | 254:22,23 255:1,3 | **2300** 73:10 | **5** | **97** 152:23 |
| **2:35** 137:6 | 255:5 257:7 | **237** 4:12 | **5** 3:3 30:22 237:15 | **99** 172:9 |
| **20** 5:22 166:16 | **2022** 9:16 20:6,11 | **24** 111:13 159:6 | **5H12-20191216-2...** | |
| 172:21 202:16 | 30:1,4 32:11 42:8 | 222:1 223:12 | 102:3 251:19 | |
| **20th** 6:19 62:24 63:3 | 56:12 58:8 59:5,9 | **24th** 31:6 91:1 | **5H12-20220207-2...** | |
| 88:20 90:18 | 62:24 63:4,16,24 | 254:16 | 106:15 | |
| 254:17 | 69:17 71:7 90:10 | **25** 218:9 222:22 | **5H12-20220711-2...** | |
| **20-page** 46:14 | 91:4,7,13 93:4 | 223:5 | 222:19 223:11 | |
| **2001** 2:7 | 103:20 110:3,11 | **25th** 30:4 31:21 32:4 | 225:4 | |
| **2013** 185:15,22 | 111:18 114:12 | 32:14 | **5/13/2022** 255:4,13 | |
| 186:5 | 121:21 126:9,11 | **250** 4:13 | 255:16 | |
| **2014** 8:16,21 153:14 | 126:15 141:23 | **255** 4:14 | **50** 49:6 72:19 78:4 | |
| 249:21 | 143:18 150:21 | **26** 20:6,11 30:1 | 81:16 | |
| **2015** 173:17 220:14 | 160:24 172:18 | 56:12 114:11 | **500** 2:3 73:15 | |
| **2016** 117:24 118:1 | 176:5 183:9 197:5 | 237:8 | **58** 3:15 | |
| 173:10 174:5 | 204:21 206:1,23 | **26th** 69:17 | | |
| 184:21 186:5 | 207:5,13 208:1,2,4 | **2620** 2:7 | ——————— | |
| **2017** 121:11 155:2 | 221:14 245:21 | **27** 250:18,18 251:20 | **6** | |
| **2018** 43:9 46:3,17 | 246:8,18 247:8,13 | 254:20 | **6** 3:7 33:5 47:1 | |
| 154:23,24 | 247:18 248:11 | **28** 255:19 | 189:11 237:14 | |
| **2019** 78:8,15,17 | 253:21 254:14 | **28th** 154:18 | **6:10** 260:13 | |
| 81:11 86:17 | 255:2,11 | **29th** 256:12 | **60** 41:2 119:10 | |
| 121:15 154:18 | **2023** 1:10 5:23 11:16 | | 193:16 | |
| 210:3,15 211:3,10 | 12:13 13:3 80:19 | ——————— | **60-second** 50:24 | |
| **202** 4:6 | 139:23 140:3,7,14 | **3** | **600** 83:21 | |
| **2020** 14:3 17:20 | 184:13 197:8 | **3** 9:6 14:9 153:21 | **61** 3:16 | |
| 33:15,23 34:9,14 | 207:22 253:21 | 209:18 223:4 | | |
| 35:16 36:3 37:5,18 | 261:6 | 231:1 253:20,21 | ——————— | |
| 42:18 43:17 72:7 | **2024** 80:13,16 | 253:21 | **7** | |
| 74:3 76:5 78:11 | 261:19 | **3rd** 42:18 43:17 72:7 | **7** 3:8 42:10 47:16 | |
| 80:19 81:12 84:9 | **209** 4:7 | 74:3 76:5 78:11 | 172:16 261:19 | |
| 86:2,10,17,24 | **21** 4:10 18:12 21:14 | 184:13 | **7th** 110:11 210:15 | |
| 87:16 88:10,12,17 | 22:5 23:3 33:23 | **30** 3:11 129:8 132:20 | **7/11/22** 63:2 | |
| 88:23 89:8,22 90:3 | 34:9,13 35:16 36:3 | **30XI00141800** 1:16 | **75-day** 132:20 | |
| 90:6,8 91:22 92:14 | 37:5,18 49:24 84:9 | 261:3,19 | | |
| 93:3,7,23 96:19 | 86:2,10,24 87:15 | **30-plus** 249:22 | ——————— | |
| 97:1 103:13 104:7 | 88:9,17 96:19 97:1 | **31** 218:16 | **8** | |
| 111:14 119:18 | 184:18 209:5 | **31st** 197:5 | **8** 46:10 132:2 | |
| 121:17 144:7 | 211:13 221:20 | **32** 218:23 | **8/20/21** 255:8 | |
| 146:21 152:19 | 258:9 259:11 | **33** 3:12 | **8/28/19** 3:21 | |
| 153:19 154:1 | **21st** 7:17 8:24 9:21 | **36** 189:10 | **8/29/16** 121:5 | |
| 155:17 165:22 | 10:13,22 11:5,8 | | **8:00** 192:4 | |
| 179:14 180:10,14 | 12:7 14:5 30:3 | ——————— | **80s** 241:2 | |
| 180:22 248:8 | 88:23 89:8,22 90:3 | **4** | **8031** 79:9 | |
| 251:11 253:12,20 | 90:10 91:4,13,22 | **4** 9:14,14 13:18 20:2 | **8084** 79:9 | |
| 258:9 259:11 | 93:3,4 103:13 | **4,700** 177:24 | **84** 3:17 | |
| **2021** 6:20 7:17 8:24 | 104:7 253:12 | **4:01** 193:19 | | |
| 9:21 10:13,22 11:5 | **210** 4:8 | **4:07** 193:21 | ——————— | |
| 11:8 12:7 14:5 | **218** 4:9 | **4:30** 208:16,22 | **9** | |
| | | **4:48** 208:24 | **9** 3:9 57:24 | |
| | | **42** 3:13 | **9,000** 82:10 | |
| | | | **9/1/18** 194:14 | |
| | | | **9/1/19** 194:11 | |
| | | | **9/1/20** 194:8 | |