
PLAINTIFF's EXHIBIT

Lyde, et al. v. City of Philadelphia

P-4

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - -

ADRIENNE LYDE, et al.,          :
                                :
          Plaintiff(s)    : NO. 2:22-cv-03965-MMB
                                :
          vs                    :
                                :
CITY OF PHILADELPHIA,           :
                                :
          Defendant(s)    :

- - - - -

Thursday, August 31, 2023
Via Zoom Videoconferencing
- - - - -
Oral deposition of TERRELL BAGBY,
on the above date, beginning approximately 10:00
a.m., before Louis A. Manchello, Certified Court
Reporter (New Jersey Lic. No. 30XI00141800) and
Notary Public of Pennsylvania, held with all parties
attending via Zoom Video Conferencing.
- - - - -

1  A P P E A R A N C E S :
2      WEIR GREENBLATT PIERCE
       BY:  NOAH S. COHEN, ESQUIRE
3        1339 Chestnut Street
         Suite 500
4        Philadelphia, Pennsylvania  19107
5          Counsel for the Plaintiff
6      CLARK HILL
       BY:  H. DAVID SEIDMAN, ESQUIRE and
7        MIKAILA J. JOHN, ESQUIRE
         2001 Market Street
8        Suite 2620
         Philadelphia, Pennsylvania  19103
9
         Counsel for the Defendants
10
   A L S O   P R E S E N T :
11
       ADRIENNE LYDE
12     JENNIFER ALBANDOZ
       JESSICA BOWERS
13
           - - - - -
14
15
16
17
18
19
20
21
22
23
24

1      E X H I B I T S (Continued ...)
2  DEPOSITION EXHIBITS                    MARKED
3  Bagby-21  Document Bates stamped City 1834   122
       through 1836
4  Bagby-22  Document Bates stamped City 1943   132
       through 1848
5  Bagby-23  Document Bates stamped City 1849   144
       through 1854
6
           - - - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1      I N D E X
2  WITNESS      EXAMINED BY        PAGE
3  TERRELL BAGBY
      Mr. Cohen       5
4
         - - - - -
5
6      E X H I B I T S
6
   DEPOSITION EXHIBITS            MARKED
7
   Bagby-1  Evaluations for Ms. Albandoz      9
8  Bagby-2  Letter dated 2/21/20 to Ms.     20
       Albandoz
9  Bagby-3  Memorandum dated 2/25/21 from Ms.  26
       Albandoz to Deputy Commissioner
10     Bagby
   Bagby-4  Documents Bates stamped 1438 and  30
11     1439
   Bagby-5  Interview record for Ms. Lyde    33
12 Bagby-6  Evaluation record for Ms. Lyde   34
   Bagby-7  Evaluation of Ms. Lyde dated     43
13     7/27/15
   Bagby-8  Evaluation of Ms. Lyde dated     46
14     9/7/16
   Bagby-9  Congratulations letter to Ms.    55
15     Lyde
   Bagby-10 Declaration of Nancy Giannetta   73
16 Bagby-11 Declaration of Cathy Talmadge    81
   Bagby-12 2021 budget                      83
17 Bagby-13 2022 budget                      84
   Bagby-14 2023 budget                      84
18 Bagby-15 Document Bates stamped City 6020  99
       and 6021
19 Bagby-16 Document Bates stamped Plaintiffs 106
       1 through 4
20 Bagby-17 Document Bates stamped Plaintiffs 106
       0022 through 25
21 Bagby-18 Declaration of Michele Farrell   111
   Bagby-19 Work History Detail for Norman   112
22     Williams
   Bagby-20 Document Bates stamped Plaintiffs 114
23     0014 through 0021
24 (Exhibit continued ...)

1          TERRELL BAGBY, having been duly sworn
2      or affirmed as a witness, was examined and
3          testified as follows . . .
4  BY MR. COHEN:
5      Q.    Good morning, Deputy Commissioner
6  Bagby.
7  A.    Good morning.
8      Q.    So my name is Noah Cohen.  I am the
9  attorney for the plaintiffs in this matter,
10 Jessica Bowers, Adrienne Lyde, and
11 Jennifer Albandoz.  They have a claim of gender
12 discrimination in regards to not being promoted to
13 the warden positions in 2020 through the present.
14 Do you understand that?
15 A.    Yes.
16     Q.    So I'm going to ask you some questions
17 today.  If there's ever a confusing question or you
18 want me to rephrase, just let me know, and I'm happy
19 to do that.  All right?
20 A.    Yes, sir.
21     Q.    So can you tell me a bit about your
22 employment background?
23 A.    Yes, I started at the Philadelphia
24 Department of Prisons in November of 1996.  I came

1  in as a social worker.
2  　　　After some years, I promoted
3  to -- after going back to school, I promoted to
4  social work supervisor.
5  　　　At that time, there was an
6  opportunity to work out of class as a program
7  administrator. I took that. Did that for about a
8  year. And by the time the test was opened for
9  program administrator, I tested into the position,
10  promoted into the position. I did that for a period
11  of time.
12  　　　And then, from there, I was
13  appointed as the deputy commissioner during this
14  current administration.
15  　　Q.　And was that in June of 2016 that you
16  were appointed?
17  　　A.　Yes. I have been here about seven and a
18  half years.
19  　　Q.　And when you say you took the test to
20  get the program administrator position, was that an
21  oral examination or a written examination?
22  　　A.　It was kind of a combination. You know, you
23  wrote and then you presented orally.
24  　　Q.　And for that promotion process, was

1  there a list that you were a part of?
2  　　A.　Yes, I believe so. I was number 2 on the
3  list.
4  　　Q.　And in terms of the people grading the
5  examinations, were those people from Philadelphia
6  County or from outside of Philadelphia County?
7  　　A.　I'm not 100 percent certain, but I think it
8  was from Philadelphia. I think it was our H --
9  well, central HR.
10  　　Q.　When did you get that promotion?
11  　　A.　I don't recall the actual date. I want to
12  say -- oh, my goodness. I don't recall the actual
13  date.
14  　　Q.　Fair enough. But before June of 2016
15  clearly?
16  　　A.　Oh, definitely, yes.
17  　　Q.　Yes.
18  　　A.　Definitely, yes.
19  　　Q.　And was the Rule of Two in place at
20  that time?
21  　　A.　I believe so. At that time, the Rule of Two
22  was in place.
23  　　Q.　And what is the Rule of Two?
24  　　A.　From my understanding? Because I'm not an

1  HR professional.
2  　　Q.　Sure.
3  　　A.　From my understanding is that, based on
4  someone's rank, the department can choose between
5  the two top candidates.
6  　　Q.　Got you. So have you supervised
7  Adrienne Lyde?
8  　　A.　Yes, I have.
9  　　Q.　What is your overall impression of her
10  as an employee?
11  　　A.　She's sound, intelligent. Never had a
12  problem with time and attendance. Proactive.
13  Resolves issues, problems. She's always gotten
14  superiors on her performance evaluations from me.
15  　　Q.　And have you also supervised
16  Jennifer Albandoz?
17  　　A.　Yes. Since I was deputy commissioner, yes,
18  I supervised her in her role as a program
19  administrator.
20  　　Q.　What is your overall impression of
21  Ms. Albandoz's job performance?
22  　　A.　My performance evaluations, she's always
23  gotten outstanding. Never had a problem with her
24  time or attendance. Very proactive. Seeks to solve

1  problems. She was a great employee.
2  　　Q.　I'd like to go over with you some of
3  your evaluations for Ms. Albandoz.
4  　　A.　Yes.
5  　　　MR. COHEN: So I will mark them
6  as Plaintiff's Exhibit 1 for this deposition.
7  　　　(Whereupon Bagby-1 was marked for
8  　identification.)
9  　　　MR. COHEN: And I will share my
10  screen. Let me know if you want me to zoom
11  in. I just learned a trick yesterday to zoom
12  in. So I can show off that trick.
13  　　　MR. SEIDMAN: Noah, off the
14  record.
15  　　　(Discussion off the record)
16  　　　MR. COHEN: So I think we will
17  call it Bagby-1.
18  BY MR. COHEN:
19  　　Q.　So I'm showing you what has been
20  labeled as Bagby-1. And I will represent to you
21  that this is a seven-page document.
22  　　　So I think I will start with the
23  oldest one, which is Bates stamped as City 000186.
24  Do you see that?

1 A.    Yes.
2        Q.    And am I correct that this is your
3 signature at the bottom here?
4 A.    Yes.
5        Q.    Thank you.  So fair to say you did not
6 give these ratings, correct?
7 A.    **I'm trying to figure out how Ms. Lyde is the**
8 **rater.  May I see the top of this evaluation?**
9        Q.    Sure.
10 A.    **Oh, this was when she was a social work**
11 **supervisor.**
12        Q.    Right.  So at this time, back in 2016,
13 Ms. Albandoz was a social work supervisor; is that
14 right?
15 A.    **Yes.  So Ms. Lyde would be the rater as a**
16 **program administrator.**
17        Q.    Because she had already been promoted
18 to program administrator?
19 A.    **Yes.**
20        Q.    And then you, as Ms. Lyde's supervisor
21 and as the deputy commissioner of Restorative and
22 Transition Services -- is that what RTS stands for?
23 A.    **Transitional Services, yes.**
24        Q.    You as the deputy commissioner of --

1 and I will abbreviate it to RTS.  You were, I guess,
2 in charge of ensuring that these ratings were
3 accurate; is that right?
4 A.    **Yes.**
5        Q.    Do you know if you adjusted any of
6 Ms. Lyde's ratings on this evaluation?
7 A.    **No.  I don't recall.  I don't think so.**
8        Q.    But fair to say that you found
9 Ms. Albandoz's job performance in 2016 as
10 outstanding, right?
11 A.    **Yes.  Based on the ratings, yes.**
12        Q.    And that is the highest rating that
13 exists, right?
14 A.    **Yes.**
15        Q.    So going to the next page, which is
16 Bates stamped City 185 and has a date of
17 September 6, 2017 here, did you fill out this
18 rating?
19 A.    **Yes.**
20        Q.    And at that time, were you
21 Ms. Albandoz's supervisor?
22 A.    **Yes, I was.**
23        Q.    Is that because she had been promoted
24 to a program administrator between the 2016 and 2017

1 evaluations?
2 A.    **Yes, I believe so.**
3        Q.    And were you part of the
4 decision-making team who gave her that promotion?
5 A.    **Yes.  I did sit on that panel, yes.**
6        Q.    And what can you tell me about the
7 decision to give Ms. Albandoz that promotion from
8 social work supervisor to program administrator?
9 A.    **It was a panel, and for full transparency at**
10 **the candidate interviews, I had marked Ms. Albandoz**
11 **as questionable.**
12        Q.    Okay.
13 A.    **Based on the interview.**
14        Q.    And she got the position, correct?
15 A.    **Yes.**
16        Q.    And do you know how she got that
17 position?  What the process was of actually giving
18 her the position?
19 A.    **Everyone on the panel, you know, does their**
20 **candidate profile or interview record, and it's**
21 **submitted to the commissioner based on**
22 **recommendations.**
23        Q.    Right.  And do you remember any
24 discussion about who to promote for that position?

1 A.    **I don't recall.  I don't think there was too**
2 **much discussion.  Whatever was said was pretty much**
3 **recorded on those interview sheets.**
4        Q.    Do you think promoting Ms. Albandoz
5 was the right decision?
6 A.    **Yes.  Time has shown that it was the right**
7 **decision.**
8        Q.    And at that time, do you know whether
9 the Rule of Two was in place?
10 A.    **I believe so.  I believe so.**
11        Q.    So I will go to the next evaluation,
12 dated September 11th, 2018, and you filled out this
13 evaluation, correct?
14 A.    **Yes.**
15        Q.    And then, who would be the person who
16 concurred down here; do you know?
17 A.    **That looks like Commissioner Carney's**
18 **signature.  She would be the one to sign off on the**
19 **Performance evaluations I submit.**
20        Q.    Got you.  So it looks like her
21 evaluation in 2018 is stronger than it was in 2017;
22 is that fair?
23 A.    **Definitely, yes.**
24        Q.    So had she improved in her role from

1  2017 to 2018?
2  **A.     Yes. 2017, you know, you're coming in.**
3  **You're new. There is a lot that you have to grasp**
4  **and learn. And Ms. Albandoz steadily improved, you**
5  **know.**
6  **            Like I said, I didn't even**
7  **realize that she was at that level. I've always**
8  **known her as being outstanding, but I can understand**
9  **there is a learning curve. There is a process. You**
10 **don't come in knowing everything about the position.**
11 **And she was a willing learner to learn everything**
12 **that she needed to learn.**
13     Q.    And I also understand that there is a
14 probationary period with any Civil Service
15 promotion, correct?
16 **A.     Yes.**
17     Q.    Is that six months?
18 **A.     Total, yes. It's about five months,**
19 **29 days. Like six months, yes.**
20     Q.    Do you remember if Ms. Albandoz was
21 ever at risk of not making it through that
22 probationary period?
23 **A.     No risk at all.**
24     Q.    So going to the next page, which is

1  dated September 29, 2019 --
2              MR. SEIDMAN:  September 27th.
3              MR. COHEN:  Sorry. Thank you.
4  BY MR. COHEN:
5      Q.    (Continuing) -- September 27th, 2019,
6  with the Bates stamp of City 182, were you the rater
7  of this evaluation?
8  **A.     Yes, sir.**
9      Q.    And am I correct that this shows she
10 continued on her superior and outstanding
11 job performance?
12 **A.     Yes, that looks like outstanding.**
13     Q.    Right. So it looks to me there's one,
14 two, three superiors and one, two, three, four,
15 five, six, seven outstandings, right? So that would
16 be an outstanding?
17 **A.     Yes, six and seven is the overall rating.**
18     Q.    Where is that?
19 **A.     Down the bottom it says, "Overall Rating."**
20 **That's kind of, like, your overall rating.**
21     Q.    Number --
22 **A.     It's below --**
23     Q.    Sorry. Overall Rating. I see that.
24 Yes?

1  **A.     Yes.**
2      Q.    I understand.
3  **A.     Yes.**
4      Q.    And then did you fill out this top
5  part as well, Comments to Employee?
6  **A.     Yes, sir.**
7      Q.    So it's fair to say on any evaluation
8  that you are the rater, you would have filled out
9  these Comments to Employee?
10 **A.     Yes, sir.**
11     Q.    Did you have an opportunity to provide
12 feedback to Ms. Albandoz as her supervisor?
13 **A.     Yes.**
14     Q.    And how was she at accepting and
15 incorporating feedback from you?
16 **A.     She's receptive. Any new supervisor I have,**
17 **I have weekly one-on-ones with them, just to help**
18 **them, you know, navigate that transition to the new**
19 **assignment. She's been very receptive to**
20 **supervision.**
21     Q.    Going to the next page, this is dated
22 September 3rd, 2020, and with a Bates stamp of
23 City 181, and this is your evaluation of
24 Ms. Albandoz in 2020, correct?

1  **A.     Yes.**
2      Q.    And again, she got an outstanding
3  rating, correct?
4  **A.     Yes.**
5      Q.    How many program administrators do you
6  supervisor at one time?
7  **A.     Two.**
8      Q.    And fair to say it is not -- well, is
9  it difficult to find quality program administrators?
10 **A.     I'm going to say yes.**
11     Q.    And is it critical to your -- would
12 you call it a department? What would you call RTS?
13 **A.     RTS is the department. RTS social service**
14 **is the division, I guess you could say. They're**
15 **division heads. Program administrators are division**
16 **heads. They don't supervisor the entire RTS. They**
17 **supervise the social service department or division**
18 **of RTS.**
19     Q.    Got you. So fair to say that it's
20 critical to RTS to have quality program
21 administrators?
22 **A.     Yes.**
23     Q.    So did you come to understand, between
24 the 2019 evaluation in September and the 2020

1  evaluation in September, that Ms. Albandoz had
2  applied and had been put on a list for a warden
3  position?
4  A.    From my understanding, yes.
5      Q.    How did you come to that
6  understanding?
7  A.    I mean, there is an announcement that goes
8  out and, you know, people apply for it, and you just
9  hear discussions about it.
10     Q.    Right.  Did you ever have a
11  conversation with her about -- let's say back in
12  2020 -- about the fact that she was on the warden
13  list?
14  A.    I don't think I had a conversation, but I
15  always encourage my direct reports to go for any
16  promotion that they are eligible for.
17     Q.    And once you learned that Ms. Albandoz
18  was on the warden promotional list, did you have to
19  do any kind of succession planning?
20  A.    No.  Not at that time, no.
21     Q.    And what would you have to do in order
22  to have replaced Ms. Albandoz?
23  A.    I mean, it's a Civil Service process.  You
24  would have to put out the announcement for the

1  position, and someone would have to apply for it.
2      Q.    So going to the next page of this
3  document -- it is dated September 1st, 2022, and
4  Bates stamped City 180 -- is this the evaluation you
5  did for Ms. Albandoz in 2022?
6  A.    Yes, sir.
7      Q.    And it looks like in this evaluation,
8  she received all outstanding marks; is that right?
9  A.    Yes, sir.
10     Q.    So fair to say she has gotten better
11  at her job every year that you supervised her?
12  A.    Yes, sir.
13     Q.    And I notice at least I don't have a
14  2021 evaluation.  Is that due to covid in some way?
15  A.    I don't recall.  It could be.  I don't
16  recall.
17     Q.    Fair to say, if there had been a 2021
18  evaluation of Ms. Albandoz done by you, you would
19  have rated her outstanding as well?
20  A.    Yes.  I think that was the height of covid,
21  and we did a lot of initiatives during the pandemic.
22  So definitely yes.
23     Q.    And when you say "we," who are you
24  referring to?

1  A.    Myself and all the RTS division heads.
2      Q.    And who would that be?
3  A.    I have two program administrators, a
4  director of volunteer services, a director of
5  chaplainry services, correction entries director, an
6  education director, and a psychological director.
7          MR. COHEN:  I will mark this as
8  Bagby-2.
9          (Whereupon Bagby-2 was marked for
10      identification.)
11  BY MR. COHEN:
12     Q.    And I'm showing you a letter that
13  Ms. Albandoz received on February 21st, 2020,
14  telling her that she passed the examination for the
15  position of warden and that she is ranked number 4
16  on the list.  Do you see that?
17  A.    Yes, sir.
18     Q.    So you said that you encourage your
19  direct reports to continue seeking to be promoted.
20  And am I correct that the natural progression for
21  program administrator is a warden position?
22  A.    Yes.
23     Q.    Was there anything specific you
24  remember doing to encourage Ms. Albandoz to apply

1  for and, you know, try to become a warden?
2  A.    Outside of just normal coaching of the
3  staff.  Just, you know, policy, procedure, be
4  available, be an active supervisor, be on the floor,
5  be a team player, solve problems.
6      Q.    And did she do all the things that you
7  told her she should do in order to get that
8  promotion?
9  A.    Yes.  Ms. Albandoz, as the performance
10  evaluations show, she's been a great employee.
11     Q.    And my understanding is that the
12  warden position, you can be promoted to it from
13  either the program administrator position or the
14  deputy warden position; is that right?
15  A.    Yes.
16     Q.    And in your experience -- I think you
17  said you started in 1996.  So that's, what, 27 years
18  you have been with the PDP?
19  A.    Yes, sir.
20     Q.    In those 27 years, have you seen
21  successful wardens come from the program
22  administrator side?
23  A.    Yes, I have.
24     Q.    Who can you think of specifically?

1  A.    Specifically, Joyce Adams.  She was a social
2  work supervisor when I got here.
3              She was actually an acting
4  program administrator, but she took the test to
5  become a warden.  She became a warden.
6       Q.    Right.  So she did that transition
7  from program administrator to warden?
8  A.    Yes.
9       Q.    Would you say that she was an
10  excellent warden?
11  A.    She was sound.  I mean, I don't know.  I
12  wasn't in a position to supervise her.  She was
13  sound.
14       Q.    And do you think that program
15  administrators can become excellent wardens?
16  A.    Yes.
17       Q.    And do you think that a
18  program administrator needs to have
19  correctional-side experience in order to become a
20  warden?
21  A.    Not necessarily.  I mean, it could help you,
22  but not necessarily.  I mean, you're just in a
23  leadership position, and you have to just select a
24  good, sound team around you.  That's what you have

1  deputy wardens and the like for.
2       Q.    And are there skills that someone from
3  the RTS side may bring to the table that someone
4  from the correctional side perhaps doesn't?
5  A.    Probably the clinical piece and how to deal
6  with the population that we currently have.  You
7  know, it's a very challenging population.  Workforce
8  is a little different, you know, and those clinical
9  skills can come into play.
10              But also, whether we're uniform
11  or nonuniform, we all get trained in the same
12  policies.
13       Q.    What about mindset?  Is there any kind
14  of different mindset, perhaps, from the RTS side
15  than the correctional side?
16  A.    Well, I would think that the RTS side would
17  be more, you know, programmatic and implementing
18  evidence-based programs for the population.
19       Q.    How about kind of views toward
20  reentry?  Is there any kind of different mindset
21  that you would say regarding reentry from the
22  correctional side versus the social service side?
23  A.    I would hope both sides will have the same
24  take on reentry.  But I know from the clinical side,

1  that's usually your focus.  You know, you get an
2  incarcerated person.  You provide them services and
3  resources and hope that they become better citizens
4  once they release here.
5       Q.    Right.  And is the educational
6  requirement to be a supervisor on the social
7  services side higher than it is to be a supervisor
8  on the correctional side?
9  A.    Not being an HR professional, but I would
10  say yes.
11       Q.    And do you think that the educational
12  requirement for the social services side supervisors
13  is important?
14  A.    Definitely, I believe it's important.
15       Q.    And why is that?
16  A.    Because of the nature of the work that
17  you're doing.  You know, you're working in a
18  correctional environment, and your job is to
19  rehabilitate incarcerated persons.  You have to know
20  kind of, like, their -- you know, you have to know
21  behavior, human behavior.
22       Q.    And specifically, do you think it's
23  important for a social services supervisor to have a
24  bachelor's degree?

1  A.    Yes.
2       Q.    And do you think it's important for a
3  program administrator to have a master's degree?
4  A.    Yes.  And actually, as a social work
5  supervisor, you need a master's degree as well.
6       Q.    Is that kind of your same answer that
7  you gave before in terms of why education is
8  helpful, you know, working in a prison?
9  A.    Yes.
10       Q.    And do you have a master's degree?  I
11  guess you do, right?
12  A.    Yes.
13       Q.    Did you have one at the time you were
14  appointed as deputy commissioner?
15  A.    Yes.
16       Q.    Do you think that the requirement for
17  a deputy -- and that's a requirement as a deputy
18  commissioner -- correct? -- to have a master's?
19  A.    Under the previous, I guess, Civil Service
20  process, yes.  But I believe now it's appointment.
21       Q.    Got you.  And I appreciate you are not
22  a human resources professional.
23  A.    Yes.
24       Q.    Fair enough.  So looking at this

1 letter to Ms. Albandoz, do you know who else was on
2 this February 2020 warden list?
3 **A.    Not offhand.  I didn't find out until we**
4 **kind of did it.  I don't know if this is the first**
5 **round.**
6          **No, not offhand.  I don't recall**
7 **everyone.  I know it was Ms. Albandoz, Ms. Lyde.**
8 **Those were my direct reports.**
9    Q.    Is it important for you, as a
10 supervisor of people up for a promotion, to be aware
11 of, you know, the possibility that your direct
12 reports may leave your department?
13 **A.    Yes, I would like to know that.  Sure.  Yes.**
14    Q.    And back in February of 2020, was
15 Ms. Albandoz qualified to be a warden?
16 **A.    Yes.  I mean, she sat for the test, I**
17 **believe; so yes.**
18          MR. COHEN:  I will show you what
19    I will mark as Bagby Exhibit 3, and this has
20    a Bates stamp of City 55.
21          (Whereupon Bagby-3 was marked for
22    identification.)
23 BY MR. COHEN:
24    Q.    Deputy Commissioner Bagby, I'm showing

1 you a memorandum to yourself from Ms. Albandoz,
2 dated February 25th, 2021, requesting approval to
3 change her schedule.  Do you see that?
4 **A.    Yes.**
5    Q.    Were there any issues with this that
6 you saw?  Was there any problem with her request?
7 **A.    No, I didn't see an issue with the request.**
8    Q.    Got you.  It wasn't, like, a trick
9 question.  Sorry.
10 **A.    Yes.**
11    Q.    And was she generally communicative
12 regarding, you know, you guys kind of being on a
13 team?
14 **A.    Yes.  As deputy commissioner, you know, I**
15 **have to set the vision, and it's the**
16 **program administrator's job to kind of carry out**
17 **that vision, so we have to be in communication and**
18 **work together.**
19    Q.    And as deputy commissioner, do you
20 also work directly with wardens?
21 **A.    Yes, I do.**
22    Q.    So is it helpful to you in your role
23 to have wardens that you have a good working
24 relationship with?

1 **A.    Oh, definitely, yes.**
2    Q.    Were you aware that Ms. Albandoz did
3 have experience as a correctional officer?
4 **A.    Yes, I was aware.  I believe I put that on**
5 **the candidate profile.  The interview record, yes.**
6    Q.    You are saying the interview that you
7 conducted of her in December of 2022?
8 **A.    Yes.**
9    Q.    And is that, in your opinion,
10 beneficial?
11 **A.    Yes.  I think it's a plus that she was a**
12 **rank and file in security.  I think that's a plus,**
13 **yes.**
14    Q.    So would the reverse be true?  In
15 other words, if somebody was on the correctional
16 side predominantly, perhaps a deputy warden, would
17 it be a plus if they had experience on the RTS side?
18 **A.    I think that would be a plus, yes.**
19    Q.    And why is that?
20 **A.    It makes you well rounded.  I mean, this is**
21 **a correctional environment that provides services.**
22 **So if you could do the custody and also the provider**
23 **piece, I think that's a plus.**
24    Q.    Have you ever heard anyone say

1 anything negative about Ms. Albandoz?
2 **A.    No.  I don't get involved.**
3    Q.    Got you.  What about in terms of the
4 decision of whether or not that she should --
5 specific to the decision of whether or not she
6 should be a warden?  Was there any criticism that
7 you heard of her?
8 **A.    No.  Not that I recall.**
9    Q.    And if you did hear some criticism
10 like that, do you think that you would have a memory
11 of it?
12 **A.    I probably would.  I don't think they would**
13 **have that discussion around me.  But I probably**
14 **would.**
15    Q.    Would you say that, in current PDP
16 leadership, you are most familiar with
17 Ms. Albandoz's job performance?
18 **A.    In the current leadership?  I'll also say**
19 **that Commissioner Carney is probably familiar**
20 **because she supervised Ms. Albandoz directly.**
21    Q.    So it would be you and
22 Commissioner Carney would be the people most
23 familiar with her job performance?
24 **A.    Yes.  We've supervised her directly, yes, at**

1 different points.
2 Q. And on all of your evaluations of
3 Ms. Albandoz, Commissioner Carney signed off, right?
4 A. Yes.
5 Q. Did she ever push back on any of your
6 evaluations?
7 A. Not that I recall, no.
8 Q. And if she had, I would think there
9 would be some kind of record of that, right?
10 Whether it be in a revised evaluation or something.
11 Is that fair?
12 A. Yes, I wouldn't recall.
13 Q. Fair enough.
14 Now I'd like to ask you about
15 your supervision of Ms. Lyde.
16 A. Yes.
17 Q. You already gave kind of your overall
18 impression. So I will mark this as Bagby Exhibit 4.
19 (Whereupon Bagby-4 was marked for
20 identification.)
21 BY MR. COHEN:
22 Q. I'm going to share my screen.
23 Deputy Commissioner Bagby, I'm showing you Bates
24 stamped numbers 1438 and 1439.

1 I will start with the 2018
2 evaluation of Ms. Lyde. Did you give this
3 evaluation?
4 A. Yes. This looks like when I was a social
5 work supervisor.
6 Q. So fair to say you have been
7 supervising Ms. Lyde for the past 15 years?
8 A. Yes. Off and on, yes.
9 Q. Fair to say you are the -- in PDP
10 leadership, you are the most familiar with
11 Ms. Lyde's job performance?
12 A. I would have to say that, yes.
13 Q. So do you know if this was when you
14 started supervising her in 2008?
15 A. It may have been -- I believe I was a social
16 work supervisor maybe, like, 2005. I don't recall
17 the actual date. But this may be a little later.
18 Q. And you rated her as outstanding,
19 right?
20 A. Yes.
21 Q. And at this point, Ability as
22 Supervisor, you put NA. Is that because as a
23 social worker 2, she was not a supervisor?
24 A. Yes, that's correct.

1 Q. So then, in 2010, this at least is the
2 next evaluation I have of yours.
3 Do you know if there was an
4 evaluation you gave in 2009?
5 A. I don't recall.
6 Q. Fair enough. So here, looking under
7 Comments, just at the end here, you say, "In
8 summary, your overall performance this reporting
9 period has been outstanding. Please continue the
10 excellent work. Good luck with your career
11 advancement if you so choose."
12 So is that kind of one of the
13 things you were saying earlier about trying to
14 encourage your direct reports to seek promotion?
15 A. Yes, which she eventually did.
16 Q. So at this point, she was a social
17 work services manager 2. What would have been the
18 kind of level up for her?
19 A. Social work supervisor.
20 Q. At this time, in 2010, it looks like
21 you were in that position as social work supervisor,
22 correct?
23 A. Yes.
24 Q. And in terms of her, you know, getting

1 promoted to that position, what would be your role,
2 if any?
3 A. I don't recall my part in Ms. Lyde's
4 promotional process.
5 Q. Because?
6 A. Because I was the social work supervisor.
7 So I would have been her colleague when she
8 promoted.
9 Q. I guess my question is, would somebody
10 have come to you and/or did somebody come to you and
11 say, you know, "Hey, we see these evaluations.
12 These are outstanding. I just wanted to maybe have
13 a quick conversation about her and see what you
14 think maybe relative to somebody else," or is it
15 kind of just based off the paper?
16 A. Based off the paper, pretty much.
17 Q. Why is that?
18 A. I don't know.
19 MR. COHEN: So going to the next
20 evaluations, I will mark this as Bagby
21 Exhibit 5.
22 (Whereupon Bagby-5 was marked for
23 identification.)
24 BY MR. COHEN:

Manchello Reporting, L.L.C.
www.ManchelloReporting.com
856-482-7207
loumanchello@manchelloreporting.com

1    Q.    I'm showing you a document Bates
2  stamped -- I guess this is not an evaluation --
3  Bates stamped City 1022, and is this the interview
4  record you filled out for Ms. Lyde?
5    **A.    No, that's not mine.**
6    Q.    Do you know if you were involved in
7  that interview process?
8    **A.    I'm going to say no because I would have**
9  **been a social work supervisor, and she would have**
10 **been promoting to social work supervisor, and we**
11 **were colleagues.**
12   Q.    So it's always at least two levels up
13 who are interviewed for the promotion?
14   **A.    One.    At least one or two, yes.**
15        MR. COHEN:    Okay.  Understood.
16 So I will mark this as Bagby Exhibit 6.
17        (Whereupon Bagby-6 was marked for
18        identification.)
19 BY MR. COHEN:
20   Q.    And this is dated September 5th, 2013,
21 and this is your evaluation of Ms. Lyde once she got
22 the promotion to social work supervisor, correct?
23   **A.    Yes.**
24   Q.    So she continued getting an

1  outstanding rating, right?
2    **A.    Yes.**
3    Q.    It's fair to say not everyone you
4  supervised gets outstanding or superior ratings,
5  right?
6    **A.    No, not everyone, no.**
7    Q.    Going to the next page, City 1420,
8  this is your evaluation of Ms. Lyde in 2014,
9  correct?
10   **A.    Yes.**
11   Q.    And again, she received an outstanding
12 rating, right?
13   **A.    Yes.**
14   Q.    And she also received an outstanding
15 rating in her supervision, right?
16   **A.    Yes.**
17   Q.    So fair to say she has been
18 supervising for over a decade now, correct?
19   **A.    I believe so, yes.**
20   Q.    And what is your overall impression of
21 her as a supervisor?
22   **A.    At the social work supervisor level, as you**
23 **can see, I was always rating her outstanding.  As a**
24 **program administrator, the duties become a little**

1  **bit more complex, but she has been a sound**
2  **supervisor.**
3    Q.    In terms of the two different kind of
4  tracks in the prison -- right?  You've got the
5  correctional side, and then you've got the -- is it
6  fair to say the social services side?  Is that the
7  correct terminology?  RTS side?
8    **A.    Or maybe nonuniform side.  Uniform side,**
9  **nonuniform side.**
10   Q.    Okay.  Got you.  In terms of the
11 uniform versus nonuniform side, on the uniform
12 side -- right? -- you've got deputy wardens, and
13 would the equivalent be the program administrator?
14 Is that, like, a fair comparison position?
15   **A.    I wouldn't say that.  Because, as a**
16 **program administrator, you report directly to a**
17 **deputy commissioner, the same as a warden.**
18        **Previously, as a**
19 **program administrator, you could take the test for**
20 **warden or deputy commissioner.**
21   Q.    Got you.  The program administrator
22 position is at least as high in the kind of
23 organizational hierarchy as the deputy warden
24 position; is that fair?

1    **A.    Yes.**
2    Q.    The next level down from
3  program administrator, would that be social work
4  supervisor?
5    **A.    Yes.**
6    Q.    And would the equivalent on the
7  uniform side be a captain?
8    **A.    Yes.  You could say that, yes.**
9    Q.    In other words, as a captain on the
10 uniform side, you have supervision responsibilities,
11 right?
12   **A.    Yes.**
13   Q.    And as a social work supervisor, you
14 have supervision responsibilities, right?
15   **A.    Yes.**
16   Q.    In terms of evaluating those
17 supervision responsibilities as it pertains to the
18 warden position, would you say that either is more
19 valuable than the other?
20   **A.    I can't put one value over another.**
21   Q.    Let me make sure my question is as
22 clear as I can make it.
23        In comparing, for instance, the
24 captain position on the uniform side and the social

1  work supervisor position on the nonuniform side, and
2  as those supervisor responsibilities of both
3  positions relate to being qualified for a warden
4  position -- okay? You with me? Did I lose you?
5  A.  No. I'm still here. I'm still here, sir.
6  Q.  (Continuing) -- would you say those
7  are equivalent values? In other words, that one is
8  not more valuable the other? You know, supervising
9  on the social services side is not more valuable or
10  less valuable than supervising on -- I apologize.
11         MR. SEIDMAN: Objection to the
12  form.
13         MR. COHEN: Yes.
14         MR. SEIDMAN: Do you want to
15  give it one more shot?
16         MR. COHEN: At least one.
17  BY MR. COHEN:
18  Q.  So is the supervision experience that
19  a social work supervisor receives less valuable than
20  the supervision experience that a captain would
21  receive?
22         MR. SEIDMAN: Objection.
23  A.  I don't know. The duties are different.
24  Q.  And in relation to training for the

1  warden position.
2  A.  I don't know. The duties are different.
3  Q.  I guess I'm asking if you feel you can
4  make a judgment call.
5         Do you feel you can make a
6  judgment call on that?
7  A.  No, because it's just two different duties.
8  You know, I just can't make the connection.
9  Q.  Do you understand the question? It
10  wasn't a very well-worded question.
11  A.  I was trying my best.
12  Q.  I want to give it one more shot, okay?
13  At least.
14  A.  Yes.
15  Q.  So let's do it within the context of a
16  program administrator versus a deputy warden. Okay?
17         Is time spent supervising as a
18  program administrator as valuable as training for
19  the warden position -- okay? -- as training for the
20  warden position to time spent supervising as a
21  deputy warden?
22  A.  No, I could say those are about the same. I
23  would say those are the same.
24  Q.  All right. The position under captain

1  on the uniform side, would that be lieutenant?
2  A.  Yes.
3  Q.  And again, in terms of training for
4  the warden position -- okay? -- in that context, is
5  time spent as a social work supervisor as valuable
6  as time spent supervising as a lieutenant?
7  A.  I think it's the same. Like you said
8  before -- it's different duties. It's kind of
9  similar to when you described captain and social
10  work supervisor. It's different duties.
11  Q.  Right, they are different duties. And
12  so one is ensuring that, I guess, social workers are
13  properly conducting their duties and job
14  responsibilities, right?
15  A.  Right.
16  Q.  And the other, I guess, is ensuring --
17  on the lieutenant level, that would be ensuring that
18  guards, correctional officers, are properly carrying
19  out their job responsibilities?
20  A.  Right. Yes. They have that in common, yes.
21  Q.  So in terms of ensuring that their
22  direct reports -- again, in the context of training
23  for the warden position, is one more valuable than
24  the other?

1  A.  At that level, I would say that the
2  lieutenant probably because you are more involved in
3  the day-to-day operation of a facility where, in the
4  social work supervisor position, you're pretty much
5  concentrating on programs.
6  Q.  Okay. Would you agree with me that
7  supervising employees is a critical part of training
8  for the warden position?
9  A.  Yes. You have to know how to supervise your
10  personnel, definitely.
11  Q.  And, for instance, when Ms. Lyde was a
12  social work supervisor, was that helpful training
13  for her to potentially become a warden?
14  A.  Yes. And also, Ms. Lyde had duties -- as a
15  supervisor, she worked in the work release program,
16  which was pretty, you know, intense for a
17  social work supervisor. So that was a good
18  experience for her, which I believe enabled her to
19  take the program administrator test.
20  Q.  And her involvement in that work
21  release program, was that valuable training in her
22  potentially becoming a warden?
23  A.  I think that would be valuable, yes.
24  Q.  Why?

1          MR. SEIDMAN:  Could we just take
2    a 30-second pause?
3          MR. COHEN:  Sure.
4          (Brief pause.)
5    BY MR. COHEN:
6      Q.    So, Deputy Commissioner Bagby, I think
7    you were explaining why Ms. Lyde's experience and
8    involvement in the work release program was
9    beneficial to her potentially becoming a warden.
10   **A.     In my opinion, when the discussion was for**
11   **Ms. Lyde to go to the work release program, as her**
12   **colleague and also as a shop steward at the time, I**
13   **encouraged her to take the assignment because I**
14   **believed that it would be more -- it would make you**
15   **more well rounded because you are actually -- in the**
16   **work release program, you are in the community. You**
17   **are dealing with providers.  You are dealing with a**
18   **lot of things that a social work supervisor would**
19   **get more exposure to than if you were inside one of**
20   **our facilities.  And I believe that experience**
21   **enabled her to move on to the program administrator**
22   **spot.**
23          **I think it just has to be a**
24   **progression from social work supervisor to**

1    **program administrator that I believe the duties as a**
2    **program administrator prepares you for the next**
3    **steps.**
4      Q.    And that next step would be warden,
5    correct?
6      **A.    Warden or previously, as I said, because I**
7    **was in a situation where I was a**
8    **program administrator, I applied for warden and**
9    **deputy commissioner.  Now it would be warden.**
10     Q.    Got you.  Right.  Fair to say that
11   being a program administrator is good training to be
12   a deputy commissioner?
13     **A.    It happened for me.**
14     Q.    Yes.  Right.  I would expect you to
15   agree with that.
16          MR. COHEN:  I will mark this as
17    Bagby Exhibit 7.
18          (Whereupon Bagby-7 was marked for
19    identification.)
20   BY MR. COHEN:
21     Q.    And this is your evaluation of
22   Ms. Lyde dated July 27, 2015, correct?
23     **A.    Yes.**
24     Q.    And this is your payroll number down

1    here?  2237777?
2      **A.    No.  That's actually someone else's.**
3      Q.    So maybe you didn't give this rating.
4    My mistake.
5      **A.    I was probably her colleague at that time.**
6      Q.    Oh, Ms. Lyde?
7      **A.    Yes.  I was her colleague, probably.**
8      Q.    Got you.  Because at this point, she
9    was a human services program administrator?
10     **A.    Yes.**
11     Q.    And that was also your role at that
12   time?
13     **A.    Yes.  I believe so, yes.**
14     Q.    Got you.  Okay.
15     **A.    And that looks like her fifth-month**
16   **evaluation, which is a probationary period.**
17     Q.    Got you.  Okay.  Date probation ends.
18   Okay.
19          So there is generally -- in
20   addition to a yearly evaluation, there would be a
21   probationary evaluation?
22     **A.    Yes.  For promotions.**
23     Q.    Got you.  So at this point, she had
24   been in that role as the program administrator for

1    approximately six months, fair to say?
2      **A.    Yes.  That looks like a probationary period,**
3    **yes.**
4      Q.    And I guess you would not have been
5    involved in the decision to promote Ms. Lyde because
6    you were her direct supervisor at the time; is that
7    right?  Or were you?  I should ask.  Were you
8    involved in the decision to promote her?
9      **A.    Promote her to what position?  I'm sorry.**
10     Q.    No problem.  To the
11   program administrator position.
12     **A.    No.  I don't think I was a part of that**
13   **process.**
14     Q.    Did you think that she earned that
15   promotion to the program administrator position?
16     **A.    Yes.  I think so, yes.**
17     Q.    And why is that?
18     **A.    She's pretty intelligent, and she had a good**
19   **understanding of that experience of pre-release and**
20   **also post-release from the work release process of**
21   **dealing with people who are incarcerated but pretty**
22   **much close to being in the community.  I think that**
23   **made her a well-rounded candidate.**
24     Q.    Again, to your recollection, nobody

1  came to you, during the decision to promote her to a
2  program administrator, to kind of -- outside of your
3  evaluations, to say, "Hey, you know, what do you
4  know about -- is there anything I should know about
5  her," or anything like that before the decision was
6  made?
7  **A.  No, I don't recall anyone coming to me about**
8  **that.**
9  Q.  And is that protocol in the prison?
10  That there aren't those kinds of conversations about
11  potential promotions?
12  **A.  I mean, maybe I'm just -- I'm not privy to**
13  **those conversations.**
14  Q.  Okay.
15  **A.  I haven't been a part of them.**
16  Q.  Got you.
17      MR. COHEN:  Mark this as Bagby
18  Exhibit 8.
19      (Whereupon Bagby-8 was marked for
20  identification.)
21  BY MR. COHEN:
22  Q.  So this is your evaluation of Ms. Lyde
23  dated September 7th, 2016, right?
24  **A.  Yes.**

1  Q.  And this was your evaluation of her as
2  a program administrator, correct?
3  **A.  Yes.**
4  Q.  So at this point, she had had the job
5  for, like, a bit over a year; is that right?
6  **A.  It looks like it, yes.  Or maybe longer**
7  **because she was my colleague.  So it had to be**
8  **longer.**
9  Q.  Well, I think, going back to 7, it
10  looks like her probationary period ended in
11  July of '15 for the position.
12  **A.  Okay.**
13  Q.  So I guess that's about six months,
14  right?
15  **A.  Yes.**
16  Q.  So at this time, in September of '16,
17  it's about a year and six months, give or take?
18  **A.  Okay.  That's fair to say, yes.**
19  Q.  So you gave her a rating of superior,
20  right?
21  **A.  Mm-hmm.**
22  Q.  Including her supervision of others,
23  right?
24  **A.  Yes.**

1  Q.  And at this point you had kind of
2  recently been promoted to the deputy commissioner
3  position?
4  **A.  Yes.**
5  Q.  In 2016?
6  **A.  Yes.**
7  Q.  Do you remember some kind of learning
8  curve for Ms. Lyde as a program administrator?
9  **A.  I don't think I supervised her when she**
10  **first became program administrator.**
11  Q.  Got you.  So fair to say by the time
12  you began supervising her, she was already a
13  superior program administrator?
14  **A.  I would say, yes.**
15  Q.  And in terms of her supervision of
16  others, as a program administrator, what made her
17  superior?
18  **A.  I'm sorry.  Could you repeat the question?**
19  **Something popped up on the phone.  I am so sorry.**
20  Q.  No problem.  In terms of her
21  supervision of others, as a program administrator,
22  what made her superior?
23  **A.  As a program administrator, she was in the**
24  **options program, which is our substance usage**

1  **program.  And basically, what she had to do was she**
2  **had to supervise, you know, various supervisors at**
3  **different sites, which can be challenging.**
4  Q.  How did she perform in that task?
5  **A.  I think her general skills were superior at**
6  **supervising others.**
7  Q.  I'm going to the next evaluation,
8  dated September 6, 2017.  This was also your
9  evaluation, right?  Or you gave the evaluation, I
10  should say?
11  **A.  Yes.**
12  Q.  And again, you graded her as superior
13  overall, right?
14  **A.  Yes.  There were no major, you know, changes**
15  **or anything that would warrant her to be downgraded.**
16  Q.  And then, again, September of 2019,
17  this is your evaluation of Ms. Lyde in her role as
18  program administrator, correct?
19  **A.  Yes.**
20  Q.  And I didn't see one from 2018.  Do
21  you know if you were her supervisor in 2018?
22  **A.  I believe I was.**
23  Q.  So would you think that there would be
24  an evaluation of her in 2018?

1  A.   It should have been.
2      Q.   In terms of Ms. Lyde's progression, I
3  guess by September of 2019, if she had started in
4  her role as -- if her probation ended in July of
5  2015 for the program administrator position, she
6  would have been in the role nearly five years --
7  right? -- by September of 2019, correct?
8  A.   Yes.
9      Q.   Did you encourage her to seek a
10 promotion from the program administrator position?
11 A.   Yes.
12     Q.   And why is that?
13 A.   If you see potential in someone -- and, you
14 know, I train people to take my position.  And
15 sometimes you will see employees who you believe can
16 kind of, in a selfish way, carry on your tradition
17 of doing things -- you kind of give them the extra
18 push to promote.
19             It's just something I've always
20 done, as you can see from those earlier evaluations.
21 I've always encouraged those who I believe could be
22 good, I guess, employees to the department, I always
23 encouraged them to take the next steps.
24     Q.   And in 2019, for a

1  program administrator, the next step would be
2  warden, right?
3  A.   In 2019, yes.
4      Q.   So when you encouraged her to seek
5  promotion, you were encouraging her to seek the
6  warden position, correct?
7  A.   I say warden or deputy commissioner.
8      Q.   Right.  So, in other words, you think
9  she could do the deputy commissioner position?
10 A.   I would start with the warden first.
11     Q.   Okay.
12 A.   For Ms. Lyde.
13     Q.   But you think she could do the warden
14 position?
15 A.   Yes.
16     Q.   And you thought that back in September
17 of 2019?
18 A.   Yes.
19     Q.   And did you have any conversations
20 with her about, kind of, what it would take for her
21 to do a good job as a warden?
22 A.   No.  Just general conversation I had with
23 any direct report about -- you know, just overall,
24 just being an upper management employee at the

1  prisons.
2      Q.   Was she receptive to your ideas and
3  feedback regarding being upper management in the
4  prison?
5  A.   Yes.  She was receptive, yes.
6      Q.   And does she continue to be receptive
7  to those ideas?
8  A.   Yes.  Yes, she does.
9      Q.   Did she inform you that wanted to
10 be a warden at any point?
11 A.   I think she already told me she didn't want
12 to be a warden.
13     Q.   That she did not want to be a warden?
14 A.   But that's just talk.
15     Q.   Right.
16 A.   As we see.
17     Q.   Did you come to learn that she, in
18 fact, applied to be a warden?
19 A.   Yes.  I think I eventually did see that,
20 yes.
21     Q.   Here is your evaluation with Bates
22 stamp 1072, dated September 10th, 2020, of Ms. Lyde.
23 Do you see that?
24 A.   Yes.

1      Q.   And again, she got an overall rating
2  of superb, correct?
3  A.   Superior, yes, yes.
4      Q.   Superior.  And you had increased her
5  rating of relationship with people to outstanding
6  between 2019 and 2020, correct?
7  A.   Yes.
8      Q.   Do you remember why you made that
9  change?
10 A.   I think it was more her interaction with her
11 subordinates and the members of our team.  You know,
12 communicated a little bit better with them on
13 initiatives and just making sure people, you know,
14 following up.
15             Also "relationship with people"
16 for us talks about how we deal with providers.
17 Because in our RTS, social service, you have to deal
18 with, you know, external providers, and I've always
19 heard good comments from the providers about her
20 interactions with them.
21     Q.   Got you.  And then, I don't see an
22 evaluation in 2021 for Ms. Lyde.  Do you know if one
23 was done?
24 A.   I don't recall.  You know, if it was, it

1 should be there.  I don't recall.
2 Q.    So looking at this document, which is
3 Bates stamped City 1074, this is dated
4 September 1st, 2022, correct?
5 A.    Yes.
6 Q.    And this was your evaluation of
7 Ms. Lyde?
8 A.    Yes.
9 Q.    And fair to say she continued
10 throughout 2021 and 2022 to earn a superior
11 job performance?
12 A.    Yes.  And I believe that was during the
13 height of the pandemic.
14 Q.    How did Ms. Lyde perform during the
15 pandemic?
16 A.    As a team, she was great.  I mean, we did a
17 lot of initiatives during the pandemic, setting up
18 virtual classrooms for the population to, you know,
19 attend classes.  We even introduced wireless
20 cell phones to the social worker so that
21 incarcerated persons could keep in communication
22 with their attorneys.  So we had a lot of
23 initiatives going on during the pandemic.
24 Q.    With regard to her role specifically

1 for those initiatives, how would you classify how
2 she performed?
3 A.    She performed well, yes.  At that time, she
4 had oversight of CFCF, which is our middle intake
5 facility, which is the largest.  So she had a lot of
6 duties over there.  She performed well.
7 Q.    And did her performance reflect well
8 on the RTS side?
9 A.    I don't quite understand the question.
10 Q.    So did Ms. Lyde's contributions to the
11 initiatives during the pandemic reflect or garner
12 positive accolades or recognition, is maybe a better
13 towards the --
14 A.    I believe so, yes.
15 MR. COHEN:  So I will share this
16 as Bagby Exhibit 9.
17 (Whereupon Bagby-9 was marked for
18 identification.)
19 BY MR. COHEN:
20 Q.    This is Bates stamped Plaintiffs 0989.
21 Do you see this letter?
22 A.    Yes, sir.
23 Q.    So it reflects that Ms. Lyde -- it
24 says, "Congratulations, you passed the examination

1 for the position of warden."
2 And she received a score of
3 101.5, correct?
4 A.    From what I see, yes, sir.
5 Q.    Do you know how it's possible someone
6 can get over a hundred on the oral exam for warden?
7 A.    I don't know the ranking system, sir.
8 Q.    Do you think that her ranking as
9 number 1, with the score of 101.5, is relevant to
10 whether or not she is qualified for the position?
11 A.    I would believe so, yes.
12 Q.    And was she excited about this?
13 A.    I don't recall.
14 Q.    So back in February of 2020, was the
15 Rule of Two still in place for Civil Service
16 positions?
17 A.    I believe so.  Like I said, not being an HR
18 professional, but I believe so.
19 Q.    So fair to say that your two
20 program administrators were both on this promotional
21 list, correct?
22 A.    Yes.
23 Q.    And ranked one and four on the list,
24 right?

1 A.    Yes.
2 Q.    Do you feel any pride in that?
3 A.    Oh, definitely, yes.
4 Q.    Why is that?
5 A.    Because those are my direct reports, and I
6 believe that, you know, hopefully, I like to think
7 that I served as a positive role model and a good
8 instructor to help them to move up in this
9 department.
10 MR. COHEN:  Can we take, like, a
11 five-minute break?
12 (Short recess taken at
13 11:22 a.m.)
14 (Proceedings resumed at
15 11:34 a.m.)
16 BY MR. COHEN:
17 Q.    Hi, Deputy Commissioner Bagby.
18 A.    Yes.  Good afternoon.  Good morning.
19 Q.    So in your experience with the
20 Philadelphia Department of Prisons, are people in
21 leadership positions ever put in roles in advance of
22 them -- I'm not phrasing this correctly.
23 I guess what I'm wondering about
24 is shadowing and getting people ready for positions

1 within the prison system and how that works.
2       Can you speak to that a bit,
3 please?
4 **A.   I've heard of it done.  As an outside --**
5 **observed it done.  But I have not, like, been**
6 **directly involved in that.  But there were some**
7 **opportunities where I believe they call it dual**
8 **incumbency.**
9    Q.   And can you think of any examples
10 where dual incumbency was used?
11 **A.   I can't recall directly.  Like I said, I was**
12 **never directly involved in that.**
13    Q.   Are you involved in -- other than the
14 warden position -- any promotional appointments?  I
15 shouldn't use "promotional appointments."  Any
16 promotions?
17 **A.   I would say program administrator, chief**
18 **psychologist, and just some other appointments in my**
19 **division.**
20    Q.   And I guess you haven't done any
21 promotions to program administrator while Ms. Lyde
22 and Ms. Albandoz have been in those positions,
23 correct?
24 **A.   That's correct, yes.**

1    Q.   For the other positions that you are
2 involved in the promotion process, have any
3 promotions been given in the past three years?
4 **A.   That I can recall, I know we promoted a**
5 **chief psychologist.**
6    Q.   Do you know approximately when that
7 was?
8 **A.   It had to have been -- I think the prior**
9 **chief psychologist left right before the pandemic.**
10 **It could have been close to three, three, four years**
11 **ago. I don't recall the exact dates.**
12    Q.   What is the name of the current chief
13 psychologist?
14 **A.   Dr. Lynda Albert.  And also Correctional**
15 **Industries, that would be something I would be**
16 **involved in.**
17    Q.   What is Correctional Industries?
18 **A.   That's Philacor.  That's our vocational**
19 **training program.  We have a division head for that**
20 **as well.**
21    Q.   Was there promotion recently or in the
22 past few years for that?
23 **A.   No, not recently.  The previous director**
24 **left right at -- like, during the pandemic, and it's**

1 **just been someone working out of class.**
2    Q.   What is "working out of class"?
3 **A.   Basically, where, say, there is a supervised**
4 **position open within your division or unit, you can**
5 **kind of work out of class to cover that position for**
6 **a temporary period of time.**
7    Q.   And did that have to be approved by
8 somebody?
9 **A.   Yes, it has to be approved.**
10    Q.   In the case you are referring to
11 with -- I think you said it was a director position;
12 is that right?
13 **A.   Yes.**
14    Q.   (Continuing) -- did you approve that?
15 Was that your responsibility to approve it?
16 **A.   Yes.**
17    Q.   And does that out-of-class position
18 come with a differential in pay?
19 **A.   Yes.  Yes, it does.**
20    Q.   Why is that?
21 **A.   Because you are taking on the duties of**
22 **that, you know, position and responsibilities.**
23    Q.   So fair to say, when someone in the
24 Philadelphia Department of Prisons takes on the

1 duties of a specific job, they should get paid
2 consistent with that job?
3 **A.   Yes.  I believe so, yes.**
4    Q.   Is that also part of a collective
5 bargaining agreement?
6 **A.   I'm not 100 percent certain about that.**
7    Q.   Fair enough.  Is it a fair statement
8 that, on the nonuniform side, there are more women
9 in leadership roles than men?
10 **A.   I would say so.  I believe so.  I don't have**
11 **the actual numbers in front of me, but from me just**
12 **looking at my division heads, it seems like there**
13 **are more staff who happen to be female than staff**
14 **who happen to be male.**
15    Q.   And is that also true in terms of
16 supervisory staff?
17 **A.   Primarily, for many social service, I would**
18 **say yes.**
19    Q.   So if nonuniform staff were not
20 permitted to switch over to promotional
21 opportunities -- well, is a warden a uniform or
22 nonuniform position?
23 **A.   That's a uniform position.**
24    Q.   Specifically, with regards to the

1  warden position, if nonuniform staff were deemed
2  ineligible for the warden position, such as a
3  program administrator -- right? -- would that have a
4  negative impact on female applicants?
5  **A.    If you are saying the program administrators**
6  **that we currently have are two females, it would.**
7      Q.    Right.  And generally speaking, if,
8  you know, leadership positions are filled on the
9  nonuniform side, filled more by women, and not just
10  with regards to Ms. Lyde and Ms. Albandoz, but in
11  general, am I correct that there would be a negative
12  impact on women if people from -- yes, if employees
13  on the nonuniform side couldn't be promoted to
14  warden?
15          MR. SEIDMAN:  Objection to the
16      form.  If you understand ...
17          MR. COHEN:  And I'm happy to
18      rephrase because that was very long, and I
19      kind of got lost myself, I will say.  So let
20      me rephrase that.
21  BY MR. COHEN:
22      Q.    Given that women are more often in
23  leadership roles on the nonuniform side, if wardens
24  cannot come from the nonuniform side, is it fair to

1  say that will negatively impact women's ability to
2  become warden?
3          MR. SEIDMAN:  Objection to the
4      form.  You can answer if you understand the
5      question.
6  **A.    I would have to say on the social service**
7  **side, because that's where a lot of our supervisors**
8  **who happen to be women are, and those would be the**
9  **ones who will promote -- would be in the pipeline**
10  **for program administrator.  I don't want to say**
11  **that's the case for every division, but for social**
12  **service, that could be the case.**
13      Q.    And if those program administrators
14  that come from that pipeline can't progress to
15  warden, would that have a negative impact on women
16  on the RTS side?
17          MR. SEIDMAN:  Objection to the
18      form.  You can answer if you understand the
19      question.
20  **A.    Maybe if it could be asked in a different**
21  **way.**
22      Q.    Sure.  Fair enough.
23          So my understanding of what
24  you've said is that the supervisory positions on the

1  RTS side are predominantly women; is that fair to
2  say?
3  **A.    Social services --**
4          MR. SEIDMAN:  Uniform or
5      nonuniform?  Just let's get the
6      terminology --
7          MR. COHEN:  I'm saying
8      nonuniform.  I'm using them -- I'm kind of
9      interchanging nonuniform and RTS.  Right?
10  BY MR. COHEN:
11      Q.    Are those synonymous?
12  **A.    It would be RTS social service.**
13      Q.    Okay.  So I can stick that that, RTS
14  social service.  Okay?
15          So the supervisory positions in
16  the RTS social services division -- okay? -- those
17  positions -- that's social work supervisor, right?
18  I guess, really, that's the position we are talking
19  about.  I guess I'm asking about social work
20  supervisor.  Okay?  Fair to say that position is
21  predominantly held by women?
22  **A.    Most of our social work supervisors are**
23  **staff who happen to be female, yes.**
24      Q.    And the candidate pool for

1  program administrator comes from the social work
2  supervisor pool?
3  **A.    Yes.**
4      Q.    So if a program administrator gets --
5  I wanted to say "dinged," but maybe there's a better
6  word.  You know, gets -- if there is a negative --
7  sorry.  My brain is failing me.
8          If program administrators are
9  not on equal footing with deputy wardens to get a
10  warden position, does that negatively impact female
11  employees' ability to become warden?
12          MR. SEIDMAN:  Objection to the
13      form.  If you understand what it means to be
14      on equal footing and everything else loaded
15      in that question ...
16  **A.    If I'm to answer, I think it could be asked**
17  **in another form.**
18      Q.    Yes.  Fair enough.  Thank you.
19  **A.    Sorry for the delay.**
20      Q.    No, no, no.  I apologize.  It's on me.
21          So let me do it a different way.
22          If, when making the
23  determination whether or not to promote a candidate
24  who is a program administrator to the warden

1  position, the decision-maker takes away credit for
2  not being on the correctional side -- okay?  You
3  with me?
4  **A.     Yes.**
5          MR. SEIDMAN:  But are you
6      agreeing or are you just with him?
7          MR. COHEN:  Well, I haven't
8      asked a question yet.
9          MR. SEIDMAN:  I just don't want
10     the record to be construed that he agreed
11     with his statement, as opposed to him being
12     with you.
13         MR. COHEN:  It's not a question
14     yet.  It's just an "if."
15         MR. SEIDMAN:  But there was a
16     statement first, and I didn't know whether or
17     not he was agreeing to the statement or he
18     was saying, "Yes, I'm with you."
19         MR. COHEN:  Okay.  Fair enough.
20         MR. SEIDMAN:  I don't want to
21     tangle the record.
22         MR. COHEN:  That's fine.  I get
23     it.
24  BY MR. COHEN:

1      Q.    If an applicant for warden gets less
2  points in the evaluation for not being on the
3  correctional side at all, you know, not coming from
4  the correctional side, will that negatively affect
5  females' ability to become wardens?
6          MR. SEIDMAN:  Objection to the
7      form.  If you understand the question and
8      agree with the assumptions ...
9  **A.     I would request that it can be asked in a**
10 **different manner.**
11         MR. SEIDMAN:  You can always
12     come back to it during a break.
13         MR. COHEN:  I'm going to keep
14     trying, if that's okay.
15  BY MR. COHEN:
16     Q.    So the social work supervisor position
17  is the applicant pool from which the
18  program administrator position comes, correct?
19  **A.     Yes.**
20     Q.    And the social work supervisor
21  position is predominantly women, correct?
22  **A.     At this point in time, yes.**
23     Q.    And has that been true for, let's say,
24  the past five years?

1  **A.     I would say yes.**
2      Q.    And the position directly above
3  program administrator is warden, correct?
4  **A.     At this point in time, yes.**
5      Q.    And that's been true at least since
6  2020, correct?
7  **A.     Yes.  I believe ever since the Charter**
8  **changed, yes.**
9      Q.    Let me ask it this way.  Is it fair to
10 give a warden applicant a demerit because they come
11 from the RTS social services side?
12         MR. SEIDMAN:  Objection to the
13     form.  I don't think he mentioned anything
14     about demerits.
15         MR. COHEN:  Yes, he didn't.  He
16     didn't.  That's true.  I'm asking the
17     question.  I could use a synonym for demerit,
18     I guess.
19         MR. SEIDMAN:  Okay.  Demerit
20     sounds like it's some kind of disciplinary
21     process.
22  BY MR. COHEN:
23     Q.    Let me use a different word.  I'm
24  happy to use a different, maybe less problematic

1  word.
2          Is it fair for a
3  program administrator to have a disadvantage
4  relative to a deputy warden based simply on the fact
5  that he or she is a program administrator, as
6  opposed to a deputy warden?
7          MR. SEIDMAN:  Objection to the
8      form.  If you understand ...  And you can
9      have it read back to you as well, the
10     question, if you'd like.
11         MR. COHEN:  Okay.
12  BY MR. COHEN:
13     Q.    Do you want me to rephrase?
14  **A.     That would be great, yes.**
15     Q.    Yes.  Okay.  So let's say there are
16  two applicants for the warden position.  Okay?  They
17  are equal in all the ways that they can be rated for
18  the position -- okay? -- except that one is a deputy
19  warden and the other is a program administrator.
20  All right?  Should the deputy warden get the
21  position over the program administrator?
22         MR. SEIDMAN:  Objection to the
23     hypothetical.  But go ahead.
24  **A.     Answer?  I'm sorry.**

1  Q.  You can answer.
2      MR. SEIDMAN:  You can answer if
3  you understand.
4  **A.  No, I don't think it should just be based on**
5  **positions.  It probably should be more who the**
6  **candidates are.**
7      Q.  And should any value be given to
8  whether or not a warden candidate is a deputy warden
9  versus a program administrator?
10 **A.  No.  I mean, they were both eligible to take**
11 **the test.**
12     Q.  Thank you everyone for sticking with
13 me on that.
14         Do you remember Warden John
15 Delaney retiring?
16 **A.  Yes, I do.  Yes.**
17     Q.  And if I represent to you that he
18 retired on July 3rd, 2020, does that seem about
19 right?
20 **A.  Or maybe July 4th, 2020.**
21     Q.  Okay.  Do you have a memory of him
22 retiring on the fourth?
23 **A.  Yes.  It just struck me as that was**
24 **Independence Day.**

1      Q.  Okay.  Yes, I guess that would create
2  a memory.  Okay.
3         And did you know in advance of
4  his retirement, at all, that he was going retire?
5  **A.  No, I did not.**
6      Q.  Once he retired, did you have any
7  conversations with Commissioner Carney or the other
8  deputy commissioners regarding who would become the
9  warden of CFCF?
10 **A.  No, I did not.  I don't recall.**
11     Q.  At the time he retired, there were
12 four wardens, right?
13 **A.  I'm not quite sure if it was four.**
14     Q.  So there was Warden Talmadge, correct?
15 **A.  Yes.**
16     Q.  And Warden Giannetta?
17 **A.  Yes.**
18     Q.  And Warden Farrell, correct?
19 **A.  Yes.  Okay.  That sounds right, yes.**
20     Q.  Do you remember any conversations in
21 advance of Warden Delaney's retirement that the
22 Philadelphia Department of Prison really only needed
23 three wardens instead of four?
24 **A.  I do not recall being a part of those**

1  conversations.
2      Q.  I think you said earlier you worked
3  with wardens as part of your job, right?
4  **A.  Yes.**
5      Q.  Does whether or not the Philadelphia
6  Department of Prisons has three versus four wardens
7  impact your job?
8  **A.  It's a possibility, yes.**
9      Q.  And it did go from four wardens to
10 three when Warden Delaney retired, right?
11 **A.  Yes.**
12     Q.  So did that impact your job?
13 **A.  Not directly, no.  Not directly.**
14     Q.  When Warden Delaney retired,
15 Warden Talmadge became the warden of RCF, DC, and
16 ASD, correct?
17 **A.  Yes.**
18     Q.  Have you ever been involved in any
19 conversations about whether or not the
20 Detention Center needed its own warden?
21 **A.  Not that I recall.  I don't think I was a**
22 **part of those discussions.**
23     Q.  Is the Detention Center its own
24 facility?

1  **A.  At this time, it's under the umbrella of**
2  **RCF.**
3      Q.  Do you know when that happened?
4  **A.  I believe around the time that maybe one of**
5  **the wardens retired.**
6      Q.  Would there be any documentation to
7  show that?
8  **A.  I don't have -- I don't recall receiving**
9  **anything or being a part of that process.**
10     Q.  Do you know who made that decision?
11 **A.  I was not directly involved in the process.**
12 **I don't know.**
13         MR. COHEN:  So I will mark this
14 as Bagby Exhibit 10.
15         (Whereupon Bagby-10 was marked for
16 identification.)
17 BY MR. COHEN:
18     Q.  And I'm showing you the sworn
19 declaration of Nancy Giannetta.  And it's a six-page
20 document, starting at Bates stamp Plaintiffs 1015,
21 ending in Plaintiffs 1020.
22         MR. COHEN:  Who was that?
23         MR. SEIDMAN:  That was Alexa.
24         MR. COHEN:  Oh, okay.  Hi,

1     Alexa.
2 BY MR. COHEN:
3     Q.   Looking at this declaration, I will
4 show you the last page with her signature and date,
5 her electronic signature.
6     Going through this, she says, in
7 Paragraph 4, "Each and every time prior to 2020, the
8 warden hired was on an active list from the time the
9 position made available. Never before had a vacancy
10 for warden been left unfilled when there was an
11 active promotional list from which to hire from as
12 that was PDP policy and practice."
13     Do you agree with that
14 paragraph?
15 **A.   Yes, I would agree with that.**
16     Q.   In 5 she says, "It is critical to fill
17 vacant warden positions because you need good
18 leadership and a clear command structure to run a
19 facility in a safe and efficient manner for both
20 staff and inmates."
21     Do you agree with that?
22 **A.   I would agree with that.**
23     Q.   And then 6 she says, "I know from my
24 training at the National Institute of Corrections in

1 Aurora, Colorado, that generally accepted standards
2 in the correctional industry require that a warden
3 lead the institution."
4     MR. SEIDMAN: Objection to form.
5   If you know what her training actually did in
6   helping her ...
7 BY MR. COHEN:
8     Q.   And then at 7 she says, "I also know
9 that a warden is necessary to lead a correctional
10 facility from my more than three decades of
11 experience in the PDP."
12     In Paragraph 10 Warden Giannetta
13 states, "This was too much responsibility for
14 Warden Talmadge due to the numerous issues that
15 arise in each facility on a daily basis. This was
16 especially true in the summer of 2020 given the
17 crisis the PDP was under due to Covid-19. A fourth
18 warden should have been hired from the active list
19 to fill that position."
20     Do you agree with that?
21     MR. SEIDMAN: Objection to form.
22   You can answer if you understand the
23   statement.
24 **A.   Maybe if it could be asked in a different**

1 **manner.**
2     Q.   Sure. In Paragraph 9 -- and I should
3 have given the preceding paragraph. In Paragraph 9
4 Warden Giannetta states, "Warden Cathy Talmadge was
5 the warden of Detention Center (DC) at the time.
6 She was then given site responsibilities for RCF and
7 ASD as well, thereby making her warden of all three
8 facilities."
9     And then in the following
10 paragraph she says, "This was too much
11 responsibility for Warden Talmadge due to the
12 numerous issues that arise in each facility on a
13 daily basis."
14     Do you agree with
15 Warden Giannetta that Warden Talmadge having
16 responsibility as warden for DC, RCF, and ASD was
17 too much responsibility for one warden?
18 **A.   I would not directly know that. I would say**
19 **that, traditionally, they have been separate**
20 **facilities having separate leadership.**
21     Q.   And did you see any reason for that to
22 change?
23 **A.   Only reason I could see was a reduction in**
24 **population.**

1     Q.   Do you know whether or not the PDP
2 budget for the years 2020 through 2023 have a line
3 item for warden for the Detention Center?
4 **A.   I don't have that direct answer to that, if**
5 **that's the correct answer. I'm sorry.**
6     Q.   No, that's fine. I will represent to
7 you -- and I'm happy to show you if you'd like me
8 to. But I will represent to you that they do, that
9 the Philadelphia Department of Prison budget for the
10 years 2020, 2021, 2022, and 2023 have a line item
11 for a warden for the Detention Center. Okay?
12 **A.   Okay. Yes.**
13     Q.   Given that, do you see any reason to
14 not have a warden specifically assigned to the
15 Detention Center?
16     MR. SEIDMAN: Objection to form.
17   You can answer.
18 **A.   Can it be asked in another manner?**
19     Q.   Sure. Always. Yes.
20     So the Detention Center has a
21 position for warden paid for by the City for 2020
22 through the current year, 2023. Okay? Given that,
23 and given that the Detention Center has not closed
24 during your tenure with the PDP -- correct?

1    A.    That's correct, yes.  It was -- I think it
2  was depopulated but not decommissioned.
3        Q.    And given the issues at all of the
4  facilities during covid, do you see a reason to take
5  a warden position away from the Detention Center?
6              MR. SEIDMAN:  Objection to form.
7        You can answer.
8    A.    Not at that time.
9        Q.    How about at any other time while the
10 position continues to be funded?
11   A.    The only reason I can say is that if the
12 population goes down to a point where you don't need
13 those facilities, I can understand that.
14       Q.    Right.  Like, the House of Corrections
15 closed, so it did not need a warden, correct?
16   A.    Yes.
17       Q.    You agree with me that the
18 Detention Center did not close throughout covid,
19 correct?
20   A.    There was -- I'm not too sure, but there was
21 a point where it was depopulated, but it was never
22 decommissioned.
23       Q.    Currently, do you know approximately
24 how many inmates are in the Detention Center?

1    A.    I had not had the opportunity to look at the
2  census sheet this morning.  Each morning we do get
3  the census sheet that lets us know how many
4  individuals are in the facilities.
5        Q.    How was the Detention Center used
6  during covid?
7    A.    Maybe there is another way to ask that
8  question.  I'm not quite clear.
9        Q.    Who was housed in the
10 Detention Center, let's say, in 2020 and 2021?
11 Which group of inmates or classification of inmates?
12   A.    I guess male inmates, IPs.
13       Q.    And what does IP stand for?
14   A.    Incarcerated persons.
15       Q.    And Warden Talmadge stated that she
16 should not have the responsibility of Riverside
17 Correctional Facility, the Detention Center, and
18 ASD.  Do you think that opinion should have been
19 listened to?
20             MR. SEIDMAN:  Objection to form.
21       Did we lose you, Deputy
22 Commissioner Bagby?
23             THE WITNESS:  Yes, I lost you on
24 my screen.  I'm on my wireless device and I

1  lost you.
2              MR. SEIDMAN:  Are you able the
3  hear the question?
4              THE WITNESS:  Yes, I can hear
5  you.
6              MR. SEIDMAN:  Noah, do you want
7  to go on like this, or do you want to wait
8  until --
9              MR. COHEN:  Can you see the
10 screen?
11             THE WITNESS:  No.  I lost my
12 picture.  Like I said, I'm on my wireless
13 device because I wanted to be in a more
14 private office, which, unfortunately, doesn't
15 have a computer that works.  So I was using
16 my wireless device, and somehow I lost you on
17 the screen.
18       (Discussion off the record)
19 BY MR. COHEN:
20       Q.    Let me reask my question.
21       So if Warden Talmadge, acting as
22 warden for RCF, DC, and ASD, expressed concern that
23 she was essentially spread too thin, and there was
24 an approved budget for a fourth warden, is that a

1  reason why there should have been a fourth warden in
2  the PDP?
3              MR. SEIDMAN:  Objection to form.
4        You can answer, if you know.
5    A.    Maybe it could be asked a different fashion.
6        Q.    I guess the question really is, does
7  Warden Talmadge's opinion of whether there should be
8  four versus three wardens carry any weight, in your
9  opinion?
10             MR. SEIDMAN:  Objection to form.
11   A.    Maybe it could be asked in another fashion.
12             MR. COHEN:  Sure.  That's fine.
13       So I will mark this as Plaintiff's Exhibit
14 11.
15       (Whereupon Bagby-11 was marked for
16       identification.)
17 BY MR. COHEN:
18       Q.    And this is the declaration of
19 Cathy Talmadge, and it is a four-page document,
20 signed by Ms. Talmadge, August 23rd, 2023.  Do you
21 see that?
22   A.    Yes.
23       Q.    And so going to the beginning, she
24 says, in Paragraph 3, "At the time I retired I was

1 running three separate facilities as warden:
2 Riverside Correctional Facility, the
3 Detention Center, and the Alternative and Special
4 Detention --" I guess that should be unit, right?
5 **A.    Yes. ASD.**
6 Q.    Okay.  Do you agree with that
7 paragraph?
8 **A.    As far as what she is saying that she was**
9 **running three separate facilities?**
10 Q.    Yes.
11 **A.    As warden?  I believe that is true, yes.**
12 Q.    And then, next she says, "I expressed
13 my belief that the PDP should hire additional
14 wardens."
15        Did she ever express that belief
16 to you?
17 **A.    I don't think I was part of those**
18 **discussions.  I don't recall.**
19 Q.    And then she says, "Frankly, it was
20 ridiculous and a mess for me to be the warden of
21 three separate facilities, especially since the 2021
22 PDP budget accounted for four separate warden
23 positions."
24        So what is your opinion about

1 that statement?
2        MR. SEIDMAN:  Objection to form.
3 **A.    I myself have not looked at that in the**
4 **budget.**
5        **Can you still hear me?  I'm**
6 **sorry.**
7 Q.    Yes, I can hear you.  I'm just opening
8 up the 2021 and '22 and '23 budgets, just to show
9 you.
10        MR. COHEN:  And I will mark this
11 as Plaintiff's Exhibit 12.
12        (Whereupon Bagby-12 was marked for
13 identification.)
14 BY MR. COHEN:
15 Q.    And this, do you agree, is the 2021
16 operating budget for the Philadelphia prison system?
17 **A.    Yes.**
18 Q.    Looking at the budget, do you agree
19 that RCF has a budget position for the warden?
20 **A.    From what I see, yes.**
21 Q.    And same is true for the
22 Detention Center?
23 **A.    From what's presented here, yes.**
24 Q.    On the next page, also for PICC?

1 **A.    Yes.**
2 Q.    And CFCF?
3 **A.    Yes.**
4        MR. COHEN:  And then going to
5 the '22 operating budget, which I will mark
6 as Bagby-13.
7        (Whereupon Bagby-13 was marked for
8 identification.)
9 BY MR. COHEN:
10 Q.    There is a budget position for the RCF
11 warden, correct?
12 **A.    Yes, I see.**
13 Q.    And Detention Center warden?
14 **A.    Yes.**
15 Q.    And then also PICC warden?
16 **A.    Yes.**
17 Q.    And also a warden for Curran-Fromhold
18 Correctional Facility?
19 **A.    Yes.**
20 Q.    And then marking Bagby Exhibit 14,
21 this is the 2023 prison budget, correct?
22 **A.    From what I see, yes.**
23        **(Whereupon Bagby-14 was marked for**
24 **identification.)**

1 BY MR. COHEN:
2 Q.    And this budget also has a funded
3 position for the warden of RCF, right?
4 **A.    Yes.**
5 Q.    And also for the Detention Center?
6 **A.    Yes.**
7 Q.    And also for PICC?
8 **A.    Yes.**
9 Q.    And also for Curran-Fromhold?
10 **A.    Yes.**
11 Q.    So given the 2021, 2022, and 2023
12 budget showing that there is a warden position paid
13 for for the Detention Center, do you think there
14 should be a warden for the Detention Center?
15        MR. SEIDMAN:  Objection to form.
16 I think it's budgeted for, not paid for.
17        MR. COHEN:  Okay.  Fair enough.
18 I will rephrase.
19 BY MR. COHEN:
20 Q.    Given that the 2021 through 2023
21 principal budget includes positions for the warden
22 of the Detention Center, do you think the
23 Detention Center should have its own warden?
24 **A.    I mean, it's hard for me to answer that**

1 question because I'm not involved in the discussions
2 on why those decisions were made.
3     Q.   Right. How come you aren't included
4 in those discussions?
5     A.   I really can't give you a good answer on
6 that.
7     Q.   In your position as deputy
8 commissioner, shouldn't you be included in a
9 discussion of whether or not the Detention Center
10 should have its own warden?
11     A.   I think we all should be a part of that
12 discussion, yes.
13     Q.   And when you say, "we all," are you
14 referring to all three deputy commissioners?
15     A.   Yes.
16     Q.   And if you had been included in that
17 discussion, given that the position is budgeted,
18 what would your opinion have been?
19         MR. SEIDMAN: Objection to form.
20     You can answer if you understand.
21     A.   If it was budgeted, you know, I would want
22 to know the justifications. But if it wasn't
23 needed, I would want to know the justifications as
24 well.

1     Q.   And in 2020, once covid happened, and
2 2021, is it fair to say that the prison needed as
3 much leadership as possible?
4     A.   Good leadership, yes.
5         MR. SEIDMAN: Objection. That's
6     fine. That's fine.
7 BY MR. COHEN:
8     Q.   Good leadership, yes.
9         And would Adrienne Lyde have
10 been a good leader for the warden position in 2020
11 and 2021?
12     A.   It's hard to answer that because it's kind
13 of like trying to predict. What I will say is that,
14 in the process, there is a probationary period, and
15 that is your opportunity to show if you are capable
16 of doing the job or not. That's what the -- from my
17 understanding, that's what that probation period is
18 for.
19         So anyone who is newly promoted
20 goes through that probationary period. And that's
21 kind of like when you would make that evaluation
22 whether they would be permanent or not.
23     Q.   So given that there is that hedge --
24 is it fair to call the probationary period a hedge?

1     A.   I don't understand how you're using the term
2 "hedge."
3     Q.   Fair enough. I guess the way I was
4 thinking of it is, like, if it doesn't work out,
5 you've got an out, right? If the person isn't doing
6 a good job as warden, or in any position with a
7 probationary period, that probationary period gives
8 you that, kind of, off-ramp, shall we say, where
9 they don't stay in the position, right?
10     A.   Yes, sir.
11     Q.   So given that, did Adrienne Lyde
12 deserve a chance as warden in 2020 and 2021?
13         MR. SEIDMAN: Objection to form.
14     You can answer.
15     A.   Can it be asked in another -- rephrased in
16 another way?
17     Q.   Sure. I will come back to it. That's
18 fine.
19         So going back to
20 Warden Giannetta's declaration, which I believe is
21 marked as P-10, I will --
22         MR. SEIDMAN: Bagby-10, right?
23         MR. COHEN: Bagby-10.
24 BY MR. COHEN:

1     Q.   She states, starting in Paragraph 11,
2 "In August, 2021, I retired due to the lack of
3 support I experienced from Commissioner Carney after
4 several tragic events in CFCF that included deaths."
5         Does that -- and I'm not asking
6 about the reason she retired. But just in terms of
7 the timing, does August, 2021, comport with your
8 understanding of when she retired?
9     A.   I believe so.
10     Q.   And then in the next paragraph, she
11 says, "I was not permitted to provide any input into
12 who would replace me as the warden of CFCF."
13         And then in the following
14 paragraph, she says, "A warden should have been
15 hired from the active list immediately to replace me
16 as the warden of CFCF due to the nature of the
17 facility and it is the main intake facility and,
18 even more so than other facilities, requires the
19 leadership that a warden provides."
20         Do you agree with Paragraph 13
21 of Warden Giannetta's declaration?
22     A.   I will say CFCF is your flagship facility.
23     Q.   Right. And do you agree with her
24 statement that it requires a warden?

1  A.   Oh, definitely CFCF requires a warden, yes.
2     Q.   Right. And Steven Angelucci took over
3  the duties and responsibilities of warden for CFCF,
4  correct?
5  A.   Yes. From my understanding, yes.
6     Q.   And do you know when he took over
7  those duties and responsibilities?
8  A.   I don't recall the actual date.
9     Q.   How about kind of in relation to
10  Warden Giannetta's retirement?  Do you know if it
11  was within a certain period of time?
12  A.   Yes, it was a period of time where I
13  think -- well, most of the wardens had probably
14  retired and the facilities were being ran by
15  deputy wardens.
16     Q.   Right. So my question is, in regards
17  to CF, Steven Angelucci was the deputy warden
18  running that facility, right?
19  A.   Yes.
20     Q.   In terms of when he began running that
21  facility, is there any time frame that you can put
22  on that?
23  A.   No. I don't recall.  It was just so many
24  things happening during the pandemic.

1     Q.   Were you involved in any conversations
2  about deputy warden at the time Angelucci taking
3  over the duties and responsibilities of the warden
4  position?
5  A.   I don't recall being a part of the planning.
6  Maybe the announcement.  But not -- I don't recall
7  being a part of the planning process.
8     Q.   Should you have been a part of the
9  planning process?
10  A.   At the position of deputy commissioner, I
11  think we -- yes, we all should have had a seat at
12  the table.
13     Q.   And at the time of Warden Giannetta's
14  retirement, there was an active warden list, right?
15  A.   I believe so, yes.
16     Q.   And both Ms. Lyde and Ms. Albandoz
17  were on that list, right?
18  A.   I believe so, yes.
19     Q.   And Ms. Bowers was as well, correct?
20  Jessica Bowers?
21  A.   I believe so, yes.
22     Q.   When there is an active list for a
23  promotion, under prison policy, should the members
24  of that list be interviewed for the position?

1  A.   Yes. I believe so, yes.
2     Q.   And if you had been given a seat at
3  the table, would that have been your opinion?
4  A.   Yes. Vacancies, you go to the active list,
5  and you start the process, yes.
6     Q.   And at that time, in August of 2021,
7  the Rule of Two was still in place, correct?
8  A.   Yes.
9          May I shut my door real quick,
10  please? I'm sorry.
11     Q.   Yes.
12  A.   Oh, you thank, Captain. Someone got it for
13  me. Thank you.
14     Q.   So just to ask that again.  In August
15  of 2021, the Rule of Two was still in place,
16  correct?
17  A.   I believe so, yes.
18     Q.   And what that would mean is that the
19  top two members of the promotional list would be
20  interviewed and one person would be chosen for the
21  position, correct?
22          MR. SEIDMAN: Objection to form.
23     You can answer if you understand the
24     question.

1  A.   Can you --
2     Q.   Let me ask you this. I will just ask
3  you. How would the Rule of Two work in regards to
4  the warden list for promotion back in August of
5  2021?
6  A.   From my understanding, not being an HR
7  professional, you interview, and then, based on the
8  interview, you make a selection.
9     Q.   And fair to say that the people
10  interviewed would be the top two people on the list?
11  A.   Unless one of them declined.  Then you kind
12  of move down the list.  That has happened.  But most
13  times it's based on, I guess, how many vacancies you
14  have and how many people on the list, but definitely
15  starting with the number 1 and number 2.
16     Q.   And do you know approximately when it
17  shifted from Rule of Two to Rule of List?
18  A.   I don't know. I know that seemed like it
19  was a central HR thing.  And it was in the paper.
20  It was an announcement.  I'm not sure of the date.
21     Q.   Was there any notice given to -- did
22  you know ahead of time that that was going to
23  happen?
24  A.   I've heard of it, but I can't recall if

Manchello Reporting, L.L.C.
www.ManchelloReporting.com
856-482-7207
loumanchello@manchelloreporting.com

1  there was like, you know, official documentation
2  that was provided. I don't recall that.
3      Q.   So at the time, Deputy Warden
4  Angelucci took over site responsibilities for CFCF,
5  correct?
6  A.   At what time? I'm sorry.
7      Q.   Sorry. Good question. When
8  Warden Giannetta retired.
9  A.   I believe so. I do not know the actual
10  exact date, but that would be a progression.
11      Q.   Was there an announcement that he was
12  taking over?
13  A.   I'm not 100 percent sure, but I think there
14  was something that went out letting everyone know
15  that the deputy wardens would have site
16  responsibility.
17      Q.   And were they paid out of class?
18  A.   I --
19          MR. SEIDMAN: Just don't guess
20      if you don't know. It sounded like your
21      previous question you weren't sure either.
22          MR. COHEN: Please don't direct
23      the witness.
24          MR. SEIDMAN: I don't want him

1      to guess. It's not going to help anyone.
2          MR. COHEN: Okay. I assume he
3      has been deposed many times and he
4      understands. But please -- yes.
5  BY MR. COHEN:
6      Q.   Deputy Commissioner Bagby, can I
7  repeat the question, please?
8  A.   Yes.
9      Q.   You understand prison policy, correct?
10  A.   Yes.
11      Q.   So given that Deputy Warden Angelucci
12  was doing the job of warden for -- well, let me ask
13  you.
14          Did Deputy Warden Angelucci,
15  while he was a deputy warden, do the warden job of
16  CFCF?
17  A.   Yes, he did. Yes.
18      Q.   Given that, should he have been paid
19  out of class?
20  A.   In my assessment, I believe so.
21      Q.   Is that true for Deputy Warden
22  Lacombe?
23  A.   In my assessment, I believe so.
24      Q.   And is that also true for Deputy

1  Warden Norman Williams?
2  A.   In my assessment, I believe so.
3      Q.   Do you know whether those three
4  deputy wardens were paid out of class?
5  A.   Not directly. I don't have -- I don't know
6  what they were paid, no.
7      Q.   Warden Talmadge -- do you know
8  approximately when Warden Talmadge retired?
9  A.   Not exactly, no.
10      Q.   So going to her declaration, which is
11  a marked exhibit in this matter, looking at the
12  second paragraph --
13          MR. SEIDMAN: Could you share
14      the screen?
15          MR. COHEN: Oh, sorry. Yes.
16  BY MR. COHEN:
17      Q.   Ms. Talmadge states in her sworn
18  statement that she retired in September of 2021 as
19  warden. Do you see that?
20  A.   Yes.
21      Q.   Does that comport with your
22  recollection of approximately when she retired?
23  A.   I'm pretty sure she would put the accurate
24  date on there, yes.

1      Q.   Yes. And Deputy Warden Lacombe took
2  over site responsibilities for RCF, DC, and ASD,
3  correct?
4  A.   Yes. That was the progression, yes.
5      Q.   And at that time, there was an active
6  list for the warden position, correct?
7  A.   I believe so, yes.
8      Q.   And when there is an opening such as
9  there was when Warden Talmadge retired, the proper
10  procedure is to go to the list to interview,
11  correct?
12  A.   Yes, that's historically how it was done.
13      Q.   And that's how it should be done,
14  correct?
15          MR. SEIDMAN: Objection to form.
16  BY MR. COHEN:
17      Q.   Do you think that's how it should be
18  done?
19  A.   Yes. My opinion, yes.
20      Q.   And why is that?
21  A.   I mean, that's just how it is. If there's a
22  vacancy and you have a list of candidates, then
23  that's where you draw your applicants from.
24      Q.   And is it sometimes the case that a

1    list of candidates is made up entirely -- let me say
2    it this way.  Strike that.
3              Have you ever seen a list made
4    up entirely of unqualified applicants?
5    A.    No.  If they were unqualified, they probably
6    wouldn't make the list.
7         Q.    So the fact that a candidate is on the
8    list, does that mean they are, by definition,
9    qualified?
10             MR. SEIDMAN:  Objection to form.
11        You can answer.
12   A.    They were qualified to take the test to get
13   on the list, yes.
14        Q.    In September of 2021, I will represent
15   to you that the list for warden was made up of
16   Adrienne Lyde in the number 1 position,
17   Jessica Bowers in the number 2 position, and
18   Jennifer Albandoz in the number 3 position.  Okay?
19   A.    Yes.
20        Q.    Given that representation, who should
21   have been interviewed for the open warden positions?
22             MR. SEIDMAN:  Objection to form.
23        You can answer.
24   A.    Can you restate or rephrase your question?

1         Q.    Yes.  Do you know who Rodica Craescu
2    is?
3    A.    Yes.
4         Q.    Do you know whether she was on the
5    February, 2020 promotional list for warden?
6    A.    No, I'm not aware of that.
7             MR. COHEN:  So I can show you
8        that document.  I will mark this Bagby-15.
9        (Whereupon Bagby-15 was marked for
10       identification.)
11   BY MR. COHEN:
12        Q.    Bagby-15 is a two-page document Bates
13   stamped City 6020 to 21.  Do you see that?
14   A.    It was on there.  But I did see it.
15        Q.    Yes.  The second page is just this E,
16   really.
17   A.    Okay.  Yes.
18        Q.    But the first page is the warden list,
19   stating that it expires February 20th, 2022.  Do you
20   see that?
21   A.    Yes.
22        Q.    Do you know whether or not
23   Rodica Craescu had resigned by August of 2021?
24   A.    I know she resigned.  I just don't know the

1    actual date.
2         Q.    So I will represent to you that by
3    August of 2021, she had retired.  Okay?
4    A.    Okay.  Yes.
5         Q.    Given that, when Wardens Talmadge and
6    Giannetta retired in August and September of 2021,
7    what should have happened in regards to filling
8    those positions?
9    A.    From my assessment, if there was two
10   vacancies, I would have went to the list to look for
11   candidates.
12        Q.    And then what would happen once you go
13   to the list?
14   A.    You would probably look at -- if it was two
15   vacancies, you may look at -- what? -- the top
16   three.
17        Q.    And would those women be interviewed?
18   A.    Not being an HR professional, I believe so,
19   yes.
20        Q.    And at that time, was Adrienne Lyde
21   ready to be a warden?
22   A.    In my assessment, I would say yes.  As I
23   stated earlier, you always had a probationary
24   period.

1         Q.    Same question in regards to
2    Jessica Bowers.
3    A.    I've not supervised Major Bowers directly,
4    but everything that I know of her or have heard of
5    her and what I observed as my time -- oh, actually,
6    you know what?  When I was deputy commissioner, she
7    was an EAP.
8             So I did supervise her for a
9    little bit of time.  I think she would have been a
10   good candidate as well.
11        Q.    So she was ready to be a warden at
12   that time?
13   A.    I believe so.  And like I say, you also
14   always had that probationary period to see if that
15   person is cut out for the position, yes.
16        Q.    Same question in regards to
17   Ms. Albandoz.
18   A.    Yes, same response.  She would have been
19   prepared.
20        Q.    I'm going back to Warden Giannetta's
21   declaration.  In Paragraph 21 Warden Giannetta
22   states, "Back in 2019, while I was warden at RCF, I
23   remember going to Samuels & Son Seafood Market with
24   then-Deputy Warden Pierre Lacombe's wife,

1  Rina Lacombe.  At the time, Mr. Lacombe was my
2  deputy warden in charge of administration.
3              "Paragraph 22.  Rina asked me
4  why Pierre could not be a warden?
5              "23.  I told her because he did
6  not have the education credentials.
7              "24.  She responded,
8  'Deputy Commissioner Clark was going to look out for
9  Pierre and take care of him by making him a
10 warden.'"
11             Is there anything problematic in
12 those four statements from Warden Giannetta?
13             MR. SEIDMAN:  Objection to form,
14     as to the word "problematic."
15 A.     Can that be asked in another way?
16     Q.     Sure.  The warden position as of 2020
17 required a bachelor's degree, right?
18 A.     I believe so, yes.
19     Q.     Same is true in 2021, right?
20 A.     I don't know if it's a bachelor's or a
21 master's.  Like I said, I'm not the HR professional.
22     Q.     Fair enough.
23             MR. SEIDMAN:  We are creeping up
24     on 1:00 o'clock.  Do you have a plan for, I

1  guess, when we break for lunch?  Or do you
2  not have much more?  How do you want to
3  handle it?
4              MR. COHEN:  How about if we
5      took, like, 20 minutes.  Does that work for
6      people?  Or 30.
7              MR. SEIDMAN:  Deputy
8      Commissioner, is 20 minutes enough time for
9      lunch for you?
10             THE WITNESS:  That will be fine,
11     sir, yes.
12             MR. COHEN:  What if we said,
13     like, 1:20?
14             MR. SEIDMAN:  That's fine.
15     You want to stop now?
16             MR. COHEN:  Yes, that works for
17     me.
18             (Luncheon recess taken at
19     12:53 p.m.)
20             (Proceedings resumed at
21     1:26 p.m.)
22 BY MR. COHEN:
23     Q.     So, Deputy Commissioner Bagby, have
24 you, in your career as deputy commissioner, been in

1  charge of operations?
2  A.     Hello.
3      Q.     Let me reask that, I guess.
4              As deputy commissioner, have you
5  been in charge of operations?
6  A.     I will say, earlier in my assignment, the
7  deputy commissioner of administration and the deputy
8  commissioner of operations, I think they were of
9  retirement age, and they utilized some time, and
10 there were periods of time where I was the deputy
11 commissioner covering a lot.
12     Q.     When, approximately, was that?
13 A.     That was probably early in my appointment.
14     Q.     Got you.  And I think you said at some
15 point you supervised Ms. Bowers?
16 A.     Yes.  She was the EAP -- employee assistance
17 program -- director, which at that time was under
18 this office.
19     Q.     How long did you supervise her?
20 A.     It was not a very long period of time
21 because I believe that she had promoted out of that
22 position and went on to a facility.
23     Q.     And as her supervisor, how would you
24 rate her job performance?

1  A.     I wasn't, like, her direct supervisor, but
2  like I said, the EAP came under my provision.  As
3  the EAP officer, she was great.  She was very
4  responsive.  Her job was to kind of do the briefings
5  after staff critical incidents.  She was great.  She
6  was good.
7      Q.     Did you ever hear any anything
8  negative about Ms. Bowers?
9  A.     No.  I do my best to stay out of that.
10     Q.     Right.  Right before we broke for
11 lunch, I had shown you some paragraphs, and I will
12 open that back up.  So specifically Paragraphs 21
13 through 24 of Warden Giannetta's declaration.
14             So Mr. Lacombe did become
15 warden, correct?
16 A.     Yes.  He's currently warden, yes.
17     Q.     He, in order to become warden, he had
18 to get on the promotional list for warden, correct?
19 A.     I believe so, yes.
20     Q.     And he was announced as warden in
21 December of 2022, right?
22 A.     I don't have the exact date.
23     Q.     Fair enough.  Do you know whether or
24 not, on the list that Warden Lacombe was on, there

1  was a requirement for a bachelor's degree or not?
2  **A.      From my recollection, the specs had been**
3  **revised.**
4           MR. COHEN:  So I will mark this
5      as Bagby Exhibit 16, with a Bates stamp of
6      Plaintiffs 1 through 4.
7           (Whereupon Bagby-16 was marked for
8      identification.)
9  BY MR. COHEN:
10     Q.     And I will direct your attention to
11  page 3.  And this is for the warden, correct?
12 **A.      Yes.  From what is being presented, yes.**
13     Q.     And on the fourth page it shows that
14  this qualification for warden was last revised in
15  2014, right?  Do you see that?
16 **A.      Yes.**
17     Q.     And then on the third page under the
18  Educational Requirement, it states that a bachelor's
19  degree is required, correct?
20 **A.      Yes.**
21     Q.     And then I will mark this as Bagby-17.
22           (Whereupon Bagby-17 was marked for
23      identification.)
24 BY MR. COHEN:

1      Q.     And this is also a four-page document.
2  And this is Bates stamped Plaintiffs 0022 through
3  25.  And then, here at the end here, it states that
4  these qualifications were last revised in April of
5  2022, right?
6  **A.      Yes.**
7      Q.     Per this document.
8  **A.      Yes.**
9      Q.     And then under Education, there are
10  two options, right?
11 **A.      Yes.**
12     Q.     So fair to say that, in order to
13  qualify for the warden position after this revision,
14  you did not need a bachelor's degree?
15 **A.      Yes, I see that.**
16     Q.     Do you think that a warden should have
17  a bachelor's degree?
18 **A.      In my opinion, yes.**
19     Q.     Why is that?
20 **A.      I believe that that higher level education**
21 **just makes you a well-rounded individual.  There's**
22 **certain things that you learn in school that you**
23 **might not learn in the correctional environment.  I**
24 **believe that there was a reason why those before us**

1  **made that requirement.**
2           **At one point, you didn't need**
3  **that level of education, but then later on you did.**
4  **I think they did it to make it a more**
5  **professionalized type of position.**
6      Q.     And were you involved at all in the
7  decision to change the specifications regarding the
8  educational requirement for warden?
9  **A.      I don't recall.**
10     Q.     If you had been, would you have
11  expressed the opinion you just expressed, you know,
12  two questions ago?
13 **A.      I would have stated that that educational**
14 **requirement is something that's required or**
15 **necessary.**
16     Q.     The bachelor's degree?
17 **A.      Yes.  I thought it was a master's degree,**
18 **but it's actually a bachelor's degree.**
19     Q.     Right.  And in order to be a
20  program administrator, you actually need a master's,
21  right?
22 **A.      Yes.  I believe so, yes.**
23     Q.     Is there any benefit for a warden
24  having a master's degree, as opposed to merely a

1  bachelor's degree?
2  **A.      No.  I think, in my opinion, a warden having**
3  **a bachelor's would suffice.  Based on that level of**
4  **education and the experience that they have, I think**
5  **that would suffice.**
6      Q.     Do you happen to know whether the
7  three individuals initially chosen -- well, the
8  three people chosen to be promoted to warden were
9  Deputy Wardens Lacombe, Williams, and Angelucci,
10  correct?
11 **A.      At that time, yes.**
12     Q.     And that's back in 2022, right?
13 **A.      Yes.**
14     Q.     And Warden Williams did not make it
15  through his probationary period, correct?
16 **A.      That is correct, yes.**
17     Q.     And Warden Patterson,
18  Earicka Patterson, took that position, right?
19 **A.      Yes.**
20     Q.     Do you know whether or not
21  Norman Williams, Pierre Lacombe, and
22  Steven Angelucci have a bachelor's degree?
23 **A.      I don't directly know their educational**
24 **levels.**

1    Q.    So going back to Warden Giannetta's
2  declaration, if the regulations were changed to not
3  require a bachelor's degree so that a specific
4  person or people would be eligible for the warden
5  position, does that present a problem, in your
6  opinion?
7    A.    To me, yes, it would.
8    Q.    Why is that?
9    A.    I don't think you should alter specs to
10  **favor particular individuals. I think it should be**
11  **whoever meets the qualification and whoever scores**
12  **high on the test and whoever makes it through the**
13  **interview rounds. I don't think the specs should be**
14  **tailored to particular individuals. Unless you just**
15  **didn't have a pool of candidates.**
16    Q.    Right. And when Warden Delaney
17  retired in 2020, there was an active list, right?
18    A.    From what was presented here today, yes.
19    Q.    Given the challenging population in
20  covid, would you believe that a fourth warden would
21  be helpful in running the Detention Center?
22    A.    I believe so, yes.
23    Q.    And do you remember the retirement of
24  Warden Farrell? Is it Farrell or Farrell?

1    A.    **Warden Farrell. I don't recall the exact**
2  **date.**
3          MR. COHEN: I will mark this as
4      Bagby Exhibit 18.
5          (Whereupon Bagby-18 was marked for
6          identification.)
7  BY MR. COHEN:
8    Q.    I'm showing you the declaration, the
9  signed declaration, of Warden Michele Farrell, Bates
10  stamped Plaintiffs 1011 through 1014.
11          Do you see her signature at the
12  end?
13    A.    Yes, sir.
14    Q.    So according to Ms. Farrell, she
15  retired May 13th, 2022. Do you see that?
16    A.    Yes.
17    Q.    And that she had been on sick leave
18  from December of 2021, correct?
19    A.    From her statement, I see, yes.
20    Q.    And do you have a recollection of
21  then-Deputy Warden Norman Williams running PICC?
22    A.    **During that time of December, 2021?**
23    Q.    Let me say this. Yes, that's fair.
24  Prior to Deputy Warden's promotion to warden, did he

1  run PICC?
2    A.    **When Warden Farrell was out? I'm sorry.**
3    Q.    I'm just saying -- so let me try and
4  do it this way. One moment. I'm showing you what I
5  will mark as Bagby Exhibit 19.
6          (Whereupon Bagby-19 was marked for
7          identification.)
8  BY MR. COHEN:
9    Q.    This is the Work History Detail for
10  Norman Williams. And according to this document, do
11  you see that his promotion to warden is dated
12  December 26, 2022?
13    A.    Yes.
14    Q.    Prior to that date, prior to him
15  receiving that promotion, was he acting as the
16  warden of PICC?
17    A.    **It's standard progression when the warden is**
18  **not onsite that there is going to be a deputy warden**
19  **having oversight in that person's place. It's just**
20  **a progression, standard procedure.**
21    Q.    And so are you saying at the time
22  prior to Warden Farrell's retirement?
23    A.    **If she was out, then, yes, a deputy warden**
24  **would have had site responsibility.**

1    Q.    Right. And then after she retired,
2  did then-Deputy Warden Williams resume that site
3  responsibility?
4    A.    **I believe so, yes. I believe he stayed over**
5  **at PICC.**
6    Q.    Should he have been paid out of class
7  for him doing that position after Warden Farrell had
8  retired?
9    A.    **Not knowing all the protocols, if it was my**
10  **decision, I believe so, yes.**
11    Q.    Do you know if there was a list, a
12  promotional list to warden, canceled in early 2022?
13    A.    **I don't recall anything official about the**
14  **list being canceled.**
15          MR. SEIDMAN: Could you repeat
16      the question? I just missed --
17          MR. COHEN: That's fine.
18          MR. SEIDMAN: The court reporter
19      is fine. I just didn't hear it.
20          (Whereupon the court reporter read back
21      as follows:
22      "Question: Do you know if there was a
23  list, a promotional list to warden, canceled in
24  early 2022?

1     "Answer:  I don't recall anything official
2  about the list being canceled.")
3  BY MR. COHEN:
4      Q.   Is a promotional list requested?
5  **A.     Requested by whom?  I'm sorry.**
6      Q.   Let me ask it this way:  What's the
7  process of a promotional list being created?
8  **A.     I don't know all the intricate details of**
9  **the process.  I just know that, when there are**
10 **vacancies, you look at the list and see who is the**
11 **next candidates on the list.**
12     Q.   Right.  And what about when a list
13 expires?  How is another list created?
14 **A.     I believe that, when a list expires, an**
15 **announcement has to go out for the position again.**
16     Q.   And what would be the timeline for
17 when that should happen?
18 **A.     I don't know the answer to that.**
19     Q.   Do you agree that, in March of 2022,
20 the PDP had a need for wardens?
21 **A.     At that time, I believe, March, yes.**
22         MR. COHEN:  I will mark this as
23 Bagby Exhibit 20.
24         (Whereupon Bagby-20 was marked for

1      identification.)
2  BY MR. COHEN:
3      Q.   This is Bates stamped Plaintiffs 0014
4  through 0021.  So I'm showing you a document, it's
5  called an Announcement Details.  Do you see this?
6  **A.     Yes.**
7      Q.   And it's for the warden position,
8  right?
9  **A.     Yes.**
10     Q.   And then under Certification Rule, it
11 states, "Rule of List," right?
12 **A.     Yes.**
13     Q.   And do you know how the Rule of List
14 works?
15 **A.     Not in detail.  From my understanding, I**
16 **think it's called, like, the variance rule.  It kind**
17 **of allows you to go deeper than one and two to kind**
18 **of -- in the spirit of things to, you know, create**
19 **some diversity at the positions.**
20     Q.   When you say "diversity," what do you
21 mean?
22 **A.     To get different candidates, you know.  To**
23 **have some diversity.**
24     Q.   Diversity across race?

1  **A.     I believe, race, gender, yes.**
2      Q.   Prior to the change from Rule of Two
3  to Rule of List -- well, do you know how that change
4  was made?
5  **A.     No.  I just read about it in the local**
6  **newspaper, that this was something that they were**
7  **doing.**
8      Q.   Was that the Inquirer?
9  **A.     I believe it was the Daily News.**
10     Q.   Was it a process where it was
11 requested and then it had to go through some kind of
12 process in order for it to pass?
13 **A.     I'm not aware of that.**
14     Q.   Fair enough.
15         And going to the page with Bates
16 stamp number Plaintiffs 0019, here it gives a parts
17 and weights.  Do you see that?
18 **A.     Yes, sir.**
19     Q.   And it states a virtual oral exam is
20 90 percent of the weight, correct?
21 **A.     From this statement, yes.**
22     Q.   And that a seniority weighting is
23 10 percent of the weight?
24 **A.     Yes, I see that.**

1      Q.   And is there, in your opinion, a
2  benefit to an examination for a warden position?
3  **A.     Could you --**
4      Q.   Sure.  Yes that's fair.  Because it's
5  clearly in comparison to something else.
6          So in my understanding -- and
7  correct me if I'm wrong -- there are two methods for
8  developing rankings on a Civil Service promotional
9  list; is that correct?
10 **A.     Yes.  Training and, I think, education and**
11 **then exam, yes.**
12     Q.   So in comparing those two methods of
13 creating a list for the warden position
14 specifically, is there a benefit to having an exam,
15 as opposed to a training and education?
16         MR. SEIDMAN:  Objection to form.
17 **A.     Is there another way to rephrase the**
18 **question?**
19     Q.   Sure.  So you can either have -- I
20 think it's colloquially called a T&E; is that right?
21 **A.     Yes, training and education.**
22     Q.   Right.  So you can either have a T&E
23 or you can have an examination, right?
24 **A.     Yes.**

Terrell Bagby

Page 118

1  Q.  As it pertains to the warden position,
2 which method do you think is better?
3 A.  In my opinion, I've always been more leaning
4 towards examinations.
5  Q.  And why is that?
6 A.  I think the examinations, you get to kind of
7 ask certain questions that may, you know, kind of
8 get the skill set of the candidate; where a T&E is
9 pretty much like, you know, you just going by the
10 resume, you know.
11    And sometimes, if you have
12 people that are kind of, like, in the same rank,
13 they usually kind of have the same experience of
14 things.
15  Q.  There is also an interview for the
16 warden position, right?
17 A.  Yes.
18  Q.  Separate from whether an examination
19 or a T&E is used, right?
20 A.  Yes.
21  Q.  And in that interview, candidates can
22 be asked questions?
23 A.  Yes.
24  Q.  Pertaining to their knowledge and

Page 119

1 ability as a warden?
2 A.  Or how they would be as a warden, I guess.
3  Q.  Right.  Yes.  That's a better way to
4 say it, right?
5 A.  Yes.
6  Q.  So given that there is that
7 opportunity for candidates to be questioned about
8 their knowledge of information relevant to being a
9 warden, why would an examination still be helpful?
10 A.  From my assessment, not being an HR
11 professional, because the examination is what gets
12 you on that list to be interviewed.  It's a
13 progression.
14  Q.  Right.  And it creates the ranking,
15 right?
16 A.  Yes.  When I say, "the list," that's what I
17 refer to, like the ranking.
18  Q.  In Rule of Two, obviously, the ranking
19 is critical, as we've talked about.
20    Does the ranking matter in
21 Rule of List?
22 A.  Not being an HR professional, from my
23 understanding, that variance rule kind of gives you
24 a little bit more ability to reach a little deeper

Page 120

1 than one or two.
2  Q.  But is the ranking a factor in
3 determining who is going to get the job?
4 A.  I believe so.
5  Q.  And you were actually involved in the
6 decision-making process hiring the wardens from this
7 announcement, correct?
8 A.  Yes.
9  Q.  When I say, "this announcement," I'm
10 referring to the document Bates stamped
11 Plaintiffs 0014 through 21.
12 A.  Yes.
13  Q.  And in that process, did you know what
14 the rankings were of the candidates?
15 A.  I believe so, yes.
16  Q.  And did it factor into the
17 decision-making of who was hired?
18 A.  From my understanding, it factored into how
19 individuals were called for the interviews.
20  Q.  One moment.
21    THE WITNESS:  May I turn the air
22 conditioner on in this office?  It's getting
23 pretty warm.
24    MR. COHEN:  Please.

Page 121

1    THE WITNESS:  Thank you.
2    (Brief pause.)
3    MR. SEIDMAN:  You can take off
4 your coat, too, Deputy Commissioner.
5    THE WITNESS:  I always keep it
6 on.  Thank you.
7    MR. SEIDMAN:  You're welcome.
8 BY MR. COHEN:
9  Q.  I'm looking for the rankings.
10    Do you know whether, ultimately,
11 an examination or the T&E was used in regards to the
12 warden list opened July 11th, 2022?
13 A.  I don't recall.  I believe it was a T&E.
14  Q.  Were you aware of how the T&E operated
15 in this case?  In other words, how the rankings were
16 done?
17 A.  From the specs, I believe it looks like they
18 gave preference points for different things.
19  Q.  Are those specs available to you as a
20 deputy commissioner to look at?
21 A.  Specs are, yes.  They are on the City
22 website for anyone to look at.
23  Q.  How are those specs created?
24 A.  I believe within the departments, along with

Manchello Reporting, L.L.C.
www.ManchelloReporting.com
856-482-7207
loumanchello@manchelloreporting.com

1  our HR, central HR, HR divisions.
2      Q.    So did you contribute at all to the
3  specs used to rank the warden candidates in 2022?
4  **A.    I don't recall.  I don't think so, no.**
5      Q.    Who would do that in the department?
6  **A.    I have no direct knowledge, but, you know,**
7  **there is an HR, and then there is the department.**
8      Q.    When you say --
9  **A.    I was not involved in the process, so I**
10 **don't know.**
11     Q.    Got you.
12          MR. COHEN:  Can we go off the
13  record for a second?
14          (Discussion off the record)
15          MR. COHEN:  I will mark this
16  Bagby Exhibit 21.
17          (Whereupon Bagby-21 was marked for
18      identification.)
19  BY MR. COHEN:
20     Q.    This is a three-page document,
21  starting at Bates City 1834 through 1836.  And on
22  the front page it's an e-mail from Daria Song to
23  Deputy Commissioner Beaufort, Attorney Vrato, and
24  Sherell Maxwell, stating, "Notice of Established

1  Eligible List for the Warden and Deputy Warden
2  Position."
3          And then I will go to the
4  third page.  And I'll kind of rotate this.
5          Deputy Commissioner Bagby, do
6  you see this ranking of the wardens or potential
7  wardens in 2022?
8  **A.    Yes, I do.**
9      Q.    And would you agree with me that,
10  ultimately, the individuals ranked 1, 3, and 4 were
11  those chosen for the open warden positions?
12  **A.    Yes.  At that time, yes.**
13     Q.    And then, when Norman Williams did not
14  make it through the probationary period, the
15  individual Ms. Patterson, ranked number 5, was
16  promoted to warden, correct?
17  **A.    Yes.**
18     Q.    Do you believe there is a connection
19  between these individuals' rankings and whether or
20  not they got the promotion?
21  **A.    Can you, like, maybe rephrase the question?**
22  **I'm sorry.**
23     Q.    No.  That's fine.
24          So, clearly, it's not a

1  one-to-one correlation in terms of who gets the
2  promotion, because, for instance, the Deputy Warden
3  Vetter did not get the promotion, and he was ranked
4  2 on the list, right?
5  **A.    Yes, that's correct.**
6      Q.    My question is whether you know
7  whether these applicants' ranking was a factor in
8  whether they got the promotion?
9  **A.    I'm not too sure on what the question is.  I**
10 **am so sorry.**
11     Q.    No problem.  Were you part of the
12  decision-making process on who was promoted to
13  warden in 2022?
14  **A.    Yes.  I was at this panel, yes.**
15     Q.    Can you tell me how the decision was
16  made to choose the three people who were chosen at
17  that time?
18  **A.    Everyone gets that interview sheet, and then**
19  **you go by whether you find them acceptable,**
20  **questionable, or unacceptable.  And then, you know,**
21  **everyone's input is added, and then you just go**
22  **about filling those positions.**
23     Q.    Who makes the decision of who fills
24  the positions?

1  **A.    We make a recommendation to the**
2  **Commissioner.**
3      Q.    And "we" is who?
4  **A.    The deputy commissioners and the chief of**
5  **staff.**
6      Q.    And what was your involvement in that
7  recommendation?
8  **A.    Just giving my input on the candidates, on**
9  **whether I found them acceptable, unacceptable, or**
10 **questionable.**
11     Q.    Did you find more than three
12  candidates acceptable?
13  **A.    Yes.**
14     Q.    So then, besides that determination of
15  whether they were acceptable, what involvement, if
16  any, did you have?
17          MR. SEIDMAN:  Objection to form.
18  BY MR. COHEN:
19     Q.    Do you understand the question, or do
20  you want me to rephrase?
21  **A.    I think maybe another way to ask the**
22  **question would probably help me --**
23     Q.    Sure.
24  **A.    -- understand it better.**

1    Q.    Yes.  How many warden positions were
2  you trying to fill in December, 2022?
3  **A.    Three, for the three, at that time, major**
4  **facilities.**
5    Q.    Right.  And given that you found more
6  than three candidates acceptable for the position,
7  how did you help narrow that list down to three?
8  **A.    From my recollection, it kind of went,**
9  **number 1, if everyone found him acceptable.  I think**
10  **number 2, there was a large part who didn't find him**
11  **acceptable.  And then number 3, it looks like most**
12  **people found him acceptable.  And then the next one,**
13  **most people found him acceptable.  And that was ones**
14  **that filled those spots.**
15    Q.    So if I'm understanding you correctly,
16  the first step was to determine whether a candidate
17  was acceptable or not acceptable by the group; is
18  that right?
19  **A.    I believe so, yes.**
20    Q.    Do you remember which candidates, if
21  any, from this list of eight were excluded at that
22  point?
23  **A.    I believe, at that time, Major Vetter was**
24  **excluded.**

1    Q.    Okay.  Anyone else?
2  **A.    Not that I'm aware of at that time, no.**
3    Q.    Then the next step in the process
4  would be to go down the list from the top ranking
5  and give those people the job; is that right?
6  **A.    From what I recall --**
7          MR. SEIDMAN:  That's not what he
8  said.  Objection to form.
9          MR. COHEN:  David, please.
10          MR. SEIDMAN:  That's not what he
11  said.
12          MR. COHEN:  Well, I'm asking.
13  I'm trying to find out.
14  BY MR. COHEN:
15    Q.    Deputy Commissioner Bagby, so after
16  the determination was made that Deputy Warden Vetter
17  should be excluded in the potential candidates --
18  right?
19  **A.    Yes.**
20    Q.    (Continuing) -- at this point now, you
21  have seven candidates -- right? -- for the three
22  positions?
23  **A.    Yes.**
24    Q.    So my question is how, then, did those

1  seven get narrowed down to three?
2  **A.    We interview all of the candidates.  We**
3  **started in that order:  Williams, Vetter, Angelucci.**
4          **I do recall that a majority had**
5  **felt Vetter not acceptable, and we were going down**
6  **that list to fill positions.  And that's how you**
7  **came up with Williams, Angelucci, Lacombe, and then**
8  **next in line was Patterson.**
9    Q.    So it was in the order that they were
10  interviewed?
11  **A.    Well, it looks like it was based on the**
12  **ranking.  It looks like, from my recollection.**
13          **There was one, I think -- one,**
14  **two, three.  Number 4 was on vacation.  I think**
15  **Lacombe was on vacation.  Then he came back later.**
16  **That was the only thing that was, like, not in**
17  **sequence.**
18    Q.    Got you.  So then, when you were
19  giving the job or determining who was going to get
20  the job, you went by the ranking, and if the person
21  was acceptable, then they got the job; is that
22  right?
23  **A.    Based on filling those slots, from my**
24  **understanding, yes.**

1    Q.    Well, you were there, right?
2  **A.    Right.  But I just know what I voted.  I**
3  **don't know, like, what everyone else voted.**
4    Q.    Right.  But were you part of the
5  process of winnowing from seven to three?
6  **A.    Yes.**
7    Q.    So that's what I'm asking about.
8          Was that a conversation that was
9  had?
10  **A.    From my recollection, yes.  It was a brief**
11  **discussion afterwards, yes.**
12    Q.    And in that conversation, if I'm
13  understanding you correctly -- and please correct me
14  if not -- you then went down the list in order of
15  ranking and gave the job to the individual if they
16  were deemed acceptable?
17  **A.    Yes.**
18    Q.    And that was the recommendation
19  provided to Commissioner Carney?
20  **A.    Yes.  Our recommendations, yes.**
21    Q.    And that recommendation, as I
22  understand it, was that then-Deputy Wardens
23  Williams, Angelucci, and Lacombe be given the
24  promotion to warden?

1  A.    Yes.  Because there were three slots, and
2  those were the three that got those slots.
3      Q.    And they all stayed in the same
4  position they had been doing, right?
5          MR. SEIDMAN:  Objection to form.
6  BY MR. COHEN:
7      Q.    I can rephrase it.
8          Prior to Norman Williams getting
9  to the promotion to warden of PICC, he was acting as
10  the warden of PICC, correct?
11  A.    Yes, sir.
12      Q.    And prior to Steven Angelucci getting
13  the promotion to warden of CFCF, he was acting as
14  the warden of CFCF?
15  A.    Yes, sir.
16      Q.    And prior to Pierre Lacombe becoming
17  the warden of RCF, ASD, and the Detention Center, he
18  was acting as the warden of Riverside Correctional
19  Facility, ASD, and the Detention Center?
20  A.    Yes, sir.
21      Q.    Does that seem coincidental to you?
22          MR. SEIDMAN:  Objection to form.
23  I don't know how you answer that.
24  Coincidental to what?

1  BY MR. COHEN:
2      Q.    Well, I guess, let me ask it this way.
3  I mean, was there any discussion in that room when
4  you were deciding on the recommendation regarding
5  the fact that those three individuals were already
6  acting as wardens?
7  A.    From what I recall, it was just a decision
8  that was made that they would stay in their
9  assignments.  My -- yes.
10      Q.    Right.  That they would stay.  Right.
11          So, in other words, it was
12  acknowledged in that room that they were already in
13  the warden positions?
14  A.    I don't know if it was actually stated at
15  the time of interview, but I know a decision was
16  made that, since they are already in those
17  facilities, that they would remain in those
18  facilities.
19      Q.    Right.  In other words, once they were
20  made warden, you might as well keep them in the
21  facilities they are already acting as warden in.
22  A.    There was a decision that was --
23          MR. SEIDMAN:  Is that a
24  question?

1          MR. COHEN:  Yes.  I'm trying to
2  clarify.  Yes, that was a question.
3          MR. SEIDMAN:  I didn't hear the
4  question at the end.  You just made a
5  statement and left off.
6          MR. COHEN:  I thought I put my
7  voice a little higher to implicate question.
8          MR. SEIDMAN:  I don't think
9  that's going to show up on the record.
10  BY MR. COHEN:
11      Q.    So Ms. Lyde was ranked last on the
12  list, right?
13  A.    From this, yes.  From the list, yes.
14      Q.    Was she an acceptable candidate?
15  A.    I felt --
16          MR. SEIDMAN:  Objection to form.
17  You can answer.  That's okay.
18  A.    I felt her acceptable.
19      Q.    Did anyone, in your recollection, not
20  find her acceptable?  I can show you the document.
21  That's fine.
22          MR. COHEN:  Mark this as Bagby
23  Exhibit 22.
24          (Whereupon Bagby-22 was marked for

1  identification.)
2  BY MR. COHEN:
3      Q.    Showing you the cover page for
4  Ms. Lyde as of December 2nd, 2022, it's
5  Bates stamped City 1843 through City 1848.
6          MR. SEIDMAN:  That's 49.  Is it
7  48 or 49?
8          MR. COHEN:  Yes, 49 goes on to
9  the next one.
10          MR. SEIDMAN:  Yes, 48.
11  BY MR. COHEN:
12      Q.    And showing you your interview record
13  of Ms. Lyde, you note here that she has a master's
14  in social work, right?
15  A.    Yes.
16      Q.    And do you think that that is helpful
17  to her application for the warden position?
18  A.    I believe so, yes.
19      Q.    And you state here that she has no
20  disciplinary history.  And I can go through them.
21  But do you remember whether or not any of the other
22  candidates did have a disciplinary history?
23  A.    I think two candidates did, yes.
24      Q.    Do you remember who that was?

1  A.   Yes.
2      Q.   Who was that?
3  A.   I believe Norman Williams and William
4  Vetter.  I believe they had recent discipline.
5  That's what we go by:  Recent disciplinary history.
6      Q.   And would that be a reason why
7  Ms. Lyde would potentially get the position over
8  Mr. Williams, who ultimately did?
9  A.   Having a clean disciplinary history is a
10  positive factor.
11     Q.   Once it was determined that William
12  Vetter was unacceptable, should the seven remaining
13  candidates have been judged against each other?
14  A.   I mean, that's an HR question on how that
15  variance rule is supposed to work.
16     Q.   Oh.  So are you saying it was your
17  understanding that the non-commissioner
18  decision-makers, let's say, the other four
19  individuals, were supposed to go down the list by
20  ranking in the way they did?
21  A.   From my understanding -- and I'm not the HR
22  professional.  But from my understanding of the
23  variance rule, it's supposed to give you a little
24  bit more latitude to go outside of one and two to

1  fill positions.
2      Q.   Right.  But I guess my question is,
3  did someone make the decision to judge the
4  candidates in the manner in which you did, or was
5  it, kind of, policy?
6          MR. SEIDMAN:  Objection to form.
7  BY MR. COHEN:
8      Q.   Do you understand the question?
9  A.   Is there another way the question can be
10  asked?
11     Q.   Sure.  So as I understand it, there
12  would be two different ways you could have winnowed
13  from seven to three, right?
14         And I will say the two ways are
15  you could have either done it the way you did it, by
16  viewing each candidate by rank and determining
17  whether or not they are acceptable for the position,
18  or you could, once you had the seven acceptable
19  candidates, have judged them against each other and
20  picked the best candidate, right?
21  A.   That would have been my understanding.
22     Q.   That you could have done either.
23         What I'm saying is,
24  hypothetically, you could have chosen -- someone

1  could have chosen either tactic or style; is that
2  fair?
3          MR. SEIDMAN:  Objection to form.
4          I don't know if it's been
5  established that there is two different
6  forms.  We didn't talk about --
7          MR. COHEN:  What do you mean
8  "two different forms"?
9          MR. SEIDMAN:  Well, you are
10  saying there's two different forms of
11  reviewing this, and I don't think that's
12  been established.
13  BY MR. COHEN:
14     Q.   I'm saying there are, I guess, at
15  least -- I'm positing there are at least two
16  different methods from which you could pick three
17  out of seven, right?
18  A.   No, I don't think so.  I was saying what my
19  understanding of how I interpreted the variance rule
20  was that, you know, it gives you more latitude to
21  dig deeper into the candidates.  But that's just my
22  understanding.
23     Q.   In your understanding of the
24  Rule of List, could you have judged Norman Williams

1  against Robert Rose to see who would be a better
2  warden?
3  A.   That would just be as a state of my
4  interpretation of how that variance rule was to be
5  implemented.
6      Q.   But as a group, collectively, you did
7  not do that, right?
8  A.   No.  From my recollection, like I said, we
9  interviewed all the candidates, and we started from
10  the top and started filling positions.
11     Q.   Okay.  And is it your understanding
12  that's how you were mandated to do it?
13  A.   I don't quite understand the question.  I'm
14  sorry.
15     Q.   No problem.  Is it your understanding
16  that you were required to do it that way?
17  A.   That's how the process went, yes.
18     Q.   And who dictated the process?
19         MR. SEIDMAN:  Objection to form.
20  A.   Is there another way to ask the question?
21  I'm sorry.
22     Q.   Sure.  You said that's how the process
23  went, right?  You went down in order of rank --
24  right? -- to determine if they would fill the job?

1  A.    Right.
2      Q.    My question is did someone -- and
3  that's fair.  I can start there.  Did someone
4  dictate that process?
5  A.    I believe our chief of staff was the one
6  that was in the interview giving us advisement on
7  how that variance rule works.
8          Usually, there is an HR
9  professional in the interviews, but I don't recall
10  if HR was at that table.  There's always going to be
11  an HR person to kind of let us know how the process
12  works.
13          I don't think HR was at the
14  warden interviews, but I do believe the chief of
15  staff gave us advisement on the variance rule.
16      Q.    And that would be Gregory Vrato?
17  A.    Yes.  Our chief of staff, yes.
18      Q.    So going to Gregory Vrato's interview
19  record regarding Ms. Lyde -- and this is Bates
20  stamped City 1848 -- do you see at the top where he
21  says, "Ms. Lyde has a degree but I believe wardens
22  should have security supervisory experience."
23  A.    Yes, I see that.
24      Q.    Is that opinion biased towards program

1  administrators?
2  A.    That's his opinion.  And if that was the
3  case, then they wouldn't be eligible to take the
4  test.
5      Q.    Right.  So I guess I will reiterate my
6  question.  Is Mr. Vrato's opinion biased against
7  program administrators?
8          MR. SEIDMAN:  Objection to form.
9  A.    Is there another way to state that
10  question --
11      Q.    Sure.
12  A.    -- in what I'm trying to gauge whether he's
13  biased or not?
14      Q.    Is Mr. Vrato's statement here unfair
15  towards program administrators applying for the
16  position of warden?
17          MR. SEIDMAN:  Objection to form.
18      You can answer the question if you understand
19  it.
20  A.    I think it would exclude them.  I don't
21  agree with that assessment.
22      Q.    When you say "that assessment," are
23  you referring to my assessment or Mr. Vrato's
24  assessment?

1  A.    The assessment that -- well, he says that's
2  his belief.  I don't believe that.
3      Q.    You don't agree with Mr. Vrato's
4  belief?
5  A.    No, I don't agree that the HSPAs should have
6  security supervision.  That would exclude them from
7  the process.
8      Q.    And thereby negatively affect women,
9  correct?
10          MR. SEIDMAN:  Objection to form.
11  A.    Is there another way that you can ask that
12  question, sir?
13      Q.    Do you think that excluding eligible
14  HSPAs from the warden promotional list is unfair
15  towards women?
16          MR. SEIDMAN:  Objection to form.
17  A.    Is there another way to ask that question
18  without, I guess, focusing on the gender?
19      Q.    Sure.  Is excluding HSPAs from the
20  warden promotional list biased against social
21  service supervisors?
22          MR. SEIDMAN:  Objection to form.
23  A.    Is there another way to ask that question,
24  sir?

1      Q.    That's all right.  We can move on.
2  That's fine.
3          Mr. Vrato also states down here,
4  on General Comments, that "Wardens need security
5  supervisory experience."  Do you see that?
6  A.    Yes.
7      Q.    Is that a true statement?
8  A.    I would say that's his truth.  I don't
9  necessarily agree with that.
10      Q.    Well, if that were true, wouldn't that
11  preclude program administrators from the position?
12  A.    Yes.
13      Q.    So given that program administrators
14  are one of the two jobs eligible for the position,
15  shouldn't his belief preclude him from making the
16  decision of who becomes a warden?
17          MR. SEIDMAN:  Objection to form.
18  A.    Is there a different way to repeat that
19  question, sir?
20      Q.    Sure.  Given that Mr. Vrato states,
21  "Wardens need security supervisory experience," and
22  given that program administrators do not have --
23  well, do you agree program administrators do not
24  have security supervisory experience?

1    A.    For the most part, yes. And in my history,
2  I believe so, yes.
3         Q.    And every deputy warden would have
4  security supervisory experience, right?
5    A.    Yes. In our structure, yes.
6         Q.    So given that Mr. Vrato is excluding
7  program administrators from being able to do the
8  job, should he have been part of the decision-making
9  process of who got the job?
10        MR. SEIDMAN: Objection to form.
11  You can answer if you understand.
12    A.    That wouldn't be my decision, sir.
13        Q.    I appreciate it wasn't your decision.
14  But I'm asking you the question, nonetheless.
15    A.    The only thing I would say is that I just
16  don't agree with the statement that wardens have to
17  have security supervision experience. I don't agree
18  with that statement.
19        Q.    And would you agree that that
20  statement goes against the Civil Service regulations
21  regarding the qualifications for the warden
22  position?
23        MR. SEIDMAN: Objection to form.
24    A.    Is there another way to ask that question,

1  sir?
2         Q.    Do you have an idea?
3    A.    I'm sorry. Is that being asked of me? I'm
4  sorry.
5         Q.    You don't have to answer that. Okay.
6    A.    Oh, okay.
7         Q.    Sorry. My apologies.
8         And then going to Ms. Albandoz's
9  interview record, you also considered her
10  acceptable, correct?
11    A.    Yes, sir.
12        Q.    And she actually did have experience
13  as a correction officer, right?
14    A.    Yes, sir.
15        Q.    And that's Bates stamped City 1851.
16        MR. SEIDMAN: I think it's 1852.
17        MR. COHEN: His is 1851.
18        MR. SEIDMAN: The one that was
19  just on was 1852. I don't know. It just
20  flipped.
21        MR. COHEN: Yes, I flipped it.
22        MR. SEIDMAN: Okay.
23        MR. COHEN: And I will mark her
24  interview record, with cover sheet, as Bagby

1         Exhibit 23, and this starts at City 1849
2         through City 1854.
3              (Whereupon Bagby-23 was marked for
4              identification.)
5  BY MR. COHEN:
6         Q.    Do you see that? And then, regarding
7  Mr. Vrato's interview record for Ms. Albandoz, he
8  considered her questionable, correct?
9    A.    From what I see, yes, sir.
10        Q.    And then in General Comments he says,
11  "Ms. Albandoz is very good at her position, but I
12  believe a warden needs to come through supervisory
13  security ranks," right?
14    A.    That's the statement, yes, sir.
15        Q.    And in your opinion, that is
16  incorrect, correct?
17    A.    In my opinion, I don't agree with that
18  statement, yes, sir.
19        Q.    And was that opinion ever brought up
20  in regards to the entire process of promoting
21  wardens to you or around you?
22    A.    Not to me, no, sir.
23        Q.    And if it had been brought up -- and
24  when I say "it," I mean the opinion that a warden

1  needs to come through supervisory security ranks --
2  if that opinion had been brought up to you, would
3  you have stated to whomever, whether it be the
4  Commissioner or Mr. Vrato, that you do not agree
5  with that?
6    A.    I would have stated I don't agree with that.
7  That should have been in the specs to prevent people
8  from taking the test.
9         Q.    Have you ever discussed with either
10  Deputy Commissioner Clark, Deputy Commissioner
11  Beaufort, or Commissioner Carney whether or not a
12  warden needs to come through supervisory security
13  ranks?
14    A.    I don't recall having that discussion.
15        MR. COHEN: Can we take till
16  2:47?
17        MR. SEIDMAN: Sure.
18        (Short recess taken at
19  2:42 p.m.)
20        (Proceedings resumed at
21  2:48 p.m.)
22  BY MR. COHEN:
23        Q.    So fair to say that, before you,
24  Mr. Vrato, Deputy Commissioner Beaufort, and

1  Deputy Commissioner Clark got to the decision of
2  whether or not Ms. Albandoz or Ms. Lyde should be
3  promoted, the decision to hire Norman Williams,
4  Steven Angelucci, and Pierre Lacombe had already
5  been made?
6  A.     From my recollection, we didn't even discuss
7  those two candidates because the slots were already
8  filled.
9        Q.     Was there an occasion where you were
10  speaking with Ms. Lyde and Ms. Albandoz and you
11  expressed that you were sorry that they would not be
12  able to progress to your level in this
13  administration?
14  A.     I don't recollect if I had that type of
15  direct conversation with them.  I mean, I would
16  express that, you know, I would like to see them
17  eventually take my place, but I don't think I used
18  terminology like "I'm sorry."  That just doesn't
19  sound like my language.
20        Q.     Earlier you said that, when the warden
21  positions became available, administration should
22  have gone to the promotional list and interviewed
23  from that list, correct?
24  A.     If there was an active list, that would be,

1  you know, what I would believe should have been
2  done, yes.
3        Q.     And there was an active list in July,
4  2020, right?
5  A.     From what was presented today, yes.
6        Q.     And in August of 2021, right?
7  A.     From what was presented today, yes.
8        Q.     And September of 2021?
9  A.     From what was presented today to me, yes.
10        Q.     Does the Covid-19 crisis and the PDP's
11  focus on that crisis change your answer regarding
12  that statement?
13  A.     No.  I mean, I would hate to have --
14        MR. SEIDMAN:  Go ahead.
15  A.     I would hate to have lost them during that
16  time, but I would never get in the way of someone,
17  you know, taking the promotion or an opportunity to
18  be promoted, because it gives an opportunity for
19  someone to fill their vacancy.  So, I mean, I would
20  hate to have lost them during the pandemic, but I
21  wouldn't have objected to a promotion for any party.
22        Q.     And there was nothing stopping the PDP
23  from making those promotions to warden while covid
24  was going on?

1  A.     Not that I'm aware of.
2        MR. COHEN:  That's all the
3  questions I have.
4        THE WITNESS:  Thank you, sir.
5        MR. COHEN:  Thank you.
6        MR. SEIDMAN:  Thank you.
7        (Deposition concluded at
8  2:52 p.m.)
9        - - - - -

1          C E R T I F I C A T E
2        I, LOUIS A. MANCHELLO, a Certified Court
3  Reporter (N.J. License No. 30XI00141800) and Notary
4  Public of Pennsylvania, do hereby certify that the
5  deposition of TERRELL BAGBY was duly taken on August
6  31, 2023 and at the time noted above before me.  The
7  said TERRELL BAGBY was first duly sworn (or
8  affirmed) by me according to law to tell the truth,
9  the whole truth and nothing but the truth and
10  thereupon did testify as set forth in the above
11  transcript of testimony.  The testimony was taken
12  down by me stenographically.
13        I do further certify that the above
14  deposition is a full, complete, and true record of
15  all the testimony given by the said witness, to the
16  best of my knowledge and ability.
17        Electronically signed by Louis A.
18  Manchello, Certified Court Reporter (N.J. License
19  Number 30XI00141800) on September 15, 2023.
20        (This transcript may contain quoted
      material.  Such material is reproduced as read or
21  quoted by the speaker and may not be a verbatim
      replication of the printed material.)
22
        (This certification does not apply to
23  any reproduction of this transcript, unless under the
      direct supervision of the certifying reporter.)
24

1                          CERTIFICATE

2    ------------------------------------------------------

3            I, the undersigned, TERRELL BAGBY, do

4    hereby certify that I have read the deposition taken

5    of me on August 31, 2023 and that to the best of my

6    knowledge said deposition is true and accurate (with

7    the exception of the following corrections listed

8    below):

9    ------------------------------------------------------

10   Page   Line              Changes

11   _____:_____

12   _____:_____

13   _____:_____

14   _____:_____

15   _____:_____

16   _____:_____

17   _____:_____

18   _____:_____

19   _____:_____

20   _____:_____

21

     DATE:   _____          _____

22

                                  TERRELL BAGBY

23

24

**A**

**abbreviate** 11:1
**ability** 31:21 63:1
  65:11 67:5 119:1
  119:24 149:16
**able** 80:2 142:7
  146:12
**acceptable** 124:19
  125:9,12,15 126:6
  126:9,11,12,13,17
  126:17 128:5,21
  129:16 132:14,18
  132:20 135:17,18
  143:10
**accepted** 75:1
**accepting** 16:14
**accolades** 55:12
**accounted** 82:22
**accurate** 11:3 96:23
  150:6
**acknowledged**
  131:12
**acting** 22:3 80:21
  112:15 130:9,13
  130:18 131:6,21
**active** 21:4 74:8,11
  75:18 89:15 91:14
  91:22 92:4 97:5
  110:17 146:24
  147:3
**actual** 7:11,12 31:17
  61:11 90:8 94:9
  100:1
**Adams** 22:1
**added** 124:21
**addition** 44:20
**additional** 82:13
**adjusted** 11:5
**administration** 6:14
  102:2 104:7
  146:13,21
**administrator** 6:7,9
  6:20 8:19 10:16,18
  11:24 12:8 20:21
  21:13,22 22:4,7,18
  25:3 35:24 36:13
  36:16,19,21 37:3
  39:16,18 41:19
  42:21 43:1,2,8,11
  44:9,24 45:11,15
  46:2 47:2 48:8,10
  48:13,16,21,23
  49:18 50:5,10 51:1
  58:17,21 62:3
  63:10 65:1,4,24
  67:18 68:3 69:3,5
  69:19,21 70:9
  108:20

**administrators** 17:5
  17:9,15,21 20:3
  22:15 56:20 62:5
  63:13 65:8 139:1,7
  139:15 141:11,13
  141:22,23 142:7
**administrator's**
  27:16
**Adrienne** 1:3 2:11
  5:10 8:7 87:9
  88:11 98:16
  100:20
**advance** 57:21 71:3
  71:21
**advancement** 32:11
**advisement** 138:6,15
**affect** 67:4 140:8
**affirmed** 5:2 149:8
**afternoon** 57:18
**age** 104:9
**ago** 59:11 108:12
**agree** 41:6 43:15
  67:8 74:13,15,21
  74:22 75:20 76:14
  78:17 82:6 83:15
  83:18 89:20,23
  114:19 123:9
  139:21 140:3,5
  141:9,23 142:16
  142:17,19 144:17
  145:4,6
**agreed** 66:10
**agreeing** 66:6,17
**agreement** 61:5
**ahead** 69:23 93:22
  147:14
**air** 120:21
**al** 1:3
**Albandoz** 2:12 3:7,8
  3:9 5:11 8:16 9:3
  10:13 12:7,10 13:4
  14:4,20 16:12,24
  18:1,17,22 19:5,18
  20:13,24 21:9 26:1
  26:7,15 27:1 28:2
  29:1,20 30:3 58:22
  62:10 91:16 98:18
  101:17 144:7,11
  146:2,10
**Albandoz's** 8:21
  11:9,21 29:17
  143:8
**Albert** 59:14
**Alexa** 73:23 74:1
**allows** 115:17
**alter** 110:9
**Alternative** 82:3
**and/or** 33:10

**Angelucci** 90:2,17
  91:2 94:4 95:11,14
  109:9,22 128:3,7
  129:23 130:12
  146:4
**announced** 105:20
**announcement** 18:7
  18:24 91:6 93:20
  94:11 114:15
  115:5 120:7,9
**answer** 25:6 63:4,18
  65:16 69:24 70:1,2
  75:22 77:4,5,17
  78:7 81:4 85:24
  86:5,20 87:12
  88:14 92:23 98:11
  98:23 114:1,18
  130:23 132:17
  139:18 142:11
  143:5 147:11
**apologies** 143:7
**apologize** 38:10
  65:20
**applicant** 67:1,17
  68:10
**applicants** 62:4
  69:16 97:23 98:4
  124:7
**application** 133:17
**applied** 18:2 43:8
  52:18
**apply** 18:8 19:1
  20:24 149:22
**applying** 139:15
**appointed** 6:13,16
  25:14
**appointment** 25:20
  104:13
**appointments** 58:14
  58:15,18
**appreciate** 25:21
  142:13
**approval** 27:2
**approve** 60:14,15
**approved** 60:7,9
  80:24
**approximately** 1:14
  45:1 59:6 78:23
  93:16 96:8,22
  104:12
**April** 107:4
**ASD** 72:16 76:7,16
  79:18 80:22 82:5
  97:2 130:17,19
**asked** 63:20 65:16
  66:8 67:5 75:24
  77:18 81:5,11
  88:15 102:3,15

**118:22 135:10
  143:3
**asking** 39:3 64:19
  68:16 89:5 127:12
  129:7 142:14
**assessment** 95:20,23
  96:2 100:9,22
  119:10 139:21,22
  139:23,24 140:1
**assigned** 77:14
**assignment** 16:19
  42:13 104:6
**assignments** 131:9
**assistance** 104:16
**assume** 95:2
**assumptions** 67:8
**attend** 54:19
**attendance** 8:12,24
**attending** 1:18
**attention** 106:10
**attorney** 5:9 122:23
**attorneys** 54:22
**August** 1:10 81:20
  89:2,7 92:6,14
  93:4 99:23 100:3,6
  147:6 149:5 150:5
**Aurora** 75:1
**available** 21:4 74:9
  121:19 146:21
**aware** 26:10 28:2,4
  99:6 116:13
  121:14 127:2
  148:1
**a.m** 1:15 57:13,15

**B**

**B** 3:5 4:1
**bachelor's** 24:24
  102:17,20 106:1
  106:18 107:14,17
  108:16,18 109:1,3
  109:22 110:3
**back** 6:3 10:12 18:11
  26:14 30:5 47:9
  51:16 56:14 67:12
  69:9 88:17,19 93:4
  101:20,22 105:12
  109:12 110:1
  113:20 128:15
**background** 5:22
**Bagby** 1:13 3:3,10
  5:1,6 26:19,24
  30:18,23 33:20
  34:16 42:6 43:17
  46:17 55:16 57:17
  73:14 79:22 84:20
  95:6 103:23 106:5
  111:4 112:5

**114:23 122:16
  123:5 127:15
  132:22 143:24
  149:5,7 150:3,22
**Bagby-1** 3:7 9:7,17
  9:20
**Bagby-10** 3:15 73:15
  88:22,23
**Bagby-11** 3:16 81:15
**Bagby-12** 3:16 83:12
**Bagby-13** 3:17 84:6
  84:7
**Bagby-14** 3:17 84:23
**Bagby-15** 3:18 99:8
  99:9,12
**Bagby-16** 3:19 106:7
**Bagby-17** 3:20
  106:21,22
**Bagby-18** 3:21 111:5
**Bagby-19** 3:21 112:6
**Bagby-2** 3:8 20:8,9
**Bagby-20** 3:22
  114:24
**Bagby-21** 4:3 122:17
**Bagby-22** 4:4 132:24
**Bagby-23** 4:5 144:3
**Bagby-3** 3:9 26:21
**Bagby-4** 3:10 30:19
**Bagby-5** 3:11 33:22
**Bagby-6** 3:12 34:17
**Bagby-7** 3:12 43:18
**Bagby-8** 3:13 46:19
**Bagby-9** 3:14 55:17
**bargaining** 61:5
**based** 8:3 11:11
  12:13,21 33:15,16
  69:4 70:4 93:7,13
  109:3 128:11,23
**basically** 49:1 60:3
**basis** 75:15 76:13
**Bates** 3:10,18,19,20
  3:22 4:3,4,5 9:23
  11:16 15:6 16:22
  19:4 26:20 30:23
  34:1,3 52:21 54:3
  55:20 73:20 99:12
  106:5 107:2 111:9
  115:3 116:15
  120:10 122:21
  133:5 138:19
  143:15
**Beaufort** 122:23
  145:11,24
**becoming** 41:22 42:9
  130:16
**began** 48:12 90:20
**beginning** 1:14
  81:23

**behavior** 24:21,21
**belief** 82:13,15 140:2
140:4 141:15
**believe** 7:2,21 12:2
13:10,10 24:14
25:20 26:17 28:4
31:15 35:19 41:18
42:20 43:1 44:13
49:22 50:15,21
54:12 55:14 56:11
56:17,18 57:6 58:7
61:3,10 68:7 73:4
82:11 88:20 89:9
91:15,18,21 92:1
92:17 94:9 95:20
95:23 96:2 97:7
100:18 101:13
102:18 104:21
105:19 107:20,24
108:22 110:20,22
113:4,4,10 114:14
114:21 116:1,9
120:4,15 121:13
121:17,24 123:18
126:19,23 133:18
134:3,4 138:5,14
138:21 140:2
142:2 144:12
147:1
**believed** 42:14
**beneficial** 28:10 42:9
**benefit** 108:23 117:2
117:14
**best** 39:11 105:9
135:20 149:16
150:5
**better** 19:10 24:3
53:12 55:12 65:5
118:2 119:3
125:24 137:1
**biased** 138:24 139:6
139:13 140:20
**bit** 5:21 36:1 47:5
53:12 58:2 101:9
119:24 134:24
**bottom** 10:3 15:19
**Bowers** 2:12 5:10
91:19,20 98:17
101:2,3 104:15
105:8
**brain** 65:7
**break** 57:11 67:12
103:1
**brief** 42:4 121:2
129:10
**briefings** 105:4
**bring** 23:3
**broke** 105:10

**brought** 144:19,23
145:2
**budget** 3:16,17,17
77:2,9 80:24 82:22
83:4,16,18,19 84:5
84:10,21 85:2,12
85:21
**budgeted** 85:16
86:17,21
**budgets** 83:8

**C**

**C** 2:1 149:1,1
**call** 9:17 17:12,12
39:4,6 58:7 87:24
**called** 115:5,16
117:20 120:19
**canceled** 113:12,14
113:23 114:2
**candidate** 12:10,20
28:5 45:23 64:24
65:23 70:8 98:7
101:10 118:8
126:16 132:14
135:16,20
**candidates** 8:5 70:6
97:22 98:1 100:11
110:15 114:11
115:22 118:21
119:7 120:14
122:3 125:8,12
126:6,20 127:17
127:21 128:2
133:22,23 134:13
135:4,19 136:21
137:9 146:7
**capable** 87:15
**captain** 37:7,9,24
38:20 39:24 40:9
92:12
**care** 102:9
**career** 32:10 103:24
**Carney** 29:19,22
30:3 71:7 89:3
129:19 145:11
**Carney's** 13:17
**carry** 27:16 50:16
81:8
**carrying** 40:18
**case** 60:10 63:11,12
97:24 121:15
139:3
**Cathy** 3:16 76:4
81:19
**cell** 54:20
**census** 79:2,3
**Center** 72:20,23
76:5 77:3,11,15,20

77:23 78:5,18,24
79:5,10,17 82:3
83:22 84:13 85:5
85:13,14,22,23
86:9 110:21
130:17,19
**central** 7:9 93:19
122:1
**certain** 7:7 61:6
90:11 107:22
118:7
**CERTIFICATE**
150:1
**certification** 115:10
149:22
**Certified** 1:15 149:2
149:18
**certify** 149:4,13
150:4
**certifying** 149:23
**CF** 90:17
**CFCF** 55:4 71:9
84:2 89:4,12,16,22
90:1,3 94:4 95:16
130:13,14
**challenging** 23:7
49:3 110:19
**chance** 88:12
**change** 27:3 53:9
76:22 108:7 116:2
116:3 147:11
**changed** 68:8 110:2
**changes** 49:14
150:10
**chaplainry** 20:5
**charge** 11:2 102:2
104:1,5
**Charter** 68:7
**Chestnut** 2:3
**chief** 58:17 59:5,9,12
125:4 138:5,14,17
**choose** 8:4 32:11
124:16
**chosen** 92:20 109:7,8
123:11 124:16
135:24 136:1
**citizens** 24:3
**City** 1:6 3:18 4:3,4,5
9:23 11:16 15:6
16:23 19:4 26:20
34:3 35:7 54:3
77:21 99:13
121:21 122:21
133:5,5 138:20
143:15 144:1,2
**Civil** 14:14 18:23
25:19 56:15 117:8
142:20

**claim** 5:11
**clarify** 132:2
**Clark** 2:6 102:8
145:10 146:1
**class** 6:6 60:1,2,5
94:17 95:19 96:4
113:6
**classes** 54:19
**classification** 79:11
**classify** 55:1
**classrooms** 54:18
**clean** 134:9
**clear** 37:22 74:18
79:8
**clearly** 7:15 117:5
123:24
**clinical** 23:5,8,24
**close** 45:22 59:10
78:18
**closed** 77:23 78:15
**coaching** 21:2
**coat** 121:4
**Cohen** 2:2 3:3 5:4,8
9:5,9,16,18 15:3,4
20:7,11 26:18,23
30:21 33:19,24
34:15,19 38:13,16
38:17 42:3,5 43:16
43:20 46:17,21
55:15,19 57:10,16
62:17,21 64:7,10
66:7,13,19,22,24
67:13,15 68:15,22
69:11,12 73:13,17
73:22,24 74:2 75:7
80:9,19 81:12,17
83:10,14 84:4,9
85:1,17,19 87:7
88:23,24 94:22
95:2,5 96:15,16
97:16 99:7,11
103:4,12,16,22
106:4,9,24 111:3,7
112:8 113:17
114:3,22 115:2
120:24 121:8
122:12,15,19
125:18 127:9,12
127:14 130:6
131:1 132:1,6,10
132:22 133:2,8,11
135:7 136:7,13
143:17,21,23
144:5 145:15,22
148:2,5
**coincidental** 130:21
130:24
**colleague** 33:7 42:12

44:5,7 47:7
**colleagues** 34:11
**collective** 61:4
**collectively** 137:6
**colloquially** 117:20
**Colorado** 75:1
**combination** 6:22
**come** 14:10 17:23
18:5 21:21 23:9
33:10,10 52:17
60:18 62:24 63:14
67:12 68:10 86:3
88:17 144:12
145:1,12
**comes** 65:1 67:18
**coming** 14:2 46:7
67:3
**command** 74:18
**comments** 16:5,9
32:7 53:19 141:4
144:10
**commissioner** 3:9
5:5 6:13 8:17
10:21,24 12:21
13:17 25:14,18
26:24 27:14,19
29:19,22 30:3,23
36:17,20 42:6 43:9
43:12 48:2 51:7,9
57:17 71:7 79:22
86:8 89:3 91:10
95:6 101:6 102:8
103:8,23,24 104:4
104:7,8,11 121:4
121:20 122:23
123:5 125:2
127:15 129:19
145:4,10,10,11,24
146:1
**commissioners** 71:8
86:14 125:4
**common** 40:20
**communicated**
53:12
**communication**
27:17 54:21
**communicative**
27:11
**community** 42:16
45:22
**comparing** 37:23
117:12
**comparison** 36:14
117:5
**complete** 149:14
**complex** 36:1
**comport** 89:7 96:21
**computer** 80:15

concentrating 41:5
concern 80:22
concluded 148:7
concurred 13:16
conditioner 120:22
conducted 28:7
conducting 40:13
Conferencing 1:18
confusing 5:17
Congratulations
3:14 55:24
connection 39:8
123:18
considered 143:9
144:8
consistent 61:2
construed 66:10
contain 149:20
context 39:15 40:4
40:22
continue 20:19 32:9
52:6
continued 3:24 4:1
15:10 34:24 54:9
continues 78:10
Continuing 15:5
38:6 60:14 127:20
contribute 122:2
contributions 55:10
conversation 18:11
18:14 33:13 51:22
129:8,12 146:15
conversations 46:10
46:13 51:19 71:7
71:20 72:1,19 91:1
correct 10:2,6 12:14
13:13 14:15 15:9
16:24 17:3 20:20
25:18 31:24 32:22
34:22 35:9,18 36:7
43:5,22 47:2 49:18
50:7 51:6 53:2,6
54:4 56:3,21 58:23
58:24 62:11 67:18
67:21 68:3,6 71:14
71:18 72:16 77:5
77:24 78:1,15,19
84:11,21 90:4
91:19 92:7,16,21
94:5 95:9 97:3,6
97:11,14 105:15
105:18 106:11,19
109:10,15,16
111:18 116:20
117:7,9 120:7
123:16 124:5
129:13 130:10
140:9 143:10

144:8,16 146:23
correction 20:5
143:13
correctional 23:4,15
23:22 24:8,18 28:3
28:15,21 36:5
40:18 59:14,17
66:2 67:3,4 75:2,9
79:17 82:2 84:18
107:23 130:18
correctional-side
22:19
corrections 74:24
78:14 150:7
correctly 57:22
126:15 129:13
correlation 124:1
Counsel 2:5,9
County 7:6,6
court 1:1,15 113:18
113:20 149:2,18
cover 60:5 133:3
143:24
covering 104:11
covid 19:14,20 78:4
78:18 79:6 87:1
110:20 147:23
Covid-19 75:17
147:10
Craescu 99:1,23
create 71:1 115:18
created 114:7,13
121:23
creates 119:14
creating 117:13
credentials 102:6
credit 66:1
creeping 102:23
crisis 75:17 147:10
147:11
critical 17:11,20
41:7 74:16 105:5
119:19
criticism 29:6,9
Curran-Fromhold
84:17 85:9
current 6:14 29:15
29:18 59:12 77:22
currently 23:6 62:6
78:23 105:16
curve 14:9 48:8
custody 28:22
cut 101:15

_____

**D**

**D** 3:1
daily 75:15 76:13
116:9

Daria 122:22
date 1:14 7:11,13
11:16 31:17 44:17
74:4 90:8 93:20
94:10 96:24 100:1
105:22 111:2
112:14 150:21
dated 3:8,9,12,13
13:12 15:1 16:21
19:3 27:2 34:20
43:22 46:23 49:8
52:22 54:3 112:11
dates 59:11
David 2:6 127:9
Day 70:24
days 14:19
day-to-day 41:3
DC 72:15 76:5,16
80:22 97:2
deal 23:5 53:16,17
dealing 42:17,17
45:21
deaths 89:4
decade 35:18
decades 75:10
December 28:7
105:21 111:18,22
112:12 126:2
133:4
deciding 131:4
decision 12:7 13:5,7
29:4,5 45:5,8 46:1
46:5 73:10 108:7
113:10 124:15,23
131:7,15,22 135:3
141:16 142:12,13
146:1,3
decisions 86:2
decision-maker 66:1
decision-makers
134:18
decision-making
12:4 120:6,17
124:12 142:8
declaration 3:15,16
3:21 73:19 74:3
81:18 88:20 89:21
96:10 101:21
105:13 110:2
111:8,9
declined 93:11
decommissioned
78:2,22
deemed 62:1 129:16
deeper 115:17
119:24 136:21
Defendants 2:9
Defendant(s) 1:7

definitely 7:16,18
13:23 19:22 24:14
28:1 41:10 57:3
90:1 93:14
definition 98:8
degree 24:24 25:3,5
25:10 102:17
106:1,19 107:14
107:17 108:16,17
108:18,24 109:1
109:22 110:3
138:21
Delaney 70:15 72:10
72:14 110:16
Delaney's 71:21
delay 65:19
demerit 68:10,17,19
demerits 68:14
department 5:24 8:4
17:12,13,17 26:12
50:22 57:9,20
60:24 71:22 72:6
77:9 122:5,7
departments 121:24
depopulated 78:2,21
deposed 95:3
deposition 1:13 3:6
4:2 9:6 148:7
149:5,14 150:4,6
deputy 3:9 5:5 6:13
8:17 10:21,24
21:14 23:1 25:14
25:17,17 26:24
27:14,19 28:16
30:23 36:12,17,20
36:23 39:16,21
42:6 43:9,12 48:2
51:7,9 57:17 65:9
69:4,6,18,20 70:8
71:8 79:21 86:7,14
90:15,17 91:2,10
94:3,15 95:6,11,14
95:15,21,24 96:4
97:1 101:6 102:2,8
103:7,23,24 104:4
104:7,7,10 109:9
111:24 112:18,23
121:4,20 122:23
123:1,5 124:2
125:4 127:15,16
142:3 145:10,10
145:24 146:1
described 40:9
deserve 88:12
detail 3:21 112:9
115:15
details 114:8 115:5
Detention 72:20,23

76:5 77:3,11,15,20
77:23 78:5,18,24
79:5,10,17 82:3,4
83:22 84:13 85:5
85:13,14,22,23
86:9 110:21
130:17,19
determination 65:23
125:14 127:16
determine 126:16
137:24
determined 134:11
determining 120:3
128:19 135:16
developing 117:8
device 79:24 80:13
80:16
dictate 138:4
dictated 137:18
different 23:8,14,20
30:1 36:3 38:23
39:2,7 40:8,10,11
49:3 63:20 65:21
67:10 68:23,24
75:24 81:5 115:22
121:18 135:12
136:5,8,10,16
141:18
differential 60:18
difficult 17:9
dig 136:21
dinged 65:5
direct 18:15 20:19
26:8,11 32:14
40:22 45:6 51:23
57:5 77:4 94:22
105:1 106:10
122:6 146:15
149:23
directly 27:20 29:20
29:24 36:16 58:6
58:11,12 68:2
72:13,13 73:11
76:18 96:5 101:3
109:23
director 20:4,4,5,6,6
59:23 60:11
104:17
disadvantage 69:3
disciplinary 68:20
133:20,22 134:5,9
discipline 134:4
discrimination 5:12
discuss 146:6
discussed 145:9
discussion 9:15
12:24 13:2 29:13
42:10 80:18 86:9

86:12,17 122:14
129:11 131:3
145:14
**discussions** 18:9
72:22 82:18 86:1,4
**DISTRICT** 1:1,1
**diversity** 115:19,20
115:23,24
**division** 17:14,15,15
17:17 20:1 58:19
59:19 60:4 61:12
63:11 64:16
**divisions** 122:1
**document** 3:18,19,20
3:22 4:3,4,5 9:21
19:3 34:1 54:2
73:20 81:19 99:8
99:12 107:1,7
112:10 115:4
120:10 122:20
132:20
**documentation** 73:6
94:1
**Documents** 3:10
**doing** 20:24 24:17
50:17 87:16 88:5
95:12 113:7 116:7
130:4
**door** 92:9
**downgraded** 49:15
**Dr** 59:14
**draw** 97:23
**dual** 58:7,10
**due** 19:14 75:14,17
76:11 89:2,16
**duly** 5:1 149:5,7
**duties** 35:24 38:23
39:2,7 40:8,10,11
40:13 41:14 43:1
55:6 60:21 61:1
90:3,7 91:3

**E**

**E** 2:1,1,10,10 3:1,5
4:1 99:15 149:1,1
**EAP** 101:7 104:16
105:2,3
**Earicka** 109:18
**earlier** 32:13 50:20
72:2 100:23 104:6
146:20
**early** 104:13 113:12
113:24
**earn** 54:10
**earned** 45:14
**EASTERN** 1:1
**education** 20:6 25:7
102:6 107:9,20

108:3 109:4
117:10,15,21
**educational** 24:5,11
106:18 108:8,13
109:23
**efficient** 74:19
**eight** 126:21
**either** 21:13 37:18
94:21 117:19,22
135:15,22 136:1
145:9
**electronic** 74:5
**Electronically**
149:17
**eligible** 18:16 70:10
110:4 123:1 139:3
140:13 141:14
**else's** 44:2
**employee** 8:10 9:1
16:5,9 21:10 51:24
104:16
**employees** 41:7
50:15,22 62:12
65:11
**employment** 5:22
**enabled** 41:18 42:21
**encourage** 18:15
20:18,24 32:14
50:9
**encouraged** 42:13
50:21,23 51:4
**encouraging** 51:5
**ended** 47:10 50:4
**ends** 44:17
**ensuring** 11:2 40:12
40:16,17,21
**entire** 17:16 144:20
**entirely** 98:1,4
**entries** 20:5
**environment** 24:18
28:21 107:23
**equal** 65:9,14 69:17
**equivalent** 36:13
37:6 38:7
**especially** 75:16
82:21
**ESQUIRE** 2:2,6,7
**essentially** 80:23
**established** 122:24
136:5,12
**et** 1:3
**evaluating** 37:16
**evaluation** 3:12,12
3:13 10:8 11:6
13:11,13,21 15:7
16:7,23 17:24 18:1
19:4,7,14,18 30:10
31:2,3 32:2,4 34:2

34:21 35:8 43:21
44:16,20,21 46:22
47:1 49:7,9,9,17
49:24 52:21 53:22
54:6 67:2 87:21
**evaluations** 3:7 8:14
8:22 9:3 12:1
13:19 21:10 30:2,6
33:11,20 46:3
50:20
**events** 89:4
**eventually** 32:15
52:19 146:17
**everyone's** 124:21
**evidence-based**
23:18
**exact** 59:11 94:10
105:22 111:1
**exactly** 96:9
**exam** 56:6 116:19
117:11,14
**examination** 6:21,21
20:14 55:24 117:2
117:23 118:18
119:9,11 121:11
**examinations** 7:5
118:4,6
**examined** 3:2 5:2
**examples** 58:9
**excellent** 22:10,15
32:10
**exception** 150:7
**excited** 56:12
**exclude** 139:20
140:6
**excluded** 126:21,24
127:17
**excluding** 140:13,19
142:6
**exhibit** 3:24 9:6
26:19 30:18 33:21
34:16 43:17 46:18
55:16 73:14 81:13
83:11 84:20 96:11
106:5 111:4 112:5
114:23 122:16
132:23 144:1
**EXHIBITS** 3:6 4:2
**exists** 11:13
**expect** 43:14
**experience** 21:16
22:19 28:3,17
38:18,20 41:18
42:7,20 45:19
57:19 75:11 109:4
118:13 138:22
141:5,21,24 142:4
142:17 143:12

**experienced** 89:3
**expires** 99:19 114:13
114:14
**explaining** 42:7
**exposure** 42:19
**express** 82:15 146:16
**expressed** 80:22
82:12 108:11,11
146:11
**external** 53:18
**extra** 50:17
**e-mail** 122:22

**F**

**F** 149:1
**facilities** 42:20 76:8
76:20 78:4,13 79:4
82:1,9,21 89:18
90:14 126:4
131:17,18,21
**facility** 41:3 55:5
72:24 74:19 75:10
75:15 76:12 79:17
82:2 84:18 89:17
89:17,22 90:18,21
104:22 130:19
**fact** 18:12 52:18 69:4
98:7 131:5
**factor** 120:2,16
124:7 134:10
**factored** 120:18
**failing** 65:7
**fair** 7:14 10:5 11:8
13:22 16:7 17:8,19
19:10,17 25:24
30:11,13 31:6,9
32:6 35:3,17 36:6
36:14,24 43:10
45:1 47:18 48:11
54:9 56:19 60:23
61:7,7 62:24 63:22
64:1,20 65:18
66:19 68:9 69:2
85:17 87:2,24 88:3
93:9 102:22
105:23 107:12
111:23 116:14
117:4 136:2 138:3
145:23
**familiar** 29:16,19,23
31:10
**far** 82:8
**Farrell** 3:21 71:18
110:24,24,24
111:1,9,14 112:2
113:7
**Farrell's** 112:22
**fashion** 81:5,11

**favor** 110:10
**February** 20:13 26:2
26:14 27:2 56:14
99:5,19
**feedback** 16:12,15
52:3
**feel** 39:3,5 57:2
**felt** 128:5 132:15,18
**female** 61:13 62:4
64:23 65:10
**females** 62:6 67:5
**fifth-month** 44:15
**figure** 10:7
**file** 28:12
**fill** 11:17 16:4 74:16
75:19 126:2 128:6
135:1 137:24
147:19
**filled** 13:12 16:8
34:4 62:8,9 126:14
146:8
**filling** 100:7 124:22
128:23 137:10
**fills** 124:23
**find** 17:9 26:3
124:19 125:11
126:10 127:13
132:20
**fine** 66:22 77:6 81:12
87:6,6 88:18
103:10,14 113:17
113:19 123:23
132:21 141:2
**first** 26:4 48:10
51:10 66:16 99:18
126:16 149:7
**five** 14:18 15:15 50:6
67:24
**five-minute** 57:11
**flagship** 89:22
**flipped** 143:20,21
**floor** 21:4
**focus** 24:1 147:11
**focusing** 140:18
**following** 53:14 76:9
89:13 150:7
**follows** 5:3 113:21
**footing** 65:9,14
**form** 38:12 62:16
63:4,18 65:13,17
67:7 68:13 69:8
75:4,21 77:16 78:6
79:20 81:3,10 83:2
85:15 86:19 88:13
92:22 97:15 98:10
98:22 102:13
117:16 125:17
127:8 130:5,22

---

132:16 135:6
136:3 137:19
139:8,17 140:10
140:16,22 141:17
142:10,23
**forms** 136:6,8,10
**forth** 149:10
**found** 11:8 125:9
126:5,9,12,13
**four** 15:14 56:23
59:10 71:12,13,23
72:6,9 81:8 82:22
102:12 134:18
**fourth** 70:22 75:17
80:24 81:1 106:13
110:20
**four-page** 81:19
107:1
**frame** 90:21
**Frankly** 82:19
**front** 61:11 122:22
**full** 12:9 149:14
**funded** 78:10 85:2
**further** 149:13

_____

**G**

**garner** 55:11
**gauge** 139:12
**gender** 5:11 116:1
140:18
**general** 49:5 51:22
62:11 141:4
144:10
**generally** 27:11
44:19 62:7 75:1
**getting** 32:24 34:24
57:24 120:22
130:8,12
**Giannetta** 3:15
71:16 73:19 75:12
76:4,15 94:8 100:6
101:21 102:12
**Giannetta's** 88:20
89:21 90:10 91:13
101:20 105:13
110:1
**give** 10:6 12:7 31:2
38:15 39:12 44:3
47:17 50:17 68:10
86:5 127:5 134:23
**given** 59:3 62:22
70:7 75:16 76:3,6
77:13,22,23 78:3
85:11,20 86:17
87:23 88:11 92:2
93:21 95:11,18
98:20 100:5
110:19 119:6

126:5 129:23
141:13,20,22
142:6 149:15
**gives** 88:7 116:16
119:23 136:20
147:18
**giving** 12:17 125:8
128:19 138:6
**go** 9:2 13:11 18:15
42:11 69:23 72:9
80:7 92:4 97:10
100:12 114:15
115:17 116:11
122:12 123:3
124:19,21 127:4
133:20 134:5,19
134:24 147:14
**goes** 18:7 78:12
87:20 133:8
142:20
**going** 5:16 6:3 11:15
14:24 16:21 17:10
19:2 30:22 33:19
34:8 35:7 47:9
49:7 54:23 67:13
71:4 74:6 81:23
84:4 88:19 93:22
95:1 96:10 101:20
101:23 102:8
110:1 112:18
116:15 118:9
120:3 128:5,19
132:9 138:10,18
143:8 147:24
**good** 5:5,7 22:24
27:23 32:10 41:17
43:11 45:18 50:22
51:21 53:19 57:7
57:18,18 74:17
86:5 87:4,8,10
88:6 94:7 101:10
105:6 144:11
**goodness** 7:12
**gotten** 8:13,23 19:10
**graded** 49:12
**grading** 7:4
**grasp** 14:3
**great** 9:1 21:10
54:16 69:14 105:3
105:5
**GREENBLATT** 2:2
**Gregory** 138:16,18
**group** 79:11 126:17
137:6
**guards** 40:18
**guess** 11:1 17:14
25:11,19 33:9 34:2
39:3 40:12,16 45:4

47:13 50:3,22
57:23 58:20 64:18
64:19 68:18 71:1
79:12 81:6 82:4
88:3 93:13 94:19
95:1 103:1 104:3
119:2 131:2 135:2
136:14 139:5
140:18
**guys** 27:12

_____

**H**

**H** 2:6 3:5 4:1 7:8
**half** 6:18
**handle** 103:3
**happen** 61:13,14
63:8 64:23 93:23
100:12 109:6
114:17
**happened** 43:13 73:3
87:1 93:12 100:7
**happening** 90:24
**happy** 5:18 62:17
68:24 77:7
**hard** 85:24 87:12
**hate** 147:13,15,20
**head** 59:19
**heads** 17:15,16 20:1
61:12
**hear** 18:9 29:9 80:3
80:4 83:5,7 105:7
113:19 132:3
**heard** 28:24 29:7
53:19 58:4 93:24
101:4
**hedge** 87:23,24 88:2
**height** 19:20 54:13
**held** 1:17 64:21
**Hello** 104:2
**help** 16:17 22:21
57:8 95:1 125:22
126:7
**helpful** 25:8 27:22
41:12 110:21
119:9 133:16
**helping** 75:6
**Hey** 33:11 46:3
**Hi** 57:17 73:24
**hierarchy** 36:23
**high** 36:22 110:12
**higher** 24:7 107:20
132:7
**highest** 11:12
**HILL** 2:6
**hire** 74:11 82:13
146:3
**hired** 74:8 75:18
89:15 120:17

**hiring** 120:6
**historically** 97:12
**history** 3:21 112:9
133:20,22 134:5,9
142:1
**hope** 23:23 24:3
**hopefully** 57:6
**House** 78:14
**housed** 79:9
**HR** 7:9 8:1 24:9
56:17 93:6,19
100:18 102:21
119:10,22 122:1,1
122:1,7 134:14,21
138:8,10,11,13
**HSPAs** 140:5,14,19
**human** 24:21 25:22
44:9
**hundred** 56:6
**hypothetical** 69:23
**hypothetically**
135:24

_____

**I**

**idea** 143:2
**ideas** 52:2,7
**identification** 9:8
20:10 26:22 30:20
33:23 34:18 43:19
46:20 55:18 73:16
81:16 83:13 84:8
84:24 99:10 106:8
106:23 111:6
112:7 115:1
122:18 133:1
144:4
**immediately** 89:15
**impact** 62:4,12 63:1
63:15 65:10 72:7
72:12
**implemented** 137:5
**implementing** 23:17
**implicate** 132:7
**important** 24:13,14
24:23 25:2 26:9
**impression** 8:9,20
30:18 35:20
**improved** 13:24 14:4
**incarcerated** 24:2,19
45:21 54:21 79:14
**incidents** 105:5
**included** 86:3,8,16
89:4
**includes** 85:21
**Including** 47:22
**incorporating** 16:15
**incorrect** 144:16
**increased** 53:4

**incumbency** 58:8,10
**Independence** 70:24
**individual** 107:21
123:15 129:15
**individuals** 79:4
109:7 110:10,14
120:19 123:10,19
131:5 134:19
**Industries** 59:15,17
**industry** 75:2
**ineligible** 62:2
**inform** 52:9
**information** 119:8
**initially** 109:7
**initiatives** 19:21
53:13 54:17,23
55:1,11
**inmates** 74:20 78:24
79:11,11,12
**input** 89:11 124:21
125:8
**Inquirer** 116:8
**inside** 42:19
**instance** 37:23 41:11
124:2
**Institute** 74:24
**institution** 75:3
**instructor** 57:8
**intake** 55:4 89:17
**intelligent** 8:11
45:18
**intense** 41:16
**interaction** 53:10
**interactions** 53:10
**interchanging** 64:9
**interpretation** 137:4
**interpreted** 136:19
**interview** 3:11 12:13
12:20 13:3 28:5,6
34:3,7 93:7,8
97:10 110:13
118:15,21 124:18
128:2 131:15
133:12 138:6,18
143:9,24 144:7
**interviewed** 34:13
91:24 92:20 93:10
98:21 100:17
119:12 128:10
137:9 146:22
**interviews** 12:10
120:19 138:9,14
**intricate** 114:8
**introduced** 54:19
**involved** 29:2 34:6
41:2 45:5,8 58:6
58:12,13 59:2,16
72:18 73:11 86:1

91:1 108:6 120:5
122:9
**involvement** 41:20
42:8 125:6,15
**IP** 79:13
**IPs** 79:12
**issue** 27:7
**issues** 8:13 27:5
75:14 76:12 78:3
**item** 77:3,10

**J**

**J** 2:7
**Jennifer** 2:12 5:11
8:16 98:18
**Jersey** 1:16
**Jessica** 2:12 5:10
91:20 98:17 101:2
**job** 8:21 11:9 15:11
19:11 24:18 27:16
29:17,23 31:11
40:13,19 47:4
51:21 54:11 61:1,2
72:3,7,12 87:16
88:6 95:12,15
104:24 105:4
120:3 127:5
128:19,20,21
129:15 137:24
142:8,9
**jobs** 141:14
**John** 2:7 70:14
**Joyce** 22:1
**judge** 135:3
**judged** 134:13
135:19 136:24
**judgment** 39:4,6
**July** 43:22 47:11
50:4 70:18,20
121:12 147:3
**June** 6:15 7:14
**justifications** 86:22
86:23

**K**

**keep** 54:21 67:13
121:5 131:20
**kind** 6:22 15:20
18:19 23:13,19,20
24:20 25:6 26:4
27:12,16 30:9,17
32:12,18 33:15
36:3,22 40:8 46:2
48:1,7 50:16,17
51:20 60:5 62:19
64:8 68:20 87:12
87:21 88:8 90:9
93:11 105:4

115:16,17 116:11
118:6,7,12,13
119:23 123:4
126:8 135:5
138:11
**kinds** 46:10
**know** 5:18 6:22 9:10
11:5 12:16,19 13:8
13:16 14:2,5 16:18
18:8 21:1,3 22:11
23:7,8,17,24 24:1
24:17,19,20,20
25:8 26:1,4,7,11
26:13 27:12,14
31:13 32:3,24
33:11,18 34:6 38:8
38:23 39:2,8 41:9
41:16 46:3,4,4
49:2,14,21 50:14
51:23 53:11,13,18
53:22,24 54:18
56:5,7 57:6 59:4,6
60:22 62:8 65:6
66:16 67:3 71:3
73:3,10,12 74:23
75:5,8 76:18 77:1
78:23 79:3 81:4
86:21,22,23 90:6
90:10 93:16,18,18
93:22 94:1,9,14,20
96:3,5,7 99:1,4,22
99:24,24 101:4,6
102:20 105:23
108:11 109:6,20
109:23 113:11,22
114:8,9,18 115:13
115:18,22 116:3
118:7,9,10 120:13
121:10 122:6,10
124:6,20 129:2,3
130:23 131:14,15
136:4,20 138:11
143:19 146:16
147:1,17
**knowing** 14:10 113:9
**knowledge** 118:24
119:8 122:6
149:16 150:6
**known** 14:8

**L**

**L** 2:10
**labeled** 9:20
**lack** 89:2
**Lacombe** 95:22 97:1
102:1,1 105:14,24
109:9,21 128:7,15
129:23 130:16

146:4
**Lacombe's** 101:24
**language** 146:19
**large** 126:10
**largest** 55:5
**latitude** 134:24
136:20
**law** 149:8
**lead** 75:3,9
**leader** 87:10
**leadership** 22:23
29:16,18 31:10
57:21 61:9 62:8,23
74:18 76:20 87:3,4
87:8 89:19
**leaning** 118:3
**learn** 14:4,11,12
52:17 107:22,23
**learned** 9:11 18:17
**learner** 14:11
**learning** 14:9 48:7
**leave** 26:12 111:17
**left** 59:9,24 74:10
132:5
**letter** 3:8,14 20:12
26:1 55:21
**letting** 94:14
**let's** 18:11 39:15
64:5 67:23 69:15
79:10 134:18
**level** 14:7 32:18
35:22 37:2 40:17
41:1 107:20 108:3
109:3 146:12
**levels** 34:12 109:24
**Lic** 1:16
**License** 149:3,18
**lieutenant** 40:1,6,17
41:2
**line** 77:2,10 128:8
150:10
**list** 7:1,3 18:2,13,18
20:16 26:2 56:21
56:23 74:8,11
75:18 89:15 91:14
91:17,22,24 92:4
92:19 93:4,10,12
93:14,17 97:6,10
97:22 98:1,3,6,8
98:13,15 99:5,18
100:10,13 105:18
105:24 110:17
113:11,12,14,23
113:23 114:2,4,7
114:10,11,12,13
114:14 115:11,13
116:3 117:9,13
119:12,16,21

121:12 123:1
124:4 126:7,21
127:4 128:6
129:14 132:12,13
134:19 136:24
140:14,20 146:22
146:23,24 147:3
**listed** 150:7
**listened** 79:19
**little** 23:8 31:17
35:24 53:12 101:9
119:24,24 132:7
134:23
**loaded** 65:14
**local** 116:5
**long** 62:18 104:19,20
**longer** 47:6,8
**look** 79:1 100:10,14
100:15 102:8
114:10 121:20,22
**looked** 83:3
**looking** 25:24 32:6
54:2 61:12 74:3
83:18 96:11 121:9
**looks** 13:17,20 15:12
15:13 19:7 31:4
32:20 44:15 45:2
47:6,10 121:17
126:11 128:11,12
**lose** 38:4 79:21
**lost** 62:19 79:23 80:1
80:11,16 147:15
147:20
**lot** 14:3 19:21 42:18
54:17,22 55:5 63:7
104:11
**Louis** 1:15 149:2,17
**luck** 32:10
**lunch** 103:1,9 105:11
**Luncheon** 103:18
**Lyde** 1:3 2:11 3:11
3:12,12,13,15 5:10
8:7 10:7,15 26:7
30:15 31:2,7 34:4
34:21 35:8 41:11
41:14 42:11 43:22
44:6 45:5 46:22
48:8 49:17 51:12
52:22 53:22 54:7
54:14 55:23 58:21
62:10 87:9 88:11
91:16 98:16
100:20 132:11
133:4,13 134:7
138:19,21 146:2
146:10
**Lyde's** 10:20 11:6
31:11 33:3 42:7

50:2 55:10
**Lynda** 59:14

**M**

**main** 89:17
**major** 49:14 101:3
126:3,23
**majority** 128:4
**making** 14:21 53:13
65:22 76:7 102:9
141:15 147:23
**male** 61:14 79:12
**management** 51:24
52:3
**manager** 32:17
**Manchello** 1:15
149:2,18
**mandated** 137:12
**manner** 67:10 74:19
76:1 77:18 135:4
**March** 114:19,21
**mark** 9:5 20:7 26:19
30:18 33:20 34:16
43:16 46:17 73:13
81:13 83:10 84:5
99:8 106:4,21
111:3 112:5
114:22 122:15
132:22 143:23
**marked** 3:6 4:2 9:7
12:10 20:9 26:21
30:19 33:22 34:17
43:18 46:19 55:17
73:15 81:15 83:12
84:7,23 88:21
96:11 99:9 106:7
106:22 111:5
112:6 114:24
122:17 132:24
144:3
**Market** 2:7 101:23
**marking** 84:20
**marks** 19:8
**master's** 25:3,5,10
25:18 102:21
108:17,20,24
133:13
**material** 149:20,20
149:21
**matter** 5:9 96:11
119:20
**Maxwell** 122:24
**mean** 18:7,23 22:11
22:21,22 26:16
28:20 46:12 54:16
70:10 85:24 92:18
97:21 98:8 115:21
131:3 134:14

136:7 144:24
146:15 147:13,19
**means** 65:13
**meets** 110:11
**members** 53:11
91:23 92:19
**memorandum** 3:9
27:1
**memory** 29:10 70:21
71:2
**men** 61:9
**mentioned** 68:13
**merely** 108:24
**mess** 82:20
**method** 118:2
**methods** 117:7,12
136:16
**Michele** 3:21 111:9
**middle** 55:4
**MIKAILA** 2:7
**mindset** 23:13,14,20
**mine** 34:5
**minutes** 103:5,8
**missed** 113:16
**mistake** 44:4
**Mm-hmm** 47:21
**model** 57:7
**moment** 112:4
120:20
**months** 14:17,18,19
45:1 47:13,17
**morning** 5:5,7 57:18
79:2,2
**move** 42:21 57:8
93:12 141:1

**N**

**N** 2:1,10 3:1
**name** 5:8 59:12
**Nancy** 3:15 73:19
**narrow** 126:7
**narrowed** 128:1
**National** 74:24
**natural** 20:20
**nature** 24:16 89:16
**navigate** 16:18
**nearly** 50:6
**necessarily** 22:21,22
141:9
**necessary** 75:9
108:15
**need** 25:5 74:17
78:12,15 107:14
108:2,20 114:20
141:4,21
**needed** 14:12 71:22
72:20 86:23 87:2
**needs** 22:18 144:12

145:1,12
**negative** 29:1 62:4
62:11 63:15 65:6
105:8
**negatively** 63:1
65:10 67:4 140:8
**never** 8:11,23 58:12
74:9 78:21 147:16
**new** 1:16 14:3 16:16
16:18
**newly** 87:19
**News** 116:9
**newspaper** 116:6
**Noah** 2:2 5:8 9:13
80:16
**nonuniform** 23:11
36:8,9,11 38:1
61:8,19,22 62:1,9
62:13,23,24 64:5,8
64:9
**non-commissioner**
134:17
**normal** 21:2
**Norman** 3:21 96:1
109:21 111:21
112:10 123:13
130:8 134:3
136:24 146:3
**Notary** 1:17 149:3
**note** 133:13
**noted** 149:6
**notice** 19:13 93:21
122:24
**November** 5:24
**number** 7:2 15:21
20:15 43:24 56:9
93:15,15 98:16,17
98:18 116:16
123:15 126:9,10
126:11 128:14
149:19
**numbers** 30:24
61:11
**numerous** 75:14
76:12
**N.J** 149:3,18

**O**

**O** 2:10
**objected** 147:21
**Objection** 38:11,22
62:15 63:3,17
65:12 67:6 68:12
69:7,22 75:4,21
77:16 78:6 79:20
81:3,10 83:2 85:15
86:19 87:5 88:13
92:22 97:15 98:10

98:22 102:13
117:16 125:17
127:8 130:5,22
132:16 135:6
136:3 137:19
139:8,17 140:10
140:16,22 141:17
142:10,23
**observed** 58:5 101:5
**obviously** 119:18
**occasion** 146:9
**offhand** 26:3,6
**office** 80:14 104:18
120:22
**officer** 28:3 105:3
143:13
**officers** 40:18
**official** 94:1 113:13
114:1
**off-ramp** 88:8
**oh** 7:12,16 10:10
28:1 44:6 57:3
73:24 90:1 92:12
96:15 101:5
134:16 143:6
**okay** 12:12 34:15
36:10 38:4 39:12
39:16,19 40:4 41:6
44:14,17,18 46:14
47:12,18 51:11
64:13,14,16,20
66:2,19 67:14
68:19 69:11,15,16
69:18 70:21 71:1,2
71:19 73:24 77:11
77:12,22 82:6
85:17 95:2 98:18
99:17 100:3,4
127:1 132:17
137:11 143:5,6,22
**oldest** 9:23
**once** 18:17 24:4
34:21 71:6 87:1
100:12 131:19
134:11 135:18
**ones** 63:9 126:13
**one-on-ones** 16:17
**one-to-one** 124:1
**onsite** 112:18
**open** 60:4 98:21
105:12 123:11
**opened** 6:8 121:12
**opening** 83:7 97:8
**operated** 121:14
**operating** 83:16 84:5
**operation** 41:3
**operations** 104:1,5,8
**opinion** 28:9 42:10

79:18 81:7,9 82:24
86:18 92:3 97:19
107:18 108:11
109:2 110:6 117:1
118:3 138:24
139:2,6 144:15,17
144:19,24 145:2
**opportunities** 58:7
61:21
**opportunity** 6:6
16:11 79:1 87:15
119:7 147:17,18
**opposed** 66:11 69:6
108:24 117:15
**options** 48:24 107:10
**oral** 1:13 6:21 56:6
116:19
**orally** 6:23
**order** 18:21 21:7
22:19 105:17
107:12 108:19
116:12 128:3,9
129:14 137:23
**organizational** 36:23
**outside** 7:6 21:2 46:2
58:4 134:24
**outstanding** 8:23
11:10 14:8 15:10
15:12,16 17:2 19:8
19:19 31:18 32:9
33:12 35:1,4,11,14
35:23 53:5
**outstandings** 15:15
**out-of-class** 60:17
**overall** 8:9,20 15:17
15:19,20,23 30:17
32:8 35:20 49:13
51:23 53:1
**oversight** 55:4
112:19
**o'clock** 102:24

**P**

**P** 2:1,1,10
**page** 3:2 11:15 14:24
16:21 19:2 35:7
74:4 83:24 99:15
99:18 106:11,13
106:17 116:15
122:22 123:4
133:3 150:10
**paid** 61:1 77:21
85:12,16 94:7
95:18 96:4,6 113:6
**pandemic** 19:21
54:13,15,17,23
55:11 59:9,24
90:24 147:20

**panel** 12:5,9,19
124:14
**paper** 33:15,16
93:19
**paragraph** 74:7,14
75:12 76:2,3,3,10
81:24 82:7 89:1,10
89:14,20 96:12
101:21 102:3
**paragraphs** 105:11
105:12
**part** 7:1 12:3 16:5
33:3 41:7 45:12
46:15 61:4 71:24
72:3,22 73:9 82:17
86:11 91:5,7,8
124:11 126:10
129:4 142:1,8
**particular** 110:10,14
**parties** 1:17
**parts** 116:16
**party** 147:21
**pass** 116:12
**passed** 20:14 55:24
**Patterson** 109:17,18
123:15 128:8
**pause** 42:2,4 121:2
**pay** 60:18
**payroll** 43:24
**PDP** 21:18 29:15
31:9 74:12 75:11
75:17 77:1,24 81:2
82:13,22 114:20
147:22
**PDP's** 147:10
**Pennsylvania** 1:1,17
2:4,8 149:4
**people** 7:4,5 18:8
26:10 29:22 45:21
50:14 53:5,13,15
57:20,24 62:12
93:9,10,14 103:6
109:8 110:4
118:12 124:16
126:12,13 127:5
145:7
**percent** 7:7 61:6
94:13 116:20,23
**perform** 49:4 54:14
**performance** 8:14
8:21,22 11:9 13:19
15:11 21:9 29:17
29:23 31:11 32:8
54:11 55:7 104:24
**performed** 55:2,3,6
**period** 6:10 14:14,22
32:9 44:16 45:2
47:10 60:6 87:14

87:17,20,24 88:7,7
90:11,12 100:24
101:14 104:20
109:15 123:14
**periods** 104:10
**permanent** 87:22
**permitted** 61:20
89:11
**person** 13:15 24:2
88:5 92:20 101:15
110:4 128:20
138:11
**personnel** 41:10
**persons** 24:19 54:21
79:14
**person's** 112:19
**Pertaining** 118:24
**pertains** 37:17 118:1
**Philacor** 59:18
**Philadelphia** 1:6 2:4
2:8 5:23 7:5,6,8
57:20 60:24 71:22
72:5 77:9 83:16
**phone** 48:19
**phones** 54:20
**phrasing** 57:22
**PICC** 83:24 84:15
85:7 111:21 112:1
112:16 113:5
130:9,10
**pick** 136:16
**picked** 135:20
**picture** 80:12
**piece** 23:5 28:23
**PIERCE** 2:2
**Pierre** 101:24 102:4
102:9 109:21
130:16 146:4
**pipeline** 63:9,14
**place** 7:19,22 13:9
56:15 92:7,15
112:19 146:17
**Plaintiff** 2:5
**plaintiffs** 3:19,20,22
5:9 55:20 73:20,21
106:6 107:2
111:10 115:3
116:16 120:11
**Plaintiff's** 9:6 81:13
83:11
**Plaintiff(s)** 1:4
**plan** 102:24
**planning** 18:19 91:5
91:7,9
**play** 23:9
**player** 21:5
**please** 32:9 58:3
92:10 94:22 95:4,7

120:24 127:9
129:13
**plus** 28:11,12,17,18
28:23
**point** 31:21 32:16
44:8,23 47:4 48:1
52:10 67:22 68:4
78:12,21 104:15
108:2 126:22
127:20
**points** 30:1 67:2
121:18
**policies** 23:12
**policy** 21:3 74:12
91:23 95:9 135:5
**pool** 64:24 65:2
67:17 110:15
**popped** 48:19
**population** 23:6,7,18
54:18 76:24 78:12
110:19
**positing** 136:15
**position** 6:9,10,20
12:14,17,18,24
14:10 18:3 19:1
20:15,21 21:12,13
21:14 22:12,23
32:21 33:1 36:14
36:22,24 37:18,24
38:1,4 39:1,19,20
39:24 40:4,23 41:4
41:8 45:9,11,15
47:11 48:3 50:5,10
50:14 51:6,9,14
56:1,10 58:14 60:4
60:5,11,17,22
61:22,23 62:1,2
64:18,20 65:10
66:1 67:16,18,21
68:2 69:16,18,21
74:9 75:19 77:21
78:5,10 83:19
84:10 85:3,12 86:7
86:17 87:10 88:6,9
91:4,10,24 92:21
97:6 98:16,17,18
101:15 102:16
104:22 107:13
108:5 109:18
110:5 113:7
114:15 115:7
117:2,13 118:1,16
123:2 126:6 130:4
133:17 134:7
135:17 139:16
141:11,14 142:22
144:11
**positions** 5:13 38:3

56:16 57:21,24
58:22 59:1 62:8
63:24 64:15,17
70:5 74:17 82:23
85:21 98:21 100:8
115:19 123:11
124:22,24 126:1
127:22 128:6
131:13 135:1
137:10 146:21
**positive** 55:12 57:7
134:10
**possibility** 26:11
72:8
**possible** 56:5 87:3
**post-release** 45:20
**potential** 46:11
50:13 123:6
127:17
**potentially** 41:13,22
42:9 134:7
**practice** 74:12
**preceding** 76:3
**preclude** 141:11,15
**predict** 87:13
**predominantly**
28:16 64:1,21
67:21
**preference** 121:18
**prepared** 101:19
**prepares** 43:2
**present** 5:13 110:5
**presented** 6:23 83:23
106:12 110:18
147:5,7,9
**pretty** 13:2 33:16
41:4,16 45:18,21
96:23 118:9
120:23
**prevent** 145:7
**previous** 25:19 59:23
94:21
**previously** 36:18
43:6
**pre-release** 45:19
**pride** 57:2
**Primarily** 61:17
**principal** 85:21
**printed** 149:21
**prior** 59:8 74:7
111:24 112:14,14
112:22 116:2
130:8,12,16
**prison** 25:8 36:4
46:9 52:4 58:1
71:22 77:9 83:16
84:21 87:2 91:23
95:9

**prisons** 5:24 52:1
57:20 60:24 72:6
**private** 80:14
**privy** 46:12
**proactive** 8:12,24
**probably** 23:5 29:12
29:13,19 41:2 44:5
44:7 70:5 90:13
98:5 100:14
104:13 125:22
**probation** 44:17
50:4 87:17
**probationary** 14:14
14:22 44:16,21
45:2 47:10 87:14
87:20,24 88:7,7
100:23 101:14
109:15 123:14
**problem** 8:12,23
27:6 45:10 48:20
110:5 124:11
137:15
**problematic** 68:24
102:11,14
**problems** 8:13 9:1
21:5
**procedure** 21:3
97:10 112:20
**Proceedings** 57:14
103:20 145:20
**process** 6:24 12:17
14:9 18:23 25:20
33:4 34:7 45:13,20
59:2 68:21 73:9,11
87:14 91:7,9 92:5
114:7,9 116:10,12
120:6,13 122:9
124:12 127:3
129:5 137:17,18
137:22 138:4,11
140:7 142:9
144:20
**professional** 8:1 24:9
25:22 56:18 93:7
100:18 102:21
119:11,22 134:22
138:9
**professionalized**
108:5
**profile** 12:20 28:5
**program** 6:6,9,20
8:18 10:16,18
11:24 12:8 17:5,9
17:15,20 20:3,21
21:13,21 22:4,7,14
22:18 25:3 27:16
35:24 36:13,16,19
36:21 37:3 39:16

39:18 41:15,19,21
42:8,11,16,21 43:1
43:2,8,11 44:9,24
45:11,15 46:2 47:2
48:8,10,13,16,21
48:23,24 49:1,18
50:5,10 51:1 56:20
58:17,21 59:19
62:3,5 63:10,13
65:1,4,8,24 67:18
68:3 69:3,5,19,21
70:9 104:17
108:20 138:24
139:7,15 141:11
141:13,22,23
142:7
**programmatic** 23:17
**programs** 23:18 41:5
**progress** 63:14
146:12
**progression** 20:20
42:24 50:2 94:10
97:4 112:17,20
119:13
**promote** 12:24 45:5
45:8,9 46:1 50:18
63:9 65:23
**promoted** 5:12 6:2,3
6:10 10:17 11:23
20:19 21:12 33:1,8
48:2 59:4 62:13
87:19 104:21
109:8 123:16
124:12 146:3
147:18
**promoting** 13:4
34:10 144:20
**promotion** 6:24 7:10
12:4,7 14:15 18:16
21:8 26:10 32:14
34:13,22 45:15
50:10 51:5 59:2,21
91:23 93:4 111:24
112:11,15 123:20
124:2,3,18 129:24
130:9,13 147:17
147:21
**promotional** 18:18
33:4 56:20 58:14
58:15 61:20 74:11
92:19 99:5 105:18
113:12,23 114:4,7
117:8 140:14,20
146:22
**promotions** 44:22
46:11 58:16,21
59:3 147:23
**proper** 97:9

properly 40:13,18
protocol 46:9
protocols 113:9
provide 16:11 24:2
89:11
provided 94:2
129:19
provider 28:22
providers 42:17
53:16,18,19
provides 28:21 89:19
provision 105:2
psychological 20:6
psychologist 58:18
59:5,9,13
Public 1:17 149:4
push 30:5 50:18
put 18:2,24 28:4
31:22 37:20 57:21
90:21 96:23 132:6
P-10 88:21
p.m 103:19,21
145:19,21 148:8

**Q**

qualification 106:14
110:11
qualifications 107:4
142:21
qualified 26:15 38:3
56:10 98:9,12
qualify 107:13
quality 17:9,20
question 5:17 27:9
33:9 37:21 39:9,10
48:18 55:9 63:5,19
65:15 66:8,13 67:7
68:17 69:10 79:8
80:3,20 81:6 86:1
90:16 92:24 94:7
94:21 95:7 98:24
101:1,16 113:16
113:22 117:18
123:21 124:6,9
125:19,22 127:24
131:24 132:2,4,7
134:14 135:2,8,9
137:13,20 138:2
139:6,10,18
140:12,17,23
141:19 142:14,24
questionable 12:11
124:20 125:10
144:8
questioned 119:7
questions 5:16
108:12 118:7,22
148:3

quick 33:13 92:9
quite 55:9 71:13
79:8 137:13
quoted 149:20,21

**R**

R 2:1,10 149:1
race 115:24 116:1
ran 90:14
rank 8:4 28:12
118:12 122:3
135:16 137:23
ranked 20:15 56:23
123:10,15 124:3
132:11
ranking 56:7,8
119:14,17,18,20
120:2 123:6 124:7
127:4 128:12,20
129:15 134:20
rankings 117:8
120:14 121:9,15
123:19
ranks 144:13 145:1
145:13
rate 104:24
rated 19:19 31:18
69:17
rater 10:8,15 15:6
16:8
rating 11:12,18
15:17,19,20,23
17:3 35:1,12,15,23
44:3 47:19 53:1,5
ratings 10:6 11:2,6
11:11 35:4
RCF 72:15 73:2 76:6
76:16 80:22 83:19
84:10 85:3 97:2
101:22 130:17
reach 119:24
read 69:9 113:20
116:5 149:20
150:4
ready 57:24 100:21
101:11
real 92:9
realize 14:7
really 64:18 71:22
81:6 86:5 99:16
reask 80:20 104:3
reason 76:21,23
77:13 78:4,11 81:1
89:6 107:24 134:6
recall 7:11,12 11:7
13:1 19:15,16 26:6
29:8 30:7,12 31:16
32:5 33:3 46:7

53:24 54:1 56:13
58:11 59:4,11
71:10,24 72:21
73:8 82:18 90:8,23
91:5,6 93:24 94:2
108:9 111:1
113:13 114:1
121:13 122:4
127:6 128:4 131:7
138:9 145:14
receive 38:21
received 19:8 20:13
35:11,14 56:2
receives 38:19
receiving 73:8
112:15
receptive 16:16,19
52:2,5,6
recess 57:12 103:18
145:18
recognition 55:12
recollect 146:14
recollection 45:24
96:22 106:2
111:20 126:8
128:12 129:10
132:19 137:8
146:6
recommendation
125:1,7 129:18,21
131:4
recommendations
12:22 129:20
record 3:11,12 9:14
9:15 12:20 28:5
30:9 34:4 66:10,21
80:18 122:13,14
132:9 133:12
138:19 143:9,24
144:7 149:14
recorded 13:3
reduction 76:23
reentry 23:20,21,24
refer 119:17
referring 19:24
60:10 86:14
120:10 139:23
reflect 55:7,11
reflects 55:23
regard 54:24
regarding 23:21
27:12 52:3 71:8
108:7 131:4
138:19 142:21
144:6 147:11
regards 5:12 61:24
62:10 90:16 93:3
100:7 101:1,16

121:11 144:20
regulations 110:2
142:20
rehabilitate 24:19
reiterate 139:5
relate 38:3
relation 38:24 90:9
relationship 27:24
53:5,15
relative 33:14 69:4
release 24:4 41:15
41:21 42:8,11,16
45:20
relevant 56:9 119:8
remain 131:17
remaining 134:12
remember 12:23
14:20 20:24 48:7
53:8 70:14 71:20
101:23 110:23
126:20 133:21,24
repeat 48:18 95:7
113:15 141:18
rephrase 5:18 62:18
62:20 69:13 85:18
98:24 117:17
123:21 125:20
130:7
rephrased 88:15
replace 89:12,15
replaced 18:22
replication 149:21
report 36:16 51:23
reporter 1:16 113:18
113:20 149:3,18
149:23
reporting 32:8
reports 18:15 20:19
26:8,12 32:14
40:22 57:5
represent 9:20 70:17
77:6,8 98:14 100:2
representation
98:20
reproduced 149:20
reproduction 149:23
request 27:6,7 67:9
requested 114:4,5
116:11
requesting 27:2
require 75:2 110:3
required 102:17
106:19 108:14
137:16
requirement 24:6,12
25:16,17 106:1,18
108:1,8,14
requires 89:18,24

90:1
resigned 99:23,24
Resolves 8:13
resources 24:3 25:22
responded 102:7
response 101:18
responsibilities
37:10,14,17 38:2
40:14,19 60:22
76:6 90:3,7 91:3
94:4 97:2
responsibility 60:15
75:13 76:11,16,17
79:16 94:16
112:24 113:3
responsive 105:4
restate 98:24
Restorative 10:21
resume 113:2 118:10
resumed 57:14
103:20 145:20
retire 71:4
retired 70:18 71:6
71:11 72:10,14
73:5 81:24 89:2,6
89:8 90:14 94:8
96:8,18,22 97:9
100:3,6 110:17
111:15 113:1,8
retirement 71:4,21
90:10 91:14 104:9
110:23 112:22
retiring 70:15,22
reverse 28:14
reviewing 136:11
revised 30:10 106:3
106:14 107:4
revision 107:13
ridiculous 82:20
right 5:19 10:12,14
11:3,10,13 12:23
13:5,6 15:13,15
18:10 19:8 21:14
22:6 24:5 25:11
30:3,9 31:19 35:1
35:5,12,15 36:4,12
37:11,14 39:24
40:11,14,15,20
43:10,14 45:7
46:23 47:5,14,20
47:23 49:9,13 50:7
51:2,8 52:15 56:24
59:9,24 60:12 62:3
62:7 64:9,17 69:20
70:19 71:12,19
72:3,10 78:14 82:4
85:3 86:3 88:5,9
88:22 89:23 90:2

90:16,18 91:14,17
102:17,19 105:10
105:10,21 106:15
107:5,10 108:19
108:21 109:12,18
110:16,17 113:1
114:12 115:8,11
117:20,22,23
118:16,19 119:3,4
119:14,15 124:4
126:5,18 127:5,18
127:21 128:22
129:1,2,4 130:4
131:10,10,19
132:12 133:14
135:2,13,20
136:17 137:7,23
137:24 138:1
139:5 141:1 142:4
143:13 144:13
147:4,6
**Rina** 102:1,3
**risk** 14:21,23
**Riverside** 79:16 82:2
130:18
**Robert** 137:1
**Rodica** 99:1,23
**role** 8:18 13:24
27:22 33:1 44:11
44:24 49:17 50:4,6
54:24 57:7
**roles** 57:21 61:9
62:23
**room** 131:3,12
**Rose** 137:1
**rotate** 123:4
**round** 26:5
**rounded** 28:20 42:15
**rounds** 110:13
**RTS** 10:22 11:1
17:12,13,13,16,18
17:20 20:1 23:3,14
23:16 28:17 36:7
53:17 55:8 63:16
64:1,9,12,13,16
68:11
**rule** 7:19,21,23 13:9
56:15 92:7,15 93:3
93:17,17 115:10
115:11,13,16
116:2,3 119:18,21
119:23 134:15,23
136:19,24 137:4
138:7,15
**run** 74:18 112:1
**running** 82:1,9
90:18,20 110:21
111:21

**S**

**S** 2:1,2,10,10 3:5 4:1
**safe** 74:19
**Samuels** 101:23
**sat** 26:16
**saw** 27:6
**saying** 28:6 32:13
62:5 64:7 66:18
82:8 112:3,21
134:16 135:23
136:10,14,18
**says** 15:19 55:24
74:6,16,23 75:8
76:10 81:24 82:12
82:19 89:11,14
138:21 140:1
144:10
**schedule** 27:3
**school** 6:3 107:22
**score** 56:2,9
**scores** 110:11
**screen** 9:10 30:22
79:24 80:10,17
96:14
**Seafood** 101:23
**seat** 91:11 92:2
**second** 96:12 99:15
122:13
**security** 28:12
138:22 140:6
141:4,21,24 142:4
142:17 144:13
145:1,12
**see** 9:24 10:8 15:23
20:16 27:3,7 33:11
33:13 35:23 49:20
50:13,15,20 52:16
52:19,23 53:21
55:21 56:4 76:21
76:23 77:13 78:4
80:9 81:21 83:20
84:12,22 96:19
99:13,14,20
101:14 106:15
107:15 111:11,15
111:19 112:11
114:10 115:5
116:17,24 123:6
137:1 138:20,23
141:5 144:6,9
146:16
**seek** 32:14 50:9 51:4
51:5
**seeking** 20:19
**Seeks** 8:24
**seen** 21:20 98:3
**SEIDMAN** 2:6 9:13
15:2 38:11,14,22

42:1 62:15 63:3,17
64:4 65:12 66:5,9
66:15,20 67:6,11
68:12,19 69:7,22
70:2 73:23 75:4,21
77:16 78:6 79:20
80:2,6 81:3,10
83:2 85:15 86:19
87:5 88:13,22
92:22 94:19,24
96:13 97:15 98:10
98:22 102:13,23
103:7,14 113:15
113:18 117:16
121:3,7 125:17
127:7,10 130:5,22
131:23 132:3,8,16
133:6,10 135:6
136:3,9 137:19
139:8,17 140:10
140:16,22 141:17
142:10,23 143:16
143:18,22 145:17
147:14 148:6
**select** 22:23
**selection** 93:8
**selfish** 50:16
**seniority** 116:22
**separate** 76:19,20
82:1,9,21,22
118:18
**September** 11:17
13:12 15:1,2,5
16:22 17:24 18:1
19:3 34:20 46:23
47:16 49:8,16 50:3
50:7 51:16 52:22
54:4 96:18 98:14
100:6 147:8
149:19
**sequence** 128:17
**served** 57:7
**service** 14:14 17:13
17:17 18:23 23:22
25:19 53:17 56:15
61:17 63:6,12
64:12,14 117:8
140:21 142:20
**services** 10:22,23
20:4,5 24:2,7,12
24:23 28:21 32:17
36:6 38:9 44:9
64:3,16 68:11
**set** 27:15 118:8
149:10
**setting** 54:17
**seven** 6:17 15:15,17
127:21 128:1

129:5 134:12
135:13,18 136:17
**seven-page** 9:21
**shadowing** 57:24
**share** 9:9 30:22
55:15 96:13
**sheet** 79:2,3 124:18
143:24
**sheets** 13:3
**Sherell** 122:24
**shifted** 93:17
**shop** 42:12
**Short** 57:12 145:18
**shot** 38:15 39:12
**show** 9:12 21:10
26:18 73:7 74:4
77:7 83:8 87:15
99:7 132:9,20
**showing** 9:19 20:12
26:24 30:23 34:1
73:18 85:12 111:8
112:4 115:4 133:3
133:12
**shown** 13:6 105:11
**shows** 15:9 106:13
**shut** 92:9
**sick** 111:17
**side** 21:22 23:3,4,14
23:15,16,22,22,24
24:7,8,12 28:16,17
36:5,6,7,8,8,9,11
36:12 37:7,10,24
38:1,9 40:1 55:8
61:8 62:9,13,23,24
63:7,16 64:1 66:2
67:3,4 68:11
**sides** 23:23
**sign** 13:18
**signature** 10:3 13:18
74:4,5 111:11
**signed** 30:3 81:20
111:9 149:17
**similar** 40:9
**simply** 69:4
**sir** 5:20 15:8 16:6,10
19:6,9,12 20:17
21:19 38:5 55:22
56:4,7 88:10
103:11 111:13
116:18 130:11,15
130:20 140:12,24
141:19 142:12
143:1,11,14 144:9
144:14,18,22
148:4
**sit** 12:5
**site** 76:6 94:4,15
97:2 112:24 113:2

**sites** 49:3
**situation** 43:7
**six** 14:17,19 15:15
15:17 45:1 47:13
47:17
**six-page** 73:19
**skill** 118:8
**skills** 23:2,9 49:5
**slots** 128:23 130:1,2
146:7
**social** 6:1,4 10:10,13
12:8 17:13,17 22:1
23:22 24:6,12,23
25:4 31:4,15,23
32:16,19,21 33:6
34:9,10,22 35:22
36:6 37:3,13,24
38:9,19 40:5,9,12
41:4,12,17 42:18
42:24 53:17 54:20
61:17 63:6,11 64:3
64:12,14,16,17,19
64:22 65:1 67:16
67:20 68:11
133:14 140:20
**solve** 8:24 21:5
**somebody** 28:15
33:9,10,14 60:8
**someone's** 8:4
**Son** 101:23
**Song** 122:22
**sorry** 15:3,23 27:9
45:9 48:18,19 65:7
65:19 69:24 77:5
83:6 92:10 94:6,7
96:15 112:2 114:5
123:22 124:10
137:14,21 143:3,4
143:7 146:11,18
**sound** 8:11 22:11,13
22:24 36:1 146:19
**sounded** 94:20
**sounds** 68:20 71:19
**speak** 58:2
**speaker** 149:21
**speaking** 62:7
146:10
**Special** 82:3
**specific** 20:23 29:5
61:1 110:3
**specifically** 21:24
22:1 24:22 54:24
61:24 77:14
105:12 117:14
**specifications** 108:7
**specs** 106:2 110:9,13
121:17,19,21,23
122:3 145:7

**spent** 39:17,20 40:5
40:6
**spirit** 115:18
**spot** 42:22
**spots** 126:14
**spread** 80:23
**staff** 21:3 61:13,13
61:16,19 62:1
64:23 74:20 105:5
125:5 138:5,15,17
**stamp** 15:6 16:22
26:20 52:22 73:20
106:5 116:16
**stamped** 3:10,18,19
3:20,22 4:3,4,5
9:23 11:16 19:4
30:24 34:2,3 54:3
55:20 99:13 107:2
111:10 115:3
120:10 133:5
138:20 143:15
**stand** 79:13
**standard** 112:17,20
**standards** 75:1
**stands** 10:22
**start** 9:22 31:1 51:10
92:5 138:3
**started** 5:23 21:17
31:14 50:3 128:3
137:9,10
**starting** 73:20 89:1
93:15 122:21
**starts** 144:1
**state** 133:19 137:3
139:9
**stated** 79:15 100:23
108:13 131:14
145:3,6
**statement** 61:7 66:11
66:16,17 75:23
83:1 89:24 96:18
111:19 116:21
132:5 139:14
141:7 142:16,18
142:20 144:14,18
147:12
**statements** 102:12
**states** 1:1 75:13 76:4
89:1 96:17 101:22
106:18 107:3
115:11 116:19
141:3,20
**stating** 99:19 122:24
**stay** 88:9 105:9
131:8,10
**stayed** 113:4 130:3
**steadily** 14:4
**stenographically**

149:12
**step** 43:4 51:1
126:16 127:3
**steps** 43:3 50:23
**Steven** 90:2,17
109:22 130:12
146:4
**steward** 42:12
**stick** 64:13
**sticking** 70:12
**stop** 103:15
**stopping** 147:22
**Street** 2:3,7
**Strike** 98:2
**stronger** 13:21
**struck** 70:23
**structure** 74:18
142:5
**style** 136:1
**submit** 13:19
**submitted** 12:21
**subordinates** 53:11
**substance** 48:24
**successful** 21:21
**succession** 18:19
**suffice** 109:3,5
**Suite** 2:3,8
**summary** 32:8
**summer** 75:16
**superb** 53:2
**superior** 15:10 35:4
47:19 48:13,17,22
49:5,12 53:3,4
54:10
**superiors** 8:14 15:14
**supervise** 17:17
22:12 41:9 49:2
101:8 104:19
**supervised** 8:6,15,18
19:11 29:20,24
35:4 48:9 60:3
101:3 104:15
**supervising** 31:7,14
35:18 38:8,10
39:17,20 40:6 41:7
48:12 49:6
**supervision** 16:20
30:15 35:15 37:10
37:14,17 38:18,20
47:22 48:15,21
140:6 142:17
149:23
**supervisor** 6:4 10:11
10:13,20 11:21
12:8 16:12,16 17:6
17:16 21:4 22:2
24:6,7,23 25:5
26:10 31:5,16,22

31:23 32:19,21
33:6 34:9,10,22
35:21,22 36:2 37:4
37:13 38:1,2,19
40:5,10 41:4,12,15
41:17 42:18,24
45:6 49:21 64:17
64:20 65:2 67:16
67:20 104:23
105:1
**supervisors** 24:12
49:2 63:7 64:22
140:21
**supervisory** 61:16
63:24 64:15
138:22 141:5,21
141:24 142:4
144:12 145:1,12
**support** 89:3
**supposed** 134:15,19
134:23
**sure** 8:2 10:9 26:13
37:21 42:3 53:13
63:22 71:13 76:2
77:19 78:20 81:12
88:17 93:20 94:13
94:21 96:23
102:16 117:4,19
124:9 125:23
135:11 137:22
139:11 140:19
141:20 145:17
**switch** 61:20
**sworn** 5:1 73:18
96:17 149:7
**synonym** 68:17
**synonymous** 64:11
**system** 56:7 58:1
83:16

___

**T**

**T** 2:10 3:5 4:1 149:1
149:1
**table** 23:3 91:12 92:3
138:10
**tactic** 136:1
**tailored** 110:14
**take** 23:24 36:19
41:19 42:1,13
47:17 50:14,23
51:20 57:10 70:10
78:4 98:12 102:9
121:3 139:3
145:15 146:17
**taken** 57:12 103:18
145:18 149:5,11
150:4
**takes** 60:24 66:1

**talk** 52:14 136:6
**talked** 119:19
**talking** 64:18
**talks** 53:16
**Talmadge** 3:16
71:14 72:15 75:14
76:4,11,15 79:15
80:21 81:19,20
96:7,8,17 97:9
100:5
**Talmadge's** 81:7
**tangle** 66:21
**task** 49:4
**team** 12:4 21:5 22:24
27:13 53:11 54:16
**tell** 5:21 12:6 124:15
149:8
**telling** 20:14
**temporary** 60:6
**tenure** 77:24
**term** 88:1
**terminology** 36:7
64:6 146:18
**terms** 7:4 25:7 29:3
32:24 36:3,10
37:16 40:3,21
48:15,20 50:2
61:15 89:6 90:20
124:1
**TERRELL** 1:13 3:3
5:1 149:5,7 150:3
150:22
**test** 6:8,19 22:4
26:16 36:19 41:19
70:11 98:12
110:12 139:4
145:8
**tested** 6:9
**testified** 5:3
**testify** 149:10
**testimony** 149:11,11
149:15
**thank** 10:5 15:3
65:18 70:12 92:12
92:13 121:1,6
148:4,5,6
**then-Deputy** 101:24
111:21 113:2
129:22
**thin** 80:23
**thing** 93:19 128:16
142:15
**things** 21:6 32:13
42:18 50:17 90:24
107:22 115:18
118:14 121:18
**think** 7:7,8 9:16,22
11:7 13:1,4 18:14

19:20 21:16,24
22:14,17 23:16
24:11,22 25:2,16
28:11,12,18,23
29:10,12 30:8
33:14 40:7 41:23
42:6,23 45:12,14
45:16,22 47:9 48:9
49:5,23 51:8,13
52:11,19 53:10
56:8 57:6 58:9
59:8 60:11 65:16
68:13 70:4 72:2,21
78:1 79:18 82:17
85:13,16,22 86:11
90:13 91:11 94:13
97:17 101:9 104:8
104:14 107:16
108:4 109:2,4
110:9,10,13
115:16 117:10,20
118:2,6 122:4
125:21 126:9
128:13,14 132:8
133:16,23 136:11
136:18 138:13
139:20 140:13
143:16 146:17
**thinking** 88:4
**third** 106:17 123:4
**thought** 51:16
108:17 132:6
**three** 15:14,14 59:3
59:10,10 71:23
72:6,10 75:10 76:7
81:8 82:1,9,21
86:14 96:3 100:16
109:7,8 124:16
125:11 126:3,3,6,7
127:21 128:1,14
129:5 130:1,2
131:5 135:13
136:16
**three-page** 122:20
**Thursday** 1:10
**till** 145:15
**time** 6:5,8,11 7:20,21
8:12,24 10:12
11:20 13:6,8 17:6
18:20 25:13 32:20
39:17,20 40:5,6
42:12 44:5,12 45:6
47:16 48:11 55:3
60:6 67:22 68:4
71:11 73:1,4 74:7
74:8 76:5 78:8,9
81:24 90:11,12,21
91:2,13 92:6 93:22

94:3,6 97:5 100:20
101:5,9,12 102:1
103:8 104:9,10,17
104:20 109:11
111:22 112:21
114:21 123:12
124:17 126:3,23
127:2 131:15
147:16 149:6
**timeline** 114:16
**times** 93:13 95:3
**timing** 89:7
**today** 5:17 110:18
147:5,7,9
**told** 21:7 52:11
102:5
**top** 8:5 10:8 16:4
92:19 93:10
100:15 127:4
137:10 138:20
**Total** 14:18
**tracks** 36:4
**tradition** 50:16
**traditionally** 76:19
**tragic** 89:4
**train** 50:14
**trained** 23:11
**training** 38:24 39:18
39:19 40:3,22 41:7
41:12,21 43:11
59:19 74:24 75:5
117:10,15,21
**transcript** 149:11,20
149:23
**transition** 10:22
16:18 22:6
**Transitional** 10:23
**transparency** 12:9
**trick** 9:11,12 27:8
**true** 28:14 61:15
67:23 68:5,16
75:16 82:11 83:21
95:21,24 102:19
141:7,10 149:14
150:6
**truth** 141:8 149:8,9
149:9
**try** 21:1 112:3
**trying** 10:7 32:13
39:11 67:14 87:13
126:2 127:13
132:1 139:12
**turn** 120:21
**two** 7:19,21,23 8:5
13:9 15:14,14 17:7
20:3 34:12,14 36:3
39:7 56:15,19 62:6
69:16 92:7,15,19

93:3,10,17 100:9
100:14 107:10
108:12 115:17
116:2 117:7,12
119:18 120:1
128:14 133:23
134:24 135:12,14
136:5,8,10,15
141:14 146:7
**two-page** 99:12
**type** 108:5 146:14
**T&E** 117:20,22
118:8,19 121:11
121:13,14

_____

**U**

**ultimately** 121:10
123:10 134:8
**umbrella** 73:1
**unacceptable** 124:20
125:9 134:12
**undersigned** 150:3
**understand** 5:14
14:8,13 16:2 17:23
39:9 55:9 62:16
63:4,18 65:13 67:7
69:8 70:3 75:22
78:13 86:20 88:1
92:23 95:9 125:19
125:24 129:22
135:8,11 137:13
139:18 142:11
**understanding** 7:24
8:3 18:4,6 21:11
45:19 63:23 87:17
89:8 90:5 93:6
115:15 117:6
119:23 120:18
126:15 128:24
129:13 134:17,21
134:22 135:21
136:19,22,23
137:11,15
**understands** 95:4
**Understood** 34:15
**unfair** 139:14
140:14
**unfilled** 74:10
**unfortunately** 80:14
**uniform** 23:10 36:8
36:11,11 37:7,10
37:24 40:1 61:21
61:23 64:4
**unit** 60:4 82:4
**UNITED** 1:1
**unqualified** 98:4,5
**upper** 51:24 52:3
**usage** 48:24

**use** 58:15 68:17,23
68:24
**usually** 24:1 118:13
138:8
**utilized** 104:9

**V**

**vacancies** 92:4 93:13
100:10,15 114:10
**vacancy** 74:9 97:22
147:19
**vacant** 74:17
**vacation** 128:14,15
**valuable** 37:19 38:8
38:9,10,19 39:18
40:5,23 41:21,23
**value** 37:20 70:7
**values** 38:7
**variance** 115:16
119:23 134:15,23
136:19 137:4
138:7,15
**various** 49:2
**verbatim** 149:21
**versus** 23:22 36:11
39:16 70:9 72:6
81:8
**Vetter** 124:3 126:23
127:16 128:3,5
134:4,12
**Video** 1:18
**Videoconferencing**
1:11
**viewing** 135:16
**views** 23:19
**virtual** 54:18 116:19
**vision** 27:15,17
**vocational** 59:18
**voice** 132:7
**volunteer** 20:4
**voted** 129:2,3
**Vrato** 122:23 138:16
141:3,20 142:6
145:4,24
**Vrato's** 138:18
139:6,14,23 140:3
144:7
**vs** 1:5

**W**

**wait** 80:7
**want** 5:18 7:11 9:10
38:14 39:12 52:11
52:13 63:10 66:9
66:20 69:13 80:6,7
86:21,23 94:24
103:2,15 125:20
**wanted** 33:12 52:9

65:5 80:13
**warden** 5:13 18:2,12
18:18 20:15,21
21:1,12,14 22:5,5
22:7,10,20 26:2,15
28:16 29:6 36:17
36:20,23 37:18
38:3 39:1,16,19,20
39:21 40:4,23 41:8
41:13,22 42:9 43:4
43:6,8,9 51:2,6,7
51:10,13,21 52:10
52:12,13,18 56:1,6
58:14 61:21 62:1,2
62:14 63:2,15
65:10,11,24 67:1
68:3,10 69:4,6,16
69:19,20 70:8,8,14
71:9,14,16,18,21
72:10,14,15,15,20
74:8,10,17 75:2,9
75:12,14,18 76:4,4
76:5,7,11,15,15,16
76:17 77:3,11,14
77:21 78:5,15
79:15 80:21,22,24
81:1,7 82:1,11,20
82:22 83:19 84:11
84:13,15,17 85:3
85:12,14,21,23
86:10 87:10 88:6
88:12,20 89:12,14
89:16,19,21,24
90:1,3,10,17 91:2
91:3,13,14 93:4
94:3,8 95:11,12,14
95:15,15,21 96:1,7
96:8,19 97:1,6,9
98:15,21 99:5,18
100:21 101:11,20
101:21,22,24
102:2,4,10,12,16
105:13,15,16,17
105:18,20,24
106:11,14 107:13
107:16 108:8,23
109:2,8,14,17
110:1,4,16,20,24
111:1,9,21,24
112:2,11,16,17,18
112:22,23 113:2,7
113:12,23 115:7
117:2,13 118:1,16
119:1,2,9 121:12
122:3 123:1,1,11
123:16 124:2,13
126:1 127:16
129:24 130:9,10

130:13,14,17,18
131:13,20,21
133:17 137:2
138:14 139:16
140:14,20 141:16
142:3,21 144:12
144:24 145:12
146:20 147:23
**wardens** 21:21 22:15
23:1 27:20,23
36:12 62:23 65:9
67:5 71:12,23 72:3
72:6,9 73:5 81:8
82:14 90:13,15
94:15 96:4 100:5
109:9 114:20
120:6 123:6,7
129:22 131:6
138:21 141:4,21
142:16 144:21
**Warden's** 111:24
**warm** 120:23
**warrant** 49:15
**wasn't** 22:12 27:8
39:10 86:22 105:1
142:13
**way** 19:14 50:16
63:21 65:21 68:9
79:7 88:3,16 98:2
102:15 112:4
114:6 117:17
119:3 125:21
131:2 134:20
135:9,15 137:16
137:20 139:9
140:11,17,23
141:18 142:24
147:16
**ways** 69:17 135:12
135:14
**website** 121:22
**weekly** 16:17
**weight** 81:8 116:20
116:23
**weighting** 116:22
**weights** 116:17
**WEIR** 2:2
**welcome** 121:7
**well-rounded** 45:23
107:21
**well-worded** 39:10
**went** 94:14 100:10
104:22 126:8
128:20 129:14
137:17,23,23
**weren't** 94:21
**we're** 23:10
**we've** 29:24 119:19

**wife** 101:24
**William** 134:3,11
**Williams** 3:22 96:1
109:9,14,21
111:21 112:10
113:2 123:13
128:3,7 129:23
130:8 134:3,8
136:24 146:3
**willing** 14:11
**winnowed** 135:12
**winnowing** 129:5
**wireless** 54:19 79:24
80:12,16
**witness** 3:2 5:2 79:23
80:4,11 94:23
103:10 120:21
121:1,5 148:4
149:15
**women** 61:8 62:9,12
62:22 63:8,15 64:1
64:21 67:21
100:17 140:8,15
**women's** 63:1
**wondering** 57:23
**word** 65:6 68:23
69:1 102:14
**words** 28:15 37:9
38:7 51:8 121:15
131:11,19
**work** 3:21 6:4,6
10:10,13 12:8 22:2
24:16 25:4 27:18
27:20 31:5,16
32:10,17,19,21
33:6 34:9,10,22
35:22 37:3,13 38:1
38:19 40:5,10 41:4
41:12,15,17,20
42:8,11,16,18,24
45:20 60:5 64:17
64:19,22 65:1
67:16,20 88:4 93:3
103:5 112:9
133:14 134:15
**worked** 41:15 72:2
**worker** 6:1 31:23
54:20
**workers** 40:12
**Workforce** 23:7
**working** 24:17 25:8
27:23 60:1,2
**works** 58:1 80:15
103:16 115:14
138:7,12
**wouldn't** 30:12
36:15 98:6 139:3
141:10 142:12

147:21
**written** 6:21
**wrong** 117:7
**wrote** 6:23

**X**
**X** 3:1,5 4:1

**Y**
**year** 6:8 19:11 47:5
47:17 77:22
**yearly** 44:20
**years** 6:2,18 21:17
21:20 31:7 50:6
59:3,10,22 67:24
77:2,10
**yesterday** 9:11

**Z**
**zoom** 1:11,18 9:10
9:11

**0**
**000186** 9:23
**0014** 3:23 115:3
120:11
**0019** 116:16
**0021** 3:23 115:4
**0022** 3:20 107:2
**0989** 55:20

**1**
**1** 3:19 9:6 56:9 93:15
98:16 106:6
123:10 126:9
**1st** 19:3 54:4
**1:00** 102:24
**1:20** 103:13
**1:26** 103:21
**10** 73:14 75:12
116:23
**10th** 52:22
**10:00** 1:14
**100** 7:7 61:6 94:13
**101.5** 56:3,9
**1011** 111:10
**1014** 111:10
**1015** 73:20
**1020** 73:21
**1022** 34:3
**106** 3:19,20
**1072** 52:22
**1074** 54:3
**11** 81:14 89:1
**11th** 13:12 121:12
**11:22** 57:13
**11:34** 57:15
**111** 3:21

**112** 3:21
**114** 3:22
**12** 83:11
**12:53** 103:19
**122** 4:3
**13** 89:20
**13th** 111:15
**132** 4:4
**1339** 2:3
**14** 84:20
**1420** 35:7
**1438** 3:10 30:24
**1439** 3:11 30:24
**144** 4:5
**15** 31:7 47:11 149:19
**16** 47:16 106:5
**18** 111:4
**180** 19:4
**181** 16:23
**182** 15:6
**1834** 4:3 122:21
**1836** 4:3 122:21
**1843** 133:5
**1848** 4:4 133:5
138:20
**1849** 4:5 144:1
**185** 11:16
**1851** 143:15,17
**1852** 143:16,19
**1854** 4:5 144:2
**19** 112:5
**19103** 2:8
**19107** 2:4
**1943** 4:4
**1996** 5:24 21:17

**2**
**2** 7:2 31:23 32:17
93:15 98:17 124:4
126:10
**2nd** 133:4
**2/21/20** 3:8
**2/25/21** 3:9
**2:22-cv-03965-M...**
1:4
**2:42** 145:19
**2:47** 145:16
**2:48** 145:21
**2:52** 148:8
**20** 3:8 103:5,8
114:23
**20th** 99:19
**2001** 2:7
**2005** 31:16
**2008** 31:14
**2009** 32:4
**2010** 32:1,20
**2013** 34:20

**2014** 35:8 106:15
**2015** 43:22 50:5
**2016** 6:15 7:14 10:12
11:9,24 46:23 48:5
**2017** 11:17,24 13:21
14:1,2 49:8
**2018** 13:12,21 14:1
31:1 49:20,21,24
**2019** 15:1,5 17:24
49:16 50:3,7,24
51:3,17 53:6
101:22
**2020** 5:13 16:22,24
17:24 18:12 20:13
26:2,14 52:22 53:6
56:14 68:6 70:18
70:20 74:7 75:16
77:2,10,21 79:10
87:1,10 88:12 99:5
102:16 110:17
147:4
**2021** 3:16 19:14,17
27:2 53:22 54:10
77:10 79:10 82:21
83:8,15 85:11,20
87:2,11 88:12 89:2
89:7 92:6,15 93:5
96:18 98:14 99:23
100:3,6 102:19
111:18,22 147:6,8
**2022** 3:17 19:3,5
28:7 54:4,10 77:10
85:11 99:19
105:21 107:5
109:12 111:15
112:12 113:12,24
114:19 121:12
122:3 123:7
124:13 126:2
133:4
**2023** 1:10 3:17 77:2
77:10,22 81:20
84:21 85:11,20
149:6,19 150:5
**21** 99:13 101:21
105:12 120:11
122:16
**21st** 20:13
**22** 83:8 84:5 102:3
132:23
**2237777** 44:1
**23** 83:8 102:5 144:1
**23rd** 81:20
**24** 102:7 105:13
**25** 3:20 107:3
**25th** 27:2
**26** 3:9 112:12
**2620** 2:8

**27** 21:17,20 43:22
**27th** 15:2,5
**29** 14:19 15:1

**3**
**3** 26:19 81:24 98:18
106:11 123:10
126:11
**3rd** 16:22 70:18
**30** 3:10 103:6
**30XI00141800** 1:16
149:3,19
**30-second** 42:2
**31** 1:10 149:6 150:5
**33** 3:11
**34** 3:12

**4**
**4** 3:19 20:15 30:18
74:7 106:6 123:10
128:14
**4th** 70:20
**43** 3:12
**46** 3:13
**48** 133:7,10
**49** 133:6,7,8

**5**
**5** 3:3 33:21 74:16
123:15
**5th** 34:20
**500** 2:3
**55** 3:14 26:20

**6**
**6** 11:17 34:16 49:8
74:23
**6020** 3:18 99:13
**6021** 3:18

**7**
**7** 43:17 47:9 75:8
**7th** 46:23
**7/27/15** 3:13
**73** 3:15

**8**
**8** 46:18
**81** 3:16
**83** 3:16
**84** 3:17,17

**9**
**9** 3:7 55:16 76:2,3
**9/7/16** 3:14
**90** 116:20
**99** 3:18